## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  HON. JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| **NORCA INDUSTRIAL COMPANY, LLC,** *et al.,*<br><br>                                   **Plaintiffs,**<br><br>        **v.**<br><br>**UNITED STATES,**<br><br>                            **Defendant,**<br><br>        **and**<br><br>**TUBE FORGINGS OF AMERICA, INC. and MILLS IRON WORKS, INC.,**<br><br>                     **Defendant-Intervenors.** | **Consol. Court No. 23-00231** |

## RULE 56.2 MOTION OF CONSOLIDATED PLAINTIFFS
### TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.,
### FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2(a) of the Rules of this court, consolidated plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. hereby move for judgment in their favor based upon the administrative record compiled in the Covered Merchandise Inquiry under review.  The reasons for this Motion, arguments in support thereof, and the relief requested are set forth in the accompanying Memorandum In Support.

Respectfully submitted,

/s/ Lawrence J. Bogard
Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005
(202) 776-1150

March 18, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. JENNIFER CHOE-GROVES, JUDGE

NORCA INDUSTRIAL COMPANY, LLC, *et al.,*

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

TUBE FORGINGS OF AMERICA, INC. and MILLS IRON WORKS, INC.,

Defendant-Intervenors.

Consol. Court No. 23-00231

# <u>PUBLIC VERSION</u>

### <u>MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION OF CONSOLIDATED PLAINTIFFS TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC. FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD</u>

Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005
(202) 776-1150

March 18, 2024

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... iii

MEMORANDM IN SUPPORT OF THE MOTION OF PLAINTIFFS TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC. FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD....................................................................................................1

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    A.  Determination Under Review ………………………………………………… 2

    B.  Issues Presented for Review ………………………………………………… 2

SUMMARY OF THE ARGUMENT ..……………………………………………… 3

STATEMENT OF FACTS RELEVANT TO THE ISSUES ………………………… 6

ARGUMENT ..………………………………………………………………… 16

    I.  THE FINAL CMI DETERMINATION MUST BE REASONABLE AND SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE ADMINISTRATIVE RECORD………….. 16

    II.  COMMERCE'S CREATION OF A ROUGH FITTING/UNFINISHED FITTING DICHOTOMY CONFLICTS WITH THE UNAMBIGUOUS LANGUAGE OF THE CHINA ORDER …..……………………………………………………………… 18

        A.  The Language of the China Order Governs Its Scope ..………………………………18

        B.  There Is No Language in the China Order's Scope That Is Subject to Interpretation ...19

        C.  The Distinction Between the Terms "Unfinished Fittings" and "Butt-Weld Pipe Fittings In Either Finished or Unfinished Form" Is Not Technical …………………………... 23

    III.  COMMERCE'S USE OF PRIMARY INTERPRETIVE SOURCES VERSUS SECONDARY INTERPRETIVE SOURCES DOES NOT SUPPORT THE CMI DETERMINATION BECAUSE THE LANGUAGE OF THE ORDER LEAVES NOTHING FOR COMMERCE TO INTERPRET ......................…………………… 25

    IV.  COMMERCE'S CMI DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ……………………………………………………………… 26

        A.  The Department's conclusion that the "terms 'rough fitting' and 'unfinished fitting' are distinct and separate" is not supported by substantial evidence …………………… 26

B.  The Record Documents that Commerce's Notice of Initiation of the Original CSBWPF from China Investigation Contained Language that Would Have Excluded Butt-Weld Pipe Fittings "Not Processed After Forging" Which Commerce Subsequently Deleted When Petitioners Objected ……………………………………….………………… 30

C.  The Department's Conclusion that the Essential Characteristics of CSBWPF are Imparted by Sizing Is Not Supported By Substantial Evidence …………………….. 32

    1.  Substantial evidence establishes that the essential characteristics of CSBWPF are imparted when the fitting is formed from a section of pipe ……..……………… 32

    2.  Substantial evidence does not support Commerce's conclusion that sizing or heat treatment imparts the essential characteristics of CSBWPF ……... 34

    3.  The statement that Petitioners submitted only an excerpt of a Commerce memorandum from the original investigation is false; further, Commerce misconstrued that memorandum ………………………………………………... 37

D.  Commerce Concluded that Rough Butt-Weld Pipe Fittings Are Butt-Weld Fittings in Unfinished Form in the Thailand Circumvention Inquiry …..……………………… 39

CONCLUSION ………………………………………………………………………… 44

# **TABLE OF AUTHORITIES**

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F. Supp. 2d 1166 (Ct. Int'l Trade 2009) ……………………………………………………………………………… 19

*AG der Dillinger Huttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ………………………………………………………………………..…: 16

*Anshon Iron & Steel Co. v. United States*, 358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004) ……..… 17

*Consol. Edison Co. v. NLRB,* 305 U.S. 197 (1938)…… ………………………………………... 17

*Duferco Steel v. United States*, 296 F. 3d 1087 (Fed. Cir. 2002) ……..…………………….... 19, 22

*Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778 (Fed. Cir. 1995) …………………………………………………………………………... 19, 21, 22

*Gallant Ocean (Thailand) Co. v. United States,* 602 F.3d 1319 (Fed. Cir. 2010) …….…..… 16, 21

*Hangzhou Spring Washer Co. v. United States,* 387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ………………………………………………………………………………... 17

*King Supply Company LLC. v. United States, et al*., 674 F.3d 1343 (Fed. Cir. 2012) ……..…… 29

*Luoyang Bearing Factory v. United States,* 288 F. Supp. 2d l369 (Ct. Int'l Trade 2003) ……..... 17

*Meridian Products, LLC v. United States,* 851 F.3d 1375 (Fed. Cir. 2017) ……..……………… 16

*Micron Tech., Inc.* v. *United States,* 117 F.3d 1386 (Fed. Cir. 1997) ……..……………………… 17

*Midwood Industries, Inc. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970) …………………. 22

*Nat'l Fisheries Inst. v. United States*, 637 F. Supp. 2d 1270 (Ct. Int'l Trade 2009)) …….…..… 17

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ……..………………….)) 17

*Nippon Steel Corp. v. United States,* 458 F. 3d 1345 (Fed. Cir. 2006) ………..………………… 17

*Norca Industrial Co. v. United States*, CIT Slip Op. 24-12 (Feb. 7, 2024) ……………………… 1

*Olympic Adhesives, Inc. v. United States,* 708 F. Supp. 344 (Ct. Int'l Trade 1989) …………….. 16

*OMG, Inc. v. United States,* 972 F. 3d 1358 (Fed. Cir. 2020) ……..…………………………… 19

*Pakfood Public Co. v. United States*, 724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ………..….. 17

*Sango Int'l LP v. United States*, 567 F. 3d 1356 (Fed. Cir. 2009) ……..…………………….... 18

*Seattle Marine Fishing Supply Co. v. United States,* 679 F. Supp. 1119 (Ct. Int'l Trade 1988) ………………………………………………………………………………... 16

*SKF USA, Inc. v. United States*, 263 F. 3d 1369 (Fed. Cir. 2001) ……..……………………..... 17

*Smith Corona Corp. v. United States*, 915 F.2d 683 (Fed. Cir. 1990) …………………..…… 18, 19

*Suramerica de Aleaciones Laminadas, CA.* v. *United States,* 818 F. Supp. 348 (Ct. Int'l Trade 1993), *aff'd,* 44 F. 3d 978 (Fed. Cir. 1994) …………………………………………… 17

*Tak Fat Trading Company v. United States*, 396 F.3d 1378 (Fed. Cir. 2005) ……………..… 19, 22

*Thai Plastic Bags Indus. Co. v. United States*, 949 F. Supp. 2d 1298 (2013) ……..…………… 17

*Train v. Natural Resources Defense Council*, 421 U.S. 60 (1975) ……..……………………… 17

*U.S. Steel Corp. v. United States,* 621 F.3d 1351 (Fed. Cir. 2010) ……..……………………… 16

*U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332 (2013) ……..………………………… 17

*Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) ……....……...19, 22

*Zenith Radio Corp. v. United States,* 437 U.S. 443 (1978) ……………………………………… 17

**Statutes**

19 U.S.C. §1517 ……………………………………………………………………………… 1

19 U.S.C. § 1516a ……………………………………………………………………………… 16

**Regulations**

19 C.F.R. § 351.225 ………...……………………………………………………... passim
19 C.F.R. §351.226 ……………………………………………………………….. 43
19 C.F.R. § 351.227 ..……………………………………………………………. 22
19 C.F.R. § 353.29 (1997) …………………………………………………………. 43

**Other Authorities**

*Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic Of China*, 57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) …………………………. passim

*Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521 (Final), USITC Pub. 2528 (June 1992) …………………………… 12, 34, 35

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62 (Dept Commerce Jan. 3, 1994) …..…………………………………..41, 42

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15155 (Dep't Commerce March 31, 1994) …………………………….. passim

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Final Determination of Covered Merchandise Inquiry*, 88 Fed. Reg. 69909 (Dep't Commerce Oct. 10, 2023) and accompanying *Decision Memorandum for the Final Results of Covered Merchandise Inquiry – EAPA Inv. 7335: Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China* ………………………. passim

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry*, 87 Fed. Reg. 58310 (Dept. Commerce Sept. 26 2022) ……………………………………….. 7

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41075 (Dept. Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary Results ………………………………………………………………. 11, 12, 31

*Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 56 Fed. Reg. 27730 (Dept. Commerce June 17, 1991) ………………………………………………………………………... 30

iv

**MEMORANDM IN SUPPORT OF THE MOTION OF PLAINTIFFS TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC. FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

This memorandum is submitted on behalf of Tube Forgings of America, Inc. ("TFA") and Mills Iron Works, Inc. ("Mills Iron") (collectively "Petitioners" or "domestic industry") in support of their Rule 56.2 motion for judgment upon the administrative record of *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Final Determination of Covered Merchandise Inquiry,* 88 Fed. Reg. 69909 (Dep't Commerce Oct. 10, 2023), PR Doc. 84.[1]   The Commerce Department's CMI Determination has its origins in U.S. Customs & Border Protection's ("CBP") conclusion under the Enforce and Protect Act, 19 U.S.C. §1517, that Norca Industrial Products, LLC ("Norca") and International Piping & Procurement Group, LP ("IPPG") (collectively "Norca") evaded the antidumping duties against Certain Carbon Steel Butt-Weld Pipe Fittings ("CSBWPF") from China[2] and CBP's related covered merchandise referral request to Commerce.[3]

TFA and Mills Iron were neither complainants nor parties to that EAPA investigation, and neither has any direct interest in its results.[4]   TFA and Mills Iron do, however, have a vital

---

[1] Citations to the public administrative record are cited as "PR Doc. ___;" citations to the confidential administrative record are cited as "CR Doc. ___."

