23-231
_____

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
_____

NORCA INDUSTRIAL COMPANY, LLC,

Plaintiff,

INTERNATIONAL PIPING & PROCUREMENT GROUP, LP,

Consolidated Plaintiffs,

TUBE FORGINGS OF AMERICA, INC.
AND MILLS IRON WORKS, INC.,

Consolidated Plaintiffs,

v.

UNITED STATES,
            Defendant

and

TUBE FORGINGS OF AMERICA, INC.,
MILLS IRON WORKS, INC.,

Defendant-Intervenors,

NORCA INDUSTRIAL COMPANY LLC AND
INTERNATIONAL PIPING & PROCUREMENT GROUP, LP,

Consolidated Defendant-Intervenors.
._____

DEFENDANT'S RESPONSE TO CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD
_____

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
Jared M. Cynamon
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement and Compliance
Washington, D.C.
Telephone: (202) 353-0521

ANNE M. DELMARE
Trial Attorney
Commercial Litigation Branch,
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 305-0531
E-mail: Anne.M.Delmare@usdoj.gov

May 28, 2024                    *Attorneys for Defendant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

ISSUE PRESENTED FOR REVIEW ............................................................................ 2

STATEMENT OF FACTS ............................................................................................ 3

SUMMARY OF THE ARGUMENT ............................................................................ 8

ARGUMENT ................................................................................................................ 9

    I.   Standard Of Review ......................................................................................... 9

    II.   Legal Framework For Covered Merchandise Inquiries ............................... 10

    III.  Commerce's Final Covered Merchandise Determination Is Supported By
         Substantial Evidence And Is In Accordance With Law ............................... 14

        A.   Commerce Reasonably Interpreted Whether Rough Fittings Are
             Within The Scope Of The *Order* .......................................................... 15

        B.   Commerce Properly Relied On Primary Interpretative Sources In Its
             Analysis ................................................................................................ 18

        C.   Commerce's Final Covered Merchandise Determination Is Supported
             By Substantial Evidence And In Accordance With Law ........................ 21

             1.   Commerce's Determination That The Term "Rough Fittings" Is
                 Not The Same As "Unfinished Fittings" Is Supported By
                 Substantial Evidence ...................................................................... 21

             2.   The Fact That The Scope Was Altered In The Notice Of Initiation
                 From The Original BWFP From China Investigation Does Not
                 Evince That Rough Fittings Are Covered By The Scope Of The
                 Order ............................................................................................ 23

             3.   Commerce's Conclusion That The Essential Characteristics Of
                 BWFP Are Imparted By Sizing Is Supported By Substantial
                 Evidence ........................................................................................ 26

             4.   Commerce Reasonably Concluded That Rough Butt-Weld Pipe
                 Fittings Are Butt-Weld Fittings In Unfinished Form In The
                 Thailand Circumvention Inquiry And Rough Fittings Are Not
                 Covered By The Scope Of The Order ............................................. 33

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*Am. Silicon Techs. v. United States*,
   261 F.3d 1371 (Fed. Cir. 2001) ........................................................................ 10

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ........................................................................ 10

*Arcelormittal Stainless Belg. N.V. v. United States*,
   694 F.3d (Fed. Cir. 2012) ................................................................................ 14

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) .......................................................................... 24

*Corus Staal BV v. United State*,
   502 F.3d 1370 (Fed. Cir. 2007) ........................................................................ 24

*Deacero S.A. de C.V. v. United States*,
   817 F.3d 1332 (Fed. Cir. 2016) ........................................................................ 33

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002) ........................................................................ 23

*Fedmet Res. Corp. v. United States*,
   755 F.3d 912 (Fed. Cir. 2014) .......................................................................... 12

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .................................................... 10

*King Supply Co. LLC v. United States*,
   674 F.3d 1343 (Fed. Cir. 2012) ........................................................................ 13

*Magnum Magnetics Corp. v. United States*,
   657 F. Supp. 3d 1387 (Ct. Int'l Trade 2023) .................................................... 17

*Meridian Prods., LLC v. United States*,
   851 F.3d 1375 (Fed. Cir. 2017) .................................................................. 13, 17

*Mid Continent Nail Corp. v. United States*,
   725 F.3d 1295 (Fed. Cir. 2013) .................................................................. 13, 19

*Mitsubishi Heavy Indus. Ltd. v. United States*,
   275 F.3d 1056 (Fed. Cir. 2001) .................................................................. 30-31

*OMG, Inc. v. United States*,
   972 F.3d 1358 (Fed. Cir. 2020) ........................................................................ 12

*Pokarna Engineered Stone Ltd. v. United States*,
   547 F. Supp. 3d 1300 (Ct. Int'l Trade 2021) .................................................... 32

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ...................................................................... 13-14, 14, 25, 26

*Sango Int'l L.P. v. United States*,
    484 F.3d 1371 (Fed. Cir. 2007) .................................................................................. 9-10, 13

*Sango Int'l L.P. v. United State*,
    567 F.3d 1356 (Fed. Cir. 2009) .................................................................................. 10

*Sharp Corp. v. United States*,
    837 F.2d 1058 (Fed. Cir. 1988) .................................................................................. 25, 31

*SMA Surfaces, Inc. v. United States*,
    617 F. Supp. 3d 1263 (Ct. Int'l Trade 2023) ........................................................ 17

*Tak Fat Trading Co. v. United States*,
    396 F.3d 1378 (Fed. Cir. 2005) .................................................................................. 13

*Target Corp. v. United States*,
    609 F.3d 1352 (Fed. Cir. 2010) .................................................................................. 33

*Torrington Co. v. United States*,
    156 F.3d 1361 (Fed. Cir. 1998) .................................................................. 19-20, 20, 21

*United States v. Eurodif S.A.*,
    129 S. Ct. 878 (2009) .................................................................................. 10

*United Steel & Fasteners, Inc. v. United States*,
    947 F.3d 794 (Fed. Cir. 2020) .................................................................................. 13

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) .................................................................................. 10

*Valeo N. Am., Inc. v. United States*,
    663 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ........................................................ 33

*Vandewater Int'l Inc. v. United States*,
    589 F. Supp. 3d 1324 (Ct. Int'l Trade 2022) ........................................................ 30

*Walgreen Co. v. United States*,
    620 F.3d 1350 (Fed. Cir. 2010) .................................................................................. 23

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998) .................................................................................. 33

**STATUTES**

19 U.S.C. § 1517 .................................................................................................................. 11

19 U.S.C. § 1677 .................................................................................................................. 33

iv

28 U.S.C. § 2637 ..................................................................................................... 24

**REGULATIONS**

19 C.F.R. § 351.225 ........................................................................................ *passim*

19 C.F.R. § 351.227 ........................................................................................ *passim*

56 Fed. Reg. 27,730 ................................................................................................ 23

57 Fed. Reg. 29,702 ........................................................................................ 2, 3, 4

59 Fed. Reg. 15,155 ............................................................................. 21, 22, 34, 35

86 Fed. Reg. 52,300 ............................................................................. 12, 17, 18, 19

87 Fed. Reg. 45,753 ................................................................................................34

88 Fed. Reg. 41,075 ..................................................................................................4

87 Fed. Reg. 45,753 ................................................................................................34

87 Fed. Reg. 45,753 ................................................................................................34

87 Fed. Reg. 45,753 ................................................................................................34

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| NORCA INDUSTRIAL COMPANY, LLC, | |
| Plaintiff, | |
| INTERNATIONAL PIPING & PROCUREMENT GROUP, LP, | |
| Consolidated Plaintiffs, | |
| TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC., | |
| Consolidated Plaintiffs, | |
| v. | Consol. Court No. 23-00231 |
| THE UNITED STATES | |
| Defendant, | |
| and | |
| TUBE FORGINGS OF AMERICA, INC., MILLS IRON WORKS, INC., | |
| Defendant-Intervenors, | |
| NORCA INDUSTRIAL COMPANY LLC AND INTERNATIONAL PIPING & PROCUREMENT GROUP, LP, | |
| Consolidated Defendant-Intervenors. | |

**DEFENDANT'S RESPONSE TO CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motion for judgment upon the agency record filed by

consolidated plaintiffs, Tube Forgings of America, Inc., and Mills Iron Works, Inc. (collectively

1

TFA).  ECF No. 23 (TFA Brief).  TFA challenges the final covered merchandise determination by the Department of Commerce (Commerce) finding that Chinese-origin rough fittings that undergo the second and third stages of production in Vietnam are not subject to the scope of the antidumping order on butt-weld pipe fittings (BWPF) from the People's Republic of China (China).  *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992) (*Order*).  As demonstrated below, Commerce's determination that Chinese-origin rough fittings are not within the scope of the *Order* is supported by substantial evidence and otherwise in accordance with law.  Accordingly, the United States respectfully requests that this Court sustain Commerce's covered merchandise determination and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

## I.    Administrative Decision Under Review

The administrative determination under review is the final determination in the covered merchandise inquiry on certain steel butt-weld pipe fittings from China, *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China:  Final Determination of Covered Merchandise Inquiry*, 88 Fed. Reg. 69,909 (Dep't of Commerce Oct. 10, 2023)[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 83).

