## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  HON. JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| NORCA INDUSTRIAL COMPANY, LLC, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **UNITED STATES,** <br><br> **Defendant,** <br> and <br><br> **TUBE FORGINGS OF AMERICA, INC. and MILLS IRON WORKS, INC.,** <br><br> **Defendant-Intervenors.** | **Consol. Court No. 23-00231** |

## REPLY MEMORANDUM OF CONSOLIDATED PLAINTIFFS
## TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.

Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005
(202) 776-1150

July 1, 2024

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

REPLY MEMORANDUM OF CONSOLIDATED PLAINTIFFS TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC. .................................................1

ARGUMENT ............................................................................................................... 3

   I.  COMMERCE'S USE OF INTERPRETIVE SOURCES IN ITS *CMI* WAS UNLAWFUL BECAUSE THE LANGUAGE OF THE *CHINA ORDER* IS UNAMBIGUOUS ......... 3

      A.  The "Legal Structure" Does Not Grant Commerce Discretion To Consider Interpretive Sources When Scope Language Is Unambiguous ........................................... 3

      B.  The Scope Language of the *China Order* Is Unambiguous ............................... 7

  II.  EVEN IF COMMERCE LAWFULLY CONSIDERED INTERPRETIVE SOURCES, THE *CMI* IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ........................... 10

      A.  Commerce Failed to Consider the Declarations of Experienced, Knowledgeable Industry Executives ........................................................ 11

      B.  The Revision to the Scope of the CSBWPF from China Antidumping Investigation in Response to a Letter from Petitioner's Counsel Is a Primary Interpretive Source Establishing that "Rough Fittings" Are Covered Merchandise ........................... 12

         1.  The Exclusionary Language Deleted from the Scope at Petitioner's Request Described the Product that Is the Subject of CBP's Covered Merchandise Referral ................................................................... 12

         2.  Requiring Exhaustion of Administrative Remedies Is Not Appropriate Because Commerce Addressed and Dismissed the Argument in the *PDM* .................. 13

      C.  The Petition's Discussion of Industry Standards Pertaining to CSBWPF Detracts from Any Evidence Supporting Commerce's Finding that the Essential Characteristics of CSBWPF Are Imparted By Sizing ........................................................ 16

      D.  Commerce Fundamentally Misconstrued a Primary Source Document After Falsely Stating That Petitioners Provided Only an "Excerpt" from It ........................... 18

E. The *Thailand Circumvention Determination* Expressly Stated That Chinese Origin Rough Fittings Are Within the Scope of the *China Order*; It Is a Primary Interpretive Source that Detracts from the Evidence Supporting the *CMI* ……………………… 19

CONCLUSION …………………………………………………………………………… 23

# **TABLE OF AUTHORITIES**

**Cases**

*Arcelormittal Stainless Belg. NV v. United States*, 694 F. 3d 82 (Fed. Cir 2012) ……………….. 5

*Bendure v. United States*, 554 F.2d 427 (Ct. Cl. 1977) ………………………………………… 15

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ……………………………. 15

*Deacero S.A. de C.V. v. United States*, 817 F.3d 1332 (Fed. Cir. 2016) ……………………… 21

*Duferco Steel v. United States*, 296 F. 3d 1087 (Fed. Cir. 2002) ……………………………… 4

*Ellwood City Forge v. United States*, 600 F.Supp.3d 1281 (Ct. Int'l Trade 2022) …………........ 15

*Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778 (Fed. Cir. 1995) …….. 4

*Itochu Building Products v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) ……………… 14, 15

*King Supply Company LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) …………………. 9

*Luoyang Bearing Corp. v. United States*, 347 F.Supp.2d 1326 (Ct. Int'l Trade 2004) ………... 15

*Magnum Magnetics Corp. v. United States*, 657 F. Supp. 3d 1387 (Ct. Int'l Trade 2023) …. 5, 6, 7

*McCarthy v. Madigan*, 503 U.S. 140 (1991) …………………………………………………... 14

*Meridian Products LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017) ………………… 5, 6, 7

*Mid Continent Nail Corp. v. United States*, 275 F.3d 1295 (Fed. Cir. 2013) …………………… 9

*Novosteel SA v. United States*, 284 F. 3d 1261 (Fed. Cir. 2002) ………………………………. 5, 9

*OMG, Inc. v. United States*, 972 F. 3d 1358 (Fed. Cir. 2020) …………………………………… 5

*Sango Int'l L.P v. United States*, 484 F.3d 1371 (Fed. Cir. 2007) ……………………………… 9

*SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263 (Ct. Int'l Trade 2023) …………… 5, 7

*Smith Corona Corp. v. United States*, 915 F.2d 683 (Fed. Cir. 1990) ……………………….. 4, 6

*Tak Fat Trading Company v. United States*, 396 F.3d 1378 (Fed. Cir. 2005) …………………… 5

*Target Corp. v. United States,* 609 F.3d 1352 (Fed. Cir. 2010) ……………………………….. 21

*Trust Chem. Co. Ltd. v. United States*, 791 F.Supp.2d 1257 (Ct. Int'l Trade 2011) ………….... 15

*Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) ……………. 4, 5

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ……………………….. 21

**Statutes**

19 U.S.C. § 1677j ……………………………………………………………….......... 20, 21

28 U.S.C. § 2637 ……………………………………………………………………….. 14

**Regulations**

19 C.F.R. § 351.225 …………………………………………………………….. 3, 6, 10

19 C.F.R. § 351.309 ………………………………………………………………... 14

**Other Authorities**

*Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings Fron the People's Republic of China*, 57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) …………………………… passim

*Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521 (Final), USITC Pub. 2528 (June 1992) ……………………………………… 10

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China;*
   *Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*,
   59 Fed. Reg. 62 (Dept Commerce Jan. 3, 1994) …………………………………….. 19, 20, 21
*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China;*
   *Final Affirmative Determination of Circumvention of Antidumping Duty Order*,
   59 Fed. Reg. 15155 (Dep't Commerce March 31, 1994) ………………………………….. passim
*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China:*
   *Final Determination of Covered Merchandise Inquiry*, 88 Fed. Reg. 69909 (Dep't
   Commerce Oct. 10, 2023) and accompanying Issues and Decision
   Memorandum ("*IDM*") ……………………………………………………………………… passim
*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China:*
   *Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41075 (Dept.
   Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary
   Results …………………………………………………………………………………… passim

## REPLY MEMORANDUM OF CONSOLIDATED PLAINTIFFS TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.

This Memorandum is submitted on behalf of Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. (collectively, "TFA") in reply to Defendant United States[1] and Defendant-Intervenors Norca Industrial Company LLC and International Piping & Procurement Group, LP (collectively, "Norca").[2]  As TFA has explained,[3] *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Determination of Covered Merchandise Inquiry* ("*CMI*")[4] should be remanded because the Commerce Department's conclusion that rough, as-formed butt-weld pipe fittings are not Carbon Steel Butt-Weld Pipe Fittings ("CSBWPF") within the meaning of the *China Order* is neither lawful nor supported by substantial evidence on the administrative record taken as a whole.  Specifically, Commerce abused its discretion by employing primary interpretive sources to determine the scope of the *China Order*[5] even though the scope language of that *Order* is unambiguous and dispositive, and leaves nothing for Commerce to interpret. *See TFA Br.* at 16-24.  Moreover, the *CMI* is

---

[1]  Defendant's Response To Consolidated Plaintiffs' Rule 56.2 Motion for Judgment On the Agency Record ("*Gov't Br.*"), CM/ECF Doc. 30.

[2]  Defendant-Intervenors' Response to Consolidated Plaintiffs' Motion for Judgement On the Agency Record ("*Norca Br.*"), CM/ECF Doc. 29.

[3]  Memorandum In Support of the Motion of Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. For Judgment Upon the Administrative Record ("*TFA Br.*"), CM/ECF Doc. 24.

[4]  *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Final Determination of Covered Merchandise Inquiry*, 88 Fed. Reg. 69909 (Dep't Commerce Oct. 10, 2023), PR Doc. 84, and accompanying Issues and Decision Memorandum ("*IDM*"), PR Doc. 83. All record citations are to the public administrative record and cited as "PR Doc. __."

[5]  *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings Fron the People's Republic of China*, 57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) ("*China Order*").

unsupported by substantial evidence on the record as a whole because Commerce mischaracterized and discounted primary interpretive sources that detracted from the weight of the evidence on which Commerce did rely.

The Government's response is unpersuasive.  For the most part, the Government merely repeats – often literally – Commerce's flawed conclusions in the *CMI*, while asserting that they are reasonable.  Beyond that, the Government argues that Commerce enjoys unlimited discretion to interpret the scope of antidumping duty orders, *Gov't Br.* at 7, 9, 11, 12, 14, 17, 19, and that the 2021 revisions to Commerce's regulations codified this discretion in a "legal framework" for scope determinations. *Id.* at 5, 11, 12, 14, 22, 26, 27, 28, 31.  Even so, Commerce must exercise its discretion reasonably.  It did not in this case.

The threshold question in a scope inquiry – whether the scope language of an order is unambiguous and dispositive – is a question of law which the courts review *de novo* and without deference to Commerce.  In this case, Commerce unreasonably failed to acknowledge that the *China Order* scope language is unambiguous and dispositive. Hence, the court owes no deference to the Department's consideration of interpretive sources.  Even if such consideration of interpretive sources had been reasonable, the Department cherry-picked the "primary source" evidence on which it relied, mischaracterizing and disregarding primary sources that were unsupportive of its conclusion, and leaving the *CMI* unsupported by substantial evidence.

For its part, Norca echoes the Government's arguments, but frames them more succinctly.  It is therefore not necessary to address Norca's arguments directly.

**ARGUMENT**

**I.    COMMERCE'S USE OF INTERPRETIVE SOURCES IN ITS *CMI* WAS UNLAWFUL BECAUSE THE LANGUAGE OF THE *CHINA ORDER* IS UNAMBIGUOUS**

The Government argues that the *CMI* is lawful because Commerce's 2021 amendment to its regulation governing inquiries into the scope of antidumping and countervailing duty orders, 19 C.F.R. §351.225(k)(1), created a "legal framework" that affords Commerce unbridled discretion to determine whether the scope language of an order is dispositive and to consider interpretive sources even if it is.  The Government also argues that the language of the *China Order* is, in fact, ambiguous.  Both arguments lack merit.

**A.    The "Legal Structure" Does Not Grant Commerce Discretion To Consider Interpretive Sources When Scope Language Is Unambiguous**

The Government contends that, "Pursuant to the amended regulation, Commerce *may* determine whether a product is within the scope of an order by relying on the scope language alone, if such language is dispositive. … Commerce also has the discretion to consider the additional primary and secondary sources listed in section 351.225(k)(1)." *Gov't Br.* at 12 (emphasis added).  In other words, according to the Government, in 2021 Commerce granted itself the authority to consider the primary and secondary interpretive sources listed in subsection 351.225(k)(1)(i) and (ii) if it so chooses, even when the unambiguous scope language of the order in question is dispositive.  Thus, the Government argues, Commerce was free to look past the unambiguous scope language of the *China Order*.  Commerce's 2021 amendments to its regulations notwithstanding, however, the Department does not have unlimited discretion to determine an order's scope when the scope language is unambiguous.  In the case of the CSBWPF *CMI*, Commerce did not exercise its discretion lawfully.

