Slip Op. 25-1

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.,** | |
| **Consolidated Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Jennifer Choe-Groves, Judge** |
| **Defendant,** | **Consol. Court No. 23-00231** |
| **and** | |
| **NORCA INDUSTRIAL COMPANY, LLC AND INTERNATIONAL PIPING & PROCUREMENT GROUP, LP,** | |
| **Consolidated Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final scope ruling in a covered merchandise scope referral request that certain carbon steel butt-weld pipe fittings produced using fittings from China that underwent subsequent production in Vietnam are excluded from the scope of the antidumping order on carbon steel butt-weld pipe fittings.]

Dated: January 2, 2025

Lawrence J. Bogard and John B. Totaro, Jr., Neville Peterson, LLP, of Washington, D.C., for Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc.

L. Misha Preheim, Assistant Director, and Anne M. Delmare, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was Jared Michael Cynamon, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.  Also of counsel was Ruslan N. Klafehn, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jeremy W. Dutra, Squire Patton Boggs (US) LLP, of Washington, D.C., for Defendant-Intervenors Norca Industrial Company, LLC and International Piping & Procurement Group, LP.

Choe-Groves, Judge: This case raises an issue of first impression regarding the Court's jurisdiction—specifically whether a challenge to a covered merchandise scope referral is moot after an investigation under the Enforce and Protect Act ("EAPA") has already been resolved and finally adjudicated.  For the reasons discussed below, the Court holds that it has jurisdiction.

Plaintiffs argue that more than 30 years after the antidumping duty order for carbon steel butt-weld pipe fittings went into effect, Commerce suddenly changed course in 2023 by deciding that "rough fittings," which are cut to length pipe in the form of elbows, tees, or reducers, were no longer included in the antidumping duty order, and only products that are heat-treated and processed were in scope.  For the reasons discussed below, the Court remands the covered merchandise scope

referral determination by the U.S. Department of Commerce ("Commerce") for further explanation or reconsideration.

The EAPA investigation resulted in a negative evasion determination that was sustained by this Court in a separate litigation.  In the covered merchandise scope referral that is the focus of this case, Commerce determined that "rough fittings" purchased in the People's Republic of China ("China") were not "unfinished" products within the scope of the antidumping order, and only became equivalent to in-scope "unfinished" products after further processing in the Socialist Republic of Vietnam ("Vietnam").  Thus, Commerce determined that the subject merchandise ("rough fittings" in the form of elbows, tees, or reducers) were out of scope.  The domestic manufacturers here challenge Commerce's covered merchandise scope referral determination, arguing that the products should be considered within the scope of the antidumping order.

Consolidated Plaintiffs Tube Forgings of America, Inc. ("Tube Forgings of America") and Mills Iron Works, Inc. ("Mills Iron Works") (collectively, "Plaintiffs" or "Tube Forgings") filed a Complaint in Court No. 23-00236[1]

---

[1]  Three complaints were filed in Court No. 23-00231, Court No. 23-00232, and Court No. 23-00236, which were consolidated into the above-captioned Consolidated Court No. 23-00231.  Subsequently, this Court dismissed the complaints in Court No. 23-00231 and Court No. 23-00232, leaving pending only the complaint in Court No. 23-00236 under Consolidated Court No. 23-00231.

pursuant to 19 U.S.C. § 1675, contesting the final covered merchandise referral

determination of Commerce that Chinese-origin "rough fittings" that undergo the

second and third stages of production in Vietnam are not subject to the scope of the

antidumping order on butt-weld pipe fittings from China.  See Certain Carbon

Steel Butt-Weld Pipe Fittings from People's Republic of China ("Final

Determination"), 88 Fed. Reg. 69,909 (Dep't of Commerce Oct. 10, 2023) (final

determ. covered merchandise inquiry) and accompanying Decision Memorandum

for Final Results of Covered Merchandise Inquiry ("Final IDM"), PR 83[2]; see also

Antidumping Duty Order and Amendment to Final Determination of Sales at Less

Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's

Republic of China, 57 Fed. Reg. 29,702 ("Order") (Dep't of Commerce July 6,

1992).

Before the Court is Plaintiffs' Rule 56.2 Motion for Judgment on the

Record.  Rule 56.2 Mot. [Consol. Pls.'] J. Agency R. ("Plaintiffs' Motion"), ECF

Nos. 23, 24; Mem. Supp. Mot. [Consol. Pls.'] J. Upon Admin. R. ("Pls.' Br."),

ECF Nos. 23, 24.  Defendant United States ("Defendant") filed Defendant's

Response to Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the

Agency Record.  Def.'s Resp. Consol. Pls.' Rule 56.2 Mot. J. Agency R. ("Def.'s

---

[2]  Citations to the administrative record reflect the public record ("PR"), ECF No.
36.

Resp."), ECF No. 30.  Consolidated Defendant-Intervenors Norca Industrial

Company, LLC ("Norca") and International Piping & Procurement Group, LP

("IPPG") (collectively, "Defendant-Intervenors") filed Defendant-Intervenors'

Response to Consolidated Plaintiffs' Motion for Judgment on the Agency Record.

Def.-Intervs.' Resp. Consol. Pl.'s Mot. J. Agency R. ("Def.-Intervs.' Resp."), ECF

No. 29.  Plaintiffs filed their reply brief.  Reply Mem. [Consol. Pls.] ("Pls.'

Reply"), ECF No. 38.

Oral argument was held on September 4, 2024.  Oral Arg. (Sept. 4, 2024),

ECF No. 41.  The Court ordered supplemental briefing regarding a jurisdictional

challenge raised by the Government during oral argument.  Order (Sept. 5, 2024),

ECF No. 42; Suppl. Br. Consol. Def.-Intervs. ("Def.-Intervs.' Suppl. Br."), ECF

No. 44; Def.'s Suppl. Br., ECF No. 45; Suppl. Resp. Br. Consol. [Pls.] ("Pls.'

Suppl. Br."), ECF No. 46.

For the following reasons, the Court remands the <u>Final Determination</u>.

