A-570-814
Remand
Slip Op. 25-1
**Public Document**
E&C/OV:  MB

***Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*,**
**Court No. 23-00231, Slip Op. 25-1 (CIT January 2, 2025)**
**Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (the Court) in *Tube Forgings of America, Inc. and Mills Iron Works, Inc. v.*

*United States*, Court No. 23-00231, Slip Op. 25-1 (CIT January 2, 2025) (*Remand Order*).

These final results of redetermination relate to Commerce's determination in a covered

merchandise inquiry concerning U.S. Customs and Border Protection (CBP) Enforce and Protect

Act (EAPA) Investigation 7335.  The covered merchandise inquiry pertained to whether:  (1)

Chinese-origin rough fittings that only underwent the third stage of production (*i.e.*, finishing

processes) in Vietnam are within the scope of the *Order*;[1] and (2) whether Chinese-origin rough

fittings that underwent both the second and third stages of production in Vietnam are within the

scope of the *Order*.[2]

The Court remanded to Commerce for further consideration its determination that "rough

fittings" from China that underwent the second and third stages of processing in Vietnam were

---

[1] *See Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 FR 29702 (July 6, 1992) (*Order*).
[2] *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Determination of Covered Merchandise Inquiry*, 88 FR 69909 (October 10, 2023) (*Final Determination*), and accompanying Issues and Decision Memo (IDM).

excluded from the scope of the *Order*. Consistent with the *Remand Order*, we continue to find these "rough fittings" to be excluded from the scope of the *Order*, as discussed below.

## II.    BACKGROUND

### A.  Commerce's *Final Determination*

On September 6, 2022, CBP transmitted a covered merchandise referral to Commerce requesting that we determine whether merchandise described in the referral is subject to the *Order*.[3]

In the covered merchandise referral, CBP described the production of butt-weld pipe fittings as following three stages:

1.  Converting seamless pipe into the rough shape of an elbow, tee, reducer, *etc.*, through a cold- or hot-forming (or forging) process;

2.  Reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to; and

3.   Finishing processes such as shot blasting or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting.

CBP requested that Commerce determine whether:  (1) Chinese-origin rough fittings that only underwent the third stage of production (*i.e.*, finishing processes) in Vietnam are within the scope of the *Order*; and (2) whether Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are within the scope of the *Order*.[4]

---

[3] *See* Memorandum, "Receipt of Covered Merchandise Referral and Placement of Covered Merchandise Referral Documents on the Record," dated September 27, 2022, at enclosed CBP's Letter, "Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP:  Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China," dated September 6, 2022 (Covered Merchandise Referral).

[4] *Id*. at 3.

On October 10, 2023, Commerce published the *Final Determination* in this inquiry wherein we examined the language of the *Order* and analyzed the sources described in 19 CFR 351.225(k)(1) to address the questions posed by CBP in its referral. Commerce then determined that fittings that undergo the first and second stages of production in China and the third stage of production in Vietnam are subject to the scope of the *Order*, while fittings that undergo only the first stage of production in China are not subject to the scope of the *Order*.

The petitioners[5] appealed Commerce's decision, arguing that fittings that undergo the second and third stages of production in Vietnam are subject to the scope of the *Order*.

### B. *Remand Order*

On January 2, 2024, the Court issued its *Remand Order*. In the *Remand Order*, the Court held that Commerce's determination that fittings that undergo the second and third stages of production in Vietnam are not subject to the scope of the *Order* is not supported by substantial evidence.

The Court concluded that the scope language is ambiguous with respect to whether "unfinished" fittings include further processed "rough fittings," and, thus, it held that Commerce's reliance on the sources enumerated in 19 CFR 351.225(k)(1) to address the issue in the *Final Determination* was in accordance with law. However, the Court held that Commerce's determination was not in accordance with law on other grounds, because the determination was unsupported by substantial evidence.[6]

In particular, the Court held that:

- The Petition tends to support Commerce's determination that only after the raw metal pipe undergoes the first and second production stages does it become an "unfinished" product;[7]

---

[5] The petitioners are Tube Forgings of America, Inc. and Mills Iron Works, Inc.
[6] *See Remand Order* at 22.
[7] *Id*. at 24-25.

- The U.S. International Trade Commission (ITC)'s report does not directly support Commerce's determination because it indicates that rough-formed carbon steel pipes are unfinished fittings that are later processed;[8]
- Certain scope language deleted when Commerce issued the *Order* neither supports nor undermines Commerce's determination;[9]
- Declarations from industry executives establish a recognized practice and understanding in the industry for over 30 years that rough fittings are considered butt-weld pipe fittings in unfinished form subject to the *Order*, and, thus, these declarations detract from Commerce's determination;[10] and
- A prior circumvention determination regarding further processing in Thailand[11] detracts from Commerce's determination, given that Commerce referred to rough shapes which had only undergone the first stage of finishing in China as "unfinished butt-weld pipe fittings."[12]

Therefore, the Court directed Commerce on remand to answer the fundamental question of whether a "rough fitting," which the Court defined as a pipe that has been formed into the rough shape of an elbow, tee, or reducer, is identifiable as a "butt-weld pipe fitting."[13]  The Court also directed Commerce, as part of its analysis, to:  (1) "address the Petition's lack of reference to the term 'rough fitting,' and . . . analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting";[14] (2) "reconsider or provide further explanation for disregarding the evidence of the industry declarations, particularly in light of Commerce's reconsideration on remand whether 'rough fittings,' or carbon steel pipe in the rough shape of an elbow, tee, or reducer, are butt-weld pipe fittings within the scope of the *Order*";[15] and (3)

---

[8] *Id*. at 26-27.
[9] *Id*. at 30.
[10] *Id*. at 32.
[11] *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 FR 62 (January 3, 1994) (*Thailand Circumvention Prelim*), unchanged in *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) (*Thailand Circumvention Final*) (collectively, *Thailand Circumvention Inquiry*).
[12] *See Remand Order* at 35.
[13] *Id*. at 18.
[14] *Id*. at 25.
[15] *Id*. at 33.

"address the Court's concerns about contradictory evidence on the record and the failure to provide sufficient reasons for treating similar situations differently."[16]  The Court further stated that "Commerce may examine the (k)(1) sources on remand if Commerce continues to take the position that the *Order* is ambiguous.  The Court recognizes, however, that it is possible on remand that Commerce may change its determination and conduct its analysis based on the plain language of the *Order*."[17]

### C.  *Draft Results of Redetermination*

Commerce released its Draft Results of Redetermination on March 24, 2025,[18] in which we continued to find that merchandise that undergoes the second and third stages of production in Vietnam is not subject to the scope of the *Order*.

On April 3, 2024, the petitioners and Norca Industrial Company, LLC (Norca) submitted timely comments on the Draft Remand.[19]

## III.    ANALYSIS

As directed by the Court, we have reexamined the sources enumerated in 19 CFR 351.225(k)(1) to address the questions noted above.  In accordance with the Court's *Remand Order,* Commerce has revisited the record to examine the (k)(1) sources of information on the record of this proceeding, including the original 1991 Petition,[20] the 1992 ITC Report,[21] a prior

---

[16] *Id*. at 38.
[17] *Id*. at 22.
[18] *See* Draft Results of Redetermination Pursuant to Court Remand, *Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*, Court No. 23-00231, Slip Op. 25-1 (CIT January 2, 2025), dated March 24, 2025 (Draft Remand).
[19] *See* Petitioner's Letter, "Comments of Tube Forgings of America, Inc. and Mills Iron Works, Inc.," dated April 3, 2025 (Petitioners' Draft Remand Comments); *see also* Norca's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand" dated April 3, 2025 (Norca's Draft Remand Comments).
[20] *See* Memorandum, "Relevant Scope Documents," dated June 16, 2023, at Attachment 1 (U.S. Fittings Group's Letter, "Petition for the Imposition of Antidumping Duties," dated May 22, 1991 (1991 Petition)).
[21] *See Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand,* Inv. Nos. 731-TA-520 and 521, (Final), USITC Pub. 2528 (June 1992) (1992 ITC Report).

circumvention finding,[22] and statements from industry officials.[23]  On remand, we address the Court's concerns and provide further explanation regarding our finding that products that have only undergone the first stage of production in China are not subject to the scope of the *Order*.

