UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. JENNIFER CHOE-GROVES, JUDGE

TUBE FORGINGS OF AMERICA, INC. AND
MILLS IRON WORKS, INC.,

      **Consolidated Plaintiffs,**

  **v.**

UNITED STATES,

      **Defendant,**
  **and**

NORCA INDUSTRIAL COMPANY, LLC
AND INTERNATIONAL PIPING &
PROCUREMENT GROUP, LP,

      **Consolidated Defendant-
Intervenors.**

**Consol. Court No. 23-00231**

<u>MEMORANDUM OF CONSOLIDATED PLAINTIFFS
TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.
IN OPPOSITION TO THE REDETERMINATION ON REMAND</u>

Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005
(202) 776-1150

June 16, 2025

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I.     THE *REDETERMINATION* REMAINS FUNDAMENTALLY AT ODDS WITH THE *THAILAND CIRCUMVENTION* DETERMINATION ..………..…………………….. 3

    A.     The *Redetermination's* Treatment of Chinese-Origin As-Formed Fittings Conflicts with the *Thailand Determination* …………………………………… 4

        1.     The Chinese-origin as-formed fittings at issue in the *Thailand Circumvention* Determination and the *Final CMI* are physically indistinguishable ….……………………………………………… 5

        2.     Commerce's use of the term "unfinished fitting" in the *Thailand Determination* was not a mistake ……………………………………… 7

        3.     The *Thailand Determination* was a circumvention inquiry based on merchandise subject to an antidumping duty order, pursuant to 19 U.S.C. § 1677j(b)(1)(B)(i) …………………………………………………... 8

    B.     The *China Plywood* Circumvention Determination Does Not Support the *Redetermination* ………………………………………………………... 12

II.     THE PETITION DOES NOT EXPRESSLY USE THE TERM "ROUGH FITTING" IN THE PRODUCT SCOPE BECAUSE CUT PIPE FORMED INTO THE ROUGH SHAPE OF ELBOWS, TEES, AND REDUCERS IS IDENTIFIABLE AS A BUTT-WELD PIPE FITTING IN UNFINISHED FORM ……………………………….. 14

    A.     The Petition's use of the term "unfinished fitting" in a discussion of production processes is irrelevant to the scope of the Petition ……………… 16

    B.     The *Redetermination* attributes unwarranted significance to the use of the term "bent pipe" in the Petition ……………………………………………... 17

    C.     Petitioner's Post-Initiation Clarification of the Intended Scope of Investigation ………………………………………………………………… 21

    D.     The International Trade Commission's Final Injury Report …………………… 23

i

III.   THE *REDETERMINATION* DOES NOT PRESENT A CREDIBLE
       EXPLANATION FOR DISREGARDING RECORD EVIDENCE IN THE FORM
       OF THE SWORN DECLARATIONS OF INDUSTRY EXECUTIVES ……………… 25

CONCLUSION ……………………………………………………………………… 29

# **TABLE OF AUTHORITIES**

**Cases**

*Arcelor Mittal Stainless Belgium N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ………… 28

*King Supply Company LLC. v. United States, et al*., 674 F.3d 1343 (Fed. Cir. 2012) ……………………………………………………………….. 16, 17, 27

*Target Corp. v. United States,* 609 F.3d 1352 (Fed. Cir. 2010) ……..……………………….. 10

*Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*, 750 F.Supp.3d 1364 (Ct. Int'l Trade 2025) ……………………………………………... passim

*U.K. Carbon And Graphite Co., Ltd. v. United States,* 931 F.Supp.2d 1322 (Ct. Int'l Tr. 2013) ………………………………………………..…………………………… 10, 13

*Vandewater Int'l, Inc., et al. v. United States, et al.*, 130 F. 4th 981 (Fed. Cir. 2025) ………….. 28

*Vandewater Int'l, Inc. v. United States*, 589 F.Supp. 3d 1324, *aff'd*, 130 F.4th 981 (Fed. Cir. 2025) ………………………………………………………………….. 19

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) …………………………. 10

**Statutes**

19 U.S.C. § 1677j ……………………………………………………………… passim

**Regulations**

19 C.F.R. § 351.225 ….……………………………………………………………… 14, 25

**Other Authorities**

*Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) .…………………. 1

*Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand*, Inv. Nos. 731-TA- 520 and 521 (Final), USITC Pub. 2528 (June 1992) .…………………. 23, 24, 25

*Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62 (Dept Commerce Jan. 3, 1994) …………………………………... passim

*Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15155 (Dep't Commerce March 31, 1994) ………………………………………….. 1, 9, 10

*Certain Carbon Steel Butt-Weld Pipe Fittings from The People's Republic of China: Final Determination of Covered Merchandise Inquiry,* 88 Fed. Reg. 69909 (Dep't Commerce Oct. 10, 2023) and accompanying Issues and Decision Memorandum ……………. 1, 18, 25

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Initiation of Anti-Circumvention Inquiry on Antidumping Duty Order*, 58 Fed. Reg. 47859 (Dep't Commerce Sept. 13, 1993) ...…………………………………………………… 11

*Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry,* 88 Fed. Reg. 41075 (Dept. Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary Results* …………………………………………………………………………………… 24

*Certain Hardwood Plywood Products From the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36530 (June 17, 2020) …………………...…………………………………………………………………... 14

*Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 45753 (Dep't Commerce July 29, 2022) and accompanying Preliminary Decision Memorandum ……… 12

*Certain Hardwood Plywood Products From the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46740 (July 20, 2023) and accompanying Issues and Decision Memorandum ……………………………. 12, 13, 14

*Final Results of Redetermination Pursuant to Court Remand, Vandewater International, Inc. v. United States*, Ct. No. 18-00199, Slip Op. 20-146 (CIT Oct. 16, 2020) ……………... 19

*Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 56 Fed. Reg. 27730 (June 17, 1991) ……... 21

### INTRODUCTION

This memorandum is submitted on behalf of Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. (collectively, "Petitioners") to express their strong opposition to the Redetermination on Remand issued by the U.S. Department of Commerce on May 2, 2025.[1] The Court's decision and remand order[2] held that the Final Determination in the underlying Covered Merchandise Inquiry ("*Final CMI*")[3] was unlawful and unsupported by substantial evidence. The Court found that Commerce acted arbitrarily when it deviated from its decades-long practice, established in its *Thailand Circumvention* determination,[4] of considering articles in the rough shape of an elbow, tee, or reducer, which have not been heat treated or reformed, to be butt-weld pipe fittings in unfinished form subject to the *China Order*.[5] Further, the Court directed Commerce to (1) "answer the fundamental question whether a 'rough fitting,' also known as a pipe that has been formed into the rough shape of an elbow, tee, or reducer, is identifiable as a 'butt-weld pipe fitting' within the meaning of the *China Order*," *Remand Order*

---

[1] *Certain Carbon Steel Butt-Weld Pipe Fittings from The People's Republic of China,* Final Results of Redetermination Pursuant to ("*Redet."*), Redet PR Doc. 6.

[2] *Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*, 750 F.Supp.3d 1364 (Ct. Int'l Trade 2025) ("*Remand Order*").