[2] *See* U.S. Customs and Border Protection Memorandum Re: EAPA Cons. Case No.: 7335, *Notice of Determination as to Evasion* (November 6, 2020)*,* PR Doc. 12 at 76-83 and PR Doc.13 at 1-7.

[3] *See* Letter from CBP to Assistant Secretary of Commerce for Enforcement and Compliance, Re: Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Sept. 6, 2022. ("*CMI Referral"*) PR Doc. 7.

[4] TFA and Mills Iron were not parties to CBP's EAPA investigation or Norca's appeal of that determination, CIT Ct. No. 21-00192.  None of the issues raised by TFA and Mills Iron in this matter were addressed in the court's summary affirmation of CBP's remand redetermination. *See Norca Industrial Co. v. United States*, CIT Slip Op. 24-12 (Feb. 7, 2024).  Although Norca reported to the court that "Respectfully, there will be no appeal here," in its comments on CBP's

1

interest in maintaining the full remedial effect of the *China Order*.[5]  Unfortunately, Commerce's

CMI Determination guts the *China Order* by creating a path for any party to follow to avoid

antidumping duties against CSBWPF from China.  Unless it is overturned by this court, the CMI

Determination will negate the remedial effect of the *China Order*.

**STATEMENT PURSUANT TO RULE 56.2**

**A.**    **Determination Under Review**

   *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China:*

*Final Determination of Covered Merchandise Inquiry,* 88 Fed. Reg. 69909 (Dep't Commerce

Oct. 10, 2023).

**B.**    **Issues Presented for Review**

   1.    Did Commerce unlawfully divide merchandise subject to the Covered

Merchandise Inquiry into in-scope "unfinished fittings" and out-of-scope "rough fittings" when

the unambiguous scope language of the *China Order* plainly applies to all carbon steel butt-weld

pipe fittings under 14 inches in inside diameter "in either finished or unfinished form" without

limitation, leaving nothing for Commerce to interpret?

   2.    Did Commerce act unlawfully when it employed interpretive sources listed in the

Department's Regulations, 19 C.F.R. § 351.225(k)(1), to "establish when in the production

process a fitting becomes an unfinished fitting" even though the unambiguous scope language of

the *China Order* leaves nothing for Commerce to interpret?

---

Remand Redetermination, Ct. No-00192, ECF No. 61, Norca did not report that it, as well as
TFA and Mills Iron, had appealed Commerce's CMI Determination on which CBP's remand
redetermination relied.

[5] *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than
Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*,
57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) ("*China Order*").

2

3.      Is Commerce's determination that merchandise shaped into the rough form of elbows, tees, or reducers in China, but not reformed/sized (or heat treated) prior to being exported to Vietnam for processing into finished CSBWPF, is not covered by the *China Order* supported by substantial evidence when (a) record evidence documented that the butt-weld pipe fittings industry has historically used the terms "rough" fittings, "as formed" fittings, and "unfinished" fittings interchangeably to refer to any merchandise that has been shaped into the rough form of CSBWPF but has not been processed to completion; (b) record evidence established that the essential characteristics of CSBWPF are imparted when raw material (e.g., seamless carbon steel pipe) is cut and shaped into the rough form of a butt-weld pipe fitting, rather than when the rough shaped pipe fitting is reformed/sized (or heat treated); (c) documentation from the original antidumping investigation confirmed Petitioners' intent to include imports of all butt-weld fittings, whether finished or unfinished, in the scope of the investigation; (d) Commerce dismissed the corroborative value of an internal Department memorandum from the original antidumping duty investigation, based on its own false assertion that "the petitioners provided only an excerpt from the 'corroborating' memorandum;" and (e) Commerce concluded in a 1994 circumvention determination that rough, as-formed butt-weld weld fittings were CSBWPF in unfinished form covered by the *China Order*?

## SUMMARY OF THE ARGUMENT

Commerce's CMI Determination is unlawful because Commerce failed to limit its analysis to the unambiguous scope language of the three-decade old *China Order*, as required by the long-standing precept of U.S. antidumping law that the scope of an antidumping order is determined by its plain language.  Commerce asserted that it could look beyond the *China Order's* scope language because the *Order* does not define the term "unfinished fittings."  This

rationale fails because the term "unfinished fittings" does not appear in the *China Order*. The *China Order* plainly covers "carbon steel butt-weld pipe fittings in either finished or unfinished form" without limitation or qualification, and thus applies to *all* CSBWPF that are sufficiently formed as to be identifiable as such. The extent to which merchandise formed in the shape of CSBWPF may have been processed toward completion is irrelevant. Thus, Commerce had no lawful basis for separating "rough" fittings from "unfinished" fittings.

Commerce's dismissal of the difference between the *China Order's* actual scope language ("carbon steel butt-weld pipe fittings in either finished or unfinished form") and the language that it interpreted ("unfinished fitting") as "a technical distinction" is meritless. The difference between *China Order's* actual scope language and the language Commerce opted to interpret is substantive. Commerce's focus on "unfinished fittings" as a distinct category of CSBWPF manifested a failure to recognize that the *China Order* applies to all CSBWPF in either finished or unfinished form. As a result, Commerce created a subcategory of CSBWPF in unfinished form, namely "rough" fittings, that it unlawfully concluded are both separate from "unfinished" fittings and outside the scope of the *Order*. Commerce's exercise in interpreting a term that the *China Order* does not use was unlawful.

Commerce's defense of its use of primary interpretive sources over secondary interpretive sources fails because Commerce should not have relied on *any* interpretive sources to determine whether there is a point in the production process at which "a fitting has been sufficiently advanced to become an unfinished pipe fitting" when the scope language plainly describes butt-weld pipe fittings in either finished or unfinished form. Commerce's resort to interpretive sources to create a dichotomy between "rough fittings" and "unfinished fittings" even though neither term appears in the *China Order's* scope language was unlawful.

Commerce's conclusion that the "terms 'rough fitting' and 'unfinished fitting' are distinct and separate" is not supported by substantial evidence for multiple reasons. First, the record demonstrates that "rough fittings," "as formed fittings," and "unfinished fittings" are terms that the CSBWPF industry commonly uses interchangeably to describe CSBWPF in unfinished form without regard to the extent of processing toward completion. These terms do not describe distinct and separate types of butt-weld pipe fittings in unfinished form.

Second, when Commerce included language in its Notice of Initiation of the original CSBWPF from China antidumping investigation that would have excluded CSBWPF "not processed after forging," Petitioners immediately objected to the exclusionary language, stating "The petitioner's intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished . . .." In response, Commerce retracted the objectionable language. This history shows that Petitioners expressly intended "roughs fittings," *i.e.,* fittings that have not been "processed after forming," to be covered by the *China Order* and that Commerce acted accordingly.

Third, record evidence establishes that once steel pipe has been cut and formed into the rough shape of a butt-weld pipe fitting it has no other use than to be completed into finished CSBWPF. It has, at the point of forming, acquired the essential characteristics of CSBWPF. Commerce's conclusion that the essential characteristics of butt-weld pipe fittings is imparted by the sizing or heat-treating processes is unsupported by substantial evidence. Moreover, substantial evidence establishes that sizing does not dedicate the product to use as CSBWPF, nor does it establish the product's identity as such. Commerce's conclusion otherwise cannot be squared with evidence that CSBWPF is manufactured to specific industry standards for material grade and product dimensions that identify a product as CSBWPF. These standards are met

when the product is formed from cut pipe, not when the product is sized. The costs to size butt-weld fittings are small relative to the costs to cut and form seamless pipe, and record evidence demonstrating this fact further undermines Commerce's conclusion that sizing imparts the essential characteristics of CSBWPF.

Fourth, when Petitioners submitted a Commerce Department Memorandum from the record of the original antidumping investigation to corroborate statements by domestic industry executives concerning the essential characteristics of CSBWPF, Commerce falsely stated that Petitioners submitted only an excerpt of that memorandum. Further, Commerce misconstrued the substance of the memorandum.

Finally, Commerce had previously concluded that rough butt-weld pipe fittings are in-scope butt-weld fittings in unfinished form in a 1994 anticircumvention determination involving "as-formed" tee fittings exported from China and finished in Thailand. That determination detracts from any evidence supporting Commerce's conclusion that "rough" fittings are not unfinished fittings by (a) corroborating the statements of domestic industry executives concerning the interchangeable use of the terms "rough" fittings, "as formed" fittings and "unfinished" fittings, and (b) establishing the precedent that Commerce itself had used the term "unfinished fittings" to describe rough, as-formed fittings. Moreover, Commerce misinterpreted the 1994 circumvention determination as supporting its conclusions in the CMI Determination.

## STATEMENT OF FACTS RELEVANT TO THE ISSUES

### Initiation of the Inquiry

On September 6, 2022, CBP submitted a covered merchandise referral request to Commerce concerning "rough" CSBWPF that was formed in China, exported to Vietnam, processed into finished CSBWPF in Vietnam, and then imported into the United States by Norca

and IPPG. *CMI Referral,* PR Doc. 7. CBP's referral request was framed in terms of Norca's

assertions concerning the various phases in the process of producing CSBWPF:

> Norca states that the first stage of production for CSBW pipe
> fittings involves converting seamless pipe "into the rough shape of
> an elbow, tee, reducer, etc., through a cold- or hot forming (or
> forging) process."  Norca further states that the second stage of
> production involves reforming or sizing the rough fitting so that
> the fitting will match the pipe it is destined to be welded to, and the
> third stage includes finishing processes such as "shot blasting, or
> other cleaning, machine beveling, boring and tapering, grinding,
> die stamping, inspection, and painting."

*Id.* at 3-4 PR Doc. 7.

Shortly thereafter, Commerce initiated the challenged covered merchandise inquiry.

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Notice of*

*Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry*, 87 Fed. Reg.

58310 (Dept. Commerce Sept. 26 2022).  PR Doc. 4. The Notice of Initiation accurately quoted

the unambiguous scope language of the *China Order* as follows:

> The merchandise covered by the *Order* consists of certain carbon
> steel butt-weld pipe fittings, having an inside diameter of less than
> 14 inches, imported in either finished or unfinished form. These
> formed or forged pipe fittings are used to join sections in piping
> systems where conditions require permanent, welded connections,
> as distinguished from fittings based on other fastening methods
> (*e.g.,* threaded, grooved, or bolted fittings).