## II.    Issue Presented For Review

Whether Commerce's final determination that Chinese-origin rough fittings that undergo the second and third stages of production in Vietnam are not subject to the scope of the *Order* is supported by substantial evidence and in accordance with law.

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the covered merchandise inquiry.

## STATEMENT OF FACTS

### I.     Scope Of The Order

In July 1992, Commerce published in the *Federal Register* the antidumping duty order on

certain steel butt-weld pipe fittings from China.  *See* 57 Fed. Reg. at 29,702 (*Order*).  The

merchandise covered by the *Order* consists of:

> {C}arbon steel butt-weld pipe fittings, having an inside diameter of
> less than 14 inches, imported in either finished or unfinished form.
> These formed or forged pipe fittings are used to join sections in
> piping systems where conditions require permanent, welded
> connections, as distinguished from fittings based on other fastening
> methods ( e.g., threaded, grooved, or bolted fittings). Carbon steel
> butt-weld pipe fittings are currently classified under subheading
> 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the
> HTS subheading is provided for convenience and customs purposes,
> our written description of the scope of this proceeding is dispositive.

> *Id.*

### II.     CBP's Covered Merchandise Referral To Commerce

On September 6, 2022, U.S. Customs and Border Protection (CBP) transmitted a covered

merchandise referral to Commerce requesting that the agency determine whether the

merchandise described in the referral—certain steel butt-weld pipe fittings from China—is

subject to the *Order*.  *See* P.R. 7.[2]  In its request, CBP described the production of butt-weld pipe

fittings as having the following three stages:

> 1. Converting seamless pipe into the rough shape of an elbow, tee,
>    reducer, etc., through a cold- or hot-forming (or forging)
>    process;

---

[2] *See* P.R. 7, Memorandum, "Receipt of Covered Merchandise Referral and Placement of
Covered Merchandise Referral Documents on the Record," dated September 27, 2022, at
enclosed CBP's Letter, "Covered Merchandise Referral Request for Merchandise Under EAPA
Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial
Company, LLC and International Piping & Procurement Group, LP:  Antidumping Duty Order
on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China," dated
September 6, 2022 (Covered Merchandise Referral).

2. Reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to; and

3. Undergoing finishing processes such as shot blasting or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting.

*Id.* at 3-4.  CBP asked Commerce to determine whether:  (1) Chinese-origin rough fittings that only underwent the third stage of production (*i.e.,* finishing processes) in Vietnam are within the scope of the *Order*; and (2) whether Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are within the scope of the *Order*.  P.R. 6.

On September 26, 2022, Commerce initiated a covered merchandise inquiry.  *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Notice of Covered Merchandise Referral and Initiation of Covered Merchandise Inquiry*, 87 Fed. Reg. 58,310 (Dep't of Commerce Sept. 26, 2022).  The products subject to the underlying inquiry are rough or unfinished fittings originating in China and processed into BWPF through two production scenarios in Vietnam.  IDM at 3.  The two production scenarios are:  Scenario 1:  Chinese-origin unfinished CSBWPF undergo the final (*i.e.*, finishing processes) of three production stages in Vietnam; and Scenario 2:  Chinese-origin rough butt-weld pipe fittings undergo the second and third stages of production in Vietnam.  *Id.*

## III.    <u>Commerce's Covered Merchandise Determination</u>

In its preliminary and final determinations, pursuant to 19 C.F.R. § 351.227(f), Commerce applied the analysis described in 19 C.F.R. § 351.225(k) governing scope rulings. *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41,075 (Dep't of Commerce June 23, 2023) (*Preliminary Determination*), and accompanying Preliminary Decision

Memorandum (PDM) at 4 (P.R.63); IDM at 17-27.  Commerce found that Chinese-origin rough

fittings that underwent both the second and third stages of production in Vietnam are not within

the scope of the *Order.  See* PDM 7-12; IDM at 17-27.[3]

### A.  Commerce's Preliminary Determination

In its *Preliminary Determination,* Commerce applied the framework set forth in

19 C.F.R. § 351.225(k)(1)(i), and determined "that rough fittings do not constitute unfinished

fittings and, therefore, are not subject to the *Order* when exported from China to

Vietnam."  PDM at 8.  In particular, Commerce found that the scope does not define an

unfinished fitting, and therefore Commerce consulted other (k)(1) sources, including the *Petition*

and the final report issued by the U.S. International Trade Commission (ITC) in the investigation

underlying the *Order.*  PDM at 8; *see* 19 C.F.R. § 351.225(k)(1)(i); *see* Petitioners' Letter,

"Petitioners' Reply to the Department's Questionnaire dated January 25, 2023," dated February

28, 2023 (Petitioners' CMI Questionnaire Response) (P.R. 51) at Exh. 5 at 5-6 (*Petition*).

Commerce first considered the *Petition*, which describes the production process for butt-

weld pipe fittings in three stages.  *See* PDM at 8-9.  First, the pipe is cut to length and then

formed into the desired shape of the fitting through various methods.  *Id*.; *see Petition* at 5-6.

Next, there is a reforming or coining process where fittings may also undergo heat

treatment.  *Id*.  Finally, the third stage is the finishing processes that the unfinished fittings

undergo, which include shot blasting, beveling, and painting to transform the unfinished fitting

into a finished butt-weld pipe fitting.  *Id*.  The *Petition* states that it is only after the first two

---

[3] Commerce found that subject unfinished butt-weld pipe fittings exported from China that undergo the final stage of production in Vietnam remain subject to the scope of the *Order* because they are not substantially transformed into products of Vietnam by the finishing processes performed in Vietnam.  *See* IDM 3-14.  Because all challenges to that determination have been voluntarily dismissed, we do not further discuss this production scenario.

stages of production are complete that the product is considered an "unfinished fitting" and subject to the *Order* within the meaning of the scope.  PDM at 9 citing *Petition* at 5-6 ("After these processes, the bent pipe is considered to be an unfinished 'elbow.'").  Commerce also analyzed the 1992 ITC Final Report, which describes an unfinished pipe fitting as "a fitting that has been advanced after forging but which requires at least one more processing step (*i.e.*, {stage three finishing processes}) to finish the fitting."  PDM at 9; *see Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521, (Final), USITC Pub. 2528 (June 1992) (1992 ITC Report)) at 4, fn 6.

After considering these interpretive sources, Commerce applied these sources to the production scenarios at issue in the covered merchandise inquiry.  In particular, CBP's Covered Merchandise Referral described the production process in three stages, which mirrored the same stages as the *Petition*.  PDM at 9; *see* P.R. 7, Covered Merchandise Referral at 3.  Thus, comparing the production process in the *Petition* to the production process described in the Covered Merchandise Referral, Commerce determined that a fitting is not considered an unfinished butt-welded fitting until *after* the stage two operations, which include reforming, coining, and heat treatment.  PDM at 9.  Commerce found that this interpretation was further confirmed by the 1992 ITC Report.  *Id.*  Additionally, Commerce found that because products undergoing the final two production steps in Vietnam "were not subject to the *Order* (*i.e.,* unfinished or finished butt-weld pipe fittings) when they were exported from China, such products cannot be subject to the *Order* after undergoing stages two and three of production in Vietnam prior to exportation to the United States."  *See* PDM at 12.

Subsequently, the parties filed case briefs, and TFA argued that Commerce's preliminary determination that rough fittings were not subject to the *Order* was incorrect.  *See* Petitioners'

Letter, "Petitioners' Case Brief," dated June 28, 2023 (TFA Case Brief) (P.R. 69). Thereafter, Norca Industrial Company, LLC (Norca) submitted a rebuttal brief, arguing that Commerce correctly determined that rough fittings that underwent the last two production stages in Vietnam were not subject to the *Order*. *See* Norca's Letter, "Norca Industrial Company, LLC Rebuttal Case Brief," dated July 3, 2023 (Norca's Rebuttal Brief) (P.R. 70).