Decisions of the Court of Appeals for the Federal Circuit have established a clear hierarchy of factors governing Commerce's resolution of scope issues, the foundational factor being an order's scope language. *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990). ("The class or kind of merchandise encompassed by a final antidumping order is determined by the order."); *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) ("a predicate for the interpretive process is language in the order that is subject to interpretation.").

Even decisions that acknowledge consideration of factors beyond an order's scope language underscore the primacy of the order's language. *See,* for example, *Duferco Steel v. United States*, 296 F. 3d 1087, 1097 (Fed. Cir. 2002) ("Review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order. *But they cannot substitute for language in the order itself.*" (emphasis added)). *Duferco* further observed that "While the petition, factual findings, legal conclusions, and preliminary orders can aid in the analysis, they cannot substitute for the language of the order itself, which remains the 'cornerstone' in any scope determination." *Id.* Consistent with the foundational role of the order's scope language, the CAFC has held that interpretive sources are secondary to the scope language. "The primary source in making a scope ruling is the antidumping order being applied (and the prior scope determinations applying that order)." *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1356-57 (Fed. Cir. 2010). The *Walgreen* court underscored the hierarchy of factors for determining scope: "This court has made clear that it is the language of Commerce's final order that defines the scope of the order albeit 'with the aid of the antidumping petition, the factual findings and legal conclusions adduced from the administrative investigations, and the preliminary order.' While the petition, factual findings, legal conclusions, and preliminary orders can aid in the

4

analysis, they cannot substitute for the language of the order itself, which remains the 'cornerstone' in any scope determination." *Id.* at 1357 (citations omitted).  Thus, "The language of the order determines the scope of an antidumping duty order" and "The language of the order, not the petition, controls." *Tak Fat Trading Company v. United States*, 396 F.3d 1378, 1382 and 1386 (Fed. Cir. 2005); *see also OMG, Inc. v. United States*, 972 F. 3d 1358, 1363 (Fed. Cir. 2020).

As the CAFC explained in *Meridian Products LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017), "Commerce's inquiry *must* begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation. . . . *If the scope is unambiguous, it governs*." (citations omitted, emphasis added).  The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that the court reviews *de novo*. *Id.* at 1382*; see also, Arcelormittal Stainless Belg. NV v. United States*, 694 F. 3d 82, (Fed. Cir 2012); *OMG, supra*, at 1363; *Magnum Magnetics Corp. v. United States*, 657 F. Supp. 3d 1387, 1393 (Ct. Int'l Trade 2023).  As such, "the court does not owe deference to Commerce for its determination of whether the text of the scope order is unambiguous …." *SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263, 1272, n. 3 (Ct. Int'l Trade 2023), citing *Arcelormittal*.   Only a "low threshold [is] needed to show that Commerce [has] justifiably found an ambiguity . . . ." *Arcelormittal* at 90, citing *Novosteel SA v. United States*, 284 F. 3d 1261, 1272 (Fed. Cir. 2002).  However, "it is not justifiable [for Commerce] to identify an ambiguity where none exists." *Id.*

The court in *Meridian Products* described the hierarchy as follows:

> [N]o specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders. . . . Commerce has filled the statutory gap with a regulation that sets forth a two-step test for answering scope questions, 19 C.F.R. § 351.225(k), and our case law has added another layer to the inquiry. First, Commerce must look to the text of an order's scope; second, Commerce will

> consult descriptions of the merchandise in other sources; and third,
> if still necessary, Commerce may consider additional factors
> comparing the merchandise in question to merchandise subject to
> the order.

*Meridian Products* at 1381.

At least one decision of this court has characterized this description as "creat{ing} a three-step inquiry for evaluation of scope language," *Magnum Magnetics* at 1394, such that "Commerce's review of the scope language is inseparable from consideration of the {section 351.225}(k)(1) sources." *Id.* at 1393. But consistent with the Federal Circuit's jurisprudence since *Smith Corona*, the only mandatory step described in *Meridian Products* is the first one, in which Commerce *must* look to the text of the order. The court did not state that Commerce "must" consider descriptions of the merchandise in the second step, it merely said that Commerce "will" do so. The court's view that Commerce will take that step only if necessary is apparent from (a) the court's statement that "If the scope is unambiguous it governs," (b) the absence of mandatory language as in the first step, and (c) the fact that Commerce may consider additional factors "if still necessary." In short, *Meridian Products* and decisions that follow its lead do not authorize Commerce to rely on sources beyond the scope language of an order when that language is unambiguous and dispositive.

The Government points to the 2021 amended scope regulation as authorizing Commerce to reach beyond the unambiguous scope language of the *China Order* to determine its scope. While the regulation does state that Commerce "will consider the language of the scope and may make its determination on this basis alone if the language of the scope … is dispositive." 19 C.F.R. § 351.225(k)(1), reading the regulation to grant Commerce discretion ("may make its determination") to base a scope determination on interpretive sources even when the scope language is unambiguous cannot be squared with the case law. As *Meridian* observes,

6

"Commerce's inquiry *must* begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation. … *If the scope is unambiguous, it governs*." *Meridian Products* at 1381.

Finally, the Federal Circuit has observed that "The relevant scope terms are 'unambiguous' if they have 'a single clearly defined or stated meaning'." *Meridian Products* at 1381, n. 7.  This court has echoed that observation. *Magnum Magnetics Corp.* at 1394; *SMA Surfaces* at 1273.