## BACKGROUND

### Legal Framework for Scope Determination

The descriptions of merchandise covered by the scope of an antidumping or

countervailing duty order must be written in general terms, and questions may arise

as to whether a particular product is included within the scope of an order.  <u>See</u> 19

C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it

to issue scope rulings that clarify whether the product is in scope.  Id.  Although

there are no specific statutory provisions that govern Commerce's interpretation of

the scope of an order, Commerce is guided by case law and agency regulations.

See Meridian Prods., LLC v. United States, ("Meridian Products"), 851 F.3d 1375

(Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  See, e.g.,

OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  Id.  If the

language is ambiguous, however, Commerce interprets the scope with the aid of

the sources set forth in 19 C.F.R. § 351.225(k)(1).  Meridian Prods., 851 F.3d at

1382.  If the (k)(1) sources do not dispositively answer the question, Commerce

may consider the (k)(2) factors under 19 C.F.R. § 351.225(k)(2).  Id.

Commerce may consider the following interpretive sources under 19 C.F.R.

§ 351.225(k)(1) to determine whether merchandise is covered by the scope of an

order:

(A)   The descriptions of the merchandise contained in the petition
        pertaining to the order at issue;

(B)   The descriptions of the merchandise contained in the initial
        investigation pertaining to the order at issue;

(C)   Previous or concurrent determinations of the Secretary,
        including prior scope rulings, memoranda, or clarifications

        pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

(D)    Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1)(i).

    Secondary interpretive sources include any other determinations of the Secretary or the Commission not identified above, rulings or determinations by U.S. Customs and Border Protection ("Customs"), industry usage, dictionaries, and any other relevant record evidence. Id. § 351.255(k)(1)(ii). If there is a conflict between these secondary interpretive sources and the primary interpretive sources of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue. Id.

    It is well-established that "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce 'interpret' an order in a manner contrary to its terms." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001). When a party challenges a scope determination, the Court must determine whether the scope of the order "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco Steel, Inc. v. United States ("Duferco"), 296 F.3d 1087, 1089 (Fed. Cir. 2002).

## Plain Language of the Scope Order

The scope language of the <u>Order</u> in this case states in relevant part:

> The products covered by this order are carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings). Carbon steel butt-weld pipe fittings are currently classified under subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS). Although the HTS subheading is provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.

<u>Order</u>, 57 Fed. Reg. at 29,702.

Commerce defined the subject merchandise at issue as "rough and unfinished fittings originating in China and processed into butt-weld pipe fittings through two production scenarios in Vietnam," with the first production scenario involving "Chinese-origin unfinished butt-weld pipe fittings [that] undergo the final stage (*i.e.*, finishing processes) of three production stages in Vietnam" and the second production scenario involving "Chinese-origin rough butt-weld pipe fittings [that] undergo the second and third stages of production in Vietnam."  Final IDM at 3.

## Administrative Proceedings and Procedural History

### EAPA Litigation

In a separate litigation, Norca Industrial Company, LLC et al. v. United States, Consol. Court No. 21-00192 ("EAPA Litigation"), this Court sustained a negative evasion determination under the EAPA, 19 U.S.C. § 1517. Norca Indus. Co. v. United States ("Norca II"), 48 CIT __, 680 F. Supp. 3d 1343 (2024). The EAPA Litigation concerned potential evasion of the Order by Defendant-Intervenors Norca and IPPG, importers of butt-weld pipe fittings from Vietnam. See Norca Indus. Co., LLC et al. v. United States, Consol. Court No. 21-00192.

During the underlying EAPA investigation, Customs issued a covered merchandise referral request to Commerce. Customs' Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP: Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Covered Merchandise Referral Request") (Sept. 6, 2022), PR 7.

After Commerce published its final determination in the covered merchandise referral, Customs made a negative evasion determination in the EAPA Litigation, which this Court sustained in a final judgment issued on February 7, 2024. Norca II, 48 CIT __, 680 F. Supp. 3d at 1346; Order (Feb. 7,

2024), ECF No. 64.  The deadline to appeal the final judgment expired on April 8,

2024.  No party filed an appeal and then the entries were liquidated.

### Covered Merchandise Referral Request

In the Covered Merchandise Referral Request that is at issue in this case,

Customs stated that the record showed contradicting information provided by

Norca and BW Fittings, and described the production of Norca's and IPPG's

carbon steel butt-weld pipe fittings as involving three stages of production:

1. Converting seamless pipe into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process;

2. Reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to; and

3. Undergoing finishing processes such as shot blasting or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting.

Covered Merchandise Referral Request at 3–4.

Norca claimed that its merchandise exported by BW Fittings into the United

States underwent at least the second and third stages of production in Vietnam, and

that the rough fittings imported by BW Fittings from China were not "unfinished"

carbon steel butt-weld pipe fittings covered by the Order.  Id. at 4.  However, BW

Fittings reported that it phased in its production capabilities for carbon steel butt-

weld pipe fittings.  Id.  BW Fittings reported that production records demonstrated

that in some cases, it performed only the third stage of production, while in other

cases, it performed both the second and third stages of production.  Id.  Customs requested that Commerce determine whether Norca's and IPPG's "Chinese-origin rough fittings" purchased from BW Fittings were covered by the Order in two scenarios: (1) Chinese-origin rough fittings that only underwent the third stage of production (*i.e.,* finishing processes) in Vietnam and (2) Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam. Id.

Commerce issued a preliminary covered merchandise determination on June 23, 2023, in which it determined that "rough butt-weld pipe fittings from China that are processed in Vietnam into finished butt-weld pipe fittings in the final two stages of production are not subject to the scope of the Order" and "that unfinished butt-weld pipe fittings from China that are processed in Vietnam into finished butt-weld pipe fittings are subject to the scope of the Order." Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Preliminary Determination"), 88 Fed. Reg. 41,075 (Dep't of Commerce June 23, 2023) (preliminary results of covered merchandise inquiry) and accompanying Decision Memorandum for Preliminary Results ("PDM"), PR 63, 66.