As a general matter, Commerce acknowledges that our use of the term "rough fitting" to describe the precursor products to both the unfinished and finished butt-weld pipe fittings subject to the Covered Merchandise Inquiry created confusion among the parties and with the Court. We solely adopted this term to refer to the merchandise at issue in a manner which was consistent with the language used in the first production scenario posed by CBP.[24]  Thus, we referred to merchandise that had undergone the first production stage as a "rough fitting" and merchandise that had undergone the first two production stages as an "unfinished fitting."[25]  However, as noted by the Court, this term is not used in the 1991 Petition.[26]  To cure this confusion, and for the purposes of this remand, Commerce instead identifies products by stage of production as follows:  (1) "rough shapes" for pipe which has undergone only conversion into a rough shape of an elbow, tee, reducer, *etc.*, through a cold- or hot-forming (or forging) process; and (2) "unfinished fittings" for rough shapes which have been reformed or sized to match the pipe it is destined to be welded to, but which have not been finished.

With this as a backdrop, we address each of the Court's specific concerns below.

The 1991 Petition

In the *Remand Order,* the Court stated the following:

---

[22] *See Thailand Circumvention Inquiry*.
[23] *See* Petitioners' Letter, "Petitioners' Reply to the Department's Questionnaire dated January 25, 2023," dated February 28, 2023, at Exhibits 1, 2, and 3 (Declarations from Domestic Industry Executives).
[24] As noted above, in the Covered Merchandise Referral, CBP directly asks Commerce to determine "whether (1) Chinese-origin rough fittings that only underwent the third stage of production (*i.e.*, finishing processes) in Vietnam are within the scope of the *Order*; and (2) whether Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are within the scope of the *Order*."  *See* Covered Merchandise Referral at 4.
[25] *See Final Determination* IDM at 19-20.
[26] *See Remand Order* at 23.

The Petition demonstrates that the second stage of production, which involves reforming or sizing the rough fitting, is significant because it is at this stage that the fitting will match the pipe to which it will be welded. *Id.*

The Court observes that notwithstanding the Petition's lack of using the term "rough fitting," the Petition tends to support Commerce's determination that only after the raw metal pipe undergoes the first production stage (converting seamless pipe, cutting to the proper length) and the second production stage (hot- or cold-forming, reforming/sizing), it then becomes an "unfinished" product. *Id.* at 5-7. By describing the production process starting from raw material, then cutting, hot- or cold-forming, and reforming or sizing to match the pipe it is destined to be welded to, the Petition articulates an intent that a product becomes an "unfinished" pipe only after undergoing this process. *Id.*[27]

However, the Court further held that "the {1991} Petition does not mention the term 'rough fitting,' which detracts from Commerce's determination that the {1991} Petition defines 'rough fitting' as a product that only underwent the first production stage."[28]  Therefore, on remand, the Court directed Commerce to "address the Petition's lack of reference to the term 'rough fitting,' and {} analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting."[29]

As discussed above, we clarify that Commerce used the term "rough fitting" as a simple repetition of the term set forth in CBP's covered merchandise referral; as the Court correctly notes, this term is not defined.  Thus, it is not surprising that the 1991 Petition does not use the term "rough fitting."

In contrast, the 1991 Petition does distinguish between merchandise that has undergone the first stage of the production process and merchandise that has undergone the first and second stages of production.  For instance, with respect to a fitting that is in the rough shape of an

---

[27] *See Remand Order* at 24-25.
[28] *Id.* at 23.
[29] *Id.* at 25.

elbow, the 1991 Petition describes the production process and uses the term "bent pipe." Bent pipe is a product of seamless pipe that has undergone the first stage of the production process. Specifically, the 1991 Petition states:

> The bent pipe drops off the mandrel and is examined for correctness of size and shape. Often the bent pipe must undergo a "reforming" or "coining" operation… The operation is necessary to ensure that the fitting will match the pipe to which it is attached. Fittings that are formed at a temperature under 1,200 {degrees Fahrenheit (F)} or above 1,800 {degrees} F must also undergo heat treatment which relieves stress build-up within the fitting during the forming process. After these processes, the bent pipe is considered to be an unfinished "elbow." The production of an unfinished "tee" or an unfinished "reducer" is somewhat different before the coining operation.[30]

While the 1991 Petition does not directly or explicitly identify the product that results from the first production process (either as a "rough fitting" or by another term), it makes a distinction between a product that has undergone the first step in the production process (*i.e.*, bent pipe) and one that has undergone a second, more crucial process (*i.e.*, an unfinished fitting). We find it meaningful that only after the second stage of production does the 1991 Petition identify the product as an unfinished fitting.

Similarly, in regard to "tees" and "reducers," the 1991 Petition states that "{t}he production of an unfinished 'tee' or an unfinished 'reducer' is somewhat different before the coining operation,"[31] again highlighting that the second stage of production, *i.e.* the coining process, is necessary for the production of an unfinished "tee" or "reducer."

In reference to the reforming and coining process, the 1991 Petition states that "{t}he operation is necessary to ensure that the fitting will match the pipe to which it is attached."[32] As discussed in Commerce's *Final Determination* IDM, "{r}ecord evidence suggests that, although

---

[30] *See* 1991 Petition at 5-6.
[31] *Id.* at 6.
[32] *Id.* at 5.

the initial forming process forms the fittings in such a way that is important for the finished product, resizing and heat treatment are crucial processes for the integrity of the finished butt-weld pipe fittings."[33]  The 1991 Petition supports this conclusion,[34] and answers the question of when a butt-weld pipe fitting becomes identifiable by clearly stating "{a}fter these processes, the bent pipe is considered to be an unfinished 'elbow.'"[35]  In conjunction with the other 19 CFR 351.225(k)(1) sources discussed below, the Petition supports a finding that a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is not identifiable as a butt-weld pipe fitting that is subject to the *Order*.

1992 ITC Report

In the *Remand Order,* the Court stated the following:

The term "rough" appears only once in the ITC Report when referencing "rough-formed unfinished fittings."  The exact sentence reads: "The combination producers Hackney, Tube Forgings, Tube-Line, and Weldbend purchase and/or import rough-formed unfinished fittings which they bevel, bore, taper, grind, shot blast, die stamp, inspect, and paint." Id.

The Court observes that this language in the ITC Report does not directly support Commerce's determination because it indicates that rough-formed carbon steel pipes are unfinished fittings that are later processed.  The ITC Report does not confirm Commerce's determination that only after carbon steel pipes are cut, then heat-treated and sized/formed, are they then considered to be unfinished butt-weld pipe fittings.  The Court concludes that the ITC Report does not support Commerce's determination that only after the second production stage, or the sizing and reforming operations, is a carbon steel product identifiable as a butt-weld pipe fitting that is within the scope of the Order. See Final IDM at 26-27 (citing ITC Report at I-10).[36]

---

[33] *See Final Determination* IDM at 10 (citing Petitioners' Letter, "Petitioners' Reply to the Department's Questionnaire dated January 25, 2023," dated February 28, 2023, at 7; and 1992 ITC Report at I-8 ("The cold-worked product must be heat-treated …to relieve metallurgical stresses that build up during the cold-working process.") and fn. 18 ("Irrespective of the process, resizing is necessary to ensure that the butt-weld fitting will match the pipe to which it is to be welded.").

[34] *See* 1991 Petition at 6 (stating that "heat treatment {} relieves stress build-up within the fitting during the forming process" and the reforming/coining operations, where the "bent pipe. . . is subjected to great pressure. . . to achieve 'true' circularity of its cross section and precise outer diameter," are "necessary to ensure that the fitting will match the pipe to which it is attached.").

[35] *Id.*

[36] *See Remand Order* at 26-27.

We do not dispute the Court's conclusion with respect to the reference to "rough-formed unfinished fittings." However, as noted above, we believe that our use of the term "rough fittings" in the *Final Determination* created unnecessary confusion; we did not intend this term to be synonymous with the term "rough-formed unfinished fittings." Further, and consistent with the Court's ruling, we agree that "rough-formed unfinished fittings," as described in the cited quotation, are within the scope of the *Order* because they have undergone the first two production stages, and all that remains is the third, and final, stage.

Our reliance on the 1992 ITC Report as support for our conclusion stemmed from a different quote, which states that:

> an unfinished pipe fitting is a fitting that has been advanced after forging but which requires at least one more processing step (*i.e.*, shot blasting, machine beveling, boring and tapering, grinding, die stamping, inspecting or painting) to finish the fitting."[37]

This quote clearly shows that a shape that has been forged is not yet an unfinished fitting; instead, the shape has to be "advanced after forging" to attain this status, and only then may the unfinished fitting be further processed to become the final, finished product. The ITC's description aligns with the 1991 Petition's description of the production process, contributing to our finding that the second stage of production is necessary for merchandise that has been formed into the shape of a fitting to be considered an unfinished fitting.