[3] *Certain Carbon Steel Butt-Weld Pipe Fittings from The People's Republic of China: Final Determination of Covered Merchandise Inquiry,* 88 Fed. Reg. 69909 (Dep't Commerce Oct. 10, 2023) and accompanying Issues and Decision Memorandum ("*Final CMI*").

[4] *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 15155 (Dep't Commerce March 31, 1994) ("*Thailand Determination*").

[5] *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29702 (Dep't Commerce July 6, 1992) ("*China Order*").

at 1374; (2) "address the Petition's lack of reference to the term 'rough fitting,'" and "analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting," *Id.* at 1377; and (3) "reconsider or provide further explanation for disregarding the evidence of the industry declarations {that} establish a recognized practice and understanding in the industry for over 30 years that rough fittings are considered butt-weld pipe fittings in unfinished form subject to the Order." *Id.* at 1380.

On remand, Commerce "continue{s} to find these 'rough fittings' to be excluded from the scope of the *Order*." *Redet.* at 2. In so doing, Commerce fails to correct any of the errors identified by the Court. Commerce continues to deviate arbitrarily from the 1994 *Thailand Circumvention* determination's finding that Chinese-origin as-formed fittings are subject to the *China Order*. The *Redetermination* incorrectly concludes that a pipe that has been formed into the rough shape of an elbow, tee, or reducer is not identifiable as a butt-weld pipe fitting in unfinished form within the meaning of the *China Order*. It offers no credible response to the fact that the Petition does not expressly use the term "rough fitting" because the scope language of the Petition identified the products subject to the investigation in terms of their physical characteristics. Finally, it fails to present a reasonable explanation for disregarding the sworn declarations of experienced industry executives which comprise unrefuted evidence of the decades-long practice and understanding in the industry that rough fittings are considered butt-weld pipe fittings in unfinished form.

Simply put, like the *Final CMI*, the *Redetermination* is arbitrary and unsupported by substantial evidence. The Court should order a second remand.

## ARGUMENT

**I.    THE *REDETERMINATION* REMAINS FUNDAMENTALLY AT ODDS WITH THE *THAILAND CIRCUMVENTION* DETERMINATION**

In remanding the *Final CMI*, the Court expressly recognized the fundamental conflict between the *Final CMI* and the 1994 *Thailand Circumvention* determination, characterizing Commerce's position in the *Final CMI* as "disingenuous":

> It is contradictory for Commerce to have previously referred to a carbon steel product in the rough shape of an elbow, tee, or reducer, which was not heated or formed, as an "unfinished butt-weld pipe fitting" 30 years ago in 1994 . . ., and then claim that such product is no longer considered an "unfinished butt-weld pipe fitting," but should be considered a "rough fitting" in the 2023 Final IDM. This contradiction without justification is puzzling and disingenuous.
> . . .
> It is clear that, after more than 30 years, Commerce suddenly and surprisingly changed its decades-long past practice without recognizing a switch in this case, and without providing a sufficient explanation to depart from its past practice. Even though Commerce does not specifically admit that it is departing from past practice and taking a new position in this case, that is clearly the situation here, with Commerce reversing its stance on "unfinished butt-weld pipe fittings."

*Remand Order* at 1381-82.

The Court concluded that "Commerce acted arbitrarily by deviating from its decades-long interpretation and practice." *Id.*  It then directed Commerce "to provide sufficient reasons for treating similar situations differently." *Id.*  The *Redetermination* utterly fails to satisfy the Court's directive.  It does not establish a reasonable, lawful and evidence-supported reason for treating as-formed elbows, tees, and reducers differently in the *Final CMI* than in the *Thailand Circumvention* determination.

3

**A.     The *Redetermination's* Treatment of Chinese-Origin As-Formed Fittings Conflicts with the *Thailand Determination***

Rather than address the Court's concern substantively, the *Redetermination* echoes Commerce's previous arguments to the effect that Commerce's inconsistent treatment of Chinese-origin as-formed fittings is the illusory result of confusing terminology: "{W}e agree with the Court that the difference in terminology used in the *Thailand Circumvention Inquiry* and the *Final Determination* created confusion.  We clarify that while the terms employed in these determinations were inconsistent, the treatment of the products at issue were {*sic*} not." *Redet.* at 15.  The *Redetermination* does not address the substantive conflict between the two determinations that the Court identified.  Instead, it attempts to resolve the conflict by revising the *Thailand Circumvention* determination some 31 years after the fact: "We acknowledge that the use of the term 'unfinished fitting' in the *Thailand Circumvention Inquiry* was inaccurate, and our failure to explain clearly Commerce's prior mistake created confusion." *Redet.* at 16.  The *Redetermination* then echoes the argument that failed to persuade the Court in the first place, *viz.*, "Had Commerce truly considered these rough shapes to be unfinished butt-weld pipe fittings, there would have been no need for a circumvention inquiry at all because rough shapes would have already been explicitly covered by the scope of the order." *Id.*

Detracting from Commerce's surmise about what the Department may have "truly considered" in 1994, record evidence flatly contradicts the assertion that Commerce's treatment of the Chinese-origin as-formed fittings subject to the *Final CMI* is not inconsistent with the *Thailand Circumvention* determination, as explained below.

1. **The Chinese-origin as-formed fittings at issue in the *Thailand Circumvention* Determination and the *Final CMI* are physically indistinguishable**

The *Redetermination* does concede that the Chinese-origin as-formed fittings at the heart of the *Thailand Determination* and the Chinese-origin as-formed fittings at issue in the *Final CMI* are "similar." *Redet.* at 18. But it does so in an apparent effort to avoid discussing the record evidence showing that they are physically indistinguishable -- evidence that fatally undermines the *Redetermination*.

The respondent in the *Thailand Determination*, Awaji Sangyo (Thailand) Co., Ltd. ("AST"), reported that it had "purchased Chinese 'as formed' fittings from Mitsui Co., Ltd., a Japanese trading company. The 'as-formed' fittings were produced by Shenzhen Fitting Manufacturing Factory, which is located {in} . . . Shenzhen, China." Letter from Neville Peterson LLP to Secretary of Commerce dated October 26, 2022, PR Doc. 31 at 8 and Attachment B, page 4. AST also reported that all its imports from China consisted of "as-formed" fittings of six inches or under in outside diameter, *Id.* at Attachment B, page 6, which it later described as unfinished tees: "The unfinished tees which AST imported from China were in as-formed condition, which were not advanced beyond cold-forming (*i.e.*, the bulge process). Accordingly, AST had to 'decap' the closed 'head' of the as-formed tees and provide heat treatment, as well as run them through all of the processes downstream of the heat treatment process." *Id.* at Attachment C, page 4. AST continued, "The unfinished tees were in 'as-formed' condition, which had not been advanced in processing beyond the cold-forming stage. Neither heat treatment, decapping, descaling, endfacing, cleaning, coating nor marking had been provided to the as-formed tees prior to the importation of the merchandise into Thailand." *Id.* at Attachment C, page 5. "The unfinished Chinese tees which AST converted to finished tees for

exportation to the United States were as-formed tees not advanced beyond cold-forming." *Id.* at Attachment C, page 14.  In short, the record is irrefutable that the "as-formed" fittings imported from China into Thailand "were not advanced beyond cold-forming*." See also Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China; Affirmative Preliminary Determination of Circumvention of Antidumping Duty Order*, 59 Fed. Reg. 62, 63 (Dept Commerce Jan. 3, 1994) ("*Thai Prelim*").