*Id.* at 58311

The Notice of Initiation stated that "The covered merchandise inquiry will address

whether the scope covers rough fittings originating in China and processed into butt-weld pipe

fittings through two production scenarios in Vietnam" that it described in a footnote as "rough

fittings that were shipped from China to Vietnam and were either: (1) reformed or sized (so that

the fitting will match the pipe it is destined to be welded to) and finished (*i.e.,* shot blasted, or

other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and

7

painting) prior to shipping to the United States; or (2) only finished prior to shipping to the United States." *Id.* Reflecting its own confusion in the inquiry, Commerce's Final CMI Determination designated the "reformed/sized and finished" fittings as Scenario 2 and the "finished only" fittings as Scenario 1. *Decision Memorandum for the Final Results of Covered Merchandise Inquiry – EAPA Inv. 7335: Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China* ("*IDM*") at 3; PR Doc. 83.

**Petitioners' Responses**

TFA and Mills Iron (joined by a third U.S. manufacturer) responded to the Notice of Initiation on October 26, 2022, refuting Norca's assertions as presented in CBP's referral request and arguing that the unambiguous language of the *China Order* establishes that it "applies to any item that has been sufficiently formed as to be dedicated to ultimate use as a butt-weld pipe fitting. The degree of processing to which an item has been subjected is irrelevant once the initial forming process that dedicates it to use as a butt-weld pipe fitting has been performed. … {T}he term 'unfinished form' embraces 'rough' or 'as-formed' pipe fittings." Accordingly, Petitioners argued, fittings formed/forged in China and reformed/sized and finished in Vietnam are covered by the *China Order*. *Letter to Secretary of Commerce from Neville Peterson LLP*, dated October 26, 2022, ("*Pet. 10/26 Ltr.*") at 3-4. PR Doc. 31.

Petitioners also argued that, contrary to Norca's assertions, manufacturing CSBWPF involves multiple phases of a single production process rather than three separate and discrete production processes and that the first phase -- forming seamless pipe into a rough-shaped fitting -- transforms the pipe into a pipe fitting in unfinished form, *i.e.*, covered merchandise. Petitioners also established as false Norca's characterization of the Department's 1994

circumvention determination of pipe fittings produced in Thailand from Chinese-origin products as focused on "unfinished fittings" rather than "roughs."

Petitioners made similar arguments in comments rebutting Norca's and IPPG's responses to the Notice of Initiation, which they submitted to Commerce on November 7, 2022. *Letter to Secretary of Commerce from Neville Peterson LLP*, dated November 7, 2022 at 3-4 and 6-7. PR Doc. 33.

On January 25, 2023, Commerce issued a Request for Additional Information in which it asked all parties a series of questions, including whether (a) the CSBWPF produced in Vietnam fell into the same class or kind of merchandise as CSBWPF produced in China, and (b) the finishing processes performed in Vietnam changed the important qualities or uses of merchandise that had been both formed and reformed/sized in China. Commerce also asked the parties to compare: (1) the sophistication of the production processes performed in China to the sophistication of the production processes performed in Vietnam, (2) the cost or value added by the production processes performed in China to the cost or value added by the production processes performed in Vietnam, and (3) the level of investment in China to the level of investment in Vietnam. Commerce further asked the parties to identify both the essential characteristics of CSBWPF and the point in the production process at which those essential characteristics were imparted. Commerce also asked whether a "rough" butt-weld pipe fitting that had undergone only the forming/forging process could be used for any other purpose. Finally, Commerce asked the parties to identify the value added at specific points in the production process. *Letter from U.S. Department of Commerce to All Interested Parties*, dated January 25, 2023. PR Doc. 37.

Petitioners submitted their response on February 28, 2023, stating that the CSBWPF produced in Vietnam fell into the same class or kind of merchandise as CSBWPF produced in China. *Letter to Secretary of Commerce from Neville Peterson LLP*, dated Feb. 28, 2023. PR Doc 50. They provided evidence establishing, *inter alia*, that: (1) the finishing processes in Vietnam do not change the important qualities or use of the Chinese-origin fittings; *Id.* at 6-8 (2) the production processes performed in China are significantly more sophisticated than those performed in Vietnam; *Id.* at 8-10 (3) the costs of or value added by production processes performed in China are substantially higher than the costs of or value added by production processes performed in Vietnam; *Id.* at 10-14, PR Doc. 50, and Exh. 1-3, PR Doc. 51; (4) the level of investment in China is substantially higher than the level of investment in Vietnam; *Id.* at 14-18, PR Doc. 50, and Exh. 1-3, PR Doc. 51; (5) the essential characteristics of CSBWPF are imparted by the process of forming pipe or other raw material into the rough shape of a pipe fitting and the essential characteristics are not changed by finishing operations performed in Vietnam; *Id.* at 18-21, PR Doc. 50, and Exh. 1-3, PR Doc. 51; and (6) a butt-weld pipe fitting that had undergone only the forming/forging process cannot be used for any other purpose. *Id.* at 21, PR Doc. 50, and Exh. 1-3, PR Doc. 51. In this context, Petitioners submitted data showing the cost of or value added by each phase of their production of CSBWPF, *Id.* at Exh.1-3, PR Doc. 51, and explained that their costs/added values for each production phase reasonably represent the relative added values among the same production phases for Chinese and Vietnamese producers because the process of manufacturing CSBWPF is the same world-wide

Petitioners' response also included Declarations under Penalty of Perjury from executives of three U.S. manufacturers testifying that (a) the CSBWPF industry historically and currently used the terms "roughs," "as formed fittings," and "unfinished" fittings interchangeably to refer

to any product that had been formed or forged into the rough shape of a pipe fitting but not completed into a finished pipe fitting, without regard to the extent of any intermediate production steps, *Id.* at Exh. 1-3 and (b) the essential characteristics of CSBWPF are conferred by the process of forming raw material into the rough shape of a pipe fitting because the resulting product has no use other than to be finished into CSBWPF. *Id.* at Exh. 1-3.

Also included in Petitioners' response were source documents from the administrative record of the CSBWPF from China antidumping duty investigation, including (a) relevant portions of the Petition for Imposition of Antidumping Duties, *Id.* at Exh. 5(b) an internal Commerce memorandum from the antidumping duty investigation, *Id.* at Exh. 4 and (c) a letter from Petitioners' counsel objecting to Commerce's addition of a sentence to the investigation's scope language that would have excluded unfinished fittings that are not processed after forging, because Petitioners "intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished…". *Id.* at Exh. 6, Second Attch.  Notably, Commerce then deleted the language to which Petitioners objected. *Id.*

**The Preliminary Determination**

Commerce published its Preliminary Covered Merchandise Determination on June 23, 2023. *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41075 (Dept. Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary Results. ("*PDM*") PR Docs. 63 and 66.

Ignoring the language that defines the *China Order's* scope as "butt-weld pipe fittings in either finished or unfinished form" without limitation, the *PDM* asserted that "For purposes of this covered merchandise inquiry, the terms 'rough fitting' and 'unfinished fitting' are separate

11

and distinct." *Id.* at 12. PR Doc. 63. After asserting that the unambiguous term "unfinished

fitting" was not defined in the *Order*, the *PDM* attempted to interpret it by resorting to (1)

language in the CSBWPF from China Petition that did not identify the subject merchandise but

instead explained its production and use, *id.* at 8-9*,* and (2) an isolated footnote in the ITC's final

material injury determination. *id.* at 9*, citing Certain Carbon Steel Butt-Weld Pipe Fittings from

China and Thailand*, Inv. Nos. 731-TA- 520 and 521 (Final), USITC Pub. 2528 (June 1992) at 4,

n. 6.

    Further, giving primacy to the section of the Petition that explained the process for

manufacturing CSBWPF, the *PDM* discounted documentation showing that Commerce had

unilaterally added the following sentence to the scope language during the original investigation,

"Unfinished butt-weld pipe fittings that are not machines (sic), not tooled and not otherwise

processed after forging are not included in the scope of this investigation," but then deleted it

after Petitioners objected to it as conflicting with their intent to "include imports of all butt-weld

fittings of the kind described, whether finished or unfinished." *Id.* at 10-11.  Commerce also

dismissed as "conflated" and "confusion" Petitioners' evidence of the industry's history of

interchangeably using the terms "rough," "as formed," and "unfinished" to describe all products

after forming but before completion. *Id.* at 9.

    On these bases, Commerce "agree{d} with IPPG and Norca that . . . rough fittings that

have only undergone the first stage of production are not unfinished butt-weld pipe fittings

within the meaning of the scope, . . . ." *Id.* at 8.

**Petitioners' Case Brief**

    The parties submitted Case Briefs and Rebuttal Briefs on June 28 and July 3, 2023. *Case

Brief of Tube Forgings of America, Inc., Mills Iron Works, Inc., and Hackney-Ladish, Inc.*, June

28, 2023 ("*Pet. Case Br.*"), PR Doc. 69.; *Rebuttal Brief of Tube Forgings of America, Inc., Mills Iron Works, Inc., and Hackney-Ladish, Inc.*, July 3, 2023, PR Doc. 71.  In their Case Brief, Petitioners first argued that the Preliminary Determination violated the long-standing precept that the class or kind of merchandise encompassed by a final antidumping duty order is determined by the language of the order because Commerce ignored the plain language of the *China Order*, substituted language not in the *Order*, and then attempted to interpret the substitute language. Petitioners further argued that Commerce's use of the interpretive factors listed in 19 C.F.R. § 351.225(k)(1) was unlawful because the *China Order's* scope language is plain on its face and leaves nothing to be interpreted.

Petitioners also argued that the Preliminary Determination is not supported by substantial evidence because record evidence establishes that it is the forming operation which creates a butt-weld pipe fitting in unfinished form.  Prior to this operation, Petitioners argued, seamless carbon steel pipe is simply a raw material that could be used to manufacture any number of final products.  Once the cut-to-length pipe has been formed into the shape of a "rough" elbow, tee, or reducer it has no use other than to be further processed into a finished butt-weld pipe fitting. Thus, the record evidence in fact demonstrated that the terms "rough" fittings, "as formed" fittings, and "unfinished" fittings do not and never have described distinct and separate types of butt-weld pipe fittings.

Finally, Petitioners argued that Commerce misinterpreted the *Thailand* circumvention determination.  Commerce had stated that the Thailand circumvention determination found the Chinese-origin rough butt-weld fittings that had not been further processed after being shaped in China before being exported to Thailand were non-subject merchandise that was circumventing the *China Order*.  To the contrary, the *Thailand Determination* found that the products exported

from China were butt-weld fittings in unfinished form and thus were merchandise subject to the *China Order*.