> ### B.  <u>Final Determination</u>

After analyzing the parties' arguments, Commerce continued to determine that rough fittings are not subject to the *Order*. *See* IDM at 17-27. Commerce addressed TFA's argument that rough butt-weld pipe fittings are butt-weld pipe fittings in unfinished form, such that Commerce's consideration of interpretative sources was improper. *See id*. First, Commerce disagreed with TFA that rough fittings are a form of unfinished butt-weld pipe fitting covered by the scope's plain language. *See id.* at 17. Instead, Commerce explained that the scope covers "… carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form" and that the scope does not define "rough fittings." *Id.* In accordance with 19 C.F.R. §§ 351.227(f) and 351.225(k)(1), Commerce relied on the language of the *Order* while also exercising its discretion to look to the *Petition* and other (k)(1) interpretive sources to aid in its determination. IDM at 20-21. On this basis, Commerce continued to find that "a rough fitting is a fitting that has only undergone the first stage of production and is not covered by the scope of the *Order.*" *Id*. at 19.

Additionally, Commerce disagreed with TFA that the essential characteristics of the subject merchandise are imparted after production stage one, *id*. at 22-27, and cited record evidence indicating that the "initial forming process forms the fittings in such a way that is important for the finished product" and "resizing and heat treatment are crucial processes for the

integrity of the finished butt-weld pipe fittings." *Id*. at 22 (citing *Petition* at 6). Commerce also

cited the *Petition*, which explains that the second stage of production "is necessary to ensure that

the fitting will match the pipe to which it is attached," and the heat treatment fittings received are

necessary to relieve stress build-up within the fitting during the forming process. *Id*. at 22 (citing

*Petition* at 6). Thus, record evidence demonstrated that "{t}he essential characteristic of the

butt-weld pipe fitting is imparted when the fitting is processed into an unfinished butt-weld pipe

fitting that is suitable to undergo the finishing processes and for connection to another

pipe." IDM at 22; PDM at 16.

Therefore, pursuant to 19 C.F.R. § 351.225(k)(1), Commerce, relying on the language of

the *Order* and the production process described in the *Petition* and ITC Report, determined that a

rough fitting does not become an unfinished butt-welded fitting (and, thus, subject merchandise)

until after the second stage of production. Accordingly, Commerce determined that rough butt-

weld pipe fittings from China that undergo the second and third stages of production in Vietnam

are not subject to the scope of the *Order*. IDM at 27.

This consolidated appeal followed. *See* Summons, ECF No. 1 (Nov. 1, 2023). On March

18, 2024, Norca and International Pipping & Procurement Group, LP (IPPG) voluntarily

dismissed their appeals. *See* Notice of Voluntary Dismissal, ECF No. 28 (Mar. 18, 2024);

*International Piping & Procurement Group, LP v. United States*, Court Number 23-00232, ECF

No. 24 (Mar. 18, 2024). As such, TFA's claims are the only claims remaining in this

consolidated action.

## SUMMARY OF THE ARGUMENT

TFA's challenge to Commerce's covered merchandise determination is based on a

misreading of the governing law and the record evidence, as well as mere disagreement with the

weight that Commerce accorded the record evidence.  Commerce lawfully determined that rough butt-weld pipe fittings from China that undergo the second and third stages of production in Vietnam are not subject to the scope of the *Order*.  TFA's arguments provide no basis for remand.

When analyzing whether Chinese-origin rough fittings that undergo further production in Vietnam are covered by the scope of the *Order*, Commerce reasonably exercised its discretion under 19 C.F.R. § 351.225(k)(1)(i) to consider the plain language of the *Order* as well as primary interpretative sources.  Notably, the interpretative sources demonstrated that a rough fitting is not considered an unfinished butt-welded fitting until after stage two operations, which include reforming, coining, and heat treatment.  Accordingly, rough fittings that have only undergone the first stage of production are not unfinished butt-weld pipe fittings within the meaning of the scope and, therefore, not subject to the scope of the *Order*.  Thus, rough butt-weld pipe fittings from China that undergo the second and third stages of production in Vietnam are not subject to the scope of the *Order*.

As for TFA's other challenges, they boil down to mere disagreement with Commerce's determination.  TFA's disagreement with Commerce's assessment of the record evidence does not render Commerce's covered merchandise determination unsupported by that evidence.  Accordingly, the Court should sustain Commerce's covered merchandise determination and deny TFA's motion.

## ARGUMENT

### I.    Standard Of Review

This Court "must uphold a scope ruling unless {it finds the ruling} to be 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Sango Int'l L.P. v.*

*United States,* 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif S.A.*, 129 S. Ct. 878, 886 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support' the conclusion reached," *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)), "taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984), *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more than a mere scintilla").

"Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)). "{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted).

## II.    <u>Legal Framework For Covered Merchandise Inquiries</u>

Commerce is often called upon to determine whether a certain product is included within the scope of an antidumping or countervailing duty order because it necessarily writes scope language in general terms.  19 C.F.R. § 351.225(a).  Commerce's determinations concerning a particular product are made in accordance with its regulations.  Under 19 C.F.R. § 351.225(d),

Commerce may make scope rulings based on the information in a scope request and the sources set forth in 19 C.F.R. § 351.225(k)(1).

Under the Enforce and Protect Act (EAPA), 19 U.S.C. § 1517, Federal agencies or interested parties may submit allegations to CBP that merchandise covered by an antidumping or countervailing duty order has entered the United States through evasion.  If the allegations reasonably suggest that evasion is occurring, the statute mandates a formal investigation process and an investigation timeline.  19 U.S.C. § 1517(b).  CBP's regulations establish additional deadlines and procedures governing the investigation, which facilitate CBP's compliance with its statutorily required deadlines.  19 C.F.R. Part 165.

During such investigations, EAPA authorizes CBP to submit a covered merchandise referral to Commerce when CBP is "unable to determine whether the merchandise at issue is covered merchandise{.}" 19 U.S.C. § 1517(b)(4)(A).  In conducting its analysis for a covered merchandise inquiry, Commerce has promulgated regulations authorizing Commerce to apply the analytical framework and procedures set forth in its regulation governing scope rulings, 19 C.F.R. § 351.225(k).[4]  *See* 19 C.F.R. § 351.227(f).

---

[4] 19 C.F.R. 351.225(k)(1)(i), which was modified in 2021, provides, in pertinent part, as follows:

> (1) In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.
> (i)    The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of the Secretary:
> (A)  The descriptions of the merchandise contained in the petition pertaining to the order at issue;
> (B)  The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

In modifying 19 C.F.R. § 351.225(k)(1)(i), Commerce clarified the analytical framework that it would apply in scope rulings, recognizing that the U.S. Court of Appeals for the Federal Circuit had expressed differing views on "whether the sources under the current § 351.225(k)(1) are used to interpret the 'plain meaning' of the text of the scope, or whether the plain meaning analysis comes first, and only once a determination on the plain meaning is determined, then the current § 351.225(k)(1) sources are considered." *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,323 (Dep't of Commerce Sept. 20, 2021) (citing cases); *compare Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (holding that the plain language is "paramount" and stating that, in "reviewing the plain language of a duty order," Commerce "must consider" the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior determinations) and the Commission"), with *OMG, Inc. v. United States*, 972 F.3d 1358, 1363-66 (Fed. Cir. 2020) (holding that Commerce should look at the (k)(1) factors only after determining that the governing language in the scope order is ambiguous).

Pursuant to the amended regulation, Commerce may determine whether a product is within the scope of an order by relying on the scope language alone, if such language is dispositive. 19 C.F.R. § 351.225(k)(1). Commerce also has the discretion to consider the additional primary and secondary sources listed in section 351.225(k)(1). The primary (k)(1) sources include descriptions from the petition and investigation, prior Commerce determinations relating to the same order or other orders with similar language, or prior ITC determinations

---

(C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue{.}

12

relating to the same order.  19 C.F.R. § 351.225(k)(1)(i).  Secondary (k)(1) sources include other Commerce or ITC determinations, industry usage, and dictionaries.  19 C.F.R. 51.225(k)(1)(ii)). To the extent secondary sources conflict with the primary sources, however, the primary sources "will normally control."  *Id.* (citing 19 C.F.R. § 351.225(k)(1)(ii)).