### B.  The Scope Language of the *China Order* Is Unambiguous

The Government contends that the scope of the *China Order* is ambiguous because "the threshold question" in the covered merchandise inquiry was "whether rough fittings are an unfinished butt-weld pipe fitting … covered by the language of the *Order*," while "The scope . . . does not define 'rough fittings' or even include the term, and therefore, Commerce had to determine whether a 'rough fitting' is the same as an unfinished fitting or whether a 'rough fitting' is a precursor product." *Gov't Br.* at 16.  This argument fails on two counts.

First, as TFA explained at page 7 of its principal brief, the scope language of the *China Order* covers: "carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form."[6] This scope language clearly defines the merchandise subject to the *China Order* as all CSBWPF of the referenced inner diameter without regard to the extent to which they may be completed.

Second, the "threshold question" did not require Commerce to define "rough fittings" and "unfinished fittings" to resolve the issues posed by CBP's covered merchandise referral.  The

---

[6] 87 Fed. Reg. 58310, 58311; 57 Fed. Reg. 29702, 29703.

*China Order's* scope language unambiguously covers both "rough fittings" and "unfinished fittings" because both are butt-weld pipe fittings in unfinished form.  Once raw material – e.g., seamless carbon steel pipe or tube – has been formed into the rough shape of a butt-weld pipe fitting it has no use other than to be finished into a butt-weld pipe fitting. PR Doc. 48 at 3; PR Doc. 50 at 19-21. The extent to which a rough elbow, tee, or reducer is processed after initial forming simply does not matter.  A rough-formed elbow, tee, or reducer is a butt-weld pipe fitting.  It is a butt-weld pipe fitting in unfinished form until all remaining production operations have been performed, at which point it is a butt-weld pipe fitting in finished form.  As such, the term "butt-weld pipe fitting in finished or unfinished form" has "a single clearly defined or stated meaning."

Moreover, nothing in the Covered Merchandise Referral from U.S. Customs & Border Protection required Commerce to define "rough fittings" or differentiate them from "unfinished fittings."  CBP described the subject of its Referral as seamless pipe that that had been converted in China "into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process." PR Doc. 7 at 3.  CBP then asked Commerce for two determinations concerning such "rough fittings": (1) whether performing just a series of finishing operations in Vietnam removed them from the scope of the *China Order*, *id.* at 4. and (2) whether performing reforming or sizing operations in Vietnam in addition to finishing operations in Vietnam removed them from the scope of the *China Order*. *Id.*  Significantly, both scenarios involved seamless pipe that that had been converted in China "into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process" -- merchandise that, on its face, was Chinese-origin carbon steel butt-weld pipe fittings in unfinished form.

In issuing scope rulings, "Commerce ... enjoys substantial freedom to interpret and clarify its antidumping orders.  But while it may interpret those orders, it may not change them." *Novosteel, supra* at 1269.  In a decision reviewing a Commerce decision concerning the scope of the *China Order*, the CAFC stated that "Commerce cannot interpret an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms," *King Supply Company LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012).

The courts do "afford 'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms' and does not 'change the scope of the order.'"  *Mid Continent Nail Corp. v. United States*, 275 F.3d 1295, 1300 (Fed. Cir. 2013).  Nevertheless, "just as orders cannot be extended to include merchandise that is not within the scope of the order as reasonably interpreted, merchandise facially covered by an order may not be excluded from the scope of the order unless the order can reasonably be interpreted so as to exclude it." *Mid Continent, supra* at 1301.

The scope language of the *China Order* explicitly and unambiguously applies to butt-weld pipe fittings in unfinished form.  CBP's Covered Merchandise Referral described Chinese-origin merchandise that irrefutably was butt-weld pipe fittings in unfinished form.  Commerce needed no sources to resolve the covered merchandise inquiry beyond the unambiguous language of the *China Order* and CBP's description of the product in its referral.

Contrary to Commerce's determination, the scope language of the *China Order* was dispositive,[7] leaving nothing about the scope of the *China Order* for Commerce to interpret.

---

[7] The CAFC has observed that "dispositive" in this context means "having the quality or function of directing, controlling, or disposing of something."  *See Sango Int'l L.P v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).

The court owes no deference to Commerce's conclusion otherwise. Commerce's use of subsection (k)(1) sources to interpret scope language that was unambiguous and dispositive was unreasonable and unlawful. The *CMI* should therefore be remanded.

## II.    EVEN IF COMMERCE LAWFULLY CONSIDERED INTERPRETIVE SOURCES, THE *CMI* IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Even if Commerce could lawfully consider interpretive sources beyond the unambiguous scope language of the *China Order*, the evidence supporting Commerce's conclusion that rough butt-weld pipe fittings are not subject to the *China Order* comprises only two sources: (1) a discussion in the antidumping Petition "tracing" the stages of integrated production of CSBWPF that is entirely separate from the description of subject merchandise, PR Doc. 51, Ex. 5 at 3-7;[8] and (2) a footnote in the International Trade Commission's report supporting its final injury investigation. *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521 (Final), USITC Pub. 2528 (June 1992) at 4, n. 6. TFA's Rule 56.2 Memorandum demonstrated that the *CMI* was not supported by substantial evidence when all relevant primary interpretive sources are considered because Commerce considered only sources that it deemed to support its conclusion while it refused to consider sources that detracted from it. In response, the Government invokes its interpretation of the "legal framework," *Gov't Br.* at 22, 26, 28, charges that TFA "failed to exhaust its administrative remedies," Gov't Br. at 24, 31, and misconstrues interpretive sources that do not support the *CMI*. None of the Government's responses establish that the *CMI* is supported by substantial evidence.