On October 10, 2023, Commerce issued its final covered merchandise determination, explaining that a "rough fitting" is merely a material input used in the production of an unfinished fitting and does not become covered merchandise

Consol. Court No. 23-00231                                                    Page 12

(or an unfinished fitting) until after the second stage of production.  Final Determination, 88 Fed. Reg. 69,909.  Commerce continued to determine that "rough butt-weld pipe fittings from China that undergo the second and third stages of production in Vietnam are not subject to the scope of the Order."  Final IDM at 27.

On November 1, 2023, Norca filed this action pursuant to 28 U.S.C. § 1581(c) contesting certain aspects of Commerce's Final Determination.  See Compl., ECF No. 6.  On January 9, 2024, this Court consolidated the three cases. Order (Jan. 9, 2024), ECF No. 22.  This Court later granted Norca's and IPGG's motions to voluntarily dismiss their complaints.  See Order (Mar. 18, 2024), ECF Nos. 27, 28.  Plaintiffs remained as Consolidated Plaintiffs, whereas Norca and IPPG remained as Consolidated Defendant-Intervenors in this suit (and were dismissed as Plaintiffs when their complaints were dismissed).

## JURISDICTION AND STANDARD OF REVIEW

The Court of International Trade ("CIT") has subject matter jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi), and 28 U.S.C. § 1581(c).  The Court will hold unlawful "any determination, finding, or conclusion [that] is unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Article III of the U.S. Constitution limits federal courts to hearing actual, ongoing "cases" and "controversies."  U.S. CONST. art. III, § 2, cl. 1 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, [or] the Laws of the United States . . . [and] to Controversies to which the United States shall be a Party.").  An actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.  Davis v. FEC, 554 U.S. 724, 732–33 (2008).

The Court acknowledges that the prior EAPA Litigation became final when this Court issued a judgment in that case.  Thus, any decision from this Court in the covered merchandise scope ruling would not affect the outcome of the EAPA Litigation, and there are no longer entries that can be affected by a decision from this Court, which raises mootness concerns.

Norca and IPPG argue that this covered merchandise scope referral case is moot because the Court entered final judgment in the EAPA Litigation, which is no longer a live controversy, and the scope referral inquiry only exists to address the specific question asked by Customs in the EAPA Litigation.  Def.-Intervs.' Suppl. Br. at 3–5.  Norca and IPPG assert that a "ruling in this case on the scope of the [Order] would be purely hypothetical, divorced from any factual dispute capable of being remedied.  The absence of a live issue renders this action moot, thus depriving this Court of subject matter jurisdiction."  Id. at 5.  Norca and IPPG

contend that Plaintiffs could instead file a new petition for an antidumping duty investigation or could request that Commerce initiate a scope inquiry or a circumvention inquiry, in order to address whether finished carbon steel butt-weld pipe fittings manufactured in Vietnam using Chinese-origin rough parts are subject to the Order.  Id.

The Court disagrees, however, with Defendant-Intervenors' arguments regarding mootness because harm is still possible if the covered merchandise referral determination is relied upon by Commerce in future proceedings, as discussed below, and thus a live case or controversy still exists.

As an initial matter, the Government notes correctly that the issue "whether a plaintiff maintains constitutional standing in a case challenging a covered merchandise determination after the underlying EAPA case that gave rise to the covered merchandise determination has reached judgment and the entries have been liquidated appears to be an issue of first impression before this Court."  Def.'s Suppl. Br. at 4.  The Government states that both "the EAPA and covered merchandise inquiries under 19 C.F.R. § 351.227 involve relatively new regulatory schemes."  Id.

The Government explains that 19 C.F.R. § 351.225(k), which describes the substantive basis for Commerce's scope rulings, was revised in 2021.  Id.  One (k)(1) source that Commerce may rely on as a primary source pursuant to 19

C.F.R. § 351.225(k) is a previous or concurrent Commerce scope determination

pertaining to both the order at issue and other orders with same or similar

language.  Id. at 5.  Significantly, the Government notes that:

> The language in 19 C.F.R. § 351.225(k)(1) does not delineate or limit
> Commerce's consideration of prior scope determinations based on the
> origination of the scope determination (*i.e.*, a referral arising from an
> EAPA investigation or a scope ruling application from an interested
> party). . . .  Thus, going forward, Commerce may consider this scope
> determination—like any other scope determination made by
> Commerce—as a primary interpretive source pursuant to 19 C.F.R.
> § 351.225(k)(1).

Id.  In other words, the Government explains in its supplemental brief on

jurisdiction that Commerce will treat the covered merchandise scope referral ruling

in the same substantive manner as a scope ruling application.  The significance is

that the covered merchandise scope referral ruling can be relied on by Commerce

in future scope proceedings involving all imports of butt-weld pipe fittings, and

thus a litigant's rights could be affected by the covered merchandise scope referral

ruling.

Plaintiffs frame the issue in terms of injury.  As discussed in their

supplemental brief on jurisdiction, Plaintiffs maintain an "interest in preventing the

unlawful Covered Merchandise Determination at issue here from serving as a

primary—indeed, governing—interpretive source for any interpretation of the

[Order's] scope and to maintain the scope of the [Order] consistent with its

unambiguous scope language and Petitioner's intent." Pls.' Suppl. Br. at 2. Tube

Forgings explains further that "the controversy here concerns Commerce's scope

ruling that [Tube Forgings] contends is unlawful and deprives the domestic butt-

weld fittings industry of the full, intended protection of the [Order]. That

controversy is very much alive." Id. at 3.

 The Court agrees with the Government and Plaintiffs that this case is not

moot because the Government has indicated that Commerce intends to rely on the

covered merchandise scope ruling as a primary interpretative (k)(1) source in

future scope cases affecting all imports of butt-weld pipe fittings. Thus, the issue

whether Commerce's covered merchandise scope ruling is in accordance with law

and supported by substantial evidence is still a live issue. The Court concludes that

the challenge to the covered merchandise scope ruling, despite the conclusion of

the underlying EAPA investigation, is still a live case or controversy for Article III

jurisdiction, and therefore the Court will consider the merits.

## DISCUSSION

 Whether an ambiguity exists in an antidumping order is a question of law

that the Court considers de novo. Meridian Prods., 851 F.3d at 1382. The plain

scope language "carbon steel butt-weld pipe fittings in either finished or unfinished

form" does not mention "rough fittings" that were further processed, which were

the products identified by Customs in the covered merchandise scope referral

request.  The scope language also does not define what "unfinished" means, nor does the scope language provide a definition for "butt-weld pipe fittings."