Of note, the 1992 ITC Report does not refer to merchandise that has been formed into the shape of a fitting as a "fitting." Instead, the 1992 ITC Report refers to merchandise that has undergone the first step of production as "pipe" (similar to the 1991 Petition's description of merchandise that has undergone the first step of production as "bent pipe").[38] For example,

---

[37] *See* 1992 ITC Report at 4, fn 6.
[38] *Id.* at I-8, fn 18.

when discussing the production of an "elbow," the 1992 ITC Report states that "{a}fter forming, the pipe must undergo a 'reforming' or 'sizing' operation,"[39] which is similar to the second stage of the production process (*i.e.,* reforming or sizing the rough fitting so that the fitting will match the pipe to which it is destined to be welded).

The Court directed Commerce on remand to answer the fundamental question of whether a "rough fitting" is identifiable as a "butt-weld pipe fitting," and it permitted us to "examine the (k)(1) sources on remand if Commerce continues to take the position that the *Order* is ambiguous."[40]  While the 1992 ITC Report does not refer to any other merchandise as "rough" or "rough formed," this source provides valuable guidance:  a "rough fitting" (*i.e.*, bent pipe in various shapes) is not identifiable as a "butt-weld pipe fitting"; it is merely an input used to produce such merchandise.

Declarations from Domestic Industry Executives

> In the *Remand Order,* the Court stated that:
>
> {The} industry declarations detract from Commerce's determination because the industry declarations show that the terms "rough," "as formed," and "unfinished" fittings are, or have been, used interchangeably in the butt-pipe weld pipe fittings industry. . . . . The Court observes that the declarations from industry executives establish a recognized practice and understanding in the industry for over 30 years that rough fittings are considered butt-weld pipe fittings in unfinished form subject to the <u>Order</u>.
>
> If there is a conflict between secondary and primary interpretive (k)(1) sources, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue. 19 C.F.R
>
> § 351.255(k)(1)(ii).
>
> However, the Court is troubled here because the evidence on the record demonstrates that the industry has long understood that "rough fittings," also

---

[39] *Id.*
[40] *See Remand Order* at 22.

known as carbon steel in the rough shape of elbows, tees, or reducers, are butt- weld pipe fittings in unfinished form within the scope of the <u>Order</u>.

. . .

The Court does not agree with Commerce that the contrary evidence of the declarations of domestic industry executives should be ignored or minimized, particularly when weighing over 30 years of understanding and industry practice against a new policy that Commerce only developed in this covered merchandise referral request for the first time in 2023.

The Court remands for Commerce to reconsider or provide further explanation for disregarding the evidence of the industry declarations, particularly in light of Commerce's reconsideration on remand whether "rough fittings," or carbon steel pipe in the rough shape of an elbow, tee, or reducer, are butt-weld pipe fittings within the scope of the <u>*Order*</u>.  Commerce may not lightly ignore decades of practice and understanding without providing more explanation for its determination.  The Court remands this case for Commerce to answer these questions.[41]

We clarify that as part of our analysis, Commerce considered the industry declarations as secondary interpretive sources in accordance with 19 CFR 351.225(k)(1)(ii).  As the Court has recognized, Commerce's regulations state that "in the event of a conflict between these secondary interpretive sources and the primary interpretive sources under paragraph (k)(1)(i) of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue."[42]  Here, in assessing the information discussed in the declarations as well as the other evidence on the record, Commerce finds that the primary sources are sufficient to answer the question of whether shapes formed during the first stage of production are sufficiently processed to be considered unfinished fittings.

We acknowledge the Court's concerns with our approach in the *Final Determination*, and as instructed by the Court, we are providing further explanation for our determination that these declarations are less probative than the (k)(1) sources on the record of this proceeding.  As

---

[41] *Id.* at 33.
[42] *See* 19 CFR 351.225(k)(1)(ii).

discussed in detail above, the 1991 Petition and the 1992 ITC Report distinguish between the products produced at each stage of the production process (*i.e.*, bent pipe/forgings after the first stage, unfinished fittings after the second stage, and finished butt-weld pipe fittings after the third stage).  The information in these documents contradict the claims made by the petitioners in their submitted declarations that the industry has always used these terms synonymously.  Further, as discussed in more detail below, these claims are also belied by the petitioners' own actions.  In particular, the petitioners, as far back as 1993, alleged that first-stage forgings completed in Thailand were circumventing the *Order*; had these products already been in-scope merchandise, such an allegation would have been wholly unnecessary.[43]

We find meaningful that neither the 1991 Petition nor the 1992 ITC Report use the term "rough forgings" or "rough fittings,"[44] which detracts from the petitioners' current claim that the terms are not only interchangeable but also widely used.   The Court also noted the absence of this term in the 1991 Petition and 1992 ITC Report in its *Remand Order*.[45]

Thus, in responding to the Court's directive, we have considered these declarations within the context of the totality of the evidence on the record, including the descriptions of the production process in the 1991 Petition and the 1992 ITC Report, the absence of these terms in the primary sources described above, and Commerce's finding that products that had completed

---

[43] *See, e.g.*, *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 87 FR 45753 (July 29, 2022) (*China Plywood Circumvention Prelim*), and accompanying Preliminary Decision Memorandum (PDM) at 14 ("Before determining whether merchandise is circumventing the *Orders*, we must first determine whether any of the merchandise subject to the scope inquiry is covered by the scope of the *Orders*.  If we find that any merchandise is already subject to the *Orders*, then it is unnecessary to determine whether such merchandise is circumventing the *Orders*.  However, if any inquiry merchandise is not currently subject to the *Orders*, we must examine whether such products are circumventing the *Orders* and should be covered by the *Orders*" (internal citations omitted)), unchanged in *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46740 (July 20, 2023) (*China Plywood Circumvention Final*) and accompanying Issues and Decision Memorandum (IDM) (collectively, *China Plywood Circumvention Inquiry*).
[44] *See, e.g.*, 1992 ITC Report at I-7 through I-10.
[45] *See Remand Order* at 23 and 26.

stage one processing were circumventing the *Order*. Because the recent claims made by industry officials in their declarations conflict with information in the primary interpretive sources enumerated in 19 CFR 351.225(k)(1) (all of which, unlike the industry declarations were on the administrative record long before 2023), we afforded the primary interpretive sources more weight than the industry declarations, which are secondary interpretive sources, consistent with our regulations.[46]

*Thailand Circumvention Inquiry*

In the *Remand Order,* the Court stated:

The Court finds problematic Commerce's reliance on the Thailand circumvention inquiry in the final covered merchandise determination, which confusingly stated that a product that Commerce previously called an "unfinished butt-weld pipe fitting" in the 1994 Thailand circumvention inquiry was no longer considered an "unfinished butt-weld pipe fitting" here, but instead was considered to be a "rough fitting." *Id.* at 25. It is contradictory for Commerce to have previously referred to a carbon steel product in the rough shape of an elbow, tee, or reducer, which was not heated or formed, as an "unfinished butt-weld pipe fitting" 30 years ago in 1994 (and apparently for the ensuing 30 years), and then claim that such product is no longer considered an "unfinished butt-weld pipe fitting," but should be considered a "rough fitting" in the 2023 Final IDM. This contradiction without justification is puzzling and disingenuous.

The Court concludes that the Thailand Circumvention Determination is a (k)(1) source that detracts from Commerce's determination that carbon steel products in the rough shape of an elbow, tee, or reducer, which were not heated or formed, are "rough fittings" rather than "unfinished butt-weld pipe fittings."

It is clear that after more than 30 years, Commerce suddenly and surprisingly changed its decades-long past practice without recognizing a switch in this case, and without providing a sufficient explanation to depart from its past practice. Even though Commerce does not specifically admit that it is departing from past practice and taking a new position in this case, that is clearly the situation here, with Commerce reversing its stance on "unfinished butt-weld pipe fittings." Both the Thailand circumvention inquiry and the declarations of the industry executives support Plaintiffs' contention that the carbon steel products in the rough shape of an elbow, tee, or reducer, not heated or formed, were considered to be "unfinished butt-weld pipe fittings" for over 30 years since the Order went into effect in 1992.

---

[46] *See* 19 CFR 351.225(k)(1)(i)-(ii).

Commerce is entitled to change its views, but the Court concludes that Commerce acted arbitrarily by deviating from its decades-long interpretation and practice of considering products in the rough shape of an elbow, tee, or reducer, which were not heated or formed, to be butt-weld pipe fittings, without offering sufficient reasons. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}gency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States,* 91 F.3d 232, 237 (D.C. Cir. 1996))).