Work process control forms used by the Vietnamese producer of the pipe fittings imported by Norca similarly identified its Chinese-origin unfinished fittings involved in *Final CMI* as as-formed tees that were not advanced beyond forming: (1) an "Unfinished products requisition" form described the "material" requisitioned from inventory as an unfinished 2" standard tee meeting ASTM A234; (2) a "product process flow card" showed the production process performed in Vietnam on this 2" standard tee started with "heat treatment" of the unfinished tees and that "cutting" and "forming & rough machining" were not performed in Vietnam; and (3) a "Finished Product Warehouse Receipt" describing the "material" of the finished 2" standard tee as meeting ASTM A234.  All three documents reference the same flow card number and purchase order number, thereby confirming that they pertain to the same pipe fitting.[6]

Record evidence thus clearly establishes that there are no physical differences between the Chinese-origin as-formed fittings in the *Thailand Circumvention* determination and the

---

[6]  *See*, e.g., Attachment 5 to U.S. Customs and Border Protection Memorandum re: Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP: Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China (September 2, 2022), PR Doc. 12 at unpaginated pages 37, 52 and 54.

Chinese-origin as-formed fittings in the *Final CMI*. The only difference is that Commerce found them to be subject to the *China Order* in the *Thailand Circumvention* determination but not in the *Final CMI*. The *Redetermination's* claim that "while the terms employed in these determinations were inconsistent, the treatment of the products at issue {was} not," *Redet.* at 15, cannot be reconciled with the record evidence. The *Redetermination* continues to manifest the arbitrary, inconsistent treatment of similar articles that the Court rejected as "puzzling and disingenuous."

### 2. Commerce's use of the term "unfinished fitting" in the *Thailand Determination* was not a mistake

In an attempt to rewrite the history of the *Thailand Circumvention* inquiry, the *Redetermination* characterizes the use of the term "unfinished butt-weld pipe fittings" in the *Thailand Circumvention* determination as a "mistake," *Redet.* at 16, ("our failure to explain clearly Commerce's prior mistake created confusion"). But the *Redetermination* avoids any reference to the actual language of the *Thailand Circumvention*, which unquestionably equates "unfinished fittings" to "as-formed" fittings and undeniably found that the Chinese-origin unfinished as-formed fittings were merchandise subject to the *China Order*:

> The pipe fittings finished in Thailand and exported to the United States were completed from unfinished "as-formed" pipe fittings manufactured in the PRC. Therefore, the merchandise exported to the United States is *completed from merchandise subject to the antidumping duty order* and produced in the country with respect to which the antidumping duty order applies.

*Thai Prelim.* at 63.

Far from being a mistake, this statement reflects the fact that the *Thailand Circumvention* determination was made pursuant to 19 U.S.C. § 1677j(b)(1)(B)(i).

Further undermining the *Redetermination's* attempt to dismiss language in the *Thailand Circumvention* as a "mistake," it bears repeating that AST itself referred to the products it imported into Thailand for processing interchangeably as Chinese-origin "as-formed" tees and "unfinished" fittings.  Unquestionably, the language of the *Thailand Circumvention* determination that the *Redetermination* dismisses as a "mistake" in fact conformed to AST's usage, and Awaji's usage is evidence that the Department's intentionally used the term "unfinished butt-weld pipe fittings."  Moreover, AST's description of its as-formed tees as "unfinished fittings" corroborates the sworn statements of industry executives that the term "unfinished" embraces all butt-weld pipe fittings that have been formed into the rough shape of an elbow, tee, or reducer, but not processed to completion. *See, infra,* at 15, 25-28.

 In short, the *Redetermination* is wrong.  The language in the *Thailand Circumvention* determination confirming that the Chinese rough fittings at issue were both "unfinished 'as-formed' pipe fittings" and "merchandise subject to the antidumping duty order," *Thai Prelim* at 63, was not a confusing mistake in terminology, it was the foundational conclusion on which the *Thailand Circumvention* determination was based.

### 3. The *Thailand Determination* was a circumvention inquiry based on merchandise subject to an antidumping duty order, pursuant to 19 U.S.C. § 1677j(b)(1)(B)(i)

After conceding that the Chinese-origin as-formed fittings at issue in the *Thailand Circumvention* determination were "similar" to the Chinese-origin as-formed fittings at issue in the *Final CMI*, the *Redetermination* asserts that Commerce's "treatment" of the Chinese-origin as-formed fittings in the *Final CMI* was not inconsistent with the *Thailand Circumvention* determination because "the question being asked of Commerce differs in these inquiries." *Redet.* at 18.  The *Redetermination* then repeats Commerce's assertion in the *Final CMI*, *i.e.*, that, by

definition, a circumvention inquiry cannot involve merchandise subject to the order in question and therefore the conclusion in the *Thailand Circumvention* determination is not germane to the *Final CMI*. It excuses the two conflicting findings concerning Chinese-origin as-formed fittings as follows: "Because we have not conducted a circumvention inquiry {in the *Final CMI*} nor made any findings of circumvention that bring these products into the Order, our conclusion in this proceeding differed from the analysis and determination made in the Thailand Circumvention Inquiry." *Redet.* at 19.

This explanation fails for two reasons. First, it focuses incorrectly on the products that were produced from Chinese-origin as-formed fittings rather than on the Chinese-origin as-formed fittings themselves. The conclusion that Chinese-origin as-formed fittings are subject to the *China Order* was a foundational element of the *Thailand Circumvention* determination, rather than the result of that inquiry. In other words, as a factor in the Department's analysis, the determination that Chinese-origin as-formed fittings are subject to the *China Order* was not dependent on the nature of the *Thailand* inquiry. Accordingly, the fact that Commerce conducted a circumvention inquiry in the *Thailand Circumvention* determination rather than a covered merchandise inquiry does not touch on, much less diminish, Commerce's 1994 finding that Chinese-origin as-formed fittings are covered by the *China Order*. Accordingly, the different analytic framework employed in Commerce's 1994 finding does not establish as lawful Commerce's inconsistent treatment of Chinese-origin as-formed fittings in the *Final CMI*.