**The Final Determination**

Commerce published its final determination in the *Federal Register* on October 10, 2023. Commerce again employed its definition of a "rough" butt-weld pipe fitting as merchandise that had been formed in the rough shape of a pipe fitting but had not been reformed/sized or heat treated, and reiterated its conclusion that such rough fittings are not butt-weld fittings in unfinished form subject to the *China Order*.

Commerce rejected all of Petitioners' arguments against the conclusion that rough fittings as defined by Commerce are not butt-weld fittings in unfinished form. *Decision Memorandum for the Final Results of Covered Merchandise Inquiry – EAPA Inv. 7335: Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, September 29, 2023 ("*IDM*"); PR Doc. 83. In defending its creation of a rough fitting/unfinished fitting dichotomy Commerce looked past the unambiguous term "unfinished form" to pose what it termed "the salient question . . . what constitutes an 'unfinished butt-weld pipe fitting' in the first instance?" *Id.* at 17. Commerce then answered this (unnecessary) question -- not by looking at the Petition's description of its scope or Petitioners' subsequent confirmation of the intended scope of the Petition -- but rather by turning to separate language in the Petition that explained the production of CSBWPF and using that explanation to circumscribe the *Order's* scope:

> Based on the foregoing {discussion of the production process}, for the purposes of this covered merchandise inquiry, we find that the terms "rough fitting" and "unfinished fitting" are distinct and separate, . . .. For purposes of this final determination, an unfinished fitting is a fitting that has undergone production stages one and two and is covered by the scope of the *Order* when it is exported from China and is not removed from the *Order* when it undergoes finishing processes in Vietnam. In contrast, a rough fitting is a

14

> fitting that has only undergone the first stage of production and is
> not covered by the scope of the *Order* when exported from China.
> For the sake of clarity here, we use the term "rough fitting" to mean
> a product that has undergone the first stage of production but not the
> second and third stages; however, this product is a material input to
> the production of unfinished and finished fittings, not an unfinished
> fitting in its own right.

*Id.* at 19.

Commerce defended looking beyond the *China Order's* scope language by claiming that

the scope "does not define a key term (*i.e.,* unfinished fittings)," *Id.* at 20, blatantly ignoring both

the *China Order's* actual scope language and the fact that such language plainly applies to any

product that is dedicated to use as a butt-weld pipe fitting but has not been processed to the point

of being finished.

In addition, Commerce attempted to distinguish decisions of this court and the Court of

Appeals for the Federal Circuit, asserted that CBP would not have made the covered

merchandise referral if the *Order's* scope language were clear, and "disagreed" that "the

essential characteristic of a fitting is imparted when the fitting is formed from a section of pipe"

while reiterating its preliminary conclusion that reforming/sizing imparts the essential

characteristics of CSBWPF.  In rejecting Petitioners' arguments concerning the essential

characteristics of CSBWPF, Commerce falsely stated that Petitioners "provided only an excerpt

from {their} 'corroborating' memorandum." *Id.* at 24.

Commerce reiterated its interpretation of the 1994 Thailand circumvention determination

as finding out-of-scope merchandise to be circumventing the *China Order*.  *Id.* at 25-26.  In

addition, Commerce "acknowledge{d} that the terms 'rough' fittings, 'as-formed' fittings, and

unfinished fittings have been used interchangeably at times in other segments of the proceeding"

but dismissed this fact as "underscore{ing} that there may have been confusion concerning these terms." *Id.* at 26.

Commerce summarized its final determination: "{B}ased on the language of the *Order* and the production process described in the Petition, a rough fitting does not become an unfinished fitting (and, thus, subject merchandise) until after the second stage of production. . . . {W}e continue to find that rough butt-weld fittings from China that undergo the second and third stages of production in Vietnam are not subject to the scope of the *Order*." *Id.* at 27.

## ARGUMENT

**I.    THE FINAL CMI DETERMINATION MUST BE REASONABLE AND SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE ADMINISTRATIVE RECORD**

The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i):

> The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.

*See Gallant Ocean (Thailand) Co. v. United States,* 602 F.3d 1319, 1323 (Fed. Cir. 2010); *U.S. Steel Corp. v. United States,* 621 F.3d 1351, 1357 (Fed. Cir. 2010); *Olympic Adhesives, Inc. v. United States,* 708 F. Supp. 344 (Ct. Int'l Trade 1989); *Seattle Marine Fishing Supply Co. v. United States*, 679 F. Supp. 1119, 1125 (Ct. Int'l Trade 1988).

In making determinations concerning the scope of antidumping or countervailing duty orders (and, analogously, covered merchandise determinations), Commerce is guided by case law and its regulations.  *Meridian Products, LLC v. United States*, 851 F. 3d 1375, 1381 (Fed. Cir. 2017).  The court defers to Commerce if the Department's determination is reasonable.  *See AG der Dillinger Huttenwerke v. United States*, 648 F. Supp. 3d 1321, 1325 (Ct. Int'l Trade 2023) ("when reviewing agency determinations, findings, or conclusions for substantial

evidence, the court assesses whether the agency action is reasonable given the record as a whole."), *citing Nippon Steel Corp. v. United States,* 458 F. 3d 1345, 1350-51 (Fed. Cir. 2006). *See also Zenith Radio Corp. v. United States,* 437 U.S. 443, 450 (1978) (quoting *Train v. Natural Resources Defense Council*, 421 U.S. 60, 75 (1975). Otherwise, the agency is not owed judicial deference. *Anshon Iron & Steel Co. v. United States,* 358 F. Supp. 2d 1236, 1243 (Ct. Int'l Trade 2004). Deference is not owed to Commerce's arbitrary decisions. *Pakfood Public Co. v. United States*, 724 F. Supp. 2d 1327, 1334-35 (Ct. Int'l Trade 2010) (citing *SKF USA, Inc. v. United States*, 263 F. 3d 1369, 1378 (Fed. Cir. 2001) and *Nat'l Fisheries Inst. v. United States,* 637 F. Supp. 2d 1270, 1282 (Ct. Int'l Trade 2009)); *U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1336 (2013); *Thai Plastic Bags Indus. Co. v. United States*, 949 F. Supp. 2d 1298, 1302 (2013).

An agency determination is based on substantial evidence if it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). The standard "requires more than a mere scintilla" but is satisfied by "something less than the weight of evidence." *Luoyang Bearing Factory* v. *United States,* 288 F. Supp. 2d l369, 1370 (Ct. Int'l Trade 2003) (citations omitted); *see also Micron Tech., Inc.* v. *United States,* 117 F.3d 1386, 1393 (Fed. Cir. 1997); *Hangzhou Spring Washer Co.* v. *United States,* 387 F. Supp. 2d 1236, 1240 (Ct. Int'l Trade 2005).

In conducting its review, it is not sufficient for the court merely to find "that the evidence supporting {the agency's} decision is substantial when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Suramerica de Aleaciones Laminadas, CA.* v. *United States,* 818 F. Supp. 348,353 (Ct. Int'l

Trade 1993), *aff'd,* 44 F. 3d 978 (Fed. Cir. 1994); *Sango Int'l LP v. United States*, 567 F. 3d

1356, 1362 (Fed. Cir. 2009) (court review includes all "evidence that supports and detracts" from

Commerce's conclusion).

## II. COMMERCE'S CREATION OF A ROUGH FITTING/UNFINISHED FITTING DICHOTOMY CONFLICTS WITH THE UNAMBIGUOUS LANGUAGE OF THE *CHINA ORDER*

In deciding that a pipe fitting that had been formed but not sized or heat treated[6] is not a

"pipe fitting in unfinished form" Commerce failed to limit its analysis to the scope language of

the three-decade old *China Order*, which unambiguously states that the *Order* covers "carbon

steel butt-weld pipe fittings in either finished or unfinished form" without limitation or

qualification.  The *China Order* states plainly that it applies to *all* pipe fittings that are

sufficiently formed as to be identifiable as such, regardless of the extent to which they may have

been processed toward completion.  Looking beyond the *China Order's* explicit scope language,

Commerce's CMI Determination unlawfully interpreted "unfinished form" to exclude "rough"

butt-weld pipe fittings which had not undergone sizing or heat treatment. *See, e.g., IDM* at 19,

PR Doc. 83.  Using sizing as a bright line that limits the *Order* to some, but not all, CSBWPF in

unfinished form, Commerce created a rough fitting/unfinished fitting dichotomy that conflicts

with the unambiguous language of the Order.

### A. The Language of the *China Order* Governs Its Scope

Fundamental to U.S. antidumping law, "The class or kind of merchandise encompassed

by a final antidumping order is determined by the order." *Smith Corona Corp. v. United States*,

915 F.2d 683, 685 (Fed. Cir. 1990).  Thus, "a predicate for the interpretive process is language in

---

[6] To be concise, we use the term "sized" to refer to the process variously called "sizing," "reforming," or "coining."

the order that is subject to interpretation." *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995).  The Court of Appeals for the Federal Circuit has held that "review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order.  *But they cannot substitute for language in the order itself*." *Duferco Steel v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002) (emphasis added). "While the petition, factual findings, legal conclusions, and preliminary orders can aid in the analysis, they cannot substitute for the language of the order itself, which remains the 'cornerstone' in any scope determination." *Id.*  The Federal Circuit "has made clear that *it is the language of Commerce's final order that defines the scope* of the order albeit 'with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order.'" *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) citing *Smith Corona* and *Duferco* (emphasis added). Thus, "The language of the order determines the scope of an antidumping duty order" and "The language of the order, not the petition, controls." *Tak Fat Trading Company v. United States*, 396 F.3d 1378, 1382 and 1386 (Fed. Cir. 2005); *see also OMG, Inc. v. United States*, 972 F. 3d 1358, 1363 (Fed. Cir. 2020).  Further, ''under the statutory scheme, Commerce owes deference to the intent of the proposed scope of an antidumping investigation as expressed in an antidumping petition." *Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F. Supp. 2d 1166, 1174 (Ct. Int'l Trade 2009).

**B.  There Is No Language in the *China Order's* Scope That Is Subject to Interpretation**

As the CAFC observed in *Ericsson*, "a predicate for the interpretive process is language in the order that is subject to interpretation."  Commerce's CMI Determination unlawfully attempts to interpret language that is not subject to interpretation.