If Commerce determines that descriptions of the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the product falls within the order's scope.  *See* 19 C.F.R. § 351.225(e); *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005).  The (k)(1) sources are "dispositive" when they "definitively answer the scope question."  *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).  The Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as an issue of fact under the substantial evidence standard.  *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017) (citing *Fedmet Res. Corp*., 755 F.3d at 919-22).  Only when the (k)(1) sources are not dispositive will Commerce consider the five criteria set forth in § 351.225(k)(2).  *See* 19 C.F.R. § 351.225(k)(2); *see also United Steel and Fasteners, Inc*., 947 F.3d at 799.  These factors include: "(A) the physical characteristics of the merchandise; (B) expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2)(i).

The Court grants "significant deference to Commerce's interpretation of a scope order." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (citing *Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)).  This is because scope rulings involve "highly fact-intensive and case-specific determination{s}," *King Supply*

13

*Co. LLC v. United States,* 674 F.3d 1343, 1345 (Fed. Cir. 2012), making it "particularly within

{Commerce's} expertise." *Sandvik Steel Co. v. United States,* 164 F.3d 596, 600 (Fed. Cir.

1998). A party challenging a scope ruling by Commerce under the substantial evidence standard

"has chosen a course with a high barrier to reversal." *Id.* (internal citation and quotations

omitted).

### III. Commerce's Final Covered Merchandise Determination Is Supported By Substantial Evidence And Is In Accordance With Law

Commerce correctly determined that "rough fittings" that have only undergone the first

stage of production are not unfinished butt-weld pipe fittings within the meaning of the scope,

and, therefore, processing these fittings into finished butt-weld pipe fittings in Vietnam does not

place those finished products in the scope of the *Order.  See* PDM at 8-12; *see also* IDM at 17-

27.

Pursuant to the regulatory framework, Commerce's scope inquiry began with an

examination of the plain scope language to determine whether it contains an ambiguity and, thus,

is open to interpretation. *Arcelormittal Stainless Belg. N.V. v. United States,* 694 F.3d 82, 86, 88

(Fed. Cir. 2012); *see also* IDM at 17. Commerce followed 19 C.F.R. § 351.225(k) and

determined that the plain language of the scope did not unambiguously define an "unfinished"

fitting and, as a result, Commerce exercised its discretion to consider other (k)(1) sources,

including the *Petition* and the ITC's final report in the investigation underlying the *Order.  See*

PDM at 8; IDM at 17.

The *Petition* described products as "unfinished fittings" only after the first two stages of

production were complete. *See Petition* at 6-7; PDM at 8-9. After comparing the production

process in the *Petition* to the production process presented in the Covered Merchandise Referral,

Commerce concluded that a fitting is not considered an "unfinished" fitting until *after* stage two

of production.  PDM at 9; *compare* Covered Merchandise Referral at 3 *to Petition* at 6-7.

Moreover, the ITC's Final Report states, "an unfinished pipe fitting is a fitting that has been

advanced after forging but which requires at least one more processing step (*i.e.*, {stage three

finishing processes}) to finish the fitting."  PDM at 9; 1992 ITC Report at 4, fn 6.  Thus, relying

on (k)(1) primary interpretative sources, Commerce found that fittings are only considered

unfinished butt-welded fittings and, therefore, subject to the *Order*, after they have undergone

stages one and two of production.  PDM at 9; IDM at 27.  On this basis, Commerce reasonably

determined that Chinese-origin rough fittings, *i.e.*, fittings that have completed the first stage of

production, are outside the scope of the *Order* when they are exported from China, such that they

cannot later become subject to the *Order* after undergoing the second and third production stages

in Vietnam.  PDM at 9; IDM at 27.

    TFA contends that:  (1) Commerce incorrectly limited the *Order* to some, but not all,

BWPF in unfinished form in contravention of the language of the *Order*; (2) Commerce should

not have considered primary interpretive sources in its scope analysis; and (3) Commerce's final

determination is not supported by substantial evidence.  *See* TFA Br. at 2-3 and 16-44.  As we

demonstrate below, TFA's arguments provide no basis for remand.

### A.  Commerce Reasonably Interpreted Whether Rough Fittings Are Within The Scope Of The *Order*

    TFA argues that the language of the scope "unambiguously covers 'carbon steel butt-

weld pipe fittings in either finished or unfinished form' without limitation or qualification" and

"applies to *all* pipe fittings that are sufficiently formed as to be identifiable as such, regardless of

the extent to which they may have been processed toward completion."  TFA Br. at 18.

Specifically, TFA contends:  (1) Commerce's misinterpreted language that is not subject to

interpretation; and (2) Commerce's conclusion that "rough" fittings are not "unfinished fittings"

creates subcategories of merchandise that do not exist in the *Order's* scope language.  *See id*. at

18-24.  However, as we demonstrate below, TFA is mistaken.

First, TFA argues that there is no language in the *Order* that is subject to interpretation

because the *Order* "…covers 'carbon steel butt-weld pipe fittings in either finished or unfinished

form' without further limitation or qualification" and "nothing in the *Order's* scope language

supports Commerce's division of "butt-weld pipe fittings in unfinished form" into subcategories

based on the extent to which they have been processed to completion."  *Id*. at 19-20.  However,

TFA misunderstands Commerce's determination.  There is no disagreement that "the

merchandise covered by the *Order* consists of certain carbon steel butt-weld pipe fittings, having

an inside diameter of less than 14 inches, imported in either finished or unfinished form."  IDM

at 2.  The threshold question, however, is whether rough fittings are an unfinished butt-weld pipe

fitting, such that they are covered by the language of the *Order*.  IDM at 17.

Here, Commerce was tasked with determining "…whether Chinese-origin rough fittings

that underwent both the second and third stages of production in Vietnam are within the scope of

the *Order*."  *See* CBP Referral. The scope, however, does not define "rough fittings" or even

include the term, and therefore, Commerce had to determine whether a "rough fitting" is the

same as an "unfinished" fitting or whether a "rough fitting" is a precursor product.  IDM at 17;

*see* PDM at 8.  Thus, the salient question was not whether unfinished butt-weld pipe fittings are

within the scope (they are) but rather what constitutes an "unfinished butt-weld pipe fitting" in

the first instance.  IDM at 17.  Commerce then explained that the "language of the scope,

including the descriptions of merchandise expressly excluded from the scope" was not

dispositive because the scope is silent on whether rough fittings are a form of unfinished butt-

weld pipe fitting.[5]  *Id.*; *see also* 19 C.F.R. § 351.225(k)(1).  Accordingly, Commerce exercised

its discretion to consider primary interpretive sources set forth in 19 C.F.R. § 351.225(k)(1)(i).

*See also Meridian Prods., LLC*, 851 F.3d at 1381 ("{f}irst, Commerce must look to the text of an

order's scope."); *SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263, 1272 n.2 (Ct. Int'l

Trade 2023) ("In September 2021, Commerce promulgated a final rule that amended the text of

19 C.F.R. § 351.225(k)(1) to reflect the three-step inquiry {in *Meridian Products*} that had been

fashioned by the Federal Circuit's combining of case law and the prior code provisions.");

*Magnum Magnetics Corp. v. United States*, 657 F. Supp. 3d 1387, 1394 (Ct. Int'l Trade 2023).

     Commerce's determination comports with the regulations governing this inquiry.  *See* 19

C.F.R. § 351.225(k)(1).  As a result of the 2021 modification to the regulation, which applies to

the covered merchandise determination at issue, to determine if the scope of an order covers a

product, Commerce "*may* make its determination" on the basis of the language of the scope

alone, but has the discretion to consider the (k)(1) sources, including prior scope rulings related

to the order at issue.  19 C.F.R. § 351.225(k)(1) (emphasis added); *Regulations To Improve

Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg.

52,300, 52,323 (Dep't of Commerce Sept. 20, 2021) (citing cases).