---

[8] Following its description of subject CSBWPF, the Petition described its use, the relevant industry standards, and the differences among integrated producers, converters, and combination producers before tracing production steps.

A.  **Commerce Failed to Consider the Declarations of Experienced, Knowledgeable Industry Executives**

Knowledgeable CSBWPF industry executives, each with decades of experience, submitted sworn declarations stating, "Historically and currently, the terms 'rough,' 'as formed,' or 'unfinished' fittings have been and still are used interchangeably in the butt-weld pipe fittings industry. They are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process." PR Doc. 51 at Ex. 1, ¶ 5, Ex. 2, ¶ 7, Ex. 3, ¶ 7.  Arguing that TFA misapplies the relevant legal framework, the Government dismisses these declarations as conflicting secondary interpretive sources which Commerce was free to ignore in favor of primary interpretive sources that "establish the point in the production process when a fitting becomes an unfinished fitting." *Gov't Br.* at 22.

The Government's argument misses the mark.  As TFA discussed in its Rule 56.2 memorandum, *TFA Br.* at 19-22, and above at pages 7-8, nothing in CBP's covered merchandise referral required Commerce to differentiate "rough fittings" from "unfinished fittings" or define either product.  Commerce nevertheless noted the "complete or near total absence of the term 'rough fitting' in the investigation" while attempting to determine when a "rough fitting" becomes an "unfinished fitting" and *IDM* at 27. The declarations of industry officials respond directly to the issue as Commerce framed it.  Moreover, those declarations were submitted as part of the domestic industry's response to a Request for Additional Information that Commerce sent to all parties. PR Doc. 37.  Having asked for additional information and received sworn statements that the terms "roughs" and "unfinished fittings" are used interchangeably in the industry, it was incumbent on Commerce to use that information.  That it chose not to confirms that Commerce failed to consider the weight of evidence on the record as a whole.

**B. The Revision to the Scope of the CSBWPF from China Antidumping Investigation in Response to a Letter from Petitioner's Counsel Is a Primary Interpretive Source Establishing that "Rough Fittings" Are Covered Merchandise**

**1. The Exclusionary Language Deleted from the Scope at Petitioner's Request Described the Product that Is the Subject of CBP's Covered Merchandise Referral**

In contrast to the Petition, the Notice of Initiation published in the Federal Register describing the merchandise subject to the CSBWPF from China antidumping investigation included the following exclusionary language: "Unfinished butt-weld pipe fittings that are not machined, not tooled, and not otherwise processed after forging are not included in the scope of this investigation." 46 Fed. Reg. 27730 (June 17, 1991). On the day following publication of the notice, Petitioner requested that Commerce delete this exclusionary language because "The petitioner's intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished (wherever they may be classified) from the countries in question." PR Doc. 51 at Ex. 6, Letter from McKenna & Cuneo page 3. Consistent with Petitioner's intent, Commerce did delete the language excluding "fittings that are not machined, not tooled, and not otherwise processed after forging" from the *China Order's* scope language.

The Government argues that Commerce in the *CMI* reasonably disagreed that the deleted language was intended to cover rough fittings, and that Commerce "inferred" that the deleted language was "unnecessary to proper administration of the scope and may have added confusion." *Gov't Br.* at 25. This argument is readily dismissed.

The sentence that Commerce initially included in the investigation's scope and then excluded at Petitioner's request unquestionably described rough fittings -- *i.e.*, "fittings that are not machined, not tooled, and not otherwise processed after forging" -- even if the sentence used the term unfinished fitting. Indeed, the deleted sentence clearly describes the product that is the

subject of Scenario 2 in CBP's covered merchandise referral -- seamless pipe that that had been converted in China into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process, but not further processed until after being exported to Vietnam.

In addition, Commerce's speculative "inference" as to why Commerce may have deleted the sentence that would have excluded rough fittings is nonsensical in the face of the Petitioner's express request that the sentence be deleted in order to achieve the Petitioner's intended product coverage. Groundless for the same reason is the Government's assertion that Commerce deleted the sentence because "it would have been confusing to characterize {fittings that are not machined, not tooled, and not otherwise processed after forging} in the scope language as 'unfinished.'"

### 2.   Requiring Exhaustion of Administrative Remedies Is Not Appropriate Because Commerce Addressed and Dismissed the Argument in the *PDM*

The Government urges the court not to entertain the forgoing arguments because "Commerce was deprived of an opportunity to address these arguments in the first instance during the comment period," despite acknowledging that Commerce "explicitly addressed -- and rejected" them in its preliminary determination. *Gov't Br.* at 25-26. The Government's argument is unpersuasive.

The Government asks the court to disregard TFA's arguments concerning Commerce's revision of the scope of the antidumping investigation because TFA did not make them in its administrative Case Brief. *Gov't Brief* at 24-25. But the Government fails to acknowledge that TFA did argue that Commerce's revision of the investigation's scope was evidence that rough fittings were subject to the *China Order* when it submitted Petitioner's revision request letter as part of TFA's response to Commerce's Request for Additional Information. PR Doc. 50 at 2-6, PR Doc. 51 at Ex. 6. In fact, Commerce addressed and dismissed TFA's argument in the

13

Preliminary Determination, stating, "According to the petitioners, Commerce's acquiescence amounted to an agreement that 'roughs,' … are unfinished butt-weld pipe fittings covered by the Order. However, the description of the production process included in the Petition … contradicts this claim." and "the language that Commerce removed was unnecessary to the proper administration of the scope and may have merely added confusion to it."[9]  Commerce had notice and opportunity to address – and, in fact, did address -- this issue at the administrative level.