Thus, because the plain scope language does not mention the subject merchandise that were the focus of the covered merchandise scope referral, the Court concludes that the scope language is ambiguous with respect to whether "unfinished" fittings include further processed "rough fittings," and is also ambiguous as to what the definition of "unfinished" fittings means.

At the heart of this case is the distinction between "rough," "unfinished," and "finished" fittings, as well as the fundamental question of what is a "butt-weld pipe fitting."

Plaintiffs contend that the language of the Order "states plainly that it applies to *all* pipe fittings that are sufficiently formed as to be identifiable as such, regardless of the extent to which they may have been processed toward completion."  Pls.' Br. at 18.  Plaintiffs assert that "nothing in the [Order's] scope language supports Commerce's division of 'butt-weld pipe fittings in unfinished form' into subcategories based on the extent to which they have been processed to completion."  Id. at 20.

Commerce identified the relevant questions as whether a "rough fitting" is the same as an "unfinished fitting" (which Commerce viewed as subject to the Order), or whether a "rough fitting" is instead simply a precursor product before

becoming an "unfinished fitting" (which Commerce viewed as outside the scope of the <u>Order</u>).  Final IDM at 17.  Commerce determined that the latter was the case, which Tube Forgings challenges here in this litigation.

The Court directs Commerce on remand to answer the fundamental question whether a "rough fitting," also known as a pipe that has been formed into the rough shape of an elbow, tee, or reducer, is identifiable as a "butt-weld pipe fitting," which follows the language in the <u>Order</u>.  Commerce may continue to examine whether a "rough fitting" is an "unfinished" fitting, but must also answer the more relevant and direct question whether a "rough fitting" is identifiable as a "butt-weld pipe fitting."

The questions referred by Customs to Commerce in the covered merchandise scope referral focused on the production continuum from raw seamless pipe being transformed into "unfinished" and "finished" products, following three production stages:

1.  Converting seamless pipe into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process;

2.  Reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to; and

3.  Undergoing finishing processes such as shot blasting or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting.

Covered Merchandise Referral Request at 3–4; Final IDM at 3.

Commerce determined that "rough fittings" and "unfinished fittings" were distinct and separate. Final IDM at 19. Specifically, Commerce determined that an unfinished fitting that underwent the first and second production stages in China (first, converting seamless pipe; and second, reforming/sizing, as noted above) was covered by the scope of the <u>Order</u>, and was not removed from the <u>Order</u> when the third production stage (undergoing finishing processes) took place outside of China in Vietnam. <u>Id.</u> Commerce also determined that a "rough fitting" was a fitting that only underwent the first stage of production (converting seamless pipe) and was not covered by the <u>Order</u> when exported from China. <u>Id.</u> Commerce explained that the "rough fitting," which only underwent the first stage of production (converting seamless pipe), was a mere "material input" (*i.e.,* precursor) and was not considered an "unfinished fitting" subject to the <u>Order</u>. <u>Id.</u>

Plaintiffs challenge Commerce's determination that "rough fittings" that were further processed in Vietnam are not covered by the <u>Order</u>. Pls.' Br. at 18–24, 44; Pls.' Reply at 3–10; <u>see also</u> Pls.' Br. at 18 ("[The <u>Order</u>] unambiguously . . . covers 'carbon steel butt-weld pipe fittings in either finished or unfinished form' without limitation or qualification" and "states plainly that it applies to all pipe fittings that are sufficiently formed as to be identifiable as such, regardless of the extent to which they may have been processed toward completion.").

Plaintiffs argue that the scope language "clearly establishes that any Chinese-origin merchandise identifiable as a butt-weld pipe fitting is subject to the Order without regard to the degree to which it might have been processed toward being a finished product."  Pls.' Br. at 24.  Plaintiffs assert that "a product is identifiable as a butt-weld pipe fitting when it has been formed into the rough shape of, for example, an elbow, tee, or reducer because, once it is formed, it is dedicated to use as a butt-weld pipe fitting and has no other use."  Id.

The Court does not agree with Plaintiffs that the scope language is plain and unambiguous as to what is meant by "unfinished" fittings.  The Order does not define "unfinished" or "butt-weld pipe fittings."  Plaintiffs' own argument, that a product is identifiable as a butt-weld pipe fitting when it has been formed into the rough shape of an elbow, tee, or reducer, is not clearly demonstrated based on the plain language of the Order.  The Order merely states that "products covered by this order are carbon steel butt-weld pipe fittings, . . . imported in either finished or unfinished form."  Order, 57 Fed. Reg. at 29,702.  It is not clear based on this plain language whether "unfinished" form or "butt-weld pipe fittings" includes products that have been formed into the rough shape of an elbow, tee, or reducer, as Plaintiffs contend.  Therefore, the Court concludes that the language in the Order is ambiguous.

Although Commerce did not describe the scope language as ambiguous, Commerce expressed confusion with the plain language of the Order in its scope determination.  For example, while Commerce acknowledged that unfinished butt-weld pipe fittings were covered under the scope, it sought to define "what constitutes an 'unfinished butt-weld pipe fitting' in the first instance."  Final IDM at 17 (Commerce stated that, "[t]he salient question is not whether unfinished butt-weld pipe fittings are within the scope (they are), but rather what constitutes an 'unfinished butt-weld pipe fitting' in the first instance.  Is a rough fitting the same as an 'unfinished fitting'?  Or is it instead simply a precursor product?  The scope is silent on this point.").  Commerce disagreed that "the phrase 'butt-weld pipe fittings . . . in either finished or unfinished form,' plainly establishes that all merchandise identifiable as a butt-weld pipe fitting is subject merchandise regardless of the degree to which it might be processed."  Id.  Commerce determined that it was necessary to consider the (k)(1) primary and secondary interpretative sources to answer the referred scope inquiry.  See id.