The Court remands this case for Commerce to address the Court's concerns about contradictory evidence on the record and the failure to provide sufficient reasons for treating similar situations differently.[47]

As a threshold matter, we agree with the Court that the difference in terminology used in the *Thailand Circumvention Inquiry* and the *Final Determination* created confusion. We clarify that while the terms employed in these determinations were inconsistent, the treatment of the products at issue were not, as discussed further below.

Under Commerce's longstanding practice, before determining whether merchandise is circumventing an antidumping duty order, Commerce first determines whether any of the merchandise subject to the scope inquiry is covered by the scope of the order.[48] If we find that any merchandise is already subject to the order, then it is unnecessary to determine whether such merchandise is circumventing the order. However, if any inquiry merchandise is not currently subject to the order, we must examine whether such products are circumventing the orders and should be covered by the orders.[49]

In other words, it is not Commerce's normal practice to conduct a circumvention inquiry on merchandise already subject to an antidumping duty order. Instead, Commerce's analysis of

---

[47] *See Remand Order* at 36-38.

[48] *See, e.g.*, *China Plywood Circumvention Prelim* PDM at 14 (citing *Deacero S.A. de C.V. v. United States*, 942 F.Supp.2d 1321, 1461-62 (CIT 2013) ("When Commerce initiates a scope inquiry under 19 {CFR}351.225(k), it assesses 'whether a particular product is included within the scope of an order.' *When Commerce initiates a circumvention inquiry... it asks whether a product outside an order's literal scope should nonetheless be included within the scope* as part of the class or kind of merchandise subject to the antidumping duty order." (internal citations omitted and emphasis added)).); unchanged in *China Plywood Circumvention Final*.

[49] *See China Plywood Circumvention Prelim* PDM at 14, unchanged in *China Plywood Circumvention Final*.

merchandise explicitly covered by an order would be covered by a scope ruling; in cases where the scope ruling involves a product further processed outside of the order country, Commerce typically analyzes whether the merchandise was substantially transformed in the third country, such that the country of origin of the product would shift to the third country, thus removing it from the order. With this framework in mind, in the *Thailand Circumvention Inquiry*, Commerce evaluated whether Chinese carbon steel pipe products that were: (1) cut to length, and cold-formed in China; and (2) cut and heat treated (stage two), then shot blasted, beveled, precision-machined, cleaned, coated or painted, and marked (stage three) in Thailand into finished butt-weld pipe fittings were circumventing the *Order*.[50]

   We acknowledge that the use of the term "unfinished butt-weld pipe fittings" in the *Thailand Circumvention Inquiry* was inaccurate, and our failure to explain clearly Commerce's prior mistake created confusion. However, had Commerce truly considered these rough shapes to be unfinished butt-weld pipe fittings, there would have been no need for a circumvention inquiry at all because rough shapes would have already been explicitly covered by the scope of the *Order*. Instead, Commerce conducted a circumvention inquiry, albeit with an inaccurate description of the inquiry merchandise.

   Based on the foregoing, we find that our determinations in response to the Covered Merchandise Referral and the *Thailand Circumvention Inquiry* were consistent in methodology, even if they were inconsistent in terminology. In both cases, as discussed above, Commerce did *not* find that the products were within the scope of the existing *Order*, but rather that the products processed in Thailand only became so as a result of a circumvention (which is distinct from a scope) finding. As a result, Commerce continues to find that the *Thailand Circumvention*

---

[50] *See Thailand Circumvention Prelim*, 59 FR at 64.

*Inquiry* supports Commerce's determination that rough shapes produced from only the first stage

of the production process are not subject to the scope of the *Order.*

## IV.     INTERESTED PARTY COMMENTS

As noted above, Commerce released the Draft Remand on March 24, 2025.[51]  The

petitioners and Norca submitted comments on April 3, 2025,[52] which are addressed below.

**Comment 1:   Whether Commerce's Draft Remand is Inconsistent with the *Thailand
Circumvention Inquiry***

*Petitioners' Comments*[53]

The following is a verbatim summary of argument submitted by the petitioners.  For further
details, *see* the Petitioners Draft Remand Comments at 9-19.

> {Commerce} argued before the CIT that {the *Final Determination*} is consistent
> with the determination in {the *Thailand Circumvention Final*}.  The Court found
> this argument to be "disingenuous," and it directed {Commerce} "to provide
> sufficient reasons for treating similar situations differently."   The draft
> redetermination merely continues to argue that the two determinations are
> consistent.  Thus, it fails to comply with the CIT's directive.
>
> A. {Commerce's} treatment of the China-Origin as-formed fittings in this
>    proceeding is not consistent with the *Thailand Determination*
> B. The term "unfinished fitting" in the *Thailand Determination* was not a
>    mistake
> C. The *Thailand Determination* was a circumvention inquiry conducted
>    under {section 781(b) of the Tariff Act of 1930, as amended (the Act)}
> D. The *Certain Hardwood Plywood Products* circumvention determination
>    does not support the draft redetermination.

*Norca's Comments*[54]

Norca did not provide a summary of its arguments.  For further information, *see* Norca's
Comments at 2-3.

---

[51] *See* Draft Remand.
[52] *See* Petitioners' Draft Remand Comments; *see also* Norca's Draft Remand Comments.
[53] *See* Petitioners' Draft Remand Comments.
[54] *See* Norca's Draft Remand Comments.

**Commerce's Position:** We disagree with petitioners' arguments and continue to find that the Draft Remand is consistent with the *Thailand Circumvention Inquiry*.

The petitioners argue that because the merchandise in the underlying preceding and the *Thailand Circumvention Inquiry* are similar, Commerce's treatment of products in this inquiry is not consistent with the *Thailand Circumvention Inquiry*.[55] Although we agree with petitioners that the merchandise in the *Thailand Circumvention Inquiry* and the underlying proceeding are similar, in that both have only undergone the first stage of production, we disagree that our treatment is inconsistent. The description of the manufacturing process in the *Thailand Circumvention Prelim* indicates that the Chinese supplier cut carbon steel pipe to a pre-determined length, lubricated the pipe, and cold-formed it using a hydraulic press (*i.e.*, the first stage of production).[56] The Thai manufacturer received the product in this "as-formed condition, with the bulging head closed" then "cuts the bulging head off the tee, heat treats the 'decapped' as-formed tee" (*i.e.*, the second stage of production), and performs the finishing processes (*i.e.*, the third stage of production).[57] This merchandise is similar (because it underwent the first stage of production in China and the second and third stages in a third country), to the "Chinese-origin rough fittings" that underwent both the second and third stages of production in Vietnam about which CBP requested guidance in the underlying referral.

Despite the likeness of the merchandise, the question being asked of Commerce differs in these inquiries. In the *Thailand Circumvention Inquiry*, Commerce was asked to determine whether Chinese-origin butt-weld pipe fittings that are completed in Thailand are circumventing

---

[55] *See* Petitioners' Draft Remand Comments at 11-13.
[56] *See Thailand Circumvention Prelim*, 59 FR at 64.
[57] *Id.*

the *Order*.[58]  Here, CBP asked Commerce whether Chinese-origin rough fittings that underwent

both the second and third stages of production in Vietnam are within the scope of the *Order*.[59]

These are fundamentally different questions, and it follows that the answer to these questions

would be different, though not mutually exclusive.  While Commerce determined in the *Thailand*

*Circumvention Inquiry* that butt-weld pipe fittings completed in Thailand should be covered by

the scope of the *Order*, an affirmative circumvention finding was necessary for that conclusion.[60]

In fact, the petitioners acknowledge that the merchandise in the *Thailand Circumvention Inquiry*

was "outside the literal scope of the {*Order*}."[61]  Here, the question that Commerce set out to

answer is whether butt-weld pipe fittings completed in Vietnam fall within the scope of the

*Order* based on a scope inquiry, not a finding of circumvention.  There was no request for a

circumvention inquiry, and Commerce did not conduct a circumvention analysis.  As noted by

the petitioners, the merchandise in question is outside the scope of the *Order*.  Because we have

not conducted a circumvention inquiry nor made any findings of circumvention that bring these

products into the *Order*, our conclusion in this proceeding differed from the analysis and

determination made in the *Thailand Circumvention Inquiry*.