Second, Commerce's explanation does not acknowledge the statutory authority underlying the *Thailand Circumvention* determination, which was a "third country completion or assembly" circumvention inquiry conducted pursuant to 19 U.S.C. § 1677j(b). *See Thailand Determination*, 59 Fed. Reg. at 15155. 19 U.S.C. § 1677j grants Commerce authority to

"Prevent{…} circumvention of antidumping and countervailing duty orders," while subsection (b) thereof addresses that authority as it applies to "merchandise completed or assembled in other foreign countries." 19 U.S.C. § 1677j(b)(1)(B)(i) authorizes Commerce to include within the scope of an antidumping duty order "merchandise … of the same class or kind as any merchandise produced in a foreign country that is the subject of" an order which, "(B) before importation into the United States, … is completed or assembled in another foreign country *from merchandise which* (i) *is subject to such order*." (emphasis added); *see Target Corp. v. United States,* 609 F.3d 1352, 1355 (Fed. Cir. 2010); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998); *U.K. Carbon And Graphite Co., Ltd. v. United States,* 931 F.Supp.2d 1322, 1334 (Ct. Int'l Tr. 2013).

Commerce's *Thailand Determination* included an affirmative finding pursuant to §1677j(b)(1)(B)(i). The merchandise subject to the inquiry was certain "pipe fittings finished in Thailand." These were described in the determination only as "pipe fittings … which are exported in unfinished form from the PRC to Thailand, where some finishing is performed," 59 Fed. Reg. at 15156, although the administrative record established conclusively that they were "unfinished tees . . . in 'as-formed' condition, which had not been advanced in processing beyond the cold-forming stage." *See supra* at 5. Pursuant to 19 U.S.C. § 1677j(b)(1)(B)(i), Commerce found circumvention of the *China Order* because the inquiry's subject finished pipe fittings from Thailand were completed from merchandise *that was itself subject to the order*, specifically Chinese-origin as-formed butt-weld pipe fittings in unfinished form. Conforming to the requirements of § 1677j(b)(1)(B)(i), Commerce expressly determined that "{t}he pipe fittings finished in Thailand and exported to the United States were completed from unfinished 'as-formed' pipe fittings manufactured in the PRC. Therefore, the merchandise exported to the

United States is *completed from merchandise subject to the antidumping duty order* and produced in the country with respect to which the antidumping duty order applies." *Thai Prelim* at 63 (emphasis added) (unchanged in the final determination).[7]

Circumvention inquiries involving merchandise that has been completed or assembled from merchandise subject to the antidumping duty order in question are explicitly contemplated by the statute. If Commerce's argument that a circumvention determination cannot involve merchandise covered by an order had merit, there could never be a case in which 19 U.S.C. § 1677j(b)(B)(i) could be invoked when the inquiry merchandise "is completed or assembled in another foreign country from merchandise which …(i) is subject to such order." Commerce's explanation for treating Chinese-origin as-formed fittings differently in the *Final CMI* than in the *Thailand Circumvention* determination would render § 1677j(b)(B)(i) superfluous.

The *Redetermination* does not directly address the language of either 19 U.S.C. § 1677j(b)(B)(i) or the *Thailand Determination*. Instead, it quotes from Commerce's Notice of Initiation of the Thailand Circumvention Inquiry,[8] apparently to emphasize that the *Thailand* inquiry was a circumvention inquiry, while "neither CBP, nor the petitioners, nor any other party requested that {Commerce} conduct a circumvention inquiry" in the underlying covered merchandise inquiry. *Redet.* at 20. It is worth noting, however, that, while the *Redetermination* accurately quotes the Notice of Initiation, the Notice itself only paraphrases the statute. That paraphrasing conflates the statute's language, deleting any reference to circumvention by

---

[7] Commerce also made an affirmative finding pursuant to 19 U.S.C. § 1677j(b)(1)(B)(ii), that the unfinished "as-formed" pipe fittings manufactured in China were "produced in the country with respect to which the antidumping duty order applies."

[8] *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Initiation of Anti-Circumvention Inquiry on Antidumping Duty Order*, 58 Fed. Reg. 47859-60 (Dep't Commerce Sept. 13, 1993).

completion or assembly in a third country using "merchandise which . . . is subject to {an antidumping duty} order."  Whatever Commerce's reason for citing the Notice of Initiation instead of a substantive determination or the statute itself , the Notice does not establish that a circumvention inquiry cannot involve third-country completion or assembly using merchandise subject to the antidumping duty order at issue, nor does it detract from the fact that Commerce did determine in the *Thailand Circumvention* determination that Chinese-origin as-formed fittings were subject to the *China Order*.

**B.    The *China Plywood* Circumvention Determination Does Not Support the Redetermination**

The *Redetermination* attributes unwarranted significance to the *China Plywood* circumvention determination,[9] apparently to support its argument that the difference between a circumvention inquiry (as in the *Thailand Circumvention* determination) and a scope inquiry (as in the *Final CMI*) explains Commerce's inconsistent conclusions concerning Chinese-origin as-formed fittings.  In repeatedly invoking *China Plywood*,[10] Commerce may hope to distract from the fact – fatal to the *Redetermination* -- that Commerce did find Chinese-origin as-formed fittings to be subject to the *China Order* as a fundamental element of the *Thailand Circumvention* determination.  *China Plywood*, however, does not undermine the relevance of

---

[9] *Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 45753 (Dep't Commerce July 29, 2022) and accompanying Preliminary Decision Memorandum *and Certain Hardwood Plywood Products From the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 Fed. Reg. 46740 (July 20, 2023) and accompanying Issues and Decision Memorandum.

[10] *Redet.* at 13, 15, 22-24.

the *Thailand Circumvention* determination or establish that Commerce's inconsistent treatment of China-origin as-formed fittings in this case is lawful.

In the *Thailand Circumvention* determination, Commerce found under 19 U.S.C §§1677j(b)(1)(B)(i) and (ii) that the "'as-formed' pipe fittings" that were produced in China -- and subsequently exported to Thailand for further processing into finished butt-weld pipe fittings – were both (i) "merchandise subject to the antidumping duty order" and also (ii) "produced in the country with respect to which the antidumping duty order applies."[11]  In contrast, each of the five production scenarios in *China Plywood* involved third-country processing of "inputs produced in China" or "Chinese-origin hardwood plywood inputs," but **not** merchandise subject to the *Plywood Orders*.  Commerce's finding of third-country circumvention in *China Plywood* was a finding pursuant **only** to 19 U.S.C §1677j(b)(1)(B)(ii).[12]  Because Commerce made an affirmative finding under § 1677j(b)(1)(B)(i) in the *Thailand Circumvention* determination, but not in the *China Plywood* circumvention determination, Commerce's citation to *China Plywood* does not provide the explanation lacking in the *Final CMI* that would justify the fundamental inconsistency between the conclusion that Commerce reached in the *Thailand Circumvention* and its conclusion in the *Final CMI*.  Commerce's argument notwithstanding, *China Plywood* is inapposite.

---

[11] *Thai Prelim.* at 63.  *See also U.K. Carbon And Graphite Co., Ltd. v. United States,* 931 F.Supp.2d 1322, 1334 (Ct. Int'l Tr. 2013), describing Commerce's affirmative findings under both clauses of 19 U.S.C §1677j(b)(1)(B) in the underlying circumvention determination.

[12] *Plywood Final IDM* at 11-12. *See* 19 U.S.C §1677j(b)(1)(B)(ii) ("before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which- … (ii) is produced in the foreign country with respect to which such order or finding applies").