19

Commerce purported to agree that the language of an order determines it scope "where possible," but contended that it could look beyond the *China Order's* scope language "because it does not define a key term (*i.e.*, unfinished fittings)." *IDM* at 20. PR Doc. 83.  Commerce's rationale fails for multiple reasons.  Fundamentally, Commerce interprets the term "unfinished fittings" in the CMI Determination, but the *Order* does not use that term.  Rather, the *Order* states clearly that it covers "carbon steel butt-weld pipe fittings in either finished or unfinished form" without further limitation or qualification.  That language describes *all* butt-weld pipe fittings sufficiently shaped as to be identifiable as such.  Nothing in the *Order's* language limits its scope based on the extent to which a butt-weld pipe fitting may have been processed to completion.  The absence of any such a limitation confirms that there is nothing in the *China Order's* scope language for Commerce to interpret.  Thus, nothing in the *Order's* scope language supports Commerce's division of "butt-weld pipe fittings in unfinished form" into subcategories based on the extent to which they have been processed to completion.  Commerce's failure to base its determination on the *Order's* actual language led it to the facially absurd exercise of attempting to establish "the point in the production process when a fitting becomes an unfinished fitting." *Id.* at 19.  Contrary to Commerce's misguided exercise, merchandise that has been shaped into the form of a butt-weld pipe fitting, but which has not yet been processed to the point of being a finished butt-weld pipe fitting, cannot undergo production processes that advance it to status as an "unfinished fitting" – because it is already a butt-weld fitting in unfinished form.

Similarly, when Commerce concluded that "rough fittings" are separate and distinct from "unfinished fittings," *id.*, it declared that it was "essential" for it to "define and distinguish between 'rough' and 'unfinished' butt-weld pipe fittings" using interpretive sources because "parties throughout the inquiry have used the term inconsistently and in conflict." *Id.* at 20, n. 96.

But this semantic rationale fails in the face of the fact that neither the term "rough pipe fitting" nor the term "unfinished pipe fitting" appear in the *China Order's* scope language. Neither term is, in the words of the *Gallant* court, "language in the order that is subject to interpretation."

It appears that Commerce distinguished "rough" fittings from unfinished fittings because it focused on language in CBP's referral request rather than the scope language of the *China Order*. Norca and CBP both used the term "rough" fittings[7] in EAPA investigation 7335 to refer to all merchandise that was formed in China and exported to Vietnam for processing under either of two "scenarios." CBP used the same term, "roughs," in describing both scenarios even though the merchandise was physically different in each scenario. CBP's CMI Referral Request, *CMI Referral* at 4. PR Doc. 7. As documented in CBP's CMI Referral Request, CBP reported that "Norca also claims the rough fittings . . . imported {into Vietnam} from China are not 'unfinished' CSBW," while noting that in fact some Chinese rough fittings had undergone sizing and finishing in Vietnam and other Chinese rough fittings had undergone only finishing in Vietnam. *Id.* CBP therefore requested that Commerce make covered merchandise determinations concerning "Chinese origin rough fittings" imported into Vietnam in either of two physical conditions: (a) those that had been formed and sized in China, and (b) those that had only been formed in China. CBP described the merchandise in both physical conditions as rough butt-weld pipe fittings. Presented with a CMI request that described two potential evasion scenarios involving physically different merchandise described as "rough fittings" in both scenarios, Commerce elected to distinguish the merchandise involved in each scenario by creating its dichotomy between the "rough fittings" that were the subject of one scenario and the

---

[7] As discussed, *infra*, this broad reference to "rough" fittings is common throughout the CSBWPF industry.

"unfinished fittings" that were the subject of the other scenario.  While this may have aided

Commerce's understanding of the two evasion scenarios, it failed to account for the fact that the

merchandise in both scenarios was CSBWPF in unfinished form.

Further evidence of Commerce's misplaced focus on CBP's CMI request rather than the

*China Order's* scope language is seen in the Department's assertion that: "Had the plain

language of the scope been as clear as the petitioners suggest, it would not have been necessary

for CBP to request" the CMI.[8] *IDM* at 22. PR Doc. 83.   This assertion is meritless.[9]

Unambiguous scope language in an order does not bar a scope (or covered merchandise) inquiry.

It does, however, limit the sources that Commerce may use to make a scope (or covered

merchandise) determination, as the reviewing courts have made clear.  Commerce's assertion

that merely asking whether a product is covered by the scope of an order establishes that the

scope language is ambiguous cannot be squared with the well-established principle that the

predicate for the interpretive process is language in an order that is subject to interpretation.

Carried to its logical conclusion, Commerce's position would nullify the courts' holdings in

*Ericsson*, *Duferco*, *Walgreen*, and *Tak Fat*.

Commerce's assertion also conflicts with its regulations. The Commerce Department

regulation governing covered merchandise inquiries, 19 C.F.R. § 351.227(f), authorizes

---

[8] In a similar vein, Commerce also asserted that two prior anticircumvention inquiries involving CSBWPF from China would not have been necessary if the *Order* were not ambiguous. *Id.*  That assertion fails in the face of Commerce's own arguments that the scope of an order and circumvention of an order are separate concepts.

[9] The process of beveling and finishing a rough butt-weld pipe fitting changes its country of origin for Customs marking purposes. *Midwood Industries, Inc. v. United States*, 313 F. Supp. 951 (Cust. Ct. 1970).  Thus, a more plausible reason for CBP to request a covered merchandise inquiry would be to resolve any conflicts between CBP's country of origin marking standards and the scope of the *China Order*.

Commerce to make its determination utilizing, *inter alia*, the analysis employed in scope rulings as set forth in 19 C.F.R. § 351.225(k).  That analysis begins with the language of the order, and it ends there if that language is "dispositive":

> In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, . . ., is dispositive.

19 C.F.R. § 351.225(k)(1).

If the mere existence of a covered merchandise inquiry were sufficient to authorize Commerce to employ interpretive sources, then this section of the regulation would be meaningless.

Finally, it bears observing that the *China Order* has been in effect for more than 30 years without any confusion about whether "rough" butt-weld fittings were covered by the Order. Norca and IPPG are the only parties ever to have argued that rough butt-weld fittings are not subject merchandise – and their position plainly reflects their interest in avoiding liability as respondents in an EAPA investigation.  As the sworn declarations of members of the industry demonstrate, *Pet. 2/28 Questionnaire Resp.* at Exhs. 1-3; PR Doc. 51, CR Doc. 10, no one in the CSBWPF industry has ever been confused about whether rough fittings are butt-weld pipe fittings in unfinished form.  Evidently, Commerce was confused, but that confusion apparently stemmed from its interpretation of CBP's CMI request.  Commerce would have avoided that confusion had it properly based its analysis on the unambiguous scope language of the *China Order*.

### C.  The Distinction Between the Terms "Unfinished Fittings" and "Butt-Weld Pipe Fittings In Either Finished or Unfinished Form" Is Not Technical

Commerce's CMI Determination manifests the Department's interpretation of a term, "unfinished fitting," that is not used in the *China Order's* scope, instead of the term that is used,

"butt-weld pipe fittings in either finished or unfinished form." Although Commerce concedes that an unfinished fitting is a butt-weld pipe fitting in unfinished form, *IDM* at 17, PR Doc. 83, it dismisses the difference between an "unfinished fitting" and a butt-weld pipe fitting in unfinished form as "a technical distinction" that "misses the point" because Commerce had determined that "rough" fittings are neither "unfinished fittings" nor "butt-weld pipe fittings in unfinished form." *Id.* at 22.

Commerce's position notwithstanding, the difference between the terms "unfinished fittings" and "fittings in either finished or unfinished form" is substantive. Commerce's conclusion that "rough" fittings are not "unfinished fittings" creates subcategories of merchandise that do not exist in the *China Order's* scope language. The scope language simply does not describe subject merchandise in any separate categories. Rather, the *Order* describes subject merchandise as butt-weld pipe fittings without regard to whether they are in finished form. That language clearly establishes that *any* Chinese-origin merchandise identifiable as a butt-weld pipe fitting is subject to the *Order* without regard to the degree to which it might have been processed toward being a finished product. The *China Order's* foundational scope descriptor is simply "butt-weld pipe fittings." The language that follows – "in either finished or unfinished form" -- merely clarifies that all products identifiable as butt-weld pipe fittings are subject merchandise. As discussed, *infra*, at section IV.A., a product is identifiable as a butt-weld pipe fitting when it has been formed into the rough shape of, for example, an elbow, tee, or reducer because, once it is formed, it is dedicated to use as a butt-weld pipe fitting and has no other use.

**III.    COMMERCE'S USE OF PRIMARY INTERPRETIVE SOURCES VERSUS
         SECONDARY INTERPRETIVE SOURCES DOES NOT SUPPORT THE CMI
         DETERMINATION BECAUSE THE LANGUAGE OF THE ORDER LEAVES
         NOTHING FOR COMMERCE TO INTERPRET**

In responding to arguments that it was inappropriate for Commerce to consider

interpretive sources pursuant to 19 C.F.R. § 351.225(k), the CMI Determination quoted

extensively from the Preliminary Determination's discussion of primary interpretive sources

under § 351.225(k)(1)(i) versus secondary interpretive sources under § 351.225(k)(1)(ii).

Specifically, the Department defended as a primary interpretive source a section of the

antidumping petition that described the production process for CSBWPF separately from the

section of the petition that described subject merchandise, and discounted language from the

International Trade Commission report in the First Sunset Review of the *China Order*.  Thus, the

Department found it "appropriate to rely on the primary interpretive sources identified in 19 CFR

351.225(k)(1)(i) that relate to this proceeding in order to determine whether a product is subject

to the *Order.* Those sources clearly establish the point in the production process when a fitting

becomes an unfinished fitting, and we decline to elevate . . . statements in other proceedings

above primary interpretive sources for this *Order*."  *IDM* at 19. PR Doc. 83.

This discussion of the use of primary interpretive sources over secondary interpretive

sources does not support the CMI Determination because Commerce never should have

considered interpretive sources in the first place.  Commerce erred by employing interpretive

sources to create distinctions between "rough fittings" and "unfinished fittings" when neither of

those terms appears in the *China Order's* scope language.  The CMI Determination states that

the Department consulted interpretive sources under because the scope "does not define an

unfinished fitting." *Id.* at 20. But the reason that the *China Order* does not define "unfinished

fitting" is because it does not use that term. Resort to interpretive sources to define the term "unfinished fitting" was therefore improper.

Commerce should not have relied on *any* interpretive sources to determine whether there is a point in the production process at which a pipe fitting has been sufficiently advanced to become an unfinished pipe fitting when the actual scope language plainly describes "butt-weld pipe fittings in either finished or unfinished form" without further qualification. Had the Department limited its analysis to the language of the *China Order* -- as it should have -- it would not have put itself in the absurd position of attempting to determine when in the production process "a fitting becomes an unfinished fitting." It was improper for Commerce to employ any of the interpretive sources described in 19 CFR § 351.225(k)(1) to constrict the plain language of the *China Order*. Whether the CMI Determination gave proper weight to a primary interpretive source over a secondary interpretive source is irrelevant.