     After analyzing the primary interpretive sources, Commerce determined that the terms

"rough fitting" and "unfinished fitting" *were* distinct and separate, and the distinction was

material to the determination.  IDM at 19.  Commerce even noted that the parties within the

inquiry used the term inconsistently and in conflict with one another.  *Id*. at 20 fn. 96.  Thus,

Commerce determined that "… an unfinished fitting is a fitting that has undergone production

---

[5] In fact, contrary to TFA's assertions that there is no room for ambiguity in interpreting
the scope, the underlying covered merchandise proceeding "…was initiated because CBP was
unable to determine whether butt-weld pipe fittings that are finished as a result of further
processing in Vietnam are within the scope of the *Order*."  IDM at 22.

stages one and two and is covered by the scope…" and "…the term "rough fitting" means a product that has undergone the first stage of production but not the second and third stages…" but "… {it is not} an unfinished fitting in its own right." *Id*. at 19-20.

Second, TFA asserts that Commerce's conclusion that "rough" fittings are not "unfinished fittings" creates subcategories of merchandise that do not exist in the *Order's* scope language. *See* TFA Br. at 23-24. Commerce did not, however, find that there is a separate category of subject merchandise, but rather that the rough fittings, which have only undergone stage one of the production process (i.e., forming in a rough shape of an elbow, tee, or reducer), do not qualify as subject unfinished pipe fittings, which must undergo the second stage of production (*i.e.,* reforming, coining and sometimes heat treatment). IDM at 18-19. The Covered Merchandise Referral describes the production process for BWPFs as a three-stage process that mirrors the stages described in the 1991 Petition.[6] *Id*. at 18. Comparing "the production process in the 1991 Petition to the production process presented in the Covered Merchandise Referral," the fitting is simply not considered an unfinished fitting until *after* stage two of the production process, which includes reforming, coining, and heat treatment. IDM at 18-19.

### B. Commerce Properly Relied On Primary Interpretative Sources In Its Analysis

TFA argues that Commerce should not have relied on any interpretive sources and should have limited its analysis to the language of the *Order. See* TFA Br. at 25-26. Further, TFA contends that Commerce erred by employing interpretive sources to create distinctions between "rough fittings" and "unfinished fittings" when neither of those terms appears in the *China*

---

[6] *See* "Petition for the Imposition of Antidumping Duties," dated May 22, 1991 (1991 Petition), at 5-6. As noted previously, in the first stage, pipe is transformed into a rough shape of the fitting through a forming process. *Id*. The second stage involves the reforming or sizing process so that the fitting will be able to be welded to the pipe to which it is intended to be connected. *Id*. In the third and final stage, the fitting undergoes finishing processes such as shot blasting, beveling and painting. *Id*.

*Order's* scope language and resorting to interpretive sources to define the term "unfinished fitting" was therefore improper. *Id*. TFA's contention, however, ignores the regulations that governed Commerce's inquiry.

Commerce's consideration of interpretative sources is permissible under 19 C.F.R. § 351.225(k)(1), which permits Commerce to consider primary interpretive sources under its (k)(1) analysis. *See* 19 C.F.R. § 351.225(k)(1). As a result of the 2021 modification to the regulation, to determine if the scope of an order covers a product, Commerce "*may* make its determination" on the basis of the language of the scope alone and has the discretion to consider the (k)(1) sources, including prior scope rulings related to the order at issue. *Id*. (emphasis added); Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52,300, 52,323 (Dep't of Commerce Sept. 20, 2021).

As explained above, Commerce determined that analysis of the primary interpretative sources was required because the scope does not define "rough fittings," nor does it contain any indication that "rough fittings" are "unfinished fittings" that are covered by the plain language of the scope. *See* IDM at 17-27; *see also Mid Continent Nail Corp.*, 725 F.3d at 1300 ("The Court grants "significant deference to Commerce's interpretation of a scope order.")). Additionally, the parties used the terms "rough fittings" and "unfinished fittings" inconsistently and in conflict with one another within the inquiry. *See e.g,* IDM at 20 fn. 96. Thus, Commerce deemed it necessary to analyze the interpretive sources when determining that the terms "rough fitting" and "unfinished fitting" were distinct and separate, and it was material to the determination to note the distinction. IDM at 19; *see Torrington Co. v. United States*, 156 F.3d 1361, 1364 (Fed. Cir. 1998) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretations of its own regulations. . . . The agency's

interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.").  Commerce further determined that this distinction and use of interpretative sources was critical to its understanding of the scope of the *Order*, and to reasonably answer the Covered Merchandise Referral.  IDM at 17*; King Supply*, 674 F.3d at 1348 citing *Sandvik*, 164 F.3d at 600 ("This deference is appropriate because the meaning and scope of . . . orders are issues 'particularly within the expertise' and 'special competence' of Commerce.").

Further, TFA's argument that there is no difference between "unfinished" or "finished fittings" and that all merchandise identifiable as a butt-weld pipe fitting is subject to the *Order* is misplaced.  Notably, TFA's attempt to draw a technical distinction between a "butt-weld pipe fitting in unfinished form" and an "unfinished butt-weld pipe fitting" misses the point; rough fittings are neither "butt-weld pipe fittings in unfinished form" nor "unfinished butt-weld pipe fittings."  IDM at 22.  Rather, Commerce found rough fittings are intermediate products which can be processed into unfinished pipe fittings.  *Id*.  Relying on the *Petition*, Commerce found that the "point in the production process that an elbow, reducer, or tee becomes an unfinished fitting {is} '{a}fter these {first and second stage} processes, the bent pipe is considered to be an unfinished "elbow"' and '{t}he production of an unfinished "tee" or an "unfinished" reducer is somewhat different.'"  *Id*. at 22 (citing *Petition* at 6) (internal quotations omitted).  Thus, Commerce reasonably determined the *Petition* clarified the language of the *Order* and delineated the point at which a production input becomes an unfinished or finished fitting and, therefore, subject to the *Order*.  IDM at 22.  TFA fails to demonstrate that Commerce erred in consulting the other (k)(1) sources, including the *Petition* and the ITC's final report in the investigation underlying the *Order*.

**C. Commerce's Final Covered Merchandise Determination Is Supported By Substantial Evidence And In Accordance With Law**

Finally, TFA argues that "Commerce's {final determination} lacks such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that BWFP formed into the rough shape of elbows, tees, or reducers in China but not sized or heat treated before being exported to Vietnam for processing into finished BWPF are not covered by the *China Order*." TFA Br. at 26-44. Specifically, TFA argues that: (1) Commerce's finding that the "terms 'rough fitting' and 'unfinished fitting' are distinct and separate" is not supported by substantial evidence; (2) Commerce's notice of initiation of the BWFP from China investigation contained language that would have excluded butt-weld pipe fittings "not processed after forging" which Commerce subsequently deleted when petitioners objected; (3) Commerce's conclusion that the essential characteristics of BWFP are imparted by sizing is not supported by substantial evidence; and (4) Commerce previously concluded that rough butt-weld pipe fittings are butt-weld fittings in unfinished form in the *Thailand Circumvention Inquiry*, which undermines its findings in this case. *See id.; see Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62 (Dep't of Commerce Jan. 3, 1994) (*Thailand Circumvention Prelim*); unchanged in *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15,155 (Dep't of Commerce Mar. 31, 1994) (collectively, *Thailand Circumvention Inquiry*). As demonstrated below, each of TFA's arguments lack merit.

**1. Commerce's Determination That The Term "Rough Fittings" Is Not The Same As "Unfinished Fittings" Is Supported By Substantial Evidence**

TFA argues that the "terms 'rough fitting' and 'unfinished fitting' are not distinct and separate," and rough fittings," "as formed fittings," and "unfinished fittings" are terms the BWFP

industry has historically used interchangeably to describe butt-weld pipe fittings. As support,
TFA cites declarations of industry witnesses that were prepared for purposes of the covered
merchandise inquiry. *See* TFA Br. at 26-30; Petitioners' CMI Questionnaire Response at Exh.1-
3. According to TFA, these declarations "demonstrate that the unambiguous scope language of
the order means what it says on its face: the China Order covers all butt-weld pipe fittings in
finished or unfinished form." *Id.* at 29.

TFA misapplies the relevant legal framework. As already discussed, pursuant to 19
C.F.R. § 351.225(k)(1), Commerce may rely upon primary and secondary interpretive sources to
interpret scope language.[7] The declarations that TFA cites are secondary interpretive sources
because they are secondary evidence of industry usage and, under the relevant framework,
primary interpretive sources govern in the event of a conflict. Therefore, even if the two sources
were in conflict, by regulation, "the primary interpretive sources will normally govern in
determining whether a product is covered by the scope of the order at issue." 19 C.F.R.
§ 351.225(k)(1)(ii).