Notably, the Government does not rest its argument that TFA failed to exhaust its administrative remedies on section 351.309 of Commerce's regulations, 19 C.F.R. § 351.309. That is likely because neither covered merchandise inquiries nor scope inquiries are among the administrative proceedings in which section 351.309 requires parties to present all arguments in their Case Briefs.

Consequently, the Government's administrative remedies argument is governed by 28 U.S.C. § 2637(d), which directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." *See Itochu Building Products v. United States*, 733 F.3d 1140, 1145, n. 1 (Fed. Cir. 2013).  *Itochu* explained that "The requirement that invocation of exhaustion be 'appropriate'. . . requires that it serve some practical purpose when applied. Inquiry into the purposes served by requiring exhaustion in the particular case, and any harms caused by requiring such exhaustion, is needed to determine appropriateness." *Id.* The general purpose of the exhaustion requirement is to "protect{} administrative agency authority and promot{e} judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1991).  This

---

[9] *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41075 (Dept. Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary Results. ("*PDM*") PR Doc. 63 at 11.

court has held that "The goal of the exhaustion requirement is to ensure that 'Commerce was put on notice of the issue, and had an opportunity to resolve it." *Ellwood City Forge v. United States*, 600 F.Supp.3d 1281, 1293 (Ct. Int'l Trade 2022), citing *Trust Chem. Co. Ltd. v. United States*, 791 F.Supp.2d 1257, 1268, n. 27 (Ct. Int'l Trade 2011) and *Luoyang Bearing Corp. v. United States*, 347 F.Supp.2d 1326, 1352 (Ct. Int'l Trade 2004). That goal was met here, as Commerce's Preliminary Determination documents.

The courts have not required parties to have exhausted administrative remedies when doing so would have been futile. *Itochu, supra,* at 1146 ("a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, *i.e.*, where it is clear that additional filings with the agency would be ineffectual"); *Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ("futility applies in situations where plaintiffs would be required to go through obviously useless motions in order to preserve their rights"); *Bendure v. United States*, 554 F.2d 427, 431 (Ct. Cl. 1977).

In this case, TFA argued in its response to Commerce's Request for Additional Information that Commerce's deletion of the "not machined, not tooled, and not otherwise processed after forging" language from the investigation scope was evidence that rough fittings were subject to the *China Order*. Commerce rejected TFA's argument in the *PDM* – in terms so definitive that the Government repeats them in its brief. Nothing in the administrative record suggests that TFA could have introduced any new fact or argument that would have caused Commerce to reconsider its conclusion. No practical purpose would have been served by TFA engaging in the futile exercise of repeating its arguments in its Case Brief. Consequently, it would not be appropriate to decline to hear TFA's arguments on this issue.

**C.  The Petition's Discussion of Industry Standards Pertaining to CSBWPF Detracts from Any Evidence Supporting Commerce's Finding that the Essential Characteristics of CSBWPF Are Imparted By Sizing**

The substantial evidence cited by the Government as supporting Commerce's finding that the essential characteristics of CSBWPF are imparted by sizing is limited to: (1) language in the Petition tracing "the stages of integrated production" of CSBWPF which appears separately from the Petition's description of subject merchandise, and (2) a footnote to the ITC's Final Injury Report. *Gov't Br.* at 28, 29.  Any fair reading of these sources, however, demonstrates that neither sizing nor heat treatment are universally performed on all rough formed butt-weld pipe fittings, and neither source can reasonably be read as supporting Commerce's conclusion that these processes are "crucial."  *See TFA Br.* at 34-37.  Significantly undermining Commerce's conclusion, the Government concedes that "the record evidence underscores the pivotal role of the forming process" -- *i.e.*, forming a seamless pipe into a rough formed butt-weld pipe fitting -- "in shaping the fittings." *Gov't Br.* at 28, *citing IDM* at 22.

Moreover, Commerce's reading of the Petition was unreasonably selective.  The Department ignored the Petition's description of CSBWPF as "commodity type products, manufactured in conformity with industry standards as established by the American Society for Testing and Materials and the American National Standards Institute." PR Doc. 51, Ex.5, p. 4.[10] The Department further ignored attachments to CBP's covered merchandise referral which showed that the Vietnamese manufacturer of Norca's CSBWPF acquired Chinese-origin "unfinished products" that already met the ASTM A234 standard before being exported but

---

[10] Those standards are ASTM A234 for materials; ANSI 816.9 for dimensions.

which were not heat treated until after importation into Vietnam – evidence that Chinese-origin roughs were dedicated to use as CSBWPF and had acquired the essential characteristics of CSBWPF before heat treatment.[11]

This evidence that the forming process imparts the essential characteristics of CSBWPF was bolstered by record evidence that Commerce solicited in its Request for Additional Information. Commerce asked the parties to "explain whether fittings that have undergone the processing of stage one in China can be used for any purpose other than to be a unfinished or finished butt-weld pipe fitting." PR Doc. 37 at 2. Norca conceded that "The rough fitting that results from the first stage of the production process cannot be used for purposes other than to be an unfinished or finished butt-weld pipe fitting." PR Doc. 48 at 3. Domestic industry members also responded that forming cut pipe into the rough shape of a fitting dedicated the product to use as CSBWPF, PR Doc. 50 at 19-21, and cited as support (a) the ASTM standard, *id.* at 19-20 and n. 36, and one domestic manufacturer's standard terms sheet that requires any rough fittings which it purchases to be certified as meeting the ASTM standard. *Id.* at Ex. 3, ¶ 9 and Att. A. This evidence – which the Department solicited -- corroborates evidence in the Petition supporting the conclusion that forming pipe into an as-formed fitting imparts the essential character of CSBWPF.