As noted above, the Court concludes that the scope language is ambiguous as to the definition of an unfinished butt-weld pipe fitting.  It is well-settled that when scope language is ambiguous, Commerce may interpret the scope with the aid of the sources set forth in 19 C.F.R. § 351.225(k)(1).  Meridian Prods., 851 F.3d at 1382.  Because the scope language is ambiguous with respect to whether

further processed rough fittings were included in "unfinished" products,

Commerce's examination of the (k)(1) sources was in accordance with law.

As discussed more fully below, the Court remands Commerce's

determination as not in accordance with law on other grounds and unsupported by

substantial evidence.  Commerce may examine the (k)(1) sources on remand if

Commerce continues to take the position that the Order is ambiguous.  The Court

recognizes, however, that it is possible on remand that Commerce may change its

determination and conduct its analysis based on the plain language of the Order.

### Use of Interpretative Sources Under 19 C.F.R. § 351.225(k)(1)

The Court next turns to the question whether Commerce's determination

was supported by substantial evidence of the (k)(1) sources.

### Petition

Commerce reviewed descriptions of the merchandise contained in the

Petition pertaining to the Order at issue, which is a permissible (k)(1) source.  19

C.F.R. § 351.225(k)(1)(i)(A)–(B); Petitioners' CMI Questionnaire Resp. at Ex. 5

("Petition").  For purposes of the covered merchandise inquiry, Commerce

determined that the terms "rough fitting" and "unfinished fitting" are distinct and

separate, as well as "crucial" to its determination because "consistent terminology

is necessary in discussing the distinction between the different stages of

production."  Final IDM at 19.

In the covered merchandise scope ruling, Commerce cited the Petition for descriptions of the three-step production process of butt-weld pipe fittings, which mirrored the three production stages set forth in the Covered Merchandise Referral Request.[3]  Commerce defined each type of "fitting" with its corresponding production stage: a "rough fitting" only underwent the first production stage, an "unfinished fitting" underwent both the first and second production stages, and a "finished fitting" underwent all three stages of production.  See Final IDM at 18– 27; PDM at 9–12.[4]

The Court observes that the Petition does not mention the term "rough fitting," which detracts from Commerce's determination that the Petition defines "rough fitting" as a product that only underwent the first production stage. Commerce must address this issue on remand.

---

[3]  Commerce may look to the descriptions of the production process in its scope analysis.  See Valeo N. Am., Inc. v. United States, 610 F. Supp. 3d 1322, 1339 (2022).

[4]  An unfinished fitting is "a fitting that has undergone production stages one and two and is covered by the scope of the Order when it is exported from China and is not removed from the Order when it undergoes finishing processes in Vietnam." Final IDM at 19.  A "rough fitting" is "a fitting that has only undergone the first stage of production and is not covered by the scope of the Order when exported from China."  Id.  "Rough fitting" means "a product that has undergone the first stage of production but not the second and third stages; however, this product is a material input to the production of unfinished and finished fittings, not an unfinished fitting in its own right."  Id. at 19–20.

In the Final IDM, Commerce explained that the Petition discussed the reforming process as "necessary," the importance of heat treatment and the coining process, and the difference between an unfinished "tee" or unfinished "reducer." Final IDM at 23 (citing Petition at 5–6).

The Court observes that the Petition discussed the production process leading up to an "unfinished" pipe fitting, starting when:

> In integrated operations, producers begin with seamless pipe as their raw material and perform both forming and machining operations. . . . The stages of integrated production can be traced as follows: Where "elbows" (typically 90° or 45°) are concerned, the pipe is first cut to the proper length. The pipe is lubricated internally, and fastened onto a draw bench where it is heated until it is soft and then pushed over a mandrel. . . . The bent pipe drops off the mandrel and is examined for correctness of size and shape. Often, the bent pipe must undergo a "reforming" or "coining" operation in which it is placed in a vertical/horizontal press and subjected to great pressure, bending the pipe slightly to achieve "true" circularity of its cross section and precise outside diameter. The operation is necessary to ensure that the fitting will match the pipe to which it is attached. Fittings that are formed at a temperature under 1,200°F or above 1,800°F must also undergo heat treatment which relieves stress build-up within the fitting during the forming process. After these processes, the bent pipe is considered to be an unfinished "elbow."

Petition at 5–6. The Petition demonstrates that the second stage of production, which involves reforming or sizing the rough fitting, is significant because it is at this stage that the fitting will match the pipe to which it will be welded. Id.

The Court observes that notwithstanding the Petition's lack of using the term "rough fitting," the Petition tends to support Commerce's determination that only

after the raw metal pipe undergoes the first production stage (converting seamless pipe, cutting to the proper length) and the second production stage (hot- or cold-forming, reforming/sizing), it then becomes an "unfinished" product. Id. at 5–7. By describing the production process starting from raw material, then cutting, hot- or cold-forming, and reforming or sizing to match the pipe it is destined to be welded to, the Petition articulates an intent that a product becomes an "unfinished" pipe only after undergoing this process. Id.

On remand, Commerce should address the Petition's lack of reference to the term "rough fitting," and should analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting.

### ITC Report

Commerce reviewed descriptions of the merchandise contained in the ITC Report pertaining to the Order at issue, which is a permissible (k)(1) source. 19 C.F.R. § 351.225(k)(1)(i)(A)–(B); see also Petitioners' CMI Questionnaire Resp. at Ex. 7 ("ITC Report"), PR 51. The Court observes that the ITC Report does not describe the production process as clearly as the Petition, nor does the ITC Report state that only after completing production stages one and two does a product become an unfinished pipe fitting. The ITC Report merely recognizes that "[m]ost of the domestic industry uses pipe as the starting material to produce reducers, tees,

and elbows." ITC Report at I-7. The ITC Report states that "[t]he domestic industry includes integrated producers and combination producers. Integrated producers generally begin with seamless pipe as their raw material and perform both forming and machining operations. Combination producers produce some fittings in an integrated process and other fittings in a conversion process." Id. at I-10.

The term "rough" appears only once in the ITC Report when referencing "rough-formed unfinished fittings." The exact sentence reads: "The combination producers Hackney, Tube Forgings, Tube-Line, and Weldbend purchase and/or import rough-formed unfinished fittings which they bevel, bore, taper, grind, shot blast, die stamp, inspect, and paint." Id.