      The petitioners then argue that because Commerce conducted the *Thailand*

*Circumvention Inquiry* under section 781(b) of the Act, Commerce's treatment in this segment of

products that underwent the second and third stages of production in Vietnam is in conflict with

the *Thailand Circumvention Inquiry*.[62]  The petitioners are correct that the *Thailand*

*Circumvention Inquiry* was conducted under section 781(b) of the Act.  Here, however, we did

---

[58] *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Initiation of Anti-Circumvention Inquiry on Antidumping Duty Order*, 58 FR 47859 (September 13, 1993) (*Thailand Circumvention Initiation*).
[59] *See* Covered Merchandise Referral at 3.
[60] *See Thailand Circumvention Final*, 59 FR at 15155.
[61] *See* Petitioners' Draft Remand Comments at 19.
[62] *Id.* at 16.

not conduct a circumvention inquiry.  The *Thailand Circumvention Initiation* states the

following:

> Section 781(b) of the Act allows {Commerce} to include merchandise within the scope of an existing antidumping duty order if:  (1) The merchandise imported into the United States is of the same class or kind as merchandise produced in a foreign country that is the subject of an antidumping duty order; (2) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise imported from the country which is subject to the antidumping duty order, and the difference between the value of the completed merchandise exported to the United States and the value of the merchandise imported to the  third country prior to completion or assembly for export to the United States is small.[63]

In order for the merchandise in the *Thailand Circumvention Inquiry* to be considered

merchandise subject to the *Order*, Commerce had to reach a determination of circumvention."[64]

Because this section of the Act contemplates further processing in a third country, where

additional processing has the potential to substantially transform the merchandise such that the

country of origin could shift from the order country to the third country, section 781(b) of the

Act permits Commerce to bring the merchandise back under the order despite the additional

processing.  Regardless of whether a "rough fitting" is a fitting in unfinished form, in accordance

with the *Thailand Circumvention Inquiry*, Chinese-origin rough fittings that underwent both the

second and third stages of production in Vietnam are outside of the literal scope of the *Order*,

and can only be included in the scope of the *Order* if a circumvention inquiry is conducted.

However, neither CBP, nor the petitioners, nor any other party requested that we conduct a

circumvention inquiry, nor was Commerce otherwise required to do so.  Nonetheless, as noted

---

[63] *See Thailand Circumvention Initiation*, 58 FR at 47859-60.
[64] *See Bell Supply Co., LLC v. United States,* 888 F.3d 1222, 1229 ("Circumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders.").

by the Court, the entries at issue in this case have all been liquidated, and we have no evidence that companies are currently circumventing the *Order* in this manner.[65]

The petitioners argue that Commerce's use of the of the term "unfinished fitting" to describe inquiry merchandise in the *Thailand Circumvention Inquiry* was not a mistake.[66] We note that in the *Thailand Circumvention Initiation*, the question before Commerce was simply whether "unfinished {carbon steel butt-weld pipe} fittings" were circumventing the *Order*.[67] The entire *Thailand Circumvention Inquiry* uses the "unfinished fitting" language as that stemmed from the language of allegation that initiated the inquiry.[68] The *Thailand Circumvention Initiation* states that:

> The petitioners allege that producers of {butt-weld pipe fittings} from {China} are circumventing, within the meaning of section 781(b) of the Tariff Act of 1930, as amended (the Act), the antidumping duty order on {butt-weld pipe fittings} by exporting unfinished {butt-weld pipe fittings} to Awaji Sangyo Co. (Thailand), in Thailand, which then completes the finishing operations and exports the merchandise to the United States free of any antidumping duties.[69]

In the same way that the underlying covered merchandise inquiry language relied on the terminology transmitted in the original referral by CBP (*i.e.* "rough fittings"), Commerce too relied on the terminology that set the proceeding into motion (*i.e.* "unfinished fittings"). As discussed in the Draft Remand, we acknowledge that our use of the term "rough fitting" unnecessarily caused continued confusion. However, regardless of the terms of reference applied to the products, the description of the processes carried out in each stage has been consistent throughout the life of the *Order.* Regardless of the language used, an affirmative

---

[65] *See Remand Order* at 10.
[66] *See* Petitioners' Draft Remand Comments at 13.
[67] *See Thailand Circumvention Initiation*, 58 FR at 47859.
[68] *Id*.
[69] *Id.*.

circumvention finding was necessary to bring the merchandise at the center of the *Thailand Circumvention Inquiry* into the *Order*.

The petitioners argue that the *China Plywood Circumvention Inquiry* does not support the Draft Remand because the Draft Remand "focuses on the wrong product as the 'inquiry merchandise.'"[70]  The petitioners claim that implicit in our reliance on the *China Plywood Circumvention Inquiry* is the erroneous claim that the inquiry merchandise in that case was the Chinese input and not the plywood assembled in Vietnam because that would have been analogous to our description of the as-formed fittings from China as the inquiry merchandise.[71] We would first like to clarify that inquiry merchandise is the finished merchandise exported from the third country that is allegedly circumventing the order.  In the *China Plywood Circumvention Inquiry*, the inquiry merchandise was plywood exported from Vietnam that was assembled using certain inputs from China, and in the *Thailand Circumvention Inquiry* under this *Order*, the inquiry merchandise was undoubtedly the finished butt-weld pipe fittings exported from Thailand that was further processed from the as-formed Chinese fittings.  In the Draft Remand, we were attempting to draw attention to the inaccurate description of inputs to the inquiry merchandise as opposed to stating that the rough shapes from China were the inquiry merchandise.

The petitioners, however, misconstrue the *China Plywood Circumvention Inquiry*.  The inquiry merchandise in the *China Plywood Circumvention Inquiry* was hardwood plywood exported from Vietnam that was produced under five different production scenarios.[72]  The primary question in the plywood inquiry was whether inputs sourced from China were

---

[70] *See* Petitioners' Draft Remand Comments at 17.
[71] *Id.*, at 18.
[72] *See, e.g., China Plywood Circumvention Inquiry*.

substantially transformed such that the country-of-origin of the plywood exported from Vietnam would transfer to Vietnam from China.[73]  As a part of this analysis, Commerce determined that the essential characteristic of hardwood plywood is imparted when three or more plies of wood are glued together.[74]  Similarly, in the *Preliminary Results* of the underlying covered merchandise inquiry, we state that "{t}he essential characteristic of the butt-weld pipe fitting is imparted when the fitting is processed into an unfinished butt-weld pipe fitting that is suitable to undergo the finishing processes and for connection to another pipe" (*i.e.*, after second stage of production).[75]  The Court also notes the importance of this second stage of production by stating that "{t}he {1991} Petition demonstrates that the second stage of production, which involves reforming or sizing the rough fitting, is significant because it is at this stage that the fitting will match the pipe to which it will be welded."[76]  Rather than being in conflict, our determinations in both the plywood proceeding and this case are analogous and consistent, up until the point of the circumvention analysis, which we did not conduct in this case.

For certain production scenarios examined in the *China Plywood Circumvention Inquiry*, we determined that the products were subject to the scope of the hardwood plywood order when exported from China and were still subject to the hardwood plywood order when exported from Vietnam despite the further processing in Vietnam.[77]  To reach this conclusion, Commerce conducted a circumvention inquiry.  However, a circumvention analysis was specifically requested by the petitioner in the *China Plywood Circumvention Inquiry*; moreover, that request was accompanied by an allegation and documentation sufficient to suggest that circumvention

---

[73] *Id.*
[74] *See China Plywood Circumvention Final* IDM at 10.
[75] *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 FR 41075 (June 23, 2023) (*Preliminary Results*), and accompanying PDM at 17.
[76] *See Remand Order* at 26.
[77] *See, e.g., China Plywood Circumvention Inquiry.*

was occurring, and action was appropriate to prevent evasion of the order.[78]  In contrast, CBP's referral of the underlying covered merchandise inquiry was specifically whether the products at issue were subject to the *Order* and not whether such products were circumventing the *Order*.

We agree with the petitioners that the "analysis that {Commerce} conducted in the *Thailand Circumvention* {Inquiry} fit squarely within the authority described in the {U.S. Federal Circuit Court of Appeals' (Federal Circuit)} *Deacero* decision."[79]  In *Deacero,* the Federal Circuit stated that "{i}n order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope."[80]  We are not conducting a circumvention inquiry here, and no party to this proceeding has alleged that circumvention is occurring or requested that we conduct a circumvention inquiry.  As with the *Thailand Circumvention Inquiry* the merchandise at issue here falls outside of the literal scope of the *Order*.

**Comment 2:   Whether "Rough Fittings" Are Identifiable as Unfinished Butt-Weld Pipe Fittings**

*Petitioners' Comments*[81]

The following is a verbatim summary of argument submitted by the petitioners.[82]  For further details, *see* the Petitioners Draft Remand Comments at 23-31.