Moreover, the *Redetermination* asserts incorrectly that the "primary question in the plywood inquiry was whether inputs sourced from China were substantially transformed such that the country-of-origin of the plywood exported from Vietnam would transfer to Vietnam from China."[13]  The assertion is incorrect because, in fact, Commerce did not conduct a substantial transformation scope analysis in the final determination in *China Plywood* because an intervening decision by this court reversed a prior scope ruling on which Commerce had relied in its preliminary determination.[14]  The *Redetermination* further errs in citing *China Plywood* because the manner in which Commerce conducted the *China Plywood* proceeding was related directly to the fact that the scope language of the *Plywood* order expressly covered plywood that was subjected to certain listed processing performed in third countries.[15]

## II.    THE PETITION DOES NOT EXPRESSLY USE THE TERM "ROUGH FITTING" IN THE PRODUCT SCOPE BECAUSE CUT PIPE FORMED INTO THE ROUGH SHAPE OF ELBOWS, TEES, AND REDUCERS IS IDENTIFIABLE AS A BUTT-WELD PIPE FITTING IN UNFINISHED FORM

In remanding the *Final CMI*, the Court directed Commerce to "analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough

---

[13] *Redet.* at 22-23.

[14] *See Plywood Final IDM* at 10 and n.23 ("Because we no longer find production scenarios one, two, and three to be covered by the scope of the Orders, we also find that all case and rebuttal brief arguments addressing Commerce's scope ruling or substantial transformation analysis to be moot.")

[15] *Certain Hardwood Plywood Products From the People's Republic of China: Initiation of Anti-Circumvention Inquiries and Scope Inquiries on the Antidumping Duty and Countervailing Duty Orders; Vietnam Assembly*, 85 Fed. Reg. 36530, 36533-34 (June 17, 2020) ("Because the scope of the Orders provides that certain types of further processing do not remove the merchandise from the Orders, we find it appropriate to also initiate scope inquiries, in accordance with 19 CFR 351.225(e), to determine if any of the products made in the production scenarios described by the petitioner are covered by the scope of the Orders.")

shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting." *Remand Order* at 25.  In response, the *Redetermination* asserts that "Commerce used the term 'rough fitting' as a simple repetition of the term set forth in CBP's covered merchandise referral; …. Thus, it is not surprising that the 1991 Petition does not use the term 'rough fitting.'" *Redet.* at 7.

That assertion is false.  Commerce did not adopt the term "rough fitting" as a "simple repetition," nor did the term originate with CBP's covered merchandise referral.  In fact, the term "roughs" appears throughout the records of the Norca's Vietnamese producer.[16]  The Vietnamese producer's use of the term is entirely consistent with the generally understood meaning within the industry.   As explained in the declarations of domestic industry executives, the term "roughs" is widely recognized within the industry as applying to "unfinished fittings" once pipe has been formed into the rough shape of an elbow, tee, or reducer.[17]  Contrary to the *Redetermination*, the reason the term "roughs" does not appear in the Petition is because common industry usage made it unnecessary to do so.

Commerce surmises that "one would expect {the term 'roughs'} would have appeared on the record of this case long before the EAPA inquiry" if it were a common term in the industry. *Redet.* at 26.  Speculation as to what "one would expect" is not record evidence, nor does it detract from actual evidence on the record.  Moreover, contrary to Commerce's speculation, the absence of any controversy about whether "roughs" are pipe fittings in unfinished form – until

---

[16] *See, e.g.*, Attachment 1 to U.S. Customs and Border Protection Memorandum re: Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP: Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China (September 27, 2022), PR Doc. 8 at unpaginated pages 49-80.

[17] Questionnaire Response of Tube Forgings or America, Inc.; Mills Iron Works, Inc.; and Hackney-Ladish, Inc., dated February 28, 2023, PR Doc. 51 at Exhibits 1, 2, and 3.

Norca needed to craft a defense after becoming ensnared in an EAPA investigation -- evidences the industry's common understanding that "roughs" are fittings in unfinished form.

A.     **The Petition's use of the term "unfinished fitting" in a discussion of production processes is irrelevant to the scope of the Petition**

The *Redetermination* incorrectly finds it "meaningful" that the Petition refers to an unfinished fitting "only after the second stage of production." *Redet.* at 8.  To the contrary, this reference to the "second stage of production" is irrelevant to the scope of the *China Order.*  The term "unfinished fitting" does not appear in the scope language of the Petition, which refers to "butt-weld pipe fittings in unfinished form" and describes subject pipe fittings solely in terms of physical characteristics, specifically inside diameter and industry standards for materials and dimensions.  Commerce nevertheless contends that the Petition's description of the production process "is inextricably linked to the scope." *Id.*

This interpretation of the Petition's scope language cannot be squared with the plain language of the Petition or with the Federal Circuit's decision in *King Supply Company LLC. v. United States, et al.*, 674 F.3d 1343, 1345 (Fed. Cir. 2012), where the court observed that the scope language of the Petition "identified the products subject to {the} investigation in terms of their physical characteristics."  The discussion of production processes is thus irrelevant to scope. Further detracting from its relevance to the scope of the *China Order*, the term "unfinished fitting" is physically separated from the description of subject merchandise.  It appears only after the Petition describes the uses of butt-weld pipe fittings, the industry standards that identify butt-weld pipe fittings, and the differences among integrated producers, converters, and combination producers. PR Doc.31 at 3-7.

Commerce responds to *King Supply* in the *Redetermination* by denying that the Petition's scope "refer{red} to any specific physical characteristics." *Redet*. at 27.  But simply referring to

16

the Petition's scope language proves Commerce's assertion to be false.  As the Federal Circuit

observed in *King Supply*:

> The leading paragraph in the "product description" section of the Petition identified products subject to the investigation in terms of their physical characteristics ("carbon steel butt-weld fittings having an inside diameter of less than 360 millimeters," and satisfying certain American Society for Testing and Materials {} and American National Standards Institute {} industry standards for materials and dimensions) . . .."

*King Supply* at 1345.

Plainly, the diameter of subject pipe fittings and the industry standards for materials and

dimensions are physical characteristics that define the scope of the *China Order*.

The *Redetermination* further mischaracterizes *King Supply* by claiming that the decision

"indicates that . . . the description of the production process is crucial to defining the point at

which a fitting is considered 'unfinished.'" *Redet.* at 28.  In fact, *King Supply* indicates nothing

of the sort.  What it does do is observe that following the Petition's description of its scope, the

Petition "went on in subsequent paragraphs to describe how butt-weld pipe fittings are generally

made, used, and sold," *King Supply* at 1345, thereby emphasizing that the "made used, and sold"

discussion was entirely separate from the scope language.

**B.    The *Redetermination* attributes unwarranted significance to the use of the term "bent pipe" in the Petition**

The *Redetermination* continues to pursue the *Final CMI's* analytic goal of attempting to

determine when in the production process "a fitting becomes an unfinished fitting."[18]  While the

*Redetermination* employs a different term, *i.e.,* "bent pipe," its analysis remains unchanged. The

*Redetermination* states, "with respect to a fitting that is in the rough shape of an elbow, the 1991

---

[18] The *Redetermination* echoes the absurd logic of the *Final CMI*, arguing that "additional processing is necessary before a fitting is considered a butt-weld pipe fitting." *Redet.* at 30.