## IV.   COMMERCE'S CMI DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's CMI Determination lacks such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that CSBWPF formed into the rough shape of elbows, tees, or reducers in China but not sized or heat treated before being exported to Vietnam for processing into finished BWPF are not covered by the *China Order*.

### A.  The Department's conclusion that the "terms 'rough fitting' and 'unfinished fitting' are distinct and separate" is not supported by substantial evidence

The Department's conclusion that the "terms 'rough fitting' and 'unfinished fitting' are distinct and separate," *Id.* at 19, is not supported by substantial evidence because the record demonstrates that "rough fittings," "as formed fittings," and "unfinished fittings" are terms the CSBWPF industry has historically used interchangeably to describe butt-weld pipe fittings in

unfinished form without regard to the extent of their processing.  These terms do not describe --

and never have described -- distinct and separate types of butt-weld pipe fittings in unfinished

form.

Executives for TFA, Mills Iron, and a third United States CSBWPF manufacturer

submitted declarations under penalty of perjury confirming that that "rough fittings," "as formed

fittings," and "unfinished fittings" are terms that the CSBWPF industry as used interchangeably

to describe merchandise that is dedicated to use as butt-weld pipe fittings but not completely

finished, without regard to the extent of their processing.  For example, Patrick Benavides, who

is the Vice President and Chief Operating Officer of TFA, declared that "The integrated

production process {for CSBWPF} typically begins with seamless carbon steel pipe. This pipe is

cut to length and then formed into the rough shape of an elbow, tee, reducer, etc., through a hot-

or cold-forming process. After this forming stage, the fittings are considered to be "rough," "as

formed," or unfinished fittings." *Pet. 2/28 Questionnaire Resp.* at Exh. 1, para 4; PR Doc. 51. He

further declared:

> Historically and currently, the terms "rough," "as formed," or
> "unfinished" fittings have been and still are used interchangeably in
> the butt-weld pipe fittings industry. They are universally understood
> to refer to the roughly shaped result of subjecting a cut length of pipe
> to the forming process. Once the cut-to-length pipe has been formed
> into the rough shape of an elbow, tee, or reducer it has no use other
> than to be converted into a finished butt-weld pipe fitting. This is
> because butt-weld pipe fittings are distinguished from other types of
> pipe fittings by the method used to attach them to piping systems.
> As the name indicates, butt-weld pipe fittings are permanently
> welded to the piping system. Other types of pipe fittings are threaded
> or attached with a "groove lock" collar. A rough butt-weld fitting
> cannot be threaded, or have a socket weld end, because it contains
> insufficient metal to accommodate the threaded or socket weld end
> without compromising the integrity and safety of the fitting wall.
> Typically, grooved fittings are manufactured by casting liquid metal
> into the required shape. CSBWPF, in contrast, are formed from cut
> seamless pipe.

27

*Id.* at Exh. 1, para 5.

The President of Mills Iron, Jeff Griffith, has spent his entire 48-year career at Mills Iron. He was employed there when Mills Iron participated in the CSBWPF from China investigation. Mr. Griffith declared that "All of our production begins with seamless carbon steel pipe. This pipe is cut to length and then formed into the rough shape of a reducer through either a cold-forming (for smaller diameter reductions) or a hot forming process (for larger reductions). After this forming stage, the fittings are considered to be 'rough,' 'as formed,' or unfinished fittings." *Id.* at Exh. 2, para 6. Mr. Griffith further stated, "The terms 'rough,' 'as formed,' and 'unfinished' fittings are used interchangeably in the butt-weld pipe fittings industry. In my 48 year experience, this has always been true. These terms are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process." *Id.* at Exh. 2, para 7.

Bruce Rust, the General Manager at Hackney Ladish, Inc. similarly declared that the terms "rough," "as formed," and "unfinished" fittings are used interchangeably in the butt-weld pipe fittings industry. *Id.* at Exh. 3, para 7. He explained that the CSBWPF industry included integrated producers who produced CSBWPF from seamless pipe, "converters" who purchased rough formed fittings from other producers and performed only finishing operations, and combination producers, who did both. He then stated:

> The existence of converters and combination producers has created a recognized commercial trade in rough butt-weld pipe fittings. Unquestionably, it was the intent of HL's predecessor company and the other companies that petitioned for antidumping duties against CSBWPF from China to address this commercial trade in roughs and to prevent circumvention of the antidumping duty order by including roughs within the scope of the CSBWPF from China petition. The *Butt-Weld Pipe Fittings from China* order accounts for

> the commercial trade in roughs or unfinished fittings by expressly
> including both finished and unfinished pipe fittings within its scope.

*Id.* at Exh. 3, para 5.

In short, the declarations of industry witnesses demonstrate that the unambiguous scope language of the order means what it says on its face: the *China Order* covers all butt-weld pipe fittings in finished or unfinished form.

The CMI Determination did not address this evidence substantively.  Instead, Commerce mischaracterized the industry's interchangeable use of the various terms as occurring only "at times" and cited use of the various terms as evidence of "confusion concerning these terms." *IDM* at 26. PR Doc. 83. Commerce cited no facts that detract from the statements of industry witnesses; it merely asserted in a footnote that the testimony of industry witnesses was "belied" by language in the antidumping petition describing the production process for CSBWPF.  The petition's description of the CSBWPF production process is simply that, however.  It says nothing about how the CSBWPF industry uses the terms "rough," "as formed," and "unfinished" fittings.  As the Court of Appeals for the Federal Circuit has observed, the scope language of the CSBWPF from China petition "identified the products subject to {the CSBWPF} investigation in terms of their physical characteristics."[10]  Just as the petition's description of the CSBWPF production process does not modify or limit the physical characteristics that identify in-scope merchandise, neither does it say anything about the terms that the industry uses to describe butt-weld pipe fittings "in unfinished form." The production process language in the petition does not detract from, much less "belie," the evidence presented in the industry statements.

---

[10] *King Supply Company LLC. v. United States, et al*., 674 F.3d 1343, 1345 (Fed. Cir. 2012).

Finally, Commerce cites no evidence to support its statement the CSBWPF industry's interchangeable use of various terms to describe butt-weld fittings in unfinished form occurs only "at times."

**B. The Record Documents that Commerce's Notice of Initiation of the Original CSBWPF from China Investigation Contained Language that Would Have Excluded Butt-Weld Pipe Fittings "Not Processed After Forging" Which Commerce Subsequently Deleted When Petitioners Objected**

When Commerce published its Notice of Initiation of the original antidumping duty investigation, the Notice contained language that excluded from the scope of the investigation37 rough fittings that were not machined, not tooled and not otherwise processed after forging:

> The products covered by this investigation are carbon steel butt-weld pipe fittings, having an inside diameter of less than 360 millimeters (14 inches) imported in either finished or unfinished form. *Unfinished butt-weld pipe fittings that are not machines, not tooled and not otherwise processed after forging are not included in the scope of this investigation.* These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).

*Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 56 Fed. Reg. 27730 (Dept. Commerce June 17, 1991); *Pet. 2/28 Questionnaire Resp.* at Exh. 6, First Attach.; PR Doc. 51.

This exclusionary language was not part of the product description in the Petition, *see id.* at Exh. 5, and its presence prompted Petitioners immediately to request that Commerce clarify that the investigation covered all unfinished CSBWPF because "The petitioner's intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished (wherever they may be classified) from the countries in question." *Id.* at Exh. 6, Second Attach. Following Petitioner's statement that it intended all unfinished fittings to be

covered by the investigation, Commerce amended the scope of the investigation, as manifested in the scope language in the *China Order*.[11]

This history is significant because sizing and heat treatment constitute processing after forging, and it establishes clearly that Petitioners intended "roughs fittings" as the CMI Determination uses the term -- *i.e.,* unfinished fittings that have not been subjected to processing after forming -- to be covered by the *China Order*. Equally important, it establishes that Commerce amended the scope language to achieve Petitioners' intent when it published the *China Order.*

The Preliminary Covered Merchandise Determination acknowledged this evidence of Petitioners' intended coverage of the CSBWPF investigation and order, but rejected it. *PDM* at 11. PR Doc. 63. In so doing, Commerce turned again to the petition's description of the production process for CSBWPF to "disagree that the Petition intended to cover rough fittings that have undergone only . . . the conversion of seamless pipe into the rough shape of a fitting." *Id.* Commerce's disagreement notwithstanding, Petitioners' express statement during the original investigation confirms the petition's intended coverage. Rough fittings that have undergone only forming of seamless pipe into the rough shape of a fitting are exactly the "Unfinished butt-weld pipe fittings that are not machined, not tooled and not otherwise processed after forging" that Commerce initially excluded from -- and then restored to -- the CSBWPF investigation.

---

[11] The Department concluded that it was not necessary to publish an amended NOI. *See id.* at Exh. 6, pg. 4.

### C. The Department's Conclusion that the Essential Characteristics of CSBWPF are Imparted by Sizing Is Not Supported By Substantial Evidence

Commerce concluded that the essential characteristics of butt-weld pipe fittings are imparted by sizing or heat treatment because these processes are "crucial" to the integrity of the pipe fitting. *IDM* at 22 PR Doc. 83. To the contrary, record evidence establishes that once steel pipe has been cut and formed into the rough shape of a butt-weld pipe fitting it has no other use than to be completed into finished CSBWPF. It has, at the point of forming, acquired the essential characteristics of CSBWPF. Commerce's conclusion otherwise is unsupported by substantial evidence.

### 1. Substantial evidence establishes that the essential characteristics of CSBWPF are imparted when the fitting is formed from a section of pipe

The testimony of domestic industry witnesses establishes that the process of forming cut-to-length pipe into, e.g., an elbow, tee, or reducer establishes the "essence" of CSBWPF. Prior to the forming process, seamless carbon steel pipe is a raw material that can be used to manufacture a number of different final products, even if it has been cut to length. After the forming process, however, the resulting rough fitting has the intended shape, diameter, and wall thickness of the finished product. It cannot be used to make any other seamless pipe product and the only kind of pipe fitting it can be used to produce is CSBWPF. An as-formed "rough" is no longer seamless pipe and it cannot be used to manufacture any product other than CSBWPF. It is useless for any other purpose. As TFA's Patrick Benavides explained,

> Once the cut-to-length pipe has been formed into the rough shape of an elbow, tee, or reducer it has no use other than to be converted into a finished butt-weld pipe fitting. This is because butt-weld pipe fittings are distinguished from other types of pipe fittings by the method used to attach them to piping systems. As the name indicates, butt-weld pipe fitting are permanently welded to the piping system. Other types of pipe fittings are threaded or attached with a "groove lock" collar. A rough butt-weld fitting cannot be

> threaded, or have a socket weld end, because it contains insufficient metal to accommodate the threaded or socket weld end without compromising the integrity and safety of the fitting wall. Typically, grooved fittings are manufactured by casting liquid metal into the required shape. CSBWPF, in contrast, are formed from cut seamless pipe.
>
> . . .
>
> The forming process establishes the "essence" of CSBWPF. Prior to the forming process, seamless carbon steel pipe – even if it has been cut to length is simply a raw material that could be used to manufacture any of a number of final products. After the forming process, the resulting rough can only be used to produce a butt-weld pipe fitting; it is no longer seamless pipe and it cannot be finished into a threaded or grooved pipe fitting or used to manufacture any other product.