Here, Commerce reviewed the primary interpretive sources, and determined that pipe
fittings are not unfinished butt-welded fittings until after the first and second stages of production
are complete. PDM at 10. The primary interpretative sources "clearly establish the point in the
production process when a fitting becomes an unfinished fitting," and the *Petition* provided the

---

[7] As stated previously, primary interpretive sources include: (1) the descriptions of the
merchandise contained in the petition; (2) the descriptions of the merchandise contained in the
initial investigation; (3) previous or concurrent determinations, including prior scope rulings,
memoranda, or clarifications pertaining to both the order at issue, as well as other orders with
same or similar language as that of the order at issue; and (4) determinations of the Commission
pertaining to the order at issue, including reports issued pursuant to the Commission's
initial investigation. *See* 19 C.F.R. § 351.225(k)(1)(i). Secondary interpretive sources include
"any other determinations of the Secretary or the Commission not identified above, Customs
rulings or determinations, industry usage, dictionaries, and any other relevant record evidence."
19 C.F.R. § 351.225(k)(1)(ii).

necessary clarity to interpret the *Order*.  PDM 10; *see* IDM at 21.  Notably, "the language of the *Petition* clearly indicates that a fitting only becomes an unfinished fitting after it undergoes the second stage of production (despite making no reference to "rough" fittings)."  IDM at 26; *see Petition* at 5-6.  As a result, Commerce found that TFA's submitted declarations claiming that the industry always uses rough fitting and unfinished fittings terms synonymously was "belied by the language of the *Order* and the complete or near total absence of the term 'rough fitting' in the Commerce or ITC investigation."  IDM at 27.  Thus, despite TFA's contention that the industry uses the terms "rough fitting" and "unfinished fittings" interchangeably, the language of this description is not supported by the primary interpretive sources, such as the *Petition*.  IDM at 26; *see* 19 C.F.R. § 351.225(k)(1)(ii) ("…the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue."); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) ("It is the responsibility of the agency, not those who initiated the proceedings, to determine the scope of the final orders."); *see also Walgreen Co. v. United States*, 620 F.3d 1350, 1355 (Fed. Cir 2010).  Thus, TFA's contention that Commerce should give more weight to the declarations of industry witnesses is unsupported by the law.

## 2. The Fact That The Scope Was Altered In The Notice Of Initiation From The Original BWFP From China Investigation Does Not Evince That Rough Fittings Are Covered By The Scope Of The Order

Next, TFA argues that Commerce's removal of certain scope language that originally appeared in the *Initiation Notice* evinces that rough fittings were intended to be covered by the scope of the *Order*.  TFA Br. 30-31 (citing *Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China,* 56 Fed. Reg. 27,730 (Dep't of Commerce June 17, 1991) (*Initiation Notice*)).  Specifically, TFA notes that the *Initiation Notice* scope language provided that "{u}nfinished butt-weld pipe fittings that are not

machines (*sic*), not tooled and not otherwise processed after forging are not included in the scope of this investigation." TFA Br. at 12; P.R. 63 at 11. The petitioners, however, subsequently requested removal of this sentence, citing their "intent to include imports of all butt-weld fittings of the kind described, whether finished or unfinished." TFA Br. at 30; P.R. 51 at Attach 6. According to TFA, Commerce's acquiescence in removing this language indicates agreement that "roughs," *i.e.*, unfinished fittings that have not been subject to processing after forming, are unfinished butt-weld pipe fittings covered by the *Order*. TFA Br. at 31. TFA is incorrect.

As an initial matter, TFA failed to exhaust its administrative remedies by failing to raise this argument before Commerce in its comments following Commerce's preliminary determination. Pursuant to 19 C.F.R. § 351.227(d), if Commerce issues a preliminary covered merchandise determination then Commerce will establish a schedule for the filing of comments and rebuttal comments. *See* 19 C.F.R. § 351.227(d). Here, Commerce explicitly addressed – and rejected – the relevance of the *Initiation Notice* in its preliminary covered merchandise determination. *See* PDM at 11-12. Yet neither TFA nor any other party challenged Commerce's interpretation in comments submitted after the preliminary determination.

In this regard, Congress has mandated that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Hence, courts take "a 'strict view' of the requirement that parties exhaust their administrative remedies . . . in trade cases." *Corus Staal*, 502 F.3d at 1379. "When administrative remedies have not been exhausted, 'judicial

review of administrative action is inappropriate,' *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed. Cir. 1988), since it is 'a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.' *Sandvik*, 164 F.3d at 599 (also quoting *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, (1952) (*L.A. Tucker*). TFA should not be permitted to circumvent the purpose of the exhaustion statute by raising for the first time before this Court an issue that was known and capable of being raised in a timely manner before Commerce. *See L.A. Tucker*, 344 U.S. at 35 (requiring exhaustion, despite trial court agreement with party's claim on its merits, when the party did not provide "any excuse for its failure to raise the objection upon at least one of its many opportunities during the administrative proceeding"). Because Commerce was deprived of an opportunity to address these arguments in the first instance during the comment period, this Court should not entertain them for the first time now.

In any event, even if the Court were to entertain TFA's belated claims, Commerce's preliminary determination was still reasonable. *See* PDM at 10-11. Specifically, Commerce reasonably disagreed that its removal of certain language from the *Initiation Notice* scope was intended to cover rough fittings. PDM at 11. Commerce instead inferred that the language in question was simply "unnecessary to the proper administration of the scope and may have merely added confusion to it." *See id*. In other words, given the *Petition*'s confirmation that fittings that are not tooled or processed after forging are not unfinished fittings, Commerce found that it would have been confusing to characterize these same fittings in scope language as "unfinished." *Id*. Commerce's interpretation is bolstered by the fact that the petitioners

themselves consented to the original scope language in the *Initiation Notice*. *Id*. at 11 fn. 52[8]

("…the scope language was sent to petitioner for approval . . . Petitioner approved . . . the

following scope language … .")).  If the petitioners' intent was as clear as TFA contends, then

the petitioners would have had no reason to approve of the scope language that appeared in the

*Initiation Notice*.

In sum, Commerce reasonably explained that the *Initiation Notice* did not evince that

rough fittings were intended to be covered by the *Order*. *Id*.; IDM at 19, 26.  The Court should

reject TFA's belated request to reweigh the record with respect to this issue.

### 3. Commerce's Conclusion That The Essential Characteristics Of BWFP Are Imparted By Sizing Is Supported By Substantial Evidence

TFA contends that record evidence establishes that once steel pipe has been cut and

formed into the rough shape of a butt-weld pipe fitting, it has no other use than to be completed

into finished BWFP.  TFA Br. at 32-39.  Specifically, TFA argues:  (1) the domestic industry

testimony establishes that after the forming process the resulting rough fitting cannot be used to

make any other seamless pipe product; (2) Commerce's conclusion that sizing imparts the

essential characteristics of BWFP is not supported by substantial evidence; and (3) domestic

industry testimony that investment in forming equipment is material and confirms that the

essential characteristics are imparted by cutting and forming seamless pipe.  *See* TFA Br. 32-39.

These assertions are flawed.

First, as explained above, TFA misapplies the regulatory framework.  Commerce may

rely upon primary and secondary interpretive sources to interpret scope language.  19 C.F.R. §

---

[8] PDM 11 fn. 52 cites Petitioners' CMI Questionnaire Response at Exh. 4 (Memorandum, "Request for Clarification of Scope:  Federal Register Notices of Initiation of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and Thailand (June 27, 1991) (Scope Clarification Memorandum).

351.225(k)(1).  And again, even if the two sources were in conflict, by regulation, "the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue." 19 C.F.R. § 351.225(k)(1)(ii).  Here, Commerce reasonably determined that the descriptions found in the primary interpretative sources relevant for determining the essential characteristics of the subject merchandise are imparted after production stages one and two and recognized the significance of the second stage of production for the subject merchandise to be considered an "unfinished" pipe fitting.  *See* IDM at 22-25.  TFA's industry declarations are secondary interpretive sources, and "in the event of a conflict between these secondary interpretive sources and the primary interpretive sources" then "the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue."  *See* 19 C.F.R. § 351.225(k)(1)(ii).  Thus, TFA overlooks the regulatory framework, and Commerce's determination to rely on primary interpretative sources is proper.