_____

[11] *See* PR Doc. 12 at unpaginated pages 37, 52 and 54, showing (1) an "Unfinished products requisition" form issued by BW Fittings Co., Ltd. ("BW"), the Vietnamese manufacturer, describing the "material" that it was requisitioning from inventory, an unfinished 2" standard tee, as meeting ASTM A234; (2) a BW "product process flow card" showing the production of a 2" standard tee meeting ASTM A234, and indicating that the steps in the production "process" performed began with "heat treatment," and that "cutting" and "forming & rough machining" were not performed, and (3) a BW "Finished Product Warehouse Receipt" describing the "material" of the finished 2" standard tee as meeting ASTM A234. All three documents reference the same flow card number and purchase order number, thereby confirming that they pertain to the same pipe fitting.

**D. Commerce Fundamentally Misconstrued a Primary Source Document After Falsely Stating That Petitioners Provided Only an "Excerpt" from It**

Petitioners submitted a copy of a primary source document from the antidumping investigation in which a Commerce case analyst recounted his efforts to learn whether "any type of butt-weld pipe fittings are entered under HTS subheading 7307.99 as 'other' pipe fittings," if they had not been advanced after forging -- *i.e.*, whether a rough butt-weld fitting could be classified as a pipe fitting "other" than CSBWPF. PR Doc. 51 at Ex. 4. The conclusion of the government specialists whom the case analyst consulted was that rough butt-weld fittings could not be classified as "other" pipe fittings, thereby corroborating other record evidence that forming seamless pipe into the shape of a butt-weld pipe fitting imparts the essential characteristics of CSBWPF. *Id.*

Commerce falsely claimed that "Petitioners provided only an excerpt" of the memorandum *IDM* at 24, PR Doc. 83. *See TFA Br.* at 37-39. It speaks volumes about the nature of Commerce's analysis that the Government makes no attempt to defend Commerce's false claim.

Parroting the *IDM*, the Government contends that this primary source "contradicts the assertion that a fitting cannot be anything other than a subject butt-weld after the initial forming into its rough shape" because "a customs agent could distinguish unfinished butt-weld from unfinished threaded pipe fittings before either of those finishing processes occurs." *Gov't Br.* at 32. This conclusion is absurd. The only reasonable conclusion to be drawn from the ability of a customs agent to distinguish a butt-weld fitting from a threaded fitting after the rough was formed but before any subsequent processing is that forming dedicates the fitting to use as a butt-weld pipe fitting. Similarly, the memorandum author's observation that types of unfinished pipe fittings other than butt-weld pipe fittings could be classified under the HTS subheading for

"other" pipe fittings is merely the unremarkable observation that products that are not dedicated to use as CSBWPF would be classified under a different HTS subheading. This observation does not detract from the fact that the forming process dedicates a rough fitting to use a CSBWPF. Commerce's fundamental mischaracterization of the case analyst's memorandum is not, as the Government contends, a "mere disagreement" with TFA's interpretation of the memorandum. It is a fundamental mischaracterization of evidence that detracts from the *CMI*.

### E. The *Thailand Circumvention Determination* Expressly Stated That Chinese Origin Rough Fittings Are Within the Scope of the *China Order*

TFA's principal brief demonstrated that Commerce mischaracterized the 1994 determination in which the Department stated that Chinese-origin as-formed tee-shaped fittings that were exported to Thailand for heat-treatment and finishing were subject to the *China Order*,[12] and thereby failed to give appropriate consideration to a primary interpretive source that detracts from evidence supporting the *CMI*. *TFA Br.* at 39-44. The Government responds by repeating Commerce's mischaracterizations of the *Thailand Determination* and by ignoring the statutory authority underlying that determination.

The Government states that "Commerce did not find that the rough fittings themselves were butt-weld pipe fittings in unfinished form or that rough fittings were subject to the *Order*." *Gov't Br.* at 34. To the contrary, as discussed further below, Commerce did find that Chinese-origin rough fittings[13] were subject to the *China Order*. Having done so, there was no need for

---

[12] *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15155 (Dep't Commerce March 31, 1994) ("*Thailand Determination*").

[13] The respondent in the *Thailand Determination* confirmed that the merchandise subject to the inquiry comprised tee-shaped fittings that it imported from China into Thailand in "as-formed" condition, which "were not advanced beyond cold-forming" and had not been heat-treated prior to importation into Thailand. *Pet. 10/26 Ltr* at 7-9 PR Doc. 31; *Certain Carbon Steel Butt-Weld*

Commerce to conclude separately that rough fittings were butt-weld pipe fittings in unfinished form.

Notably, the Government avoids the actual language of the *Thailand Determination* in favor of Commerce's mischaracterizations of it. *See Gov. Brief* at 34-5, *citing IDM* at 25, 26. Contrary to Commerce's assertion in the *IDM*, which the Government cites as fact, neither the preliminary or final determinations in the *Thailand Circumvention Inquiry* refer to the Chinese-origin as-formed pipe fittings as "a material input" that must be further processed before it becomes a fitting in unfinished form that is subject to the *Order*. To the contrary, the *Thailand Determination* is explicit that the Chinese rough fittings at issue were both "unfinished 'as-formed' pipe fittings" and "merchandise subject to the antidumping duty order." *Thai Prelim* at 63.