The Court observes that this language in the ITC Report does not directly support Commerce's determination because it indicates that rough-formed carbon steel pipes are unfinished fittings that are later processed. The ITC Report does not confirm Commerce's determination that only after carbon steel pipes are cut, then heat-treated and sized/formed, are they then considered to be unfinished butt-weld pipe fittings. The Court concludes that the ITC Report does not support Commerce's determination that only after the second production stage, or the sizing and reforming operations, is a carbon steel product identifiable as a butt-

weld pipe fitting that is within the scope of the <u>Order</u>.  <u>See</u> Final IDM at 26–27

(citing ITC Report at I-10).

### Exhibit 6 of the Petitioner's CMI Questionnaire Response

Commerce may look at previous or concurrent determinations of the

Secretary, including prior scope rulings, memoranda, or clarifications pertaining to

both the order at issue, as well as other orders with same or similar language as that

of the order at issue.  19 C.F.R. § 351.225(k)(1)(i)(C).

Plaintiffs argue that Commerce misconstrued contrary record evidence that

detracted from its determination.  Pls.' Br. at 30–31; Pls.' Reply at 12–15.  For

example, Plaintiffs assert that Exhibit 6 of the Petitioner's CMI Questionnaire

Response provides contrary evidence to Commerce's determination that "rough

fittings" are not unfinished fittings.  <u>See</u> <u>id.</u>

Attached to Exhibit 6 is a memorandum from Commerce, titled "Request for

Clarification of Scope: Federal Registrar Notices of Initiation of Certain Carbon

Steel Butt-Weld Fittings from China and Thailand," responding to the original

petitioners' request to clarify the scope language in the Notice of Initiation.  <u>See</u>

Petitioner's CMI Questionnaire Resp. at Ex. 6; <u>Certain Carbon Steel Butt-Weld</u>

<u>Pipe Fittings from the People's Republic of China</u>, 56 Fed. Reg. 27,730 (Dep't of

Consol. Court No. 23-00231                                    Page 28

Commerce June 17, 1991) (initiation of antidumping duty investigation) ("Notice of Initiation").[5]

The preliminary Notice of Initiation had language excluding unfinished fittings that were not processed, with the sentence having read, "unfinished butt-weld pipe fittings that are not machined, not tooled and not otherwise processed after forging are not included in the scope of this investigation." The final version of the Notice of Initiation deleted that sentence excluding unprocessed fittings. See Notice of Initiation.

> The products covered by this investigation are carbon steel butt-weld pipe fittings, having an inside diameter of less than 360 millimeters (14 inches) imported in either finished or unfinished form. *Unfinished butt-weld pipe fittings that are not machined, not tooled and not otherwise processed after forging are not included in the scope of this investigation.* These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings).

Notice of Initiation, 56 Fed. Reg. at 27,730 (emphasis added).

When Commerce included the language in the preliminary Notice of Initiation, the original petitioners objected, arguing that their "intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished." PDM at 11.

---

[5] Commerce did not issue an amended Notice of Initiation. See Petitioner's CMI Questionnaire Resp. at Ex. 6.

The Parties dispute the significance of the exclusion language regarding
unfinished, unprocessed products that was removed from the investigation.
Plaintiffs argue that Commerce's deletion demonstrates that the <u>Order</u> was
intended to cover all carbon steel butt-weld pipe fittings, and the <u>Order</u> was
intended to cover rough fittings that were not processed.[6]  <u>See</u> Pls.' Br. at 30–31;
Pls.' Reply at 12–15.  Defendant counters that the meaning of removing the deleted
language is ambiguous and does not demonstrate Commerce's and the original
petitioners' clear intent to include "rough fittings" in the scope of the <u>Order</u>.

Defendant argues that: (1) Commerce disagreed that its removal of certain
language from the Notice of Initiation scope was intended to cover rough fittings in
the Preliminary Determination, and one could reasonably infer that the deletion of
the language was "unnecessary to the proper administration of the scope and may
have merely added confusion to it"; and (2) the petitioners to the original Notice of
Initiation would not have approved of the scope language if they had such clear
intent to cover "rough fittings."  Def.'s Resp. at 25–26.

---

[6]  Contrary to Defendant's assertion, this argument is not waived because Plaintiffs
had argued that Commerce's revision of the investigation's scope was evidence
that "rough fittings" were subject to the <u>Order</u> during the administrative
proceedings, and Commerce responded to their argument in the Preliminary
Determination.  <u>See</u> PDM at 11.

The Court concludes that the (k)(1) source of the deleted language in the

Order does not weigh in favor of either Commerce's or Plaintiffs' interpretations.

Commerce did not provide an explanation at the time it deleted the reference to

unprocessed products from the Order, so it is unclear what significance the Court

can read into the deleted language at this point. The deleted language in the (k)(1)

source of Exhibit 6 neither supports nor undermines Commerce's determination.

### Declarations from Domestic Industry Executives

Commerce may consider secondary interpretative sources such as "industry

usage" or "any other relevant record evidence." 19 C.F.R. § 351.255(k)(1)(ii).

Plaintiffs contend that "it bears observing that the [Order] has been in effect

for more than 30 years without any confusion about whether "rough" butt-weld

fittings were covered by the Order. . . . As the sworn declarations of members of

the industry demonstrate, . . . no one in the [carbon steel butt-weld pipe fittings]

industry has ever been confused about whether rough fittings are butt-weld pipe

fittings in unfinished form." Pls.' Br. at 23.

Plaintiffs argue that Commerce did not properly consider contrary evidence

on the record of declarations from domestic industry executives stating that

"rough," "as formed," and "unfinished" fittings are, or have been, used

interchangeably in the butt-pipe weld pipe fittings industry.[7]  Pls.' Br. at 29;

Petitioners' CMI Questionnaire Resp. at Ex. 1 ("Declaration of Patrick R.