> The Petition did not use the term "roughs" because that term was in general usage in the industry to describe as-formed elbows, tees, and reducers that were not yet finished butt-weld pipe fittings.  For example, the term "roughs" was used throughout the records of the producer in Vietnam that was the subject of the Enforce and Protect Act investigation underlying Commerce's CMI referral. It was

---

[78] *See Certain Hardwood Plywood Products from the People's Republic of China:  Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 FR 36530.
[79] *See* Petitioners' Draft Remand Comments at 18-19 (citing to *Deacero S.A. de C.V. v. United States*, 817 F.3d 1332 (Fed. Cir. 2016) (*Deacero*).
[80] *See Deacero* 817 F.3d at 1337.
[81] *See* Petitioners' Draft Remand Comments.
[82] *Id.*

also used by CBP to describe unfinished pipe fittings that have only undergone the first stage of production.

    A.  The Petition's use of the term "unfinished fitting" in a discussion of production processes is not meaningful with respect to the scope of the Petition

    B.  The draft redetermination attributes unwarranted significance to the term "bent pipe" in the petition

    C.  Petitioner's post-initiation clarification of the intended scope of investigation

    D.  The International Trade Commission's Final Injury Report

*Norca's Comments*[83]

Norca did not provide a summary of its arguments. For further information, *see* Norca's Comments at 1-2.

**Commerce's Position:** We disagree with the petitioners and continue to find that products that have only undergone the first stage production are not identifiable as unfinished butt-weld pipe fittings.

      The petitioners argue that Commerce "did not adopt the term 'rough fitting' as shorthand in this covered merchandise inquiry" as it was used by multiple parties throughout the inquiry.[84] We agree with the petitioners that Commerce did not "adopt… as shorthand" the term rough fittings. Instead, Commerce used the language provided by parties to describe the merchandise throughout the proceeding. Indeed, the primary reason why Commerce used the term "rough fitting" is because this was the term used by CBP in its referral to Commerce and by interested parties. However, we realize that the usage of this term introduced unnecessary confusion. The petitioners continue to assert that "the reason the term 'roughs' does not appear in the Petition is not because the term was unused before {Commerce} adopted it in the context of this proceeding, it is because common industry usage made it unnecessary to do so." However, the

---

[83] *See* Norca's Draft Remand Comments.
[84] *See* Petitioners' Draft Remand Comments at 23.

record does not support the petitioners' claim. As discussed above, the terms "rough fitting" or "roughs" do not appear in the 1991 Petition, the 1992 ITC Report, or the *Thailand Circumvention Inquiry* at any point. If this were a common term in the industry as the petitioners allege, one would expect it would have appeared on the record of this case long before the EAPA inquiry or the underlying covered merchandise inquiry.

The petitioners argue that because the term "unfinished fitting" does not appear in language of the scope, the use of the term "unfinished fitting" in the discussion of the production process is not meaningful. The scope described merchandise covered but the *Order* as "certain carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form." We reiterate that an unfinished butt-weld pipe fitting is a butt-weld pipe fitting in unfinished form and vice versa but that neither represents the precursor input of an as-formed/forged piece of pipe. As stated in the underlying *Final Determination*:

> Although the petitioners attempt to draw a technical distinction between a "butt-weld pipe fitting in unfinished form" and an "unfinished butt-weld pipe fitting," this argument misses the point: rough fittings are neither "butt-weld pipe fittings in unfinished form" nor "unfinished butt-weld pipe fittings." Instead, they are intermediate products which are processed into unfinished pipe fittings. The production process laid out in the Petition identifies the point in the production process that an elbow, reducer, or tee becomes an unfinished fitting by stating that "{a}fter these {first and second stage} processes, the bent pipe is considered to be an unfinished 'elbow'" and "{t}he production of an unfinished 'tee' or an 'unfinished' reducer is somewhat different."[85]

The salient question here is what constitutes a butt-weld pipe fitting in unfinished form, which is thereby subject to the scope of the *Order*. As the Court agreed, the scope itself is ambiguous on this point, so Commerce may look to interpretive sources for an answer to this question.[86] When describing the production process, the 1991 Petition clearly states that after

---

[85] *See Final Determination* IDM at 22.
[86] *See Remand Order* at 21.

stage one and two of production, the fitting is considered an unfinished butt-weld pipe fitting.[87] It would serve no purpose to state this in the Petition if not to draw a distinction between products that have only undergone the first production stage and products that have undergone the first and second stages. The distinction at that point indicates that the fitting is in unfinished form and that point becomes subject to the scope.

The petitioners point to *King Supply* to support their argument that "the scope language of the Petition 'identified the products subject to {the} investigation in terms of their physical characteristics'" and, therefore, a discussion of the production process is irrelevant to the scope.[88] However, the reference in this scope to "fittings…imported in either finished or unfinished form" does not refer to any specific physical characteristics, only to products that are subject to the scope, one of which is undefined and ambiguous without reference to the description of the production process in the 1991 Petition. In *King Supply*, the question at hand was whether the scope of the order contained an end-use restriction.[89] Thus, it is reasonable that the Federal Circuit relied on the physical characteristics of the product. Here, we are considering the point at which a fitting becomes subject to the *Order* so that we are able to respond to the questions posed by CBP. Because it is necessary to understand the production process to answer the question that CBP posed, it follows that Commerce uses the production process as described in the 1991 Petition and the 1992 ITC Report, the primary interpretive sources, to aid in answering that question.

---

[87] *See* 1991 Petition at 6 ("After these processes, the bent pipe is considered to be an unfinished elbow. The production of an unfinished 'tee' or an unfinished 'reducer' is somewhat different before the coining operation. Instead of being formed over a mandrel, such fittings are pressed or hammered into a die in order to achieve the desired shape.").
[88] *See* Petitioners' Draft Remand Comments at 24 (citing to *King Supply Co., LLC v. United States,* 674 F.3d 1343, 1345 (Fed. Cir. 2012) (*King Supply*).
[89] *Id*.

The petitioners argue that because "the term 'unfinished fitting' is physically separated from the description of subject merchandise," it is not relevant to the scope of the *Order*.[90] While it is true that the term "unfinished fitting" appears later in the 1991 Petition than the description of subject merchandise, it still appears within the same section, "Product Description," and is inextricably linked to the scope.[91]  Further, while the petitioners point to *King Supply* to support the contention that a discussion of the production process is irrelevant to the scope,[92] the full paragraph noted by the petitioners states:

> In 1991 certain domestic producers submitted an antidumping duty investigation petition to Commerce and the ITC with respect to imports of butt-weld pipe fittings from China and Thailand {}.  The leading paragraph in the "product description" section of the {1991} Petition identified products subject to the investigation in terms of their physical characteristics ("carbon steel butt-weld fittings having an inside diameter of less than 360 millimeters," and satisfying certain American Society for Testing and Materials {} and American National Standards Institute {} industry standards for materials and dimensions), and went on in subsequent paragraphs to describe how butt-weld pipe fittings are generally made, used, and sold.  For example, the second paragraph of the {1991} Petition explained that "butt-weld fittings are forged steel products used to join pipe sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."[93]

While *King Supply* does note the importance of the physical characteristics of the product, it also specifies that the 1991 Petition "went on…to describe how butt-weld pipe fittings are generally made."[94]  Thus, although the petitioners point to *King Supply* to suggest that the production process is not relevant to the scope of the *Order*, *King Supply* instead indicates  that the production process is an important element of the 1991 Petition and the description of the production process is crucial to defining the point at which a fitting is considered "unfinished."

---

[90] *See* Petitioners' Draft Remand Comments at 24.
[91] *See* 1991 Petition at 3-7.
[92] *See* Petitioners' Draft Remand Comments at 24
[93] *See King Supply*, 674 F.3d at 1345-6 (internal citations omitted).
[94] *Id*., 674 F.3d at 1346.

The petitioners argue that Commerce attributes unwarranted significance to the term "bent pipe" in the 1991 Petition because "'bent pipe' has no use other than to be processed into finished butt-weld pipe fittings."[95]  We continue to find that the use of the term "bent pipe" as opposed to any other of the numerous terms that the petitioners claim can be used to describe products that have undergone the first stage of production is significant.  The petitioners have repeatedly claimed that "'bent pipe' is merely an alternative term for as-formed, rough fitting."[96]  However, the 1991 Petition did not use the term "rough fitting"; instead, it referred to "bent pipe."  As the 1991 Petition is one of the primary interpretive sources enumerated in 19 CFR 351.225(k)(1), the description of the merchandise therein provides a valuable source from which our analysis may derive.  It follows that we analyze the language present (and that which is not) to reach our conclusion regarding the inquiry merchandise and to help us understand the intent of the petition and resolve issues that arise in the present day.  Therefore, it is significant that the 1991 Petition uses the term "bent pipe" as opposed to other terms that includes "fitting."