Petition . . . uses the term 'bent pipe.'" *Redet.* at 7-8.  It explains that "Bent pipe is a product of seamless pipe that has undergone the first stage of the production process." *Id.* at 8.  It then contends that "{A} carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is not identifiable as a butt-weld pipe fitting that is subject to the *Order*." *Id.* at 9. This is the same unsupported assertion on which Commerce relied in the *Final CMI*, where it stated, "{A} rough fitting is a fitting that has only undergone the first stage of production and is not covered by the scope of the *Order* when exported from China." *Final CMI* at 19.  In short, "bent pipe" is merely an alternative term for as-formed, rough fittings.

The assertion that a carbon steel pipe that has been cut to length and formed into the rough shape of an elbow, tee, or reducer, is not identifiable as a butt-weld pipe fitting is not supported by record evidence.  To the contrary, as is true when the term used is "rough fittings," record evidence confirms that "bent pipe" has no use other than to be processed into finished butt-weld pipe fittings.  Bent pipe is useless for any other purpose, as the sworn statements of three experienced industry executives confirm.  For example, one domestic industry executive explained:

> The forming process establishes the "essence" of CSBWPF. Prior to the forming process, seamless carbon steel pipe – even if it has been cut to length is simply a raw material that could be used to manufacture any of a number of final products. After the forming process, the resulting rough can only be used to produce a butt-weld pipe fitting; it is no longer seamless pipe and it cannot be finished into a threaded or grooved pipe fitting or used to manufacture any other product.

PR Doc. 51 at Ex. 1, para. 6.

Notably, Norca agrees, having admitted that "The rough fitting that results from the first stage of the production process cannot be used for purposes other than to be an unfinished or finished

butt-weld pipe fitting." Response from Patton Boggs (US) LLP to Secretary of Commerce Pertaining to Norca and IPPG dated February 28, 2023, PR Doc. 48 at 3.

Commerce's attempt to refute record evidence that as-formed fittings are dedicated to use as butt-weld pipe fittings is meritless. Commerce misleadingly cites *Final Results of Redetermination Pursuant to Court Remand, Vandewater International, Inc. v. United States*, Ct. No. 18-00199, Slip Op. 20-146 (CIT Oct. 16, 2020) for the proposition that "the potential for formed or forged pipe to be threaded in the finishing processes and used in non-subject applications detracts from the industry declarations on the record of this inquiry." *Redet.* at 29-30.[19] Commerce's reference to the *Vandewater* redetermination is misleading, however. Nothing about the *Vandewater* redetermination suggests that as-formed fittings are not dedicated to use when they are formed into the rough shape of a butt-weld fitting. The *Vandewater* redetermination held (as did Commerce's original determination) that the products at issue were in fact butt-weld pipe fittings covered by the *China Order* even though they were beveled on one end and threaded on the other. That conclusion was affirmed by the CIT and the CAFC.[20] Thus, contrary to the *Redetermination*, the possibility of threading one end of an as-formed fitting is not evidence that it is not dedicated to use as a butt-weld pipe fitting.

The fact that industry standards governing the material and dimensions of butt-weld pipe fittings are met when seamless pipe is cut and formed into the shape of a rough elbow, tee, or reducer further demonstrates that the significance that the *Redetermination* attributes to the reference to "bent pipe" in the Petition is unwarranted. Record evidence also shows that butt-

---

[19] The *Vandewater* redetermination is available at https://access.trade.gov/login.aspx, ACCESS Barcode No. 4145998-01.

[20] *Vandewater Int'l, Inc. v. United States*, 589 F.Supp. 3d 1324, *aff'd*, 130 F.4th 981 (Fed. Cir. 2025).

weld pipe fittings are manufactured to specific industry standards, ASTM A234 for material grade and ANSI B16.9 for dimensions.  These industry standards for material and dimension identify a product as a butt-weld pipe fitting.  The standards are met when the product is formed from cut pipe, not when the product is sized.  PR Doc. 51 at Ex. 1, 2, and 3.  Additional record evidence that "bent pipe" is dedicated to use as butt-weld pipe fittings exists in the fact that purchase orders for rough fittings frequently specify these standards. *Id.* at Exh. 1, para. 7; Exh. 3, para. 9. That record evidence includes attachments to CBP's covered merchandise referral which show that the Vietnamese manufacturer of Norca's butt-weld fittings acquired Chinese-origin "unfinished products" which already met the ASTM A234 standard before being exported, even though they were not heat treated until after importation into Vietnam.[21]

Petitioners agree with the *Redetermination's* observation that the ASTM and ANSI "specifications do not identify the point in the production process when a fitting becomes a butt-weld pipe fitting," *Redet.* at 30, but disagree with the inference that Commerce draws from it. The fact that the ASTM and ANSI standards are elements of the Petition's scope language yet do not identify any "point in the production process" does not establish "that additional processing is necessary to before a fitting becomes a butt-weld pipe fitting," as the *Redetermination*

---

[21] *See* PR Doc. 12 at unpaginated pages 37, 52 and 54, showing (1) an "Unfinished products requisition" form issued by BW Fittings Co., Ltd. ("BW"), the Vietnamese manufacturer, describing the "material" that it was requisitioning from inventory, an unfinished 2" standard tee, as meeting ASTM A234; (2) a BW "product process flow card" showing the production of a 2" standard tee meeting ASTM A234, and indicating that the steps in the production "process" performed began with "heat treatment," and that "cutting" and "forming & rough machining" were not performed, and (3) a BW "Finished Product Warehouse Receipt" describing the "material" of the finished 2" standard tee as meeting ASTM A234.  All three documents reference the same flow card number and purchase order number, thereby confirming that they pertain to the same pipe fitting.

contends. *Id.* Rather, it underscores that the Petition's production process discussion is entirely separate from its scope language.

Further, Commerce attacks Petitioners' observation that the Petition's scope language describes in-scope merchandise as satisfying ASTM and ANSI standards, arguing that "Using Petitioners' logic, because the butt-weld fitting meets industry standards when the product undergoes the first stage of production, then it is already a butt-weld pipe fitting and no further processing is needed." *Id.* A more complete description of Petitioners' argument is that satisfying the industry standards coupled with the irrefutable fact that bending cut pipe to the rough shape of an elbow, tee, or reducer dedicates the rough-shaped result to use as a butt-weld pipe fitting establishes that an as-formed fitting is a butt-weld fitting in unfinished form. The further processing that Commerce contends is required merely advances the butt-weld fitting in unfinished form toward one that is in finished form.