*Pet. 2/28 Questionnaire Resp.* at Exh. 1, paras 5 and 6; PR Doc. 51.

Two other domestic industry executives submitted similar statements. *Id.* at Exh. 2, paras 8 and 9; Exh. 3, para 8.  Moreover, all three industry executives confirmed the narrative in the original antidumping duty petition concerning the recognized commercial trade in rough fittings, which are only sold for the purpose of being completed into finished CSBWPF. *Id.* at Exh. 1, para 10; Exh. 2, para 9; Exh. 3, paras 8, 9, 11.

In the CMI Determination*,* Commerce merely "disagree{d}" that the essential characteristics of CSBWPF are imparted when the rough fitting is formed from a section of pipe. *IDM* at 22; PR Doc. 83.  Notably, Commerce did not cite any evidence that detracted from the statements of the industry executives.  Instead, Commerce reiterated its opinion that the essence of CSBWPF is imparted by sizing and falsely attacked evidence corroborating the industry executives' statements.  Commerce's responses do not outweigh the evidence that the essential characteristics of CSBWPF are imparted when a rough fitting is formed because that is the point at which the product is dedicated to use as CSBWPF.

Finally, it is noteworthy that Commerce's stated goal of determining "when in the production process a fitting becomes an unfinished fitting" recognizes merchandise comprising cut pipe formed into the rough shape of an elbow, tee, or reducer as a "fitting." Commerce's recognition of the "as formed" product as CSBWPF is consistent with – indeed, it corroborates – record evidence establishing that the essential characteristics of CSBWPF are imparted by the forming process.

### 2. Substantial evidence does not support Commerce's conclusion that sizing or heat treatment imparts the essential characteristics of CSBWPF

The CMI Determination incorrectly concluded that sizing imparts the essential characteristics of CSBWPF "because resizing and heat treatment are crucial processes that allow the fittings to be properly joined with other pipes and impart structural stability to the fittings." *Id.* at 10, 22. Commerce's characterization of these processes as "crucial" is not supported by record evidence. Sizing merely enhances the useability of a rough butt-weld fitting after it has been formed. It does not dedicate the product to use as CSBWPF because the product is already dedicated to use as CSNBWPF, nor does it establish the product's identity as CSBWPF. Commerce's conclusion that sizing imparts the essential characteristics of CSBWPF is not supported by substantial evidence.

Record evidence fatally undermines the significance that Commerce attributes to sizing. The antidumping petition, for example, states that sizing is "often" – not always – performed, and then only after the rough formed fitting has been examined for size and shape. *Pet. 2/28 Questionnaire Resp.* at Exh. 5, p. 5; PR Doc. 51. Commerce cited footnote 18 of the ITC's 1992 Final Injury Report[12] as support for the assertion that sizing is a "crucial" process, *IDM* at 23; PR

---

[12] *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521 (Final), USITC Pub. 2528 (June 1992) ("1992 ITC Report").

Doc. 83, but that footnote also says that sizing is only "often" performed following bending. More importantly, it further observes that "in the hot process {for forming elbows} the resizing die is often part of the heating and bending machine." 1992 ITC Report at I-8 n.18.  Further, the text to which this footnote applies states that "The hot elbow is dropped off the mandrel and *immediately* resized in a die under pressure." *Id.* at I-8 (emphasis added). The Commission's observation is echoed by the declarations of experienced industry executives. *Pet. 2/28 Questionnaire Resp.* at Exh. 1, para. 8; Exh. 3, para. 10;  PR Doc. 51. In other words, if sizing is performed, it is often performed as part of the forming process.  Further, Commerce did not consider evidence that rough reducers generally are not sized at all.  *Id.* at Exh. 2, para. 11.

Commerce ignored altogether the evidence that CSBWPF is manufactured to specific industry standards, ASTM A234 for material grade and ANSI B16.9 for dimensions.  These industry standards for material and dimension identify a product as CSBWPF.  They are met when the product is formed from cut pipe, not when the product is sized.  Moreover, Commerce ignored evidence that purchase orders for rough fittings frequently specify these standards. *Id.* at Exh. 1, para. 7; Exh. 3, para. 9.  For example, Hackney Ladish's purchase orders for rough fittings refer to a standard terms sheet which requires that roughs be certified to the standards for CSBWPF that dedicate them to use in producing CSBWPF.  *Id.* at Exh. 3, para. 9, att. A. The fact that industry standards for the material and dimensions of CSBWPF are met when seamless pipe is cut and formed into the shape of a rough fitting confirms that the essential characteristics of CSBWPF is not imparted by sizing, and deprives Commerce's conclusion of evidentiary support.

Further, Commerce requested the parties to submit data identifying their costs and value added at various phases of the production process.  These data further undermine support for

Commerce's conclusion, but aside from passing references to the exhibit containing one of the three domestic producers' data, *IDM* at 24 and n. 129 and n. 131, PR Doc. 83, Commerce ignored it in reaching its final determination. The domestic industry members' data confirm that sizing is a minor step that is not "crucial" to the essence of CSBWPF.  For example, TFA does not account separately for the cost of sizing separately from the cost of forming cut pipe into the rough shape of a fitting because if sizing is done, it is done while the fitting is still hot from the basic forming process and is treated as part of that process. *Pet. 2/28 Questionnaire Resp.* at Exh. 1, para. 8, and Att. B; PR Doc. 51, CR Doc. 10.  As such, TFA believes that the cost of sizing is not large enough to be worth accounting for separately.

Data submitted by Hackney Ladish showed that, on [              ] basis, the investment in equipment needed to size butt-weld pipe fittings accounted for only [          ] of the investment in all production equipment, while the investment in forming equipment accounted for [          ] of total equipment investment. *Id.* at Exh. 3, para. 15, and Att. B. With respect to the relative costs of the processes to make CSBWPF, Hackney Ladish submitted data showing production costs for [                ] models of elbows and [

] of tees.  These data document that the processing costs for sizing [

] of total production costs for elbows and [

] of the total production costs for tees.  These percentages are [          ] by the percentages accounted for by cutting and forming seamless pipe, an average of [          ] for elbows and [          ] for tees.  Notably, these percentages understate the relative costs of cutting and forming and overstate the relative costs of sizing because [

]

*Id.* at Exh. 3, para. 16, att. C.

The fact that one industry member's costs to size butt-weld fittings [                    ]
of its costs to cut and form seamless pipe, while another industry member doesn't even bother to
account separately for sizing costs is fatal to Commerce's conclusion that sizing imparts the
essential characteristics of CSBWPF.  To the contrary, it confirms that the essential
characteristics are imparted by cutting and forming seamless pipe.

###    3.    The statement that Petitioners submitted only an excerpt of a Commerce memorandum from the original investigation is false; further, Commerce misconstrued that memorandum

To corroborate the declarations of the domestic industry executives concerning the
essential characteristics of CSBWPF, Petitioners submitted a copy of a one-page June 1991
Memorandum to the File in which a Commerce Department case analyst memorialized his
separate conversations with the U.S. Customs National Import Specialist responsible at the time
for tariff classification of pipe fittings and a fellow Commerce official. *Id.* at Exh. 4. As stated in
that memorandum, the goal of its author was "to determine whether such a thing as an
'unfinished carbon steel butt-weld pipe fitting' that has not been 'further advanced' exists, and if
so, where it would be classified. *Id.* The Import Specialist stated that "She was of the opinion
that all butt-weld pipe fittings are entered under {Harmonized Tariff Schedule subheading}
7307.93.30." *Id.* Concerning the classification of unfinished butt-weld pipe fittings, the Import
Specialist "suggested that it is the language 'butt-weld' . . . that triggers the 7307.93.30
classification." *Id.* The memorandum also addressed its author's personal concern that unfinished
butt-weld pipe fittings could escape the imposition of antidumping duties if they were not
beveled prior to importation, because in his view the fittings' dedication to use as CSBWPF
would not be apparent absent beveling.  In response, a knowledgeable Commerce Department
official "indicated . . . that 'threading' takes more pipe to accomplish than does beveling,

therefore a customs agent could distinguish unfinished butt-weld from unfinished threaded pipe fittings before either of those finishing processes occurs." *Id.*

Commerce responded to this corroborative evidence by falsely asserting that "Petitioners provided only an excerpt from the 'corroborating memorandum'." *IDM* at 24 PR Doc.83.  Its only support for this false allegation was mere speculation: "{T}he memorandum, as submitted by petitioners, abruptly ends at the bottom of page one and it is unclear whether the record only contains page one of a multi-page memorandum." *Id.* at 24, n. 133.  But any fair reading of the memorandum shows: (a) there is no "page one" because the single page is unnumbered, and (b) the "abrupt" ending is the logical and contextually appropriate end of a complete paragraph. Nothing about the memorandum reasonably implies that it comprised more than the single page.[13]  Petitioners did, in fact submit the complete memorandum.  Commerce's false assertion to the contrary is evidence only of  a results-oriented intent.

Moreover, Commerce misconstrued the memorandum.  First, Commerce asserted that an observation by the Customs Import Specialist that a pipe fitting which had been cut from a block of raw material and perhaps formed into a tee or elbow without further processing would potentially be classified as an "other" fitting under HTS 7307.99 rather than as a butt-weld pipe fitting "contradicts petitioners' claim . . . that a fitting cannot be anything other than a subject butt-weld pipe fitting after the initial forming into its rough shape." *Id.* at 24.  But the only reasonable reading of the memorandum shows that the import specialist was addressing a hypothetical scenario because butt-weld pipe fittings are neither cut from a block of raw material

---

[13] The memorandum was obtained from Commerce's public record of the CSBWPF from China investigation, which Commerce itself could have consulted if it had legitimate doubts that it has been submitted in complete form. That Commerce instead made false assertions speaks volumes.

nor are they classified under an HTS subheading for "other" pipe fittings.  The import
specialist's observation concerning the classification of products other than CSBWPF is thus
irrelevant.  Second, Commerce focused on a statement in the memorandum in which the writer
expressed his personal opinion that "'there are, no doubt, other types of unfinished pipe fittings,'
*i.e.*, other than threaded or beveled, that an importer could claim allowed its pipe fittings to be
entered as an 'other' pipe fitting, and not a butt-weld pipe fitting." *Id.*  The cited passage is also
irrelevant, however, because it discusses pipe fittings that are not CSBWPF and which would not
be classified under the HTS subheading for CSBWPF.  Third, while Commerce contends that the
memorandum undermines the evidence that the essential characteristics of CSBWPF are
imparted when the seamless pipe is formed into the rough shape of a fitting because it was the
author's belief that beveling was necessary to distinguish rough butt-weld pipe fittings from
other types of pipe fittings, an accurate reading of the memorandum shows that it memorializes
the observation of a more knowledgeable official, who explained why CSBWPF would be
identified as such prior to beveling.