TFA also fails to recognize that rough fittings are neither "butt-weld pipe fittings in unfinished form" nor "unfinished butt-weld pipe fittings."  *See* IDM at 22.  Instead, they are intermediate products that are processed into unfinished pipe fittings.  *Id*. ("The production process laid out in the *Petition* identifies the point in the production process that an elbow, reducer, or tee becomes an unfinished fitting by stating that "{a}fter these {first and second stage} processes, the bent pipe is considered to be an unfinished 'elbow'" and "{t}he production of an unfinished 'tee' or an 'unfinished' reducer is somewhat different.") (citing *Petition* at 6). This language in the *Petition* is significant because it clarifies the language of the *Order*, delineating the point at which a production input becomes an unfinished or finished fitting and, thus, subject to the *Order*.  IDM at 22.

Next, TFA asserts that Commerce's conclusion that sizing imparts the essential characteristics of BWFP is not supported by substantial evidence because industry standards are met when the product is formed from cut pipe, not when the product is sized, and domestic industry testimony confirms that investment in forming equipment demonstrates the essential characteristics are imparted by cutting and forming seamless pipe. *See* TFA. Br. 34-37.  Again, however, this argument misapplies the relevant legal framework set forth in 19 C.F.R. § 351.225(k)(1)(ii).

Here, pursuant to its (k)(1) analysis, Commerce relied on the *Petition* and the 1992 ITC Report to determine that "{t}he essential characteristic of the butt-weld pipe fitting is imparted when the fitting is processed into an unfinished butt-weld pipe fitting that is suitable to undergo the finishing processes and for connection to another pipe."  PDM at 16; IDM at 22. Importantly, the record evidence underscores the pivotal role of the initial forming process in shaping the fittings, with resizing and heat treatment being crucial processes for the integrity of the finished butt-weld pipe fittings. *See* IDM at 22

Specifically, the *Petition* explains that the second stage of production "is necessary to ensure that the fitting will match the pipe to which it is attached" and "{f}ittings that are formed at a temperature under 1,200F or above 1,800F must also undergo heat treatment which relieves stress build-up within the fitting during the forming process. *See* IDM at 22-24; *see Petition* at 6. Accordingly, Commerce explained, "{r}elieving this metallurgical stress in the fittings is a critical process in the second stage of production" and therefore, "{t}he first and second stages of production together impart the physical characteristics that enable a seamless pipe to be used in its intended applications as a butt-weld pipe fitting."  IDM at 22.  Thus, the second stage of production is critical to relieving the metallurgical stress while the first and second stages of

28

production "together" permit a seamless pipe to be used in its intended applications as a butt-weld pipe fitting.  *Id*. at 22; *see* 1992 ITC Report at I-8 ("The cold-worked product must be heat-treated …to relieve metallurgical stresses that build up during the cold-working process.") and n.18 ("Irrespective of the process, resizing is necessary to ensure that the buttweld fitting will match the pipe to which it is to be welded.").

TFA's attempt to suggest that the sizing and reforming operations are not always required is also misplaced.  *See* TFA Br. at 34.  Commerce explained that stage two of "{t}he operation is necessary to ensure that the fitting will match the pipe."  IDM at 23; *Petition* at 6.  And the *Petition* explains that "{t}the production of an unfinished 'tee' or an unfinished 'reducer' is somewhat different before the coining operation."  IDM at 23; *Petition* at 6.  In addition, the 1992 ITC Report characterizes this resizing as a necessary process, not an optional one.  IDM at 23 ("{a}fter forming, the pipe *must* undergo a 'reforming' or 'sizing' operation.") (citing 1992 ITC Report at I-8 fn. 18).  The 1992 ITC Report also concludes its discussion of resizing by stating that "{i}rrespective of the process, resizing is necessary to ensure that the {butt-weld pipe} fitting will match the pipe to which it is to be welded."  IDM at 24; 1992 ITC Report at I-8 fn. 18.  Accordingly, Commerce reasonably determined that the second stage of production is necessary for the production of unfinished butt-weld pipe fittings, and fittings must undergo production stages one and two to be considered a butt-weld pipe fitting in an unfinished form that is subject to the *Order*.  IDM at 24.  Contrary to TFA's assertion, the *Petition* and the 1992 ITC Report support Commerce's determination that sizing and reforming are material to the second stage of production.

Notwithstanding this detailed analysis, TFA argues that Commerce should have reached a different conclusion based on contemporaneous domestic testimony provided during the

underlying Covered Merchandise Inquiry.  But again, this testimony is a secondary interpretive source and TFA does not explain why it was improper to rely on primary interpretive sources in its (k)(1) analysis.  *See* 19 C.F.R. 351.225(k)(1)(ii); TFA Br. at 34-37; 19 C.F.R. § 351.225(k)(1)(ii) (even if the two sources were in conflict, by regulation, "the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue.").

Moreover, TFA's arguments fail to acknowledge evidence undermining its claim.  As Commerce noted in its preliminary determination, there is also record evidence from IPPG and Norca that the finishing processes do change important qualities because beveling is a finishing process, and "the beveled edges of butt-weld pipe fittings distinguish them from other types of pipe fittings."  PDM at 17; *see* Norca's March Surrebuttal Comments at 2.  Thus, left with only conflicting information from the parties, Commerce properly relied on the *Petition* and the 1992 ITC Report, which are primary interpretive sources, to support its finding that the essential characteristics of subject merchandise are imparted after production stages one and two.  IDM at 23; *see Vandewater Int'l Inc. v. United States*, 589 F. Supp. 3d 1324, 1337 (Ct. Int'l Trade 2022) ("However, for Plaintiffs to establish that Commerce's analysis of the physical characteristics of BWFPs and outlets was unreasonable, they must demonstrate that their preferred outcome was the "one and only reasonable" conclusion Commerce could reach in light of the record"); *Pokarna Engineered Stone Ltd. v. United States*, 547 F. Supp. 3d 1300, 1308, (Ct. Int'l Trade 2021) ("A party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination."); *Mitsubishi Heavy Indus. Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence." (quoting *Consolidated Edison, Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

Next, TFA contends that their costs and value added at various phases of the production process demonstrates that the investment in equipment for sizing is not economical, and therefore, Commerce's conclusion that sizing imparts the essential characteristics of BWFP is flawed. *See* TFA Br. at 35-37. TFA does not, however, make any effort to address Commerce's analysis within the relevant (k)(1) framework, which does not reference costs and value added as an interpretive source.[9] Moreover, the Court should not address this argument because TFA did not raise it before Commerce. Indeed, neither TFA's case brief nor rebuttal brief argued that the economics of the cost of sizing was not material to whether the essential characteristics of BWFP were imbued. *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed. Cir. 1988) (When administrative remedies have not been exhausted, judicial review of administrative action is inappropriate.). Thus, Commerce reasonably found that the second stage of production is necessary for the production of unfinished butt-weld pipe fittings, and fittings must undergo production stages one and two to be considered a butt-weld pipe fitting in an unfinished form that is subject to the *Order*.

Lastly, TFA argues that Commerce did not adequately weigh evidence from a corroborating memorandum and ignored details that TFA believes are necessary for Commerce's analysis. *See* TFA Br. at 37-39. This assertion is incorrect, and the memorandum underscores

---

[9] While this factor would be relevant to a substantial transformation inquiry, *see* 19 C.F.R. § 351.225(j), Commerce found in the preliminary determination that "{b}ecause the products described in the Covered Merchandise Referral under this production scenario were not subject to the *Order* (*i.e.*, unfinished or finished butt-weld pipe fittings) when they were exported from China, such products cannot be subject to the *Order* after undergoing stages two and three of production in Vietnam prior to exportation to the United States." *See* PDM at 12. Therefore, Commerce did not perform a substantial transformation analysis for this production scenario and TFA does not – nor can it now – challenge that finding in this litigation.

the contradiction in TFA's position that a fitting cannot be anything other than a subject butt-weld pipe fitting after the initial forming into its rough shape.  The memorandum "recounts a discussion with a CBP official who stated that all butt-weld pipe fittings are classifiable under a single HTSUS subheading, which is the only subheading in the scope of the *Order*, 7307.93.30, and that "a pipe fitting which had been cut from a block of raw material and perhaps formed into a 'tee' or 'elbow,' without further refinements, would potentially be classified in 7307.99," a distinct and different category covering "other" pipe fittings."  IDM at 24; *see* Petitioners' CMI Questionnaire Response at Exhibit 4.  The memorandum also includes a brief discussion of whether a customs agent could distinguish unfinished butt-weld fittings from unfinished threaded pipe fittings before those processes occur.   IDM at 24-25; *see* Petitioners' CMI Questionnaire Response at Exhibit 4.  The memorandum concludes with the author noting that the beveling of the unfinished pipe fitting distinguished butt-weld pipe fittings from other types of fittings, such as threaded fittings, and "there are, no doubt, other types of unfinished pipe fittings," *i.e.*, other than threaded or beveled, that an importer could claim allowed its pipe fittings to be entered as an 'other' pipe fitting, and not a butt-weld pipe fitting."  IDM at 25; Petitioners' CMI Questionnaire Response at Exhibit 4.