The Government echoes Commerce's position that "to find that a product is circumventing an order, Commerce normally first determines that it is not subject to the scope of that order," *Gov't Br.* at 33-34, quoting *PDM* at 12. That argument is misdirected here for two reasons. First, it fails to acknowledge that the Department's conclusion that Chinese as-formed fittings were subject to the *China Order* was made in the context of a "third country completion or assembly" circumvention inquiry conducted pursuant to 19 U.S.C. §1677j(b). *Thailand Determination*, 59 Fed. Reg. at 15155. That statutory provision authorizes Commerce to include within the scope of an order "merchandise … of the same class or kind as any merchandise produced in a foreign country that is the subject of" an order which, "before importation into the

---

*Pipe Fittings From the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62, 63 (Dept Commerce Jan. 3, 1994) ("*Thai Prelim*"). Commerce referred to these fittings in the *CMI* as having been processed to the same degree as the Chinese merchandise at issue in Scenario 2 of the *CMI*, and the Government agrees that this comparison was appropriate. See *IDM* at 19 and 25 and *Gov. Brief* at 34, 35.

United States, … is completed or assembled in another foreign country *from merchandise which* …(i) *is subject to such order* … or … (ii) is produced in the foreign country with respect to which {the} order … applies." (emphasis added); *see Target Corp. v. United States,* 609 F.3d 1352, 1355 (Fed. Cir. 2010); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998).  The merchandise subject to the *Thailand Determination* was certain "pipe fittings finished in Thailand," described as "pipe fittings … which are exported in unfinished form from the PRC to Thailand, where some finishing is performed." 59 Fed. Reg. at 15156. Commerce found such merchandise to have been completed from the first of the two categories of merchandise set forth in 19 U.S.C. §1677j(b)(1)(B): merchandise which is itself subject to the order, *i.e.*, Chinese-origin butt-weld pipe fittings in unfinished form.  Commerce explained that "{t}he pipe fittings finished in Thailand and exported to the United States were completed from unfinished 'as-formed' pipe fittings manufactured in the PRC. Therefore, the merchandise exported to the United States is *completed from merchandise subject to the antidumping duty order and* produced in the country with respect to which the antidumping duty order applies." *Thai Prelim* at 63 (emphasis added).

Second, like the *IDM*, the Government relies on the general rule that "to find that a product is circumventing an order, Commerce normally first determines that it is not subject to the scope of that order," to argue, in effect, that the *Thailand Determination* could not have found Chinese-origin as-formed fittings to be subject to the *China Order* because it was a circumvention determination, and circumvention determinations do not apply to subject merchandise.  *Gov't Brief* at 33-34, *quoting Deacero S.A. de C.V. v. United States*, 817 F.3d 1332, 1337 (Fed. Cir. 2016); *citing Target* at 1355; *Wheatland Tube* at 1370; and 19 U.S.C. § 1677j.  Fatal to the Government's argument, the non-subject merchandise found to be

circumventing in the *Thailand Determination* was the *finished* CSBWPF exported from Thailand that was completed from as-formed butt-weld pipe fittings formed in China, not the Chinese origin as-formed fittings themselves.  *See Thailand Determination*, 59 Fed. Reg. at 15156 and 15158.  As such, the fact that the *Thailand Determination* concerned circumvention does not support Commerce's conclusion that Chinese as-formed fitting are not subject to the *China Order*.

The Government's assertion that Petitioners "tacitly concede{d} that rough fittings are not within the scope of the Order when they state{d} that parties could 'circumvent the Order merely by exporting rough {buttweld pipe fittings} from China,'" *Gov't Br.* at 35, *quoting PDM* at 12, takes Petitioners' statement out of context.  That would have been clear had Commerce or the Government included the next sentence, which expresses Petitioners' general concern about maintaining the efficacy of the *China Order*: "The ability to import CSBWPF made from Chinese-origin roughs without the assessment of antidumping duties would eviscerate the remedial effect of the *Order*, leaving Petitioners unprotected from unfairly priced merchandise." *Letter to Secretary of Commerce from Neville Peterson LLP*, dated March 17, 2023 at 2. PR Doc. 60.  Petitioners did not concede that rough butt-weld pipe fittings are not within the scope of the *China Order*.  The contention otherwise is baseless and further detracts from the *CMI*.

In short, by mischaracterizing the *Thailand Determination* and ignoring its statutory authority Commerce failed to give reasonable consideration to a primary interpretive source that detracts from the weight of the evidence supporting the CMI.

**CONCLUSION**

For the reasons set forth above and in their Memorandum in Support of Their Rule 56.2 Motion, Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. respectfully request this Honorable Court to grant their motion for judgment on the administrative record and the relief requested therein.

Respectfully submitted,

Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C.  20005
(202) 776-1150

July 1, 2024

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

This brief complies with the type-volume limitation of the United States Court of International Trade Standard Chambers Procedure 2(B)(1). The brief contains 6,896 words, excluding the parts of the brief exempted by the Standard Chambers Procedures.

/s/ Lawrence J. Bogard
Lawrence J. Bogard
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005

Dated: July 1, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that copies of the attached Reply Brief of Consolidated Plaintiffs Tube

Forgings of America, Inc. and Mills Iron Works, Inc. was this day served by electronic service

through the Court's CM/ECF system on the following:

Anne Marie Delmare, Esq.
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Jeremy W. Dutra, Esq.
Squire Patton Boggs (US) LLP
2550 M Street, N.W.
Washington, D.C.   20037

Jared Michael Cynamon, Esq.
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 4610
Washington, DC 20230

Dated: July 1, 2024                    /s/ *John B. Totaro, Jr.*
                                            John B. Totaro, Jr.