Benavides"), Ex. 2 ("Declaration of Jeffrey Griffith"), Ex. 3 ("Declaration of

Bruce Rust").  Commerce determined that the industry declarations and the

Petition were conflicting (k)(1) sources regarding the interchangeability of the

terms "rough," "as formed," and "unfinished" fittings.  Final IDM at 26 ("Even if

the industry currently may use these terms interchangeably (per the petitioners'

claim), the language of the Petition itself describes what constitutes an 'unfinished'

and 'finished' fitting and the <u>Order</u> is clearly intended to only cover finished and

unfinished fittings as described in the Petition.").  While Commerce acknowledged

that the terms "rough" fittings, "as formed" fittings, and unfinished fittings have

been "used interchangeably at times in other segments of the proceeding," it

dismissed the industry's "claim that there is no difference between a rough fitting

and unfinished fitting" as simple confusion over these terms.  <u>See id.</u> at 26–27.

These industry declarations detract from Commerce's determination because

the industry declarations show that the terms "rough," "as formed," and

"unfinished" fittings are, or have been, used interchangeably in the butt-pipe weld

---

[7] These declarations are from Patrick R. Benavides, the Vice President and Chief Operating Officer of Tube Forgings; Jeffrey Griffith, the President of Mills Iron Works; and Bruce Rust, the General Manager of Hackney-Ladish.

pipe fittings industry. <u>See</u> Decl. Patrick R. Benavides at 2 ("Historically and currently, the terms 'rough,' 'as formed,' or 'unfinished' fittings have been and still are used interchangeably in the butt-weld pipe fittings industry. They are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process."); Decl. Jeffrey Griffith at 3 ("The terms 'rough,' 'as formed,' and 'unfinished' fittings are used interchangeably in the butt-weld pipe fittings industry. In my 48[-]year experience, this has always been true. These terms are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process."); Decl. Bruce Rust at 3 ("The terms 'rough,' 'as formed,' or 'unfinished' fittings are and, to my knowledge, always have been used interchangeably in the butt-weld pipe fittings industry. These terms are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process.").

The Court observes that the declarations from industry executives establish a recognized practice and understanding in the industry for over 30 years that rough fittings are considered butt-weld pipe fittings in unfinished form subject to the <u>Order</u>.

If there is a conflict between secondary and primary interpretive (k)(1) sources, the primary interpretive sources will normally govern in determining

whether a product is covered by the scope of the order at issue.  19 C.F.R

§ 351.255(k)(1)(ii).

However, the Court is troubled here because the evidence on the record

demonstrates that the industry has long understood that "rough fittings," also

known as carbon steel in the rough shape of elbows, tees, or reducers, are butt-

weld pipe fittings in unfinished form within the scope of the <u>Order</u>.

The Court does not agree with Commerce that the contrary evidence of the

declarations of domestic industry executives should be ignored or minimized,

particularly when weighing over 30 years of understanding and industry practice

against a new policy that Commerce only developed in this covered merchandise

referral request for the first time in 2023.

The Court remands for Commerce to reconsider or provide further

explanation for disregarding the evidence of the industry declarations, particularly

in light of Commerce's reconsideration on remand whether "rough fittings," or

carbon steel pipe in the rough shape of an elbow, tee, or reducer, are butt-weld pipe

fittings within the scope of the <u>Order</u>.  Commerce may not lightly ignore decades

of practice and understanding without providing more explanation for its

determination.  The Court remands this case for Commerce to answer these

questions.

### Prior Thailand Circumvention Determination

Commerce may look at previous or concurrent determinations, including

prior scope rulings, memoranda, or clarifications pertaining to the order at issue.

19 C.F.R. § 351.225(k)(1)(i)(C).  Commerce considered a prior circumvention

determination[8] in its scope analysis, which concluded that fittings finished in the

Kingdom of Thailand ("Thailand") from Chinese carbon steel cut to length pipe

were circumventing the Order.  See Final IDM at 25–26; Certain Carbon Steel

Butt-Weld Pipe Fittings from the People's Republic of China ("Thailand

Circumvention Determination"), 59 Fed. Reg. 15,155 (Dep't of Commerce Mar.

31, 1994) (affirmative final determination of circumvention of antidumping duty

order); see also Certain Carbon Steel Butt-Weld Pipe Fittings from the People's

Republic of China ("Thailand Preliminary Circumvention Determination"), 59

Fed. Reg. 62 (Dep't of Commerce Jan. 3, 1994) (affirmative preliminary

determination of circumvention of antidumping duty order).

Commerce relied on the Thailand circumvention inquiry to support its

determination that "rough fittings" were excluded from the Order.  Commerce

---

[8] An anticircumvention inquiry is similar to a scope inquiry because they are both
subsets of a scope ruling but differ because anticircumvention inquiries are
recognized by 19 C.F.R. § 351.225(g)–(j), and they are the only types of scope
rulings governed by a specific statutory scheme, 19 U.S.C. § 1677(j), and
subsection (k) factors do not apply to circumvention scope inquiries.  U.K. Carbon
& Graphite Co. v. United States, 37 CIT 1295, 1300 (2013).

determined that the subject merchandise in the Thailand circumvention inquiry,

"unfinished pipe fittings produced in [China]," were equivalent to the "rough

fittings" in the covered merchandise scope referral.  Final IDM at 25.  The subject

merchandise in the circumvention inquiry were described as "imports into the

United States of pipe fittings that were finished in Thailand from unfinished pipe

fittings produced in [China]" and these "unfinished 'as-formed' pipe fittings" from

China, <u>see</u> Thailand Preliminary Circumvention Determination; Thailand

Circumvention Determination, "[underwent] heat treatment and finishing processes

in Thailand."  Final IDM at 25.

Notably, the Thailand circumvention inquiry highlights an inconsistency in

Commerce's practices between 1994 and 2023.  The Thailand circumvention

inquiry in 1994 described the carbon steel pipe products that were cut to length, but

not heat-treated or formed, as "unfinished butt-weld pipe fittings."  <u>Id.</u>  This is

consistent with the understanding of the U.S. domestic industry, according to the

(k)(1) secondary evidence of the industry declarations.  Commerce then attempted

to explain in the Final IDM that, for purposes of the covered merchandise referral

request in 2023, those same products in the Thailand circumvention inquiry should

no longer to be considered "unfinished butt-weld pipe fittings," but instead should

be labeled "rough fittings."  <u>Id.</u>  This shows Commerce's contradictory practices

and magnifies the fact that Commerce treated the same situation differently, without sufficient explanation.