The petitioners claim that the record of this proceeding confirms that "bent pipe" has no use other than to be processed into finished butt-weld pipe fittings.[97]  We disagree with this conclusion.  Although the petitioners contend that a section of cut pipe that has undergone the initial forming process of the first stage of production is already dedicated for no other use than as a subject fitting, the public record contradicts that claim.  Commerce has previously found a product that is threaded on one end *after* the forming/forging process to be covered by the *Order*.[98]  Moreover, the language of the scope suggests that threading on both ends of the

---

[95] *See* Petitioners' Draft Remand Comments at 25.
[96] *Id.*
[97] *See* Petitioners' Draft Remand Comments at 25.
[98] "Thus, just as with other BWPFs, outlets undergo a forming or forging process to achieve their shape, and then undergo a machining process for the threading/grooving/beveling."  *See Final Results of Redetermination Pursuant to Court Remand*, *Vandewater International, Inc. v. United States*, Court No. 18-00199, Slip Op. 20-146 (CIT

product could have excluded the product given the distinction in the scope "from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)."  Thus, the potential for formed or forged pipe to be threaded in the finishing processes and used in non-subject applications contradicts the industry declarations on the record of this inquiry and detracts from the reliability of those statements.[99]  Because the record indicates that a product can be threaded after the forming process, which could remove the fittings from the scope,  the petitioners' claim that products that undergo the first stage of production are dedicated for use as butt-weld pipe fittings is unpersuasive.

The petitioners also claim that because products that undergo the first stage of production are manufactured to certain industry standards, these products are butt-weld pipe fittings.[100] While industry standards can provide important information regarding the technical specifications for a butt-weld pipe fitting, these specifications are guidelines for the production and final product.  However, these specifications do not identify the point in the production process when a fitting becomes a butt-weld pipe fitting.  Using the petitioners' logic, because the butt-weld pipe fitting meets the industry specifications when the product undergoes the first stage of production, then it is already a butt-weld pipe fitting and no further processing is needed. However, as explained above, it is Commerce's position that additional  processing is necessary before a fitting is considered a butt-weld pipe fitting, in finished or unfinished form, that is subject to the scope of the *Order*.  While the steel may meet the technical requirements to

---

October 16, 2020) (Vandewater Remand Redetermination) at 53, available at https://access.trade.gov/resources/remands/20-146.pdf.  *See also Vandewater Int'l, Inc. v. United States*, 589 F. Supp. 3d 1324 (CIT 2022) (sustaining Commerce's redetermination), *aff'd*, 130 F.4th 981, *pet. for reh'g en banc pending*.

[99] *See* Declarations from Domestic Industry Executives at Exhibit 1 ("After the forming process, the resulting rough can only be used to produce a butt-weld pipe fitting; it is no longer seamless pipe and it cannot be finished into a threaded or grooved pipe fitting or used to manufacture any other product.").

[100] *See* Petitioners' Draft Remand Comments at 26.

become a fitting, additional processing is a necessary condition to convert a piece of bent pipe into subject merchandise.

The petitioners go on to argue that the post-initiation clarification of the scope of the investigation "confirms that the {petitioners} intended the term 'unfinished butt-weld pipe fittings' to apply to as-formed fittings because resizing and heat treatment are processes that are performed after forging."[101]  In the *Remand Order*, the Court noted that "Commerce did not provide an explanation at the time it deleted the reference to unprocessed products from the Order, so it is unclear what significance the Court can read into the deleted language at this point."[102]  Although we agree that the absence of an explicit explanation for the appearance and deletion of the language in question makes it difficult to ascertain the exact reasoning for the two scope modifications, we believe the context and nature of the modifications suggest that the addition was an error that was later corrected.  In fact, we directly addressed this issue in the underlying covered merchandise inquiry, where we noted that language of unknown origin, which was not suggested by the petitioners in the 1991 Petition, was inexplicably introduced into the scope:  *Unfinished butt-weld pipe fittings that are not machines (sic), not tooled and not otherwise processed after forging are not included in the scope of this investigation.*[103]  After the petitioners objected to the newly introduced scope language, Commerce removed it from the scope, which the petitioners now attempt to frame as an acknowledgement that products that have only been formed should be included in the scope of the *Order*.[104]  However, the record of the underlying investigation contradicts the petitioners' claims.  Instead, the record indicates that

---

[101] *See* Petitioners' Draft Remand Comments at 28.
[102] *See Remand Order* at 30.
[103] *See Preliminary Results* PDM at 11 (citing Petitioners' Letter, "Petitioners' Reply to the Department's Questionnaire dated January 25, 2023," dated February 28, 2023 at 2-5 and Exhibit 6 (Memorandum, "Request for Clarification of Scope:  Federal Register Notices of Initiation of Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China and Thailand (June 27, 1991) (Scope Clarification Memorandum)).
[104] *Id.*

the language was removed because, regardless of its provenance, it caused unnecessary confusion as to the products covered by the scope. Specifically, the errant language suggests that an unfinished fitting, which is covered by the plain language of the scope, would not be covered if it had not yet undergone the finishing processes of the third stage of production (*e.g.*, machining and tooling). Such a requirement would be nonsensical and contradicts the clear intent of the scope because an unfinished fitting, based on the description in the 1991 Petition and 1992 ITC Report, is a product that has undergone the first two stages of production but has not yet undergone the third stage of production.

The petitioners contend that Commerce misunderstands the Court's conclusion regarding the 1992 ITC Report. In the *Remand Order*, the Court determined that "the ITC Report does not support Commerce's determination that only after the second production stage, or the sizing and reforming operations, is a carbon steel product identifiable as a butt-weld pipe fitting."[105] However, we did not misunderstand the Court's conclusion. Instead, in the Draft Remand, we provided additional explanation regarding our conclusions about the 1992 ITC Report for the Court to take into consideration, including discussing the appearance of the term "rough" in the 1992 ITC Report. The petitioners claim, with regard to the Court's statement that the 1992 ITC Report does not confirm Commerce's conclusion that only after the second stage of processing is a fitting identifiable as an unfinished fitting, that "{t}he CIT's conclusion is unrelated to the intended meaning of 'rough fittings.'"[106] However, the Court discusses the appearance of the term "rough" in the 1992 ITC Report and states that "{t}he term 'rough' appears only once in the {1992} ITC Report when referencing 'rough-formed unfinished fittings.'"[107] Commerce

---

[105] *See Remand Order* at 26-27.
[106] *See* Petitioners' Draft Remand Comments at 30.
[107] *See Remand Order* at 26.

discusses this term as further explanation that Commerce's use of the term "rough fittings" created unnecessary confusion and as clarification that we did not intend this term to be synonymous with the term "rough-formed unfinished fittings" as used in the 1992 ITC Report.

The petitioners argue that Commerce's characterization of the 1992 ITC Report is "contradicted by {Commerce's} revision to the scope of its investigation" because "{t}he effect of revising the investigation's scope was to include as-formed fittings within the investigation *even if they had not been processed after forging*."[108]  As discussed above, we believe the context and nature of the modifications, where the language is of unknown origin and was not suggested by the petitioner in the 1991 Petition, suggests that the addition to the scope was an error that was later corrected.  Regardless, the 1992 ITC Report supports the conclusion that a butt-weld pipe fitting is not in its unfinished form until after the second stage of production as it clearly states that "an unfinished pipe fitting is a fitting that has been advanced after forging."[109]  Again, it would serve no purpose to state this in the 1992 ITC Report if not to draw a distinction between products that have only undergone the first production stage and products that have undergone the first and second stages.  This indicates that a fitting is in unfinished form and subject to the scope of the *Order* after it has undergone the first and second stages of production.

The petitioners assert that because the 1992 ITC Report refers to a product that has undergone the first stage of production as a "hot elbow," this "confirms that an as-formed elbow (and, by implication, an as-formed tee or reducer) is identifiable as a butt-weld pipe fitting in unfinished form before being advanced after forming."[110]  This argument fails.  While the 1992 ITC Report states that, at the end of the first stage of production the "hot elbow is dropped off

---

[108] *See* Petitioners' Draft Remand Comments at 29.
[109] *See* 1992 ITC Report at 4,fn 6.
[110] *See* Petitioners' Draft Remand Comments at 31.

the mandrel," this is clearly a reference to the shape of the product.[111]  More importantly, the

1992 ITC Report does not call this product a fitting, simply an "elbow."[112]  As the 1992 ITC

Report is one of the primary interpretive sources enumerated in 19 CFR 351.225(k)(1), the

description of the merchandise therein provides a valuable source that Commerce can consider in

its analysis.  It follows that we analyze the language present (and that which is not) to reach our

conclusion regarding the inquiry merchandise.  Therefore, it is significant that the 1992 ITC

Report uses the term "elbow" here in the production process as opposed to other terms that

includes "fitting."