### C.   Petitioner's Post-Initiation Clarification of the Intended Scope of Investigation

Whatever remaining significance the *Redetermination* attributes to the absence of the terms "roughs" or "rough fittings" in the Petition is fatally undermined by Petitioner's post-initiation clarification of their intended scope of the investigation. When Commerce's Notice of Initiation describing the merchandise subject to the Butt-Weld Pipe Fittings from China antidumping investigation was published in the *Federal Register*, it contained language that would have excluded as-formed fittings (including, to use the *Redetermination's* term, "bent pipe"). The language in question stated that "Unfinished butt-weld pipe fittings that are not machined, not tooled, and *not otherwise processed after forging* are not included in the scope of this investigation." *Initiation of Antidumping Duty Investigation: Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 56 Fed. Reg. 27730 (June 17, 1991)

21

(emphasis added).  This sentence unquestionably described rough fittings (or "bent pipe"), *i.e.*, "fittings that are not machined, not tooled, and not otherwise processed after forging."  On the day following publication of the Notice, Petitioners requested that Commerce delete this exclusionary language because "The petitioner's intent is to include imports of all butt-weld fittings of the kind described, whether finished or unfinished (wherever they may be classified) from the countries in question."[22]  In response to Petitioners' statement concerning the intended scope of the investigation, Commerce deleted the language to which Petitioners objected, thereby making it clear that an unfinished fitting that had not been "processed after forging" – for example, by resizing or heat treating – was subject to the investigation.

Petitioners' request to revise the scope language confirms that they intended the term "unfinished butt-weld pipe fittings" to apply to as-formed fittings because resizing and heat treatment are processes that are performed after forging.  Moreover, the fact that Commerce granted Petitioners' request confirms that as-formed fittings (or "bent pipe" to use Commerce's latest term) were covered by the investigation and resulting antidumping duty order even if they had not been processed after forging.

The *Redetermination* discounts Petitioners' express concern about the scope of the initiation, arguing that "the context and nature of the {objectionable language} suggest that the addition was an error that was later corrected." *Redet.* at 31.  Commerce's argument has no merit. It does not matter why the language that would have excluded fittings that were not processed after forging was included in the initiation notice.  What does matter is that Petitioners objected to it and Commerce deleted it in response.  Those actions confirm that as-formed fittings that are not advanced after forging are covered by the *China Order*.

---

[22] PR Doc. 51 at Ex. 6, Letter from McKenna & Cuneo page 3.

Similarly meritless is Commerce's assertion that the language deleted from the Notice of Initiation merely "suggests that an unfinished fitting . . . would not be covered if it had not yet undergone the finishing processes of *the third stage* of production." *Redet.* at 32 (emphasis added). To the contrary, the language deleted at Petitioners' request would have excluded as-formed fittings in the rough shape of elbows, tees, or reducers because the term "advanced after forging" includes reforming/sizing and heat treatment (*i.e.*, Commerce's "second stage" of production), as well as the finishing steps that Commerce calls the third production stage. The deletion of this exclusionary language at Petitioners' request is persuasive evidence that the antidumping investigation was intended by Petitioners to cover all articles that had been formed in the rough shape of butt-weld pipe fittings, including those that had not undergone any processing steps after forming, and that the scope of the *China Order* manifests that intent.

### D.    The International Trade Commission's Final Injury Report

The report of the U.S. International Trade Commission ("ITC") in its final injury investigation[23] also undermines the *Redetermination's* assertion that references to "bent pipe" are significant. In remanding the *Final CMI*, the Court rejected Commerce's claim that the ITC report supported the *Final CMI,* stating unambiguously,

> The ITC Report does not confirm Commerce's determination that only after carbon steel pipes are cut, then heat-treated and sized/formed, are they then considered to be unfinished butt-weld pipe fittings. The Court concludes that *the ITC Report does not support Commerce's determination that only after the second production stage, or the sizing and reforming operations, is a carbon steel product identifiable as a butt- weld pipe fitting that is within the scope of the* <u>Order</u>.

*Remand Order* at 26.

---

[23] *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand*, Inv. Nos. 731-TA-520 and 521 (Final), USITC Pub. 2528 (June 1992) ("*USITC Pub. 2528*").

The *Redetermination* makes several attempts to rebut the Court, each of which fails to establish the ITC report as evidence supporting the *Final CMI*.  First, Commerce asserts that the *Final CMI* did not intend the term "rough fittings" to be synonymous with the term "rough formed unfinished fittings." *Redet.* at 10.   Beyond being *post hoc* rationalization, this assertion misses the Court's point, which was unrelated to the intended meaning of "rough fittings." Rather, the Court addressed the more fundamental fact that "The ITC Report does not confirm Commerce's determination" that only carbon steel pipes that have been cut, then heat-treated and sized/formed, are considered to be unfinished butt-weld pipe fittings.

The *Redetermination* asserts that the *Final CMI* relied on the following footnote to the ITC Report: "An unfinished pipe fitting is a fitting that has been advanced after forging but which requires at least one more process step . . . to finish the fitting."[24]   It characterizes this footnote as showing "that a shape that has been forged is not yet an unfinished fitting; instead, the shape has to be 'advanced after forging' to attain this status." *Redet.* at 10.   It is unlikely that the *Final CMI* did in fact rely on this footnote, however, because while Commerce did refer to it in its preliminary covered merchandise determination,[25] Commerce deleted the reference from the *Final CMI*.  In any event, the *Redetermination's* characterization of the footnote is contradicted by Commerce's revision to the scope of its antidumping investigation discussed above, the effect of which was to include as-formed fittings within the investigation *even if* they had not been processed after forging.

---

[24] *USITC Pub. 2528* at 4, n.6.

[25] *Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry,* 88 Fed. Reg. 41075 (Dept. Commerce June 23, 2023) and accompanying Decision Memorandum for Preliminary Results, PR Doc. 63 at 9.

Finally, the *Redetermination* cites yet another footnote to the ITC Report for the proposition that the report "does not refer to merchandise that has been formed into the shape of a fitting as a 'fitting.' Instead, the 1992 Report refers to the first step of production as 'pipe.'" *Redet.* at 10.  Reference to the main text of the ITC Report, however, describes how, after hot pipe is forced over a mandrel and the desired degree of bend is achieved, a "'*hot elbow*' is dropped off the mandrel and immediately resized in a die under pressure."[26]  The ITC's reference to the product as a "hot elbow" prior to resizing shows that an as-formed elbow (and, by implication, other as-formed shapes) is dedicated to use as a butt-weld pipe fitting and thus is identifiable as a butt-weld pipe fitting in unfinished form before being advanced after forming.

### III.    THE *REDETERMINATION* DOES NOT PRESENT A CREDIBLE EXPLANATION FOR DISREGARDING RECORD EVIDENCE IN THE FORM OF THE SWORN DECLARATIONS OF INDUSTRY EXECUTIVES

Record evidence in the covered merchandise inquiry included sworn declarations from three experienced executives in the CSBWPF industry stating that "'rough,' 'as formed,' and 'unfinished' fittings are, or have been, used interchangeably in the butt-pipe weld pipe fittings industry . . . These terms are universally understood to refer to the roughly shaped result of subjecting a cut length of pipe to the forming process." PR Doc. 51 at Exhibits 1, 2, and 3. Commerce disregarded this evidence in the *Final CMI* on the false ground that it "conflicted" with a subsection 351.225 (k)(1) evidentiary source, stating: "Even if the industry currently may use these terms interchangeably . . ., the language of the Petition itself describes what constitutes an 'unfinished' and 'finished' fitting and the <u>Order</u> is clearly intended to only cover finished and unfinished fittings as described in the Petition." *Final CMI* at 26.  The Court "d{id} not agree . . . that the contrary evidence of the declarations of domestic industry executives should be ignored

---

[26] *USITC Pub. 2528* at I-8, n.18.

or minimized, particularly when weighing over 30 years of understanding and industry practice against a new policy that Commerce only developed in this covered merchandise referral request for the first time in 2023." *Remand Order* at 33. The Court remanded accordingly, and directed the Department "to reconsider or provide further explanation for disregarding the evidence of the industry declarations . . .." *Id.*

The *Redetermination* does not comply with the Court's direction. It neither reconsiders nor provides further explanation for disregarding the industry declarations. Instead, it echoes the *Final CMI*, repeating in slightly different language the rationale rejected by the Court: "Commerce considered the industry declarations as secondary interpretive sources," *Redet.* at 12, "The information in the {Petition and the ITC report} contradict {sic} the claims made by the petitioners in their submitted declarations that the industry has always used these terms synonymously," *id.*, and "Because the recent claims made by the industry officials in their declarations conflict with information in the primary interpretive sources . . ., we afforded the primary interpretive sources more weight than the industry declarations, which are secondary sources . . ." *Id.* at 13. Merely repeating the rationale that the Court previously rejected is not a credible explanation for disregarding the industry executives' declarations.

Moreover, contrary to Commerce's "explanation," there is no conflict between the industry executives' declarations and the Petition's language. The *Redetermination*, like the *Final CMI*, observes that the Petition did not use the terms "rough forgings" or "rough fittings." But the fact that the Petition did not use those terms is not evidence that the industry in general did not and does not use them. No conflict exists between the industry executives' declarations and the Petition when the Petition says nothing at all. Rather than standing in conflict with language that was not in the Petition, the industry executives' declarations provide facts that explain why it

was not necessary for the Petition to use such language.  Specifically, the term "unfinished

fitting" – which is used in the Petition – has been and still is recognized in the industry as

interchangeable with the terms "rough," "as formed," and "unfinished" fittings.

Further, as discussed, *supra*, the assertion that the Petition and the ITC Report

"distinguish between the products produced at each stage of the production process," *Redet.* at

13, is incorrect.  An accurate reading of the Petition shows that the scope language "identified the

products subject to {the} investigation in terms of their physical characteristics, *i.e.,* butt-weld

pipe fittings under 360 millimeters in inside diameter meeting certain industry standards, in

finished or unfinished form." *See King Supply, supra*, at 1345.  The various elements of the

production process are irrelevant to scope.  In addition, the term "unfinished fitting" appears

separately in the Petition in a discussion of how butt-weld pipe fittings are made, used, and sold.

This "tracing" of the stages of integrated production of butt-weld pipe fittings is separated from

the description of subject merchandise by information concerning the uses of butt-weld pipe

fittings, the industry standards that identify butt-weld pipe fittings, and the differences among

integrated producers, converters, and combination producers.

With respect to the purported conflict between the industry executives' declarations and

the ITC Report, the Court concluded that "the ITC Report does not support Commerce's

determination that only after the second production stage, or the sizing and reforming operations,

is a carbon steel product identifiable as a butt-weld pipe fitting that is within the scope of the

Order. See Final IDM at 26-27 (citing ITC Report at I-10)." *Remand Order* at 26-27. The

*Redetermination* responds by claiming that the Department's "reliance on the ITC Report as

support for our conclusion stemmed from a different quote," citing the ITC Report at page 4,

footnote 6.  But such reliance is unlikely; as noted, at page 24 above, Commerce deleted from the *Final CMI* any reference to footnote 6 of the ITC Report.

The *Redetermination* relies on Commerce's unsupported surmise that "If these terms were used interchangeably, then both would have been present in the 1991 Petition and the 1992 ITC Report." *Redet.* at 37.  But Commerce does not provide a scintilla of evidence showing why those terms would necessarily have been present in the Petition and ITC Report.  In contrast, the declarations of experienced industry executives do provide credible evidence explaining why the terms do not appear in the Petition and ITC Report.  The industry executive declarations comprise record evidence where Commerce's unsupported assertion does not.

The Federal Circuit has recently spoken to the importance of industry usage in interpreting the scope of antidumping duty orders.  In *Vandewater International, Inc., et al. v. United States, et al.*, 130 F. 4th 981 (Fed. Cir. 2025), the CAFC cited *Arcelor Mittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012) for the proposition that "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *Vandewater* at 992. The *Vandewater* court then observed, "{T}he terms of an order should be consistent, when possible, with industry usage." *Id.*  The absence of language in the Petition exemplifies an interpretive vacuum of the type rejected by the Federal Circuit.  In that context, it was imperative for Commerce to give persuasive weight to the sworn statements of industry executives.  Commerce's failure to interpret the scope of the *China Order* consistently with industry usage further establishes that the *Redetermination* is unlawful.

28

## <u>CONCLUSION</u>

For the foregoing reasons, the *Redetermination* is unsupported by substantial evidence and is unlawful.  Tube Forgings of America, Inc. and Mills Iron Works, Inc. therefore respectfully request this Honorable Court to remand again Commerce's *Final CMI* with instructions to determine that a pipe that has been formed into the rough shape of an elbow, tee, or reducer or other shape, is identifiable as a butt-weld pipe fitting within the meaning of the *China Order* regardless of whether it is denominated as a "rough" fitting, an "as-formed" fitting or by any other nomenclature, and to grant such additional relief as the Court may deem appropriate.

Respectfully submitted,

Lawrence J. Bogard
John B. Totaro, Jr.
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C.  20005

29

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

These Comments in Opposition to the Redetermination on Remand comply with the type-volume limitation of the United States Court of International Trade Standard Chambers Procedure 2(B)(1). The brief contains 8,719 words, excluding the parts of the brief exempted by the Standard Chambers Procedures.

<u>/s/ Lawrence J. Bogard</u>
Lawrence J. Bogard
Neville Peterson LLP
1310 L Street, N.W.
Suite 300
Washington, D.C. 20005

Dated: June 16, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that copies of the attached Comments of Consolidated Plaintiffs Tube

Forgings of America, Inc. and Mills Iron Works, Inc. In Opposition to the Redetermination on

Remand was this day served by electronic service through the Court's CM/ECF system on the

following:

Anne Marie Delmare, Esq.                          Jeremy W. Dutra, Esq.
U.S. Department of Justice                          Squire Patton Boggs (US) LLP
Commercial Litigation Branch – Civil Division       2550 M Street, N.W.
P.O. Box 480                                        Washington, D.C.   20037
Ben Franklin Station
Washington, DC 20044


Jared Michael Cynamon, Esq.
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 4610
Washington, DC 20230




Dated: June 16, 2025                                /s/ *John B. Totaro, Jr.*
                                                   John B. Totaro, Jr.