> **D.  Commerce Concluded that Rough Butt-Weld Pipe Fittings Are Butt-Weld
> Fittings in Unfinished Form in the *Thailand* Circumvention Inquiry**

Commerce concedes that its 1994 *Thailand* circumvention inquiry[14] concerned Chinese-
origin "rough" as-formed butt-weld pipe fittings that were finished in Thailand before being
imported into the United States. *IDM* at 25; PR Doc. 83. It does so, however, to argue that the
*Thailand Determination* found "roughs" to be circumventing the *China Order*, and therefore it
supports Commerce's conclusion that "roughs" are not covered merchandise because a

---

[14] *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Final
Affirmative Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15155
(Dep't Commerce March 31, 1994) ("*Thailand Determination*").

circumvention determination pertains only to out-of-scope merchandise.  To the contrary, the *Thailand Determination* found that Chinese-origin rough butt-weld fittings were butt-weld fittings in unfinished form, and it also found that those rough butt-weld pipe fittings were merchandise subject to the *China Order*.  The *Thailand Determination* further demonstrates that the CMI Determination is not supported by substantial evidence.

Petitioners first discussed the *Thailand Determination* to rebut Norca's false claim that Commerce's 1994 inquiry involved only "unfinished" rather than "rough" pipe fittings produced in China.[15]  As Petitioners demonstrated in response to Norca, the respondent in the *Thailand Determination* confirmed that the merchandise subject to the inquiry comprised tee-shaped fittings that it imported into Thailand in "as formed" condition, which "were not advanced beyond cold-forming" and had not been heat-treated prior to importation into Thailand.  *Pet. 10/26 Ltr* at 7-9 PR Doc. 31. Thus, although Commerce referred to the subject merchandise in the *Thailand Determination* as "unfinished" fittings, they were, in fact, roughs.

Beyond refuting Norca's argument, the *Thailand Determination* detracts from any evidence supporting Commerce's conclusion that "rough" fittings are not unfinished fittings by (a) corroborating the statements of industry executives concerning the interchangeable use of the terms "rough" fittings, "as formed" fittings and "unfinished" fittings to describe any merchandise that has been formed into the rough shape of a fitting but not fully processed into finished CSBWPF, and (b) establishing the precedent that Commerce itself used the term "unfinished fittings" to describe rough, as-formed fittings.

---

[15]  Norca cited the *Thailand Determination* as support for its argument that "rough" pipe fittings are not "unfinished" fittings.  To Petitioners' knowledge, no other party has ever argued that "rough" fittings are not subject merchandise.

The CMI Determination correctly states that the *Thailand Determination* concerned Chinese-origin "rough" fittings.  The CMI Determination is not correct, however, in stating that the *Thailand Determination* did not find such "roughs" to be covered by the *China Order*. The Preliminary Thailand Determination states:

> The pipe fittings finished in Thailand and exported to the United States were completed from unfinished "as-formed" pipe fittings manufactured in the PRC. Therefore, the merchandise exported to the United States is *completed from merchandise subject to the antidumping duty order* and produced in the country with respect to which the antidumping duty order applies.

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62, 63 (Dept Commerce Jan. 3, 1994) ("*Thai Prelim*").

The CMI Determination's efforts to discredit the evidence that Commerce had previously held "rough" pipe fitting to be "unfinished" pipe fittings in the *Thailand Determination* are unpersuasive.  First, Commerce characterizes the *Thailand Determination* as merely "describing" the inquiry merchandise as "unfinished," even while conceding that the record shows that the products in fact were "rough fittings." *IDM* at 25, n. 138*.* PR Doc. 83. However, the *Thai Prelim* did not merely "describe" roughs as unfinished fittings, it stated as a material fact that "The pipe fittings finished in Thailand and exported to the United States were completed from unfinished 'as-formed' pipe fittings manufactured in the PRC." *Thai Prelim* at 63. The *Thailand Determination* thus stands in direct opposition to the CMI Determination's conclusion that a rough fitting is not an unfinished fitting.[16]  Moreover, even if the CMI

---

[16] It bears noting that the Thai respondent explained in detail that the product at issue was Chinese origin "as-formed" tees, which the respondent consistently stated were "unfinished" fittings, further corroborating Petitioners' evidence that the term "unfinished" embraces all butt-

Determination were correct that the *Thailand Determination* merely "described" rough fittings as unfinished fittings, the determination corroborates the Petitioners' declarations that the terms are used interchangeably within the industry – and even by Commerce.

Second, Commerce simply denies that the *Thailand Determination* equated rough fittings and unfinished fittings, stating that, "We appropriately found that the merchandise described in the Thailand Circumvention Inquiry was rough fittings *as opposed to* unfinished fittings." *IDM* at 25 (emphasis added).  PR Doc. 83. But the *Thailand Determination* made no such finding.  To the contrary, the *Thailand Determination* equated rough fittings and unfinished fittings, as the language quoted above shows.  Moreover, the Department stated explicitly that those pipe fittings -- which it described as "unfinished 'as-formed' pipe fittings manufactured in the PRC," *Thai Prelim* at 62-63, "unfinished Chinese tees," *Id.,* "Chinese unfinished pipe fittings," *Thailand Determination* at 15159, and, using the language of the *Order's* scope, "pipe fittings … which are exported in unfinished form from the PRC to Thailand," *Id.* at 15155, – are "merchandise subject to the antidumping duty order and produced in the country with respect to which the antidumping duty order applies." *Id.*

Third, Commerce argues that the *Thailand Determination* is evidence that Commerce determined 30 years ago that roughs are not unfinished fittings, stating, "Because rough fittings are not subject to the *Order,* we made a finding of circumvention" in the *Thailand Determination*. *IDM* at 25*.* PR Doc. 83.  But this assertion is contradicted by the *Thai Prelim*, which held that unfinished "as-formed" pipe fittings manufactured in China were merchandise subject to the *China Order. Thai Prelim.* at 64-65.  It is also contradicted by the Department's

---

weld pipe fittings that have been formed but not finished. *See Pet 10/26 Ltr* at Att. B and C. PR Doc. 31.

final *Thailand Determination*, which affirmed its preliminary determination, in part because "the items completed in Thailand and sold to the United States ... are completed from *merchandise produced in the PRC and covered by the order*." *Thailand Determination* at 15158 (emphasis added). Commerce also mischaracterized the *Thailand Determination* by suggesting, without citation, that it found Chinese rough pipe fittings were "material inputs to unfinished fittings" when in fact the *Thailand Determination* did not make any such finding. Thus, far from "following past precedent," *IDM* at 26, PR Doc. 83, the CMI Determination mischaracterized and directly contradicted Commerce's 1994 determination.

Finally, Commerce's argument fails to account for the context in which Commerce made the *Thailand Determination*. At the time, Commerce did not make a sharp distinction between circumvention of antidumping duty orders and evasion of antidumping duties.[17]  In 1994, the relevant Commerce Department regulation, 19 C.F.R. § 353.29, did not distinguish between scope inquiries and circumventions inquiries[18] and the EAPA's focus on "evasion" of antidumping was decades in the future. In this context, the domestic industry members' Application for a Circumvention Inquiry concluded with the following request: "For the foregoing reasons the U.S. Fittings Group respectfully requests that Commerce initiate an anticircumvention inquiry with regard to the China Order and include within the scope of that Order carbon steel butt-weld pipe fittings that have been completed or finished . . . in Thailand

---

[17]  *See, e.g., Thailand Determination* at 15158 ("the purpose of the anti-circumvention law is to prevent evasion of antidumping duty orders and findings").

[18]  *See* 19 C.F.R. §353.29 (1997), "Scope determination," which did not use the word "circumvention," but instead addressed scope determinations regarding "Products completed or assembled in the United States" in subsection (e), Products completed or assembled in other foreign countries" in subsection (f), "Minor alterations of merchandise" in subsection (g), and "Later-developed products" in subsection (h). These scenarios are now addressed in the Department's current regulation governing circumvention inquiries, 19 C.F.R. §351.226.

from unfinished fittings sourced in China, and subsequently exported to the United States." *Pet 10/26 Ltr* at Att A, p. 19*,* PR Doc. 31. Read in its proper context, the fact that the *Thailand Determination* was nominally a circumvention finding is not evidence that rough, as-formed butt-weld pipe fittings are not butt-weld pipe fittings in unfinished form within the meaning of the *China Order.*

**CONCLUSION**

For the reasons set forth above, Tube Forgings of America, Inc. and Mills Iron Works, Inc. respectfully request this Honorable Court to grant their motion for judgment on the administrative record, to remand Commerce's *Final Covered Merchandise Determination* with instructions to make a covered merchandise determination (1) without interpreting the unambiguous scope language of the *CSBWPF from China* antidumping duty order and (2) by treating "rough" butt-weld pipe fittings as CSBWPF in unfinished form within the scope of the *China Order*, and to grant such additional relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Lawrence J. Bogard
Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 Street, N.W.
Suite 300
Washington, D.C.  20005

March 18, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

This brief complies with the type-volume limitation of the United States Court of International Trade Standard Chambers Procedure 2(B)(1).  The brief contains 13,591 words, excluding the parts of the brief exempted by the Standard Chambers Procedures.

/s/ Lawrence J. Bogard
Lawrence J. Bogard
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005

Dated: March 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached Rule 56.2 Motion of Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc., Supporting Memorandum, and Proposed Order were this day served by electronic service through the Court's CM/ECF system on the following:

Anne Marie Delmare, Esq.
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Jeremy W. Dutra, Esq.
Squire Patton Boggs (US) LLP
2550 M Street, N.W.
Washington, D.C.   20037

Jared Michael Cynamon, Esq.
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 4610
Washington, DC 20230

Dated: March 18, 2024

/s/ *John B. Totaro, Jr.*
John B. Totaro, Jr.