The memorandum contradicts the assertion that a fitting cannot be anything other than a subject butt-weld pipe fitting after the initial forming into its rough shape because the CBP agent stated they could distinguish unfinished butt-weld fittings from unfinished threaded pipe fittings before those processes occur.  *See* IDM at 25; *see also* Petitioners' CMI Questionnaire Response at Exhibit 4 ("…a customs agent could distinguish unfinished butt-weld from unfinished threaded pipe fittings before either of those finishing processes occurs); and *see Pokarna Engineered Stone Ltd. v. United States*, 547 F. Supp. 3d 1300, 1308, (Ct. Int'l Trade 2021) ("A

party's ability to point to an alternative, reasonable finding on the agency record does not

provide a basis for the court to set aside an agency's determination.").  TFA's mere disagreement

with Commerce's interpretation of the memorandum does not prevent Commerce's

determination from being supported by substantial evidence as a whole.  *See Valeo N. Am., Inc.

v. United States*, 663 F. Supp. 3d 1343, 1352 (Ct. Int'l Trade 2023) citing *SolarWorld Ams., Inc.

v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (mere disagreement with Commerce's

weighing of the evidence mistakes the court's function, which is not to "reweigh the evidence.").

Accordingly, Commerce's conclusion that stage two processing is a critical step in the

production of butt-weld pipe fittings is supported by substantial evidence and in accordance with

law.

### 4.   Commerce Reasonably Concluded That Rough Butt-Weld Pipe Fittings Are Butt-Weld Fittings In Unfinished Form In The Thailand Circumvention Inquiry And Rough Fittings Are Not Covered By The Scope Of The Order

Finally, TFA argues that the *Thailand Circumvention Inquiry* further demonstrates that

the final determination in this case is not supported by substantial evidence.  *See* TFA Br. at 39-

44.  In particular, TFA contends that the *Thailand Circumvention Inquiry* supports that rough

fittings and unfinished pipe fittings are the same, and "{t}he *Thailand Determination* thus stands

in direct opposition to the {IDM} conclusion that a rough fitting is not an unfinished fitting."

TFA Br. at 41.

In a circumvention proceeding, Commerce "may determine that certain types of articles

are within the scope of a duty order, even when the articles do not fall within the order's literal

scope."  *Deacero S.A. de C.V. v. United States*, 817 F.3d 1332, 1337 (Fed. Cir. 2016); *Target

Corp. v. United States*, 609 F.3d 1352, 1355 (Fed. Cir. 2010); *see Wheatland Tube Co. v. United

States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998); *see also* 19 U.S.C. § 1677j.  Thus, "to find that a

product is circumventing an order, Commerce normally first determines that it is not subject to

the scope of that order."  PDM at 12; *see, e.g., Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 45,753 (July 29, 2022) and accompanying Preliminary Decision Memorandum at 14 ("Before determining whether merchandise is circumventing the *Orders*, we must first determine whether any of the merchandise subject to the scope inquiry is covered by the scope of the *Orders.*" (citing *Deacero S.A. de C.V. v. United States*, 942 F.Supp.2d 1321, 1461-62 (Ct. Int'l Trade 2013)).

In the *Thailand Circumvention Inquiry,* the inquiry merchandise was "unfinished 'as-formed' pipe fittings" from China that undergo heat treatment and finishing processes in Thailand.  IDM at 25; *see Thailand Circumvention Prelim*, 59 Fed. Reg. at 63.  Commerce determined that the merchandise described in the *Thailand Circumvention Inquiry* was rough fittings as opposed to unfinished fittings and was circumventing the order.  IDM at 25.  As a result, Commerce found that "imports into the United States of pipe fittings *that were finished in Thailand from {rough fittings}* produced in {China} constitute circumvention," and "pipe fittings *that were finished in Thailand from {rough fittings}* produced in {China} fall within the scope of the antidumping duty order..."  IDM at 26; *see Thailand Circumvention Inquiry*, 59 Fed. Reg. at 15,155 (emphasis added).  However, Commerce did not find that the rough fittings themselves were butt-weld pipe fittings in unfinished form or that rough fittings were subject to the *Order.* IDM at 26 ("…a pipe fitting in unfinished form is a subject fitting, while the inquiry merchandise in the *Thailand Circumvention Inquiry* was instead a material input used to produce subject unfinished and finished fittings that had yet to undergo stage two processing.").  In that case, Commerce instead determined that fittings finished in Thailand from Chinese rough fittings

circumvented the *Order* and therefore, were only subject to the *Order* after a finding of circumvention. *id*.

Here, Commerce determined that the scope covers all unfinished butt-weld pipe fittings, as well as finished products, and disagreed that the *Petition* intended to cover rough fittings that have only undergone stage one of processing, *i.e.,* conversion of seamless pipe into the rough shape of a fitting. PDM at 11. Further, TFA also "tacitly concede{d} that rough fittings are not within the scope of the *Order* when they state{d} that parties could 'circumvent the *Order* merely by exporting rough {buttweld pipe fittings} from China.'" *Id.* at 12; *see* Petitioners' March Rebuttal Comments at 2.[10] Thus, Commerce's reliance on *Thailand Circumvention Inquiry* was proper and not in tension with the final determination in this case that the material inputs to unfinished fittings are outside the scope of the *Order*.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final determination and deny plaintiffs' motion for judgment on the agency record.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principle Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

</div>

---

[10] In the underlying covered merchandise inquiry, Commerce analyzed whether rough fittings are covered by the scope. IDM at 1. Commerce did not consider whether Chinese rough fittings finished in Vietnam and exported to the United States would be circumventing the order, nor does TFA argue that Commerce should have made such a determination below.

OF COUNSEL:                                    /s/ Anne M. Delmare
Jared M. Cynamon                               ANNE M. DELMARE
Attorney                                       Trial Attorney
U.S. Department of Commerce                    U.S. Department of Justice
Office of the Chief Counsel                    Civil Division
  for Trade Enforcement and Compliance         Commercial Litigation Branch
Washington, D.C.                               P.O. Box 480
Telephone: (202) 353-0521                      Ben Franklin Station
                                               Washington, D.C. 20044
                                               Telephone: (202) 616-5196


May 28, 2024                                   *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to paragraph 2(B)(2) of the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in paragraph 2(B)(1)(b) of the Chambers Procedures for a filing under Rule 56.2(h). Specifically, excluding those exempted portions of the brief as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 10,806 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Anne M. Delmare

## **CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on this 28 day of May 2024, a copy of the

foregoing "DEFENDANT'S RESPONSE TO CONSOLIDATED PLAINTIFFS' RULE 56.2

MOTION FOR JUDGMENT ON THE AGENCY RECORD" was filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


/s/ Anne M. Delmare
ANNE M. DELMARE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| NORCA INDUSTRIAL COMPANY, LLC, <br><br> Plaintiff, <br><br> INTERNATIONAL PIPING & PROCUREMENT GROUP, LP, <br><br> Consolidated Plaintiffs, <br><br> TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> THE UNITED STATES <br><br> Defendant, <br><br> and <br><br> TUBE FORGINGS OF AMERICA, INC., MILLS IRON WORKS, INC., <br><br> Defendant-Intervenors, <br><br> NORCA INDUSTRIAL COMPANY LLC AND INTERNATIONAL PIPING & PROCUREMENT GROUP, LP, <br><br> Consolidated Defendant-Intervenors. | Consol. Court No. 23-00231 |

**ORDER**

Upon consideration of consolidated plaintiffs' motion for judgment on the agency record, defendant's response thereto, consolidated plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that consolidated plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's Final Determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2024
       New York, NY                          _____
                                             JENNIFER CHOE-GROVES, JUDGE