Commerce determined that the "unfinished butt-weld pipe fittings" in the Thailand circumvention inquiry were actually equivalent to "rough fittings" because: (1) even though the circumvention inquiry used the term "unfinished" to describe the subject merchandise, "the record indicates that the products were instead rough fittings"; and (2) there is a distinction between a "pipe fitting in unfinished form as a subject fitting" and the "inquiry merchandise in the Thailand Circumvention Inquiry" as a material input used to produce subject unfinished and finished fittings that had yet to undergo stage two processing.  Id. at 25, 26 n.143.

The Court finds problematic Commerce's reliance on the Thailand circumvention inquiry in the final covered merchandise determination, which confusingly stated that a product that Commerce previously called an "unfinished butt-weld pipe fitting" in the 1994 Thailand circumvention inquiry was no longer considered an "unfinished butt-weld pipe fitting" here, but instead was considered to be a "rough fitting."  Id. at 25.  It is contradictory for Commerce to have previously referred to a carbon steel product in the rough shape of an elbow, tee, or reducer, which was not heated or formed, as an "unfinished butt-weld pipe fitting" 30 years ago in 1994 (and apparently for the ensuing 30 years), and then claim that such product is no longer considered an "unfinished butt-weld pipe fitting," but

should be considered a "rough fitting" in the 2023 Final IDM.  This contradiction

without justification is puzzling and disingenuous.

  The Court concludes that the Thailand Circumvention Determination is a

(k)(1) source that detracts from Commerce's determination that carbon steel

products in the rough shape of an elbow, tee, or reducer, which were not heated or

formed, are "rough fittings" rather than "unfinished butt-weld pipe fittings."

  It is clear that after more than 30 years, Commerce suddenly and

surprisingly changed its decades-long past practice without recognizing a switch in

this case, and without providing a sufficient explanation to depart from its past

practice.  Even though Commerce does not specifically admit that it is departing

from past practice and taking a new position in this case, that is clearly the

situation here, with Commerce reversing its stance on "unfinished butt-weld pipe

fittings."  Both the Thailand circumvention inquiry and the declarations of the

industry executives support Plaintiffs' contention that the carbon steel products in

the rough shape of an elbow, tee, or reducer, not heated or formed, were

considered to be "unfinished butt-weld pipe fittings" for over 30 years since the

Order went into effect in 1992.

  Commerce is entitled to change its views, but the Court concludes that

Commerce acted arbitrarily by deviating from its decades-long interpretation and

practice of considering products in the rough shape of an elbow, tee, or reducer,

which were not heated or formed, to be butt-weld pipe fittings, without offering

sufficient reasons.  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir.

2001) ("[A]gency action is arbitrary when the agency offer[s] insufficient reasons

for treating similar situations differently." (quoting Transactive Corp. v. United

States, 91 F.3d 232, 237 (D.C. Cir. 1996))).

    The Court remands this case for Commerce to address the Court's concerns

about contradictory evidence on the record and the failure to provide sufficient

reasons for treating similar situations differently.

### Administrative Exhaustion of the Costs and Value Added Issue

    Plaintiffs contend that the costs and value added at various phases of the

production process of butt-weld pipe fittings, which demonstrate that the

investment in equipment for sizing is not economical, supports their argument that

Commerce's determination that the essential characteristics are imparted after

stage two of the production process is not supported by substantial evidence.  Pls.'

Br. at 35–37.  Defendant asserts that Plaintiffs waived their argument because

Plaintiffs failed to raise this issue in their administrative briefs.  Def.'s Resp. at 31.

    Before commencing suit in the CIT, an aggrieved party must exhaust all

administrative remedies available to it.  "In any civil action . . . the Court of

International Trade shall, where appropriate, require the exhaustion of

administrative remedies."  28 U.S.C. § 2637(d).  The Court "generally takes a

'strict view' of the requirement that parties exhaust their administrative remedies[.]" Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013). There are limited exceptions to the exhaustion requirement. See Pakfood Pub. Co. v. United States, 34 CIT 1122, 1145–47, 724 F. Supp. 2d 1327, 1351–52 (2010) ("[T]he court has waived the exhaustion requirement where it would have been futile for the party to raise its argument at the administrative level, as well as where the record indicates that . . . the agency in fact thoroughly considered the issue in question."); see also Holmes Prod. Corp. v. United States, 16 CIT 1101, 1104 (1992) ("[E]xhaustion may be excused if the issue was raised by another party, or if it is clear that the agency had an opportunity to consider it.").

Plaintiffs apparently did not raise the issue of cost of production/value added in their administrative case briefs, and also failed to address the waiver issue in their reply briefs before this Court. See Pls.' Reply. Therefore, the issue regarding costs and value added is waived.

Consol. Court No. 23-00231                                    Page 40

## CONCLUSION

The Court concludes that Commerce's reliance on (k)(1) interpretive sources is in accordance with law because of the ambiguous scope language. The Court concludes that Commerce's determination that "rough fittings" further processed in Vietnam were excluded from the scope of the <u>Order</u> is not supported by substantial evidence. The Court also concludes that Commerce's determination is not in accordance with law because Commerce acted arbitrarily by deviating from its decades-long interpretation and practice of considering products in the rough shape of an elbow, tee, or reducer, which were not heated or formed, to be in-scope butt-weld pipe fittings.

Accordingly, it is hereby

**ORDERED** that that this case shall proceed according to the following schedule:

(1)    Commerce shall file its remand determination on or before April 2, 2025;

(2)    Commerce shall file the administrative record on or before April 16, 2025;

(3)    Comments in opposition to the remand determination shall be filed on or before May 16, 2025;

(4)    Comments in support of the remand determination shall be filed on or

Consol. Court No. 23-00231                                           Page 41

before June 16, 2025; and

(5)    The joint appendix shall be filed on or before June 23, 2025.


                                        ___/s/ Jennifer Choe-Groves___
                                        Jennifer Choe-Groves, Judge


Dated:    ___January 2, 2025___
                New York, New York