In summary, there are many instances where the primary interpretive source enumerated

in 19 CFR 351.225(k)(1) do not refer to products that have undergone the first stage of

production (*i.e.* "bent pipe," "pipe," and the shape of the eventually fitting).  This signifies that

the product of the first stage of production is not a butt-weld pipe fitting in unfinished or finished

form, nor is it identifiable as such.

**Comment 3:   Whether Commerce Provides a Credible Explanation for Disregarding
              Industry Declarations**

*Petitioners' Comments*[113]

The following is a verbatim summary of argument submitted by the petitioners.[114]  For further
details, *see* the Petitioners Draft Remand Comments at 19-23.

> {Commerce} disregarded record evidence in the covered merchandise inquiry in
> the form of sworn declarations from executives in the butt-weld pipe fittings
> industry stating that "rough," "as formed," and "unfinished" fittings are, and have
> been, used interchangeably in the butt-pipe weld pipe fittings industry.  The CIT
> did not agree with disregarding this evidence and directed {Commerce} "to
> reconsider or provide further explanation for disregarding the evidence of the
> industry declarations."  The draft redetermination neither reconsiders this evidence

---

[111] *See* 1992 ITC Report at I-8.
[112] *Id.*
[113] *See* Petitioners' Draft Remand Comments
[114] *Id.*

nor provides further explanation for disregarding it. It merely repeats the rationale that the CIT found unpersuasive.

{Commerce's} rationale for disregarding the industry declarations in the covered merchandise inquiry was a purported conflict between the industry declarations and language in the Petition and the {1992 ITC Report}. The draft redetermination presents an almost identical rationale. For example, the draft redetermination asserts, "The information in the {Petition and the ITC Report} contradict {} the claims made by the petitioners in their submitted declarations." Merely repeating the rationale that the CIT previously rejected is not a credible explanation for disregarding the industry declarations.

There is no substantive conflict between the industry declarations and the Petition's language. The draft redetermination claims that the industry declarations conflict with the Petition because the latter "does not use the terms 'rough forgings' or 'rough fittings.'" Rather than conflicting with terms that are not used in the Petition, the industry declarations provide facts that explain why it was unnecessary for the Petition to use those terms; specifically, the industry has and still does use the term "unfinished fitting" to apply to "rough," "as formed," and "unfinished" fittings.

The draft redetermination's assertion that the Petition and the {1992} ITC Report "distinguish between the products produced at each stage of the production process," is incorrect. The Petition "identified the products subject to {the} investigation in terms of their physical characteristics," {}. Those physical characteristics were "butt-weld pipe fittings in finished or unfinished form." The various elements of the production process are irrelevant to scope.

The draft redetermination responds to the Court's conclusion that "the {1992} ITC Report does not support Commerce's determination" by stating that {Commerce's} "reliance on the {1992} ITC Report as support for our conclusion stemmed from a different quote" than the one cited by the Court. In fact, neither the quote on which the draft redetermination claims {Commerce} relied, nor the associated citation to the {1992} ITC Report, appear anywhere in the *Covered Merchandise Determination*.

*Norca's Comments*[115]

Norca did not provide a summary of its arguments. For further information, *see* Norca's Draft Remand Comments at 2.

---

[115] *See* Norca's Draft Remand Comments.

**Commerce's Position:**  We disagree with the petitioners that we afforded insufficient weight to the industry declarations.  Although the petitioners argue that Commerce "merely repeats in slightly revised terms the rationale rejected by the Court,"[116] this is not an accurate interpretation of Commerce's analysis.  In the *Remand Order*, the Court ordered Commerce to "reconsider or provide further explanation for disregarding the evidence of the industry declarations…"[117] However, in this final remand, Commerce explains that we correctly considered the industry declarations within the context of the totality of the evidence on the record and afforded primary interpretive sources more weight than the industry declarations, which are secondary interpretive sources within the meaning of CFR 351.225(k)(1)(ii).  As noted by the Court in the *Remand Order*, "{i}f there is a conflict between the primary interpretive (k)(1) sources, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue."[118]  When considering the record as a whole, because there was a conflict between these secondary interpretive sources and the primary interpretive sources outlined in 19 CFR 351.225(k)(1)(i), the primary interpretive sources guided our decision, consistent with 19 CFR 351.225(k)(1)(ii).

The petitioners contend that there is no conflict between the industry declarations and the language in the 1991 Petition because "the industry declarations provide facts that explain why it was unnecessary for the Petition to use those terms."[119]  There is, however, still conflict between the industry declarations and the 1991 Petition.  Despite the petitioners now claiming that "unfinished" and "rough" are meant to cover the same type of merchandise, this claim is not supported by the language of the 1991 Petition or the 1992 ITC Report.  The clear absence of

---

[116] *See* Petitioners' Draft Remand Comments at 21.
[117] *See Remand Order* at 33.
[118] *Id.* at 7.
[119] *See* Petitioners' Draft Remand Comments at 21.

this terminology in either source document does not mean that it was widely used to refer to the same merchandise. If these terms were used interchangeably, then both would have been present in the 1991 Petition and the 1992 ITC Report or somewhere else in the 30-year history of this *Order*; if contemporaneous documentation existed, the petitioner had numerous opportunities to submit such factual information during the information-gathering phase of this inquiry but chose not to. Moreover, the absence of a term does little to demonstrate its existence.

Although the petitioners argue that "{t}he various elements of the production process are irrelevant to the scope,"[120] Commerce continues to find that the elements of the production process are quintessential to understanding the scope of the *Order*. In the underlying covered merchandise inquiry, CBP requested that we determine whether the products in this inquiry were subject to the scope of the *Order*. Because the scope of the *Order* is ambiguous, we found it necessary to use the primary interpretive sources enumerated in 19 CFR 351.225(k)(1), including the description of the merchandise contained in the 1991 Petition. As noted above, the Court concluded that the scope language is ambiguous as to the definition of what constitutes an "unfinished" fitting.[121] Thus, the Court held that Commerce's reliance on the sources enumerated in 19 CFR 351.225(k)(1) to address the issue in the *Final Determination* was in accordance with law.[122] Therefore, we continue to rely on the primary interpretive sources enumerated in 19 CFR 351.225(k)(1), including the 1991 Petition. The description of the production process contained in the "Product Description" section of the 1991 Petition, which was drafted by the petitioners themselves, provides valuable insight into the point at which the essential characteristic of the products are imparted, which is necessary for our understanding of

---

[120] *Id.* at 22.
[121] *See Remand Order* at 17.
[122] *Id.* at 40.

the scope and the point at which a product becomes subject to the scope. Specifically, the 1991 Petition clearly identifies when a fitting becomes a fitting in its unfinished form. Because the scope states that both finished and unfinished pipe fittings are subject, one would expect to find information relevant to when in the production process a product becomes an unfinished fitting, which we have identified herein.

Lastly, the petitioners claim that Commerce did not rely on a quotation from the 1992 ITC Report to support our conclusion in the covered merchandise inquiry. Specifically, the petitioners state that "neither the quote on which the draft redetermination claims that the {*Final Results*} relied, nor the associated citation to the {1992} ITC Report appear anywhere in the {*Final Results*}.[123] This is factually incorrect as Commerce did rely on this citation for its decision. In Commerce's *Preliminary Results* PDM, we state that the 1992 ITC Report "confirms the description in the 1991 Petition by stating that an 'unfinished pipe fitting is a fitting that has been advanced after forging but which requires at least one more processing step (*i.e.*, {stage three finishing processes}) to finish the fitting.'"[124] While this quote may not appear in the *Final Determination* IDM, it does appear in Commerce's decision documents and was relied upon by Commerce.

---

[123] *See* Petitioners' Draft Remand Comments at 22-23.
[124] *See Preliminary Results* PDM at 9 (citing to 1992 ITC Report at 4, fn 6).

## V.     FINAL RESULTS OF REDETERMINATION

For foregoing reasons, Commerce continues to find in these final results of

redetermination that merchandise that has undergone the first stage of production in China and

then undergoes the second and third stages of production in Vietnam is not subject to the scope

of the *Order*.

5/2/2025

X *Chris J. Abbott*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance