23-00231

_____

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

V TUBE FORGINGS OF AMERICA, INC. and
MILL IRON WORKS, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant

and

NORCA INDUSTRIAL COMPANY, LLC and
INTERNATIONAL PIPING & PROCUREMENT,
GROUP, LP,

Defendant-Intervenor.

_____

DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

_____

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL

LESLIE M. LEWIS
Senior Attorney
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230-0001

ANNE M. DELMARE
Trial Attorney
Commercial Litigation Branch, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-0531
E-mail: Anne.M.Delmare@usdoj.gov

July 30, 2025

*Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

BACKGROUND ............................................................................................... 2

    I.   Administrative Determination Under Review And Remand Order ............................ 2

    II.   Remand Proceeding And Remand Redetermination ...................................... 4

SUMMARY .................................................................................................... 8

ARGUMENT .................................................................................................. 9

    I.   Standard Of Review ............................................................................... 9

    II.   The Court Should Sustain Commerce's Remand Redetermination Because It
        Complies With The Court's Remand Order And Is Supported By Substantial
        Evidence ............................................................................................... 9

        A.   The Petition Supports Commerce's Remand Redetermination That Carbon
            Steel Pipe Cut To Length In The Rough Shape Of An Elbow, Tee, Or
            Reducer Is Not Identifiable As A Butt-Weld Pipe Fitting Subject To The
            *Order* ................................................................................................. 9

        B.   Commerce's Remand Redetermination Does Not Conflict With The
            *Thailand Circumvention Inquiry* Determination ......................................... 21

        C.   Commerce's Remand Redetermination Complies With The Court's
            Remand Order To Further Explain Its Treatment Of Industry
            Declarations ......................................................................................... 31

CONCLUSION ............................................................................................... 34

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001) ........................................................... 9

*Crawfish Processors Alliance v. United States*,
    483 F.3d 1358 (Fed. Cir. 2007) ........................................................... 9

*Deacero S.A. de C.V. v. United States*,
    817 F.3d 1332 (Fed. Cir. 2016) ........................................................... 30

*King Supply Co., LLC v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012) ........................................... 12-13, 13, 14, 15, 16

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................ 9

*Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*,
    750 F. Supp. 3d 1364 (Ct. Int'l Trade 2025) ................... 1, 4, 9, 10, 11, 19, 20, 21, 22, 25, 31, 32, 33

*U.K. Carbon and Graphite Co. v. United States*,
    931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013) ........................................ 29

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ........................................................................ 9

*Valeo N. Am., Inc. v. United States*,
    610 F. Supp. 3d 1322 (Ct. Int'l Trade 2022) ....................................... 33

*Vandewater International, Inc., et al. v. United States, et al.*,
    130 F. 4th 981 (Fed. Cir. 2025) ....................................... 17, 18, 19, 34

**STATUTES**

19 U.S.C. § 1677j ................................................................ 22, 23, 25, 26, 27, 29

**REGULATIONS**

19 C.F.R. § 351.202 .......................................................................... 13

19 C.F.R. § 351.225 ........................................ 3, 7, 13, 14, 15, 16, 17, 25, 31

19 C.F.R. § 351.227 .......................................................................... 2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| _____ )<br>TUBE FORGINGS OF AMERICA, INC. and )<br>MILL IRON WORKS, INC., )<br> )<br>          Consolidated Plaintiffs, )<br> )<br>   v. )<br> )<br>UNITED STATES, )<br> )<br>          Defendant, )<br> )<br>   and )<br> )<br>NORCA INDUSTRIAL COMPANY, LLC and )<br>INTERNATIONAL PIPING & PROCUREMENT )<br>GROUP, LP, )<br> )<br>          Consolidated Defendant- )<br>          Intervenors. )<br>_____ ) | Consol. Court No. 23-00231 |

**DEFENDANT'S RESPONSE TO CONSOLIDATED PLAINTIFF'S**
**COMMENTS ON COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments brief (ECF No. 58) filed by consolidated plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc. (collectively TFA) concerning the Department of Commerce's remand redetermination filed in accordance with this Court's remand order in *Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*, 750 F. Supp. 3d 1364 (Ct. Int'l Trade 2025) (Remand Order).  *See* Final Results of Redetermination, Pursuant to Court Remand, May 2, 2025 (Remand Redetermination), ECF No. 56.  TFA challenges Commerce's finding that Chinese-origin rough shapes that undergo the second and third stages of production in Vietnam are not

subject to the scope of the antidumping order on butt-weld pipe fittings from the People's

Republic of China (China).  *See Antidumping Duty Order and Amendment to the Final*

*Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings*

*from the People's Republic of China*, 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992)

(*Order*).  As demonstrated below, Commerce's redetermination decision is supported by

substantial evidence and otherwise in accordance with law.  Accordingly, the United States

respectfully requests that this Court sustain Commerce's covered merchandise redetermination

and enter judgment for the United States.

## **BACKGROUND**

### I.    **Administrative Determination Under Review And Remand Order**

The administrative determination under review is the final determination in the covered

merchandise inquiry on certain steel butt-weld pipe fittings from China.[1]  *See Certain Carbon*

*Steel Butt-Weld Pipe Fittings from People's Republic of China* (Final Determination)*, 88 Fed.*

Reg. 69,909 (Dep't of Commerce Oct. 10, 2023) (P.R. 84)[2] and accompanying Issues &

Decision Memorandum for Covered Merchandise Inquiry (IDM) (P.R. 83).  For the covered

merchandise inquiry, pursuant to 19 C.F.R. § 351.227(f), Commerce applied the analysis

---

[1] On September 6, 2022, United States Customs and Border Protection (CBP) sent a covered merchandise referral to Commerce requesting that Commerce determine whether described merchandise is subject to the *Order*. *See* Memorandum, "Receipt of Covered Merchandise Referral and Placement of Covered Merchandise Referral Documents on the Record," dated September 27, 2022, at enclosed CBP's Letter, "Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP: Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China," dated September 6, 2022 (Covered Merchandise Referral) (P.R. 7).

[2] "P.R." refers to the documents in the public administrative record. "P.R.R." refers to the documents in the public remand record.

described in 19 C.F.R. § 351.225(k) governing scope rulings. *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Preliminary Results of Covered Merchandise Inquiry*, 88 Fed. Reg. 41,075 (Dep't of Commerce June 23, 2023) (Preliminary Determination), and accompanying Preliminary Decision Memorandum (PDM) at 4 (P.R.63); IDM at 17-27. As a result of its analysis, in the underlying administrative determination, Commerce found that Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are not within the scope of the *Order*. *See* PDM 7-12; IDM at 27.[3]

This litigation followed. *See* Summons, Nov. 1, 2023, ECF No. 1. On January 2, 2025, the Court held that Commerce's determination is not supported by substantial evidence and remanded to Commerce to further consider its determination that "rough fittings" from China that underwent the second and third stages of processing in Vietnam were excluded from the scope of the *Order*. *See* Remand Order. Specifically, the Court directed Commerce on remand to answer the fundamental question of whether a "rough fitting," which the Court defined as a pipe that has been formed into the rough shape of an elbow, tee, or reducer, is identifiable as a "butt-weld pipe fitting." *Id.*, 750 F. Supp. 3d at 1374. The Court also directed Commerce, as part of its analysis, to: (1) "address the Petition's lack of reference to the term 'rough fitting,' and . . . analyze whether the Petition answers the question whether a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe

---

[3] After considering the parties' arguments before the agency, Commerce determined that rough fittings are not subject to the *Order*. *See* IDM at 17-27. In addition, Commerce found that subject unfinished butt-weld pipe fittings exported from China that undergo the final stage of production in Vietnam remain subject to the scope of the *Order* because they are not substantially transformed into products of Vietnam by the finishing processes performed in Vietnam. *See* IDM 3-14. Because all challenges to that determination have been voluntarily dismissed, we do not further discuss this production scenario.

fitting"; (2) "reconsider or provide further explanation for disregarding the evidence of the industry declarations, particularly in light of Commerce's reconsideration on remand whether 'rough fittings,' or carbon steel pipe in the rough shape of an elbow, tee, or reducer, are butt-weld pipe fittings within the scope of the *Order*"; and (3) "address the Court's concerns about contradictory evidence on the record and the failure to provide sufficient reasons for treating similar situations differently."  750 F. Supp. 3d at 1374, 1377, 1380 and 1382.

## II.    Remand Proceeding And Remand Redetermination

On March 24, 2025, Commerce released for comment its draft results of redetermination, in which it continued to find that merchandise that undergoes the second and third stages of production in Vietnam is not subject to the scope of the *Order*.  *See* Draft Results of Redetermination Pursuant to Court Remand, *Tube Forgings of America, Inc. and Mills Iron Works, Inc. v. United States*, Court No. 23-00231, Slip Op. 25-1 (CIT January 2, 2025), dated March 24, 2025 (P.R.R. 1) (Draft Remand).  On May 2, 2025, Commerce filed its final remand redetermination with the Court.  *See* Remand Results, ECF No. 56-1.  The final redetermination decision addressed comments by TFA and defendant-intervenor, Norca Industrial Company, LLC (Norca).  Remand Results at 5 and 17.

In the remand results, Commerce explained that "rough fittings" are not identifiable as unfinished butt-weld pipe fittings subject to the *Order*.  *Id*. at 11-17, 24.  As an initial matter, in the underlying inquiry, Commerce acknowledged that its use of the term "rough fitting" to describe precursor products to both the unfinished and finished butt-weld pipe fittings has created confusion among parties and with the Court.  Remand Results at 6.  Commerce had adopted this term to refer to the merchandise at-issue in a manner which was consistent with the language used in the first production scenario posed by CBP in its covered merchandise referral.

*Id*. at 6. Specifically, in its covered merchandise referral, CBP asked Commerce to determine "whether (1) Chinese-origin rough fittings that only underwent the third stage of production (*i.e.*, finishing processes) in Vietnam are within the scope of the *Order*; and (2) whether Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are within the scope of the *Order*." *Id*. at 6 n.24 (quoting CBP's covered merchandise referral at 4). Thus, Commerce referred to merchandise that had undergone the first production stage as a "rough fitting" and merchandise that had undergone the first two production stages as an "unfinished fitting." *Id*. (citing IDM at 19-20).

However, in light of the Court's opinion, the redetermination decision addresses this confusion and identifies products instead by stage of production as follows: (1) "rough shapes" for pipe which has undergone only conversion into a rough shape of an elbow, tee, reducer, *etc*., through a cold- or hot-forming (or forging process); and (2) "unfinished fittings" for rough shapes which have been reformed or sized to match the pipe it is destined to be welded to, but which have not been finished. *Id*. Commerce also addressed the absence of the term "rough fitting" in the petition and clarified that its use of "rough fitting" was "a simple repetition of the term" set forth by CBP in its covered merchandise referral. Remand Results at 7. Because this term was "a simple repetition" of the language used in CBP's covered merchandise referral, Commerce concluded that the lack of the term in the petition is "not surprising." *Id*. at 7.

In the remand results, Commerce noted that the petition distinguishes between merchandise that has undergone the first stage of the production process and merchandise that has undergone the first and second stages of production. *Id*. at 7-8. Commerce explained, for example, with respect to a fitting that is in the rough shape of an elbow, the petition describes the production process and uses the term "bent pipe," which is a product of seamless pipe that has

undergone the first stage of the production process. *Id*. at 8. Specifically, the petition states that the bent pipe must undergo an operation or other processes necessary to ensure that the fitting will match the pipe to which it will be attached, and certain products must undergo a heat treatment process crucial for structural stability, and after these processes, the bent pipe is considered an "unfinished 'elbow.'" *Id*. at 8 (quoting petition at 5-6). Commerce explained that while the petition does not directly or explicitly identify the products that results from the first production process (either as a "rough fitting" or something else), it makes the distinction between a product that has undergone the first step in the production process (*i.e.*, bent pipe) and one that has undergone an additional crucial process (*i.e.*, an unfinished fitting). *Id*. Commerce further explained that only after the second stage of production does the petition identify the product as an unfinished fitting. Thus, the petition's references to certain processes support the conclusion and answers the question of when a butt-weld pipe fitting becomes identifiable, as the petition states that "{a}fter the{} {first and second stage} processes, the bent pipe is considered to be an unfinished 'elbow.'" *Id*. at 9 (quoting petition at 6).

Based on its analysis of the petition and the final report issued by the U.S. International Trade Commission (ITC) in the investigation underlying the *Order*, *i.e.*, (k)(1) primary interpretive sources, Commerce found that a second stage of production is necessary for merchandise that has been formed into the shape of a fitting to be considered an "unfinished fitting." Remand Results at 8-14. Commerce explained that while the petition does not directly identify the product that results from the first production process, it makes a distinction between a product resulting from the first step in the production process and a product that has undergone a second, more crucial process (*i.e.*, an unfinished fitting). *Id*. at 7-8. Commerce found it "meaningful that only after the second stage of production does the {petition} identify the

product as an unfinished fitting." *Id*. at 8. Commerce also found that the ITC report supports that a "rough" or "rough fitting" is merely an input used to produce subject merchandise (*i.e.*, butt-weld pipe fitting). *Id*. at 11. Commerce considered the totality of the record evidence, and afforded these primary interpretive sources more weight than the secondary sources (namely recent industry declarations) in accordance with the agency's regulations. *Id.* at 13-14; *see also* 19 C.F.R. § 351.225(k)(1)(i).

Next, Commerce explained that the remand redetermination is not inconsistent with the *Thailand Circumvention Inquiry*, because a circumvention inquiry is different from a covered merchandise inquiry. *See* Remand Results at 18-19; *see also Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 59 Fed. Reg. 62 (Dep't of Commerce, January 3, 1994) (Thailand Circumvention Prelim), unchanged in *Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 59 Fed. Reg. 15,155 (Dep't of Commerce, March 31, 1994) (Thailand Circumvention Final) (collectively, *Thailand Circumvention Inquiry*). In the *Thailand Circumvention Inquiry*, Commerce was asked to determine whether Chinese-origin butt-weld pipe fittings completed in Thailand are circumventing the *Order* and an affirmative circumvention finding was necessary for the agency's conclusion that butt-weld pipe fittings completed in Thailand should be covered by the scope of the *Order*. *Id*. Here, however, in the covered merchandise inquiry, CBP asked Commerce whether Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam are within the scope of the *Order*. This is to say, there was no request for a circumvention inquiry and no circumvention analysis was done. Remand Results at 18-19. In both cases, Commerce did not find that the products were within the scope of the existing

*Order*, and the products processed in Thailand only became so as a result of its circumvention inquiry.

Commerce also provided further explanation of its treatment of industry declarations. Specifically, Commerce explained that it considered sworn executive declarations of industry usage in the context of the totality of record evidence, which included both primary interpretive sources as well as secondary interpretive sources such as the declarations. Remand Results at 11-14. Addressing the Court's directive to provide further explanation of its treatment of industry declaration, Commerce further explained that it attributed more weight to the primary interpretive sources than to the industry declarations. *Id.* at 13-14, 36.

## SUMMARY

The redetermination decision addressed the concerns articulated by the Court in its opinion and remand order and Commerce correctly determined that products that have undergone only the first stage of production in China are not subject to the *Order*'s scope. Commerce also complied with this Court's remand order by further explaining that the underlying covered merchandise inquiry does not conflict with the *Thailand Circumvention Inquiry* because the differing applicable legal and analytical frameworks required of a circumvention inquiry and covered merchandise inquiry resulted in the different outcomes. Lastly, the redetermination decision complies with the Court's remand order by providing further explanation of Commerce's treatment of recent industry declarations. As such, the Court should sustain Commerce's remand redetermination because it complies with the Court's order and is supported by substantial evidence.

# ARGUMENT

## I.    Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (stating "{s}ubstantial evidence is more than a mere scintilla"). "Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)).

## II.    The Court Should Sustain Commerce's Remand Redetermination Because It Complies With The Court's Remand Order And Is Supported By Substantial Evidence

The Court remanded Commerce's determination that Chinese-origin "rough fittings" which underwent the second and third stages of processing in Vietnam are excluded from the *Order*'s scope.  *See* Remand Order, 750 F. Supp. 3d at 1383.  As detailed below, Commerce complied with the Court's remand order and, as such, the Court should sustain Commerce's remand redetermination.

### A.    The Petition Supports Commerce's Remand Redetermination That Carbon Steel Pipe Cut To Length In The Rough Shape Of An Elbow, Tee, Or Reducer Is Not Identifiable As A Butt-Weld Pipe Fitting Subject To The *Order*

TFA challenges Commerce's explanation that its use of the term "rough fitting" to describe precursor products to both the unfinished and finished butt-weld pipe fittings was "a simple repetition of the term" set forth by CBP in its covered merchandise referral.  Remand Results at 6-7.  TFA argues that the reason why the term "roughs" does not appear in the petition is because "common industry usage" made it unnecessary.  Pl. Comments at 15.  The Court, however, directed Commerce to address the lack of the term "rough fittings" in the petition, and Commerce explained in the redetermination that its use of the term is a repetition of the covered merchandise referral from CBP.  The record supports Commerce's explanation because there is no record use of the term prior to the covered merchandise inquiry.  TFA fails to cite any record support for its claim beyond the use by the company subject to the EAPA inquiry and CBP in its covered merchandise referral, which Commerce already acknowledged was the derivation of its use of the term, and industry declarations generated for the covered merchandise inquiry.  *See* Remand Results at 25; 15 n.16 (CBP covered merchandise referral and EAPA materials); n.17 (covered merchandise inquiry response); and 26.  Not only is the term "rough fitting" not in the petition, but it is also absent from the ITC report and the *Thailand Circumvention Inquiry*, as is the term "roughs."  *Id*. at 26.

The redetermination decision notes that "one would expect {the term} would have appeared on the record of this case long before the EAPA inquiry or covered merchandise inquiry" if it were common in the industry.  *Id*.  Declarations and documents generated for the covered merchandise inquiry do not resolve the term being absent from the agency record in this proceeding prior to the covered merchandise inquiry where, as TFA claims, "Norca needed to craft a defense after becoming ensnared in an EAPA investigation."  Pl. Comments at 15 (citing trade association's questionnaire response, dated February 28, 2023, P.R. 51 at Exhibits 1, 2, and

3).  Thus, the record supports Commerce's explanation that the use of the term "rough fitting" in these proceedings corresponds with simply using the language from the covered merchandise referral from CBP.

Moreover, according to Commerce, the petition supports its finding that a carbon steel pipe which has been cut to length in the rough shape of an elbow, tee, or reducer, is not identifiable as a butt-weld pipe fitting subject to the *Order*.  *Id*. at 7-9.  In the remand results, Commerce analyzed that the petition distinguishes between merchandise that has undergone the first stage of the production process and merchandise that has undergone the first and second stages of production.  *Id*. at 7-8.  Commerce explained, for example, with respect to a fitting that is in the rough shape of an elbow, the petition describes the production process and uses the term "bent pipe," which is a product of seamless pipe that has undergone the first stage of the production process.  *Id*. at 8.  Specifically, the petition states that the bent pipe often must undergo an operation or other processes necessary to ensure that the fitting will match the pipe to which it will be attached, and, after these processes, the bent pipe is considered an "unfinished 'elbow.'"  *Id*. at 8 (quoting petition at 5-6).  Commerce explained that while the petition does not directly or explicitly identify the products that results from the first production process (either as a "rough fitting" or something else), it makes the distinction between a product that has undergone the first step in the production process (*i.e.*, bent pipe) and one that has undergone a second, more crucial process (*i.e.*, an unfinished fitting).  *Id*.  Commerce found it meaningful that only after the second stage of production does the petition identify the product as an unfinished fitting.  According to Commerce, the petition's references to certain processes support its conclusion and answers the question of when a butt-weld pipe fitting becomes identifiable, as the

11

petition states that "{a}fter the{} {first and second stage} processes, the bent pipe is considered to be an unfinished 'elbow.'" *Id*. at 9 (quoting petition at 6).

TFA claims that the petition's use of the term "unfinished fitting" in a discussion of production processes is irrelevant to the scope as the term does not appear in the scope of the petition. Pl. Comments at 16-17. This argument, however, misses the point. The scope in the petition describes merchandise covered by the investigation and the resultant *Order* covers "certain carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form." Remand Results at 26; *see also Order*, 57 Fed. Reg. at 29,702. Commerce reiterated that an unfinished butt-weld pipe fitting is a butt-weld pipe fitting in unfinished form and vice versa but that neither constitutes the precursor input of an as-formed/forged piece of pipe. Remand Results at 26. That is, rough fittings are neither butt-weld pipe fittings in unfinished form nor unfinished butt-weld pipe fittings—they are intermediate products. *Id*. Thus, the salient question is what constitutes a butt-weld fitting in unfinished form, which is thereby subject to the *Order*'s scope. *Id*. As explained in the remand results, when describing the production process, the petition clearly states that after stage one and two of production, the fitting is considered an unfinished butt-weld pipe fitting. Commerce reasoned that "{i}t would serve no purpose to state this in the petition if not to draw a distinction between products that have only undergone the first production stage and products that have undergone the first and second stages" and that "the distinction indicates that the fitting is in unfinished form." Remand Results at 26-27. Accordingly, the petition's use of the term "unfinished fittings" in a discussion which identifies the point in the production process when intermediate products become "unfinished fittings" is relevant.

TFA claims that Commerce's interpretation of the petition's scope language cannot be squared with the Federal Circuit's decision in *King Supply Co., LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012), and that Commerce mischaracterized the holding in *King Supply*. Pl. Comments at 16-17 (citing *King Supply*, 674 F.3d at 1345-46). Specifically, TFA concludes that "discussion of production processes is irrelevant to scope," because the Federal Circuit in *King Supply* "observed that the scope language of the Petition 'identified the products subject to {the} investigation in terms of their physical characteristics.'" *Id.* at 16. However, the Federal Circuit more precisely described that "{t}he leading paragraph in the 'product description' section of the Petition identified products subject to the investigation in terms of their physical characteristics." *King Supply*, 674 F.3d at 1345; *see also* Pl. Comments at 17. That the petition's "product description" includes the physical characteristics of the merchandise subject to the scope of the proposed investigation is not surprising—indeed, it is required. *See* 19 C.F.R. § 351.202(b)(5) (2025) (requiring that the petition include a "detailed description of the merchandise" including the definition, technical characteristics and uses). Furthermore, to determine whether a product is covered by the scope of the order, Commerce may account for the descriptions of the merchandise contained in the petition. 19 C.F.R. § 351.225(k)(1)(i). TFA fails to cite to any authority to support its claim that Commerce's analysis of the description of the merchandise contained in the petition is limited to physical characteristics, and indeed *King Supply* does not stand for such a proposition.

The question in *King Supply* was whether the scope of the *Order* contains an end-use restriction. *Id.* at 1345, 1348. The administrative segment underlying *King Supply* was a scope ruling by Commerce in response to an importer's request to find its product out of scope based on an end-use restriction. *Id.* at 1347. The relevant scope language states that the "formed or

forged pipe fittings *are used* to join sections in piping systems." *Id*. (citations omitted)

(emphasis added). Commerce found the importer's product subject to the *Order* based on its

interpretation that the scope did not contain an end-use restriction, but a description of a possible

end-use. *Id*. This Court disagreed, reasoning that the *Order* described the "one and only use" of

covered pipe fittings and, as such, did not include the importer's butt-weld pipe fittings, which

were used in structural applications. *Id*. (citations omitted). Vacating this Court's judgment, the

Federal Circuit relied on the physical characteristics of the product and held that end-use

restrictions do not apply unless the order includes "clear exclusionary language" which leaves

"no reasonable doubt that certain products were intended to be outside the scope of the {} order

based solely on the end use of those products." *Id*. at 1349, *id.* at 1345; Remand Results at 27.

According to the Federal Circuit, the *Order* "specifies the physical characteristics of all pipe

fittings covered by it," but that the "are used" language is not absolute and thus does not compel

a reading of an exclusive end-use. *Id*. at 1349. Concluding that the petition supports this plain

language reading, the Federal Circuit reasoned that the "are used" language is intended to

distinguish physical characteristics and capabilities of subject pipe fittings in light of the

petition's description of subject merchandise. *Id*. at 1350. Holding that there was no end-use

restriction, the Federal Circuit reinstated Commerce's in-scope determination as the importer's

product met the scope's physical characteristics. *King Supply*, 674 F.3d at 1351.

In contrast, here, there is no end-use exclusion in the scope language at-issue. As

Commerce explained, the relevant language of *Order*'s scope refers to products which are

subject to the *Order* (*i.e.*, "fittings … imported in either finished or unfinished form"), and one

such product is "undefined and ambiguous without reference to the description to the production

process in the {} petition." Remand Results at 27; *Order*, 57 Fed. Reg. at 29,702-03. To

respond to CBP's questions in the covered merchandise inquiry, Commerce had to identify the point in the production process at which a fitting becomes subject to the *Order*. Remand Results at 27. Because of the ambiguity in the relevant language ("fitting … in unfinished form"), Commerce explained that it was authorized to take account of the petition's descriptions of the merchandise. 19 C.F.R. § 351.225(k)(1); Remand Results at 27. According to Commerce, "{b}ecause it is necessary to understand the production process to answer the question that CBP posed, it follows that Commerce uses the production process as described in the {} petition and the {} ITC {r}eport," primary interpretive sources, to aid in answering the inquiry. Remand Results at 27. Commerce's analysis is entirely consistent with the Federal Circuit's decision in *King Supply*. *Id*. at 27-28.

TFA also argues that "detracting from its relevance" to the *Order*'s scope, "the term "unfinished fitting" is "physically separated from the description of merchandise." Pl. Comments at 16. Plaintiff's argument is unavailing. Again, Commerce reiterated that an unfinished butt-weld pipe fitting is a butt-weld pipe fitting in unfinished form and vice versa. Remand Results at 26. Further, as Commerce explained, the term "unfinished fitting" appears in the petition's "product description" and Commerce may take into account the descriptions of subject merchandise contained in the petition pertaining to the order at-issue. Remand Results at 28; 19 C.F.R. § 251.225(k)(1). In the background section of its opinion in *King Supply*, the Federal Circuit summarized the petition's "product description" section, the "leading paragraph" of which "identified products subject to the investigation in terms of their physical characteristics ('carbon steel butt-weld fittings having an inside diameter of less than 360 millimeters,' and satisfying certain { … }{testing standards}, and went on in subsequent paragraphs to describe how butt-weld pipe fittings are generally made, used, and sold." *King Supply*, 674 F.3d at 1345-

46; *see also* Remand Results at 28.  As discussed in the remand results, the Court's analysis in

*King Supply* indicates that the production process is an important element of the petition's

product description and is inextricably linked to the scope.  Remand Results at 28.  The "physical

separation" of the term "unfinished fitting," in a subsequent paragraph of the product description

section does not detract from its relevance.

TFA next argues that Commerce's remand redetermination attributes "unwarranted

significance" to the use of the term "bent pipe."  Pl. Comments at 17-21.  The record belies this

contention.  Commerce reiterated its finding in the remand results that the use of the term "bent

pipe" is significant because, in contrast to other terms, it is found in the petition.  Remand

Results at 29.  TFA argues that "bent pipe" is merely an alternative term for as-formed, rough

fittings.  Pl. Comments at 18.  Commerce, however, explained that the petition did not use the

term "rough fitting"; instead, it referred to "bent pipe."  Remand Results at 29.  Again,

Commerce is authorized to take account of the petition's description of merchandise in its

analysis pursuant to the agency's scope regulations and Commerce analyzes the language present

(and that which is not) to make determinations regarding inquiry merchandise.  Commerce does

this to  ascertain the petitioner's intent and to resolve scope issues which arise.  *Id*.; *see also* 19

C.F.R. § 351.225(k)(1).  Accordingly, whereas other terms like "rough fittings" are not used in

the petition, Commerce reasonably found it is significant that the petition uses the term "bent

pipe" to describe products that have undergone the first stage of production.  Remand Results at

29.

TFA further asserts that the record confirms that "bent pipe" has no other use than to be

processed into finished butt-weld pipe fittings.  Pl. Comments at 18.  Indeed, TFA argues that

"{b}ent pipe is useless for any other purpose," as confirmed by sworn statements from "three

experienced industry executives." *Id*. Here again, the record contradicts TFA's assertion. In the remand results, Commerce explained as follows:

> Although the {plaintiff} contend{s} that a section of cut pipe that has undergone the initial forming process of the first stage of production is already dedicated for no other use than as a subject fitting, the public record contradicts that claim. Commerce previously found a product that is threaded on one end after the forming/forging process to be covered by the *Order*. Moreover, the language of the scope suggests that threading on both ends of the product could have excluded the product given the distinction in the scope 'from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).' Thus, the potential for formed or forged pipe to be threaded in the finishing processes and used in non-subject applications contradicts the industry declarations on the record of this inquiry and detracts from the reliability of those statements.

Remand Results at 29-30 (citations omitted). Accordingly, TFA's claim that "bent pipe" has no other use than to be processed into finished butt-weld fittings is unpersuasive "{b}ecause the record indicates that a product can be threaded after the forming process, which could remove the fittings from the scope." *Id*. at 30.

Next, TFA posits that the Federal Circuit's decision in *Vandewater International, Inc., et al. v. United States, et al.*, 130 F. 4th 981 (Fed. Cir. 2025) (*Vandewater*), supports its claim that the term "unfinished fitting" is synonymous and interchangeable with the terms "rough," "as formed," and "unfinished" fittings. Pl. Comments at 27. And TFA argues that *Vandewater* requires Commerce to interpret the language of the scope consistent with "industry usage" of these various terms. *Id.* Although TFA references a portion of the Court's discussion of the issue in *Vandewater*, it notably leaves out language that qualifies the Court's analysis. As the Court in *Vandewater* explained, when there is evidence of different industry customs, in other words, when there is no evidence of a "single clearly defined or stated" industry custom, such conflicting evidence cannot establish that a scope term has unambiguous meaning based on an alleged "well-defined and consistently" used industry custom. *Vandewater*, 130 F.4th at 992

17

(citing *Meridian Prods. LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017)).  Here, TFA

argues that various terms are used interchangeably.  Pl. Comments at 27.  Such interchangeable

use implies that there is no single industry term for the merchandise at issue in this litigation, and

thus to the extent that TFA argues that Commerce should give interpretive weight to their

industry usage argument, *Vandewater* does not support this premise.

TFA also claims that Commerce attributed unwarranted significance to "bent pipe" in the

petition because industry standards governing the material and dimensions of butt-weld fittings

are met when seamless pipe is cut and formed into the shape of a rough elbow, tee, or reducer

"further demonstrates."  Pl. Comments at 19-20.  TFA argues that butt-weld pipe fittings are

manufactured to specific industry standards which identify a product as a butt-weld pipe fitting,

and the standards are met when the product is formed from cut pipe, "not when the product is

sized."  *Id*. at 20.  Using TFA's logic, because the industry specifications are met when the

product undergoes the first stage of production, it is already a butt-weld pipe fitting and no

further processing is needed.  Remand Results at 30.  However, as Commerce explained,

additional processing is necessary before a fitting is considered a butt-weld pipe fitting, in

finished or unfinished form, that is subject to the scope of the *Order*.  *Id*.  And "{w}hile the steel

may meet the technical requirements to become a fitting, additional processing is a necessary

condition to convert a piece of bent pipe into subject merchandise."  *Id*. at 30-31.

TFA agrees that – although industry standards provide important information regarding

the technical specifications for butt-weld pipe fittings – these specifications do not identify the

point in the production process when a fitting *becomes* a butt-weld pipe fitting.  *Id*. at 30

(emphasis added).  Again, the petition's description of merchandise subject to the investigation

includes the production process, so it is of no consequence that these industry standards do not

identify the point when a fitting becomes a butt-weld pipe fitting. That TFA disagrees with Commerce does not render the agency's analysis or conclusions unreasonable.

TFA erroneously claims that Commerce's conclusion on "rough fittings" is undermined by the petitioner's post-initiation scope clarification. Pl. Comments at 21-22. Specifically, Commerce deleted a sentence from the scope at the petitioner's request which had stated that "{u}nfinished butt-weld pipe fittings that are not machined, not tooled, and not otherwise processed after forging are not included in the scope of this investigation," "unquestionably described rough fittings (or 'bent pipe')." Pl. Comments at 22 (citing petitioner's post-initiation scope clarification letter at 3, P.R. 51 at Ex. 6); *id*. at 21-22; *see also Initiation of Antidumping Duty Investigation*, 56 Fed. Reg. at 27,730. Thus, TFA argues that Commerce made "clear that an unfinished fitting that had not be 'processed after forging' – for example, by resizing or heat treating – was subject to the investigation." *Id*.

As the Court has already noted, Commerce did not provide an explanation for removing the reference to unprocessed products from the scope. Remand Order, 750 F. Supp. 3d at 1379-80; Remand Results at 31. In the remand results, Commerce agreed that the absence of an explicit explanation for the addition and subsequent deletion of the language in question makes it difficult to ascertain the exact reasoning for the two scope modifications, but, the "context and nature of the modifications suggest that the addition was an error that was later corrected." Remand Results at 31. Commerce addressed this issue in the covered merchandise inquiry, noting that scope language of unknown origin was inexplicably introduced into the scope and the agency removed it after the petitioners objected. *Id*. at 31 (citing preliminary results at 11). Any attempt TFA makes to frame Commerce's removal of the inexplicable language as an acknowledgement that products which have only been formed should be included in the scope of

the *Order* is unsupported by the record.  Indeed, the record indicates that it was removed because, regardless of its origin, it caused unnecessary confusion as to the products covered by scope.  *Id*. at 31-32.  As recounted by Commerce, the errant language suggests that an unfinished fitting, which is covered by the plain language of the scope, would not be covered if it had not yet undergone the finishing processes of the third stage of production (*e.g.*, machining and tooling) and "{s}uch a requirement would be nonsensical and contradicts the clear intent of the scope because an unfinished fitting, based on the description in the {} petition and {} ITC report, is a product that has undergone the first two stages of production but has not yet undergone the third stage of production."  *Id*. at 32.  Importantly, the Court has already stated that the deleted language "neither supports nor undermines Commerce's determination."  Remand Order, 750 F. Supp. 3d at 1379.

According to TFA, the ITC report also undermines Commerce's assertions regarding the significance of "bent pipe."  Pl. Comments at 23-25.  As an initial matter, contrary to TFA's argument, Commerce made no attempt to "rebut" the Court's conclusions regarding the ITC report.  Remand Results at 32.  Instead, in the remand results, Commerce provided further explanation regarding the agency's conclusions with respect to the ITC report.  *Id*.  In its remand order, the Court discusses the appearance of the term "rough" in the ITC report and states that "{t}he term 'rough' appears only once in the ITC report when referencing 'rough-formed unfinished fittings.'"  *Id*. (quoting Remand Order, 750 F. Supp. 3d at 1377).  As Commerce explains in the remand results, the term is discussed to further explain that Commerce's use of term "rough fittings" created unnecessary confusion and as clarification that Commerce did not intend the term to be synonymous with the term "rough-formed unfinished fittings" as used in the ITC report.  *Id*. at 32-33.

Commerce also explained that the ITC report supports its conclusion that a butt-weld pipe fitting is not in its unfinished form until after the second stage of production because the ITC report states that "an unfinished pipe fitting is a fitting that has been advanced after forging." *Id*. at 10.  Specifically, Commerce relied on the ITC report's statement that: "an unfinished pipe fitting is a fitting that has been advanced after forging but which requires at least one more processing step (*i.e.*, shot blasting, machine beveling, boring and tapering, grinding, die stamping, inspecting or painting) to finish the fitting." *Id*. (quoting the ITC report at 4, n.6). Accordingly, this quote indicates that a shape that has been forged is not yet an unfinished fitting; instead, the shape has to be "advanced after forging" to attain this status, and only then, may the unfinished fitting be further processed to become the final, finished product. *Id.*  The ITC report's description aligns with the petition's description of the production process, which provided support for Commerce's finding that the second stage of production is necessary for merchandise that has been formed into the shape of a fitting to be considered an unfinished fitting. *Id*.

Based on the foregoing, the Court should affirm the redetermination decision because the petition supports Commerce's redetermination that carbon steel pipe cut to length in the rough shape of an elbow, tee, or reducer is not identifiable as a butt-weld pipe fitting subject to the *Order*.

### B.    Commerce's Remand Redetermination Does Not Conflict With The *Thailand Circumvention Inquiry* Determination

In the underlying administrative segment, Commerce relied on the *Thailand Circumvention Inquiry*, a (k)(1) source, to support its determination that carbon steel products in the rough shape of an elbow, tee or reducers, which were not heated or formed, are "rough fittings" rather than "unfinished butt-weld pipe fittings" and, therefore, are excluded from the

*Order.* IDM at 26-27. The Court held that Commerce deviated without offering sufficient

reasons from its decades-long interpretation and practice of considering products in the rough

shape of an elbow, tee, or reducer, which were not heated or formed, to be "unfinished butt-weld

pipe fittings." Remand Order, 750 F. Supp. 3d at 1382. The Court directed Commerce, on

remand, to address its evidentiary concerns and lack of reasoning for treating similar situations

differently. *Id.*

 Commerce complied with the Court's remand order and continued to find that the

*Thailand Circumvention Inquiry* supports its determination in the covered merchandise inquiry.

Remand Results at 16-17. First, Commerce explained that its prior use of the term "unfinished

butt-weld pipe fittings" to describe the product at-issue in the *Thailand Circumvention Inquiry*

was inaccurate, which is why the terms employed in that case and the current covered

merchandise inquiry were inconsistent. *Id.* at 15-16. That is, Commerce had not actually

considered the product at-issue in the *Thailand Circumvention Inquiry* to be "unfinished butt-

weld pipe fittings," but rather the term used in that case derived from the petitioner's language in

reference to the product at-issue in its circumvention allegation. *Id.* at 21. "In the same way that

the underlying covered merchandise inquiry language relied on the terminology transmitted in

the original referral by CBP (*i.e.*, 'rough fittings'), Commerce too relied on the terminology that

set the proceeding into motion (*i.e.*, 'unfinished fittings')." *Id.*

 That Commerce conducted a circumvention inquiry at all in the *Thai circumvention*

*Inquiry* supports Commerce's explanation. Remand Results at 16. A circumvention inquiry

centers on whether the product at-issue, which does *not* fall within the scope of the order, *should*

be covered by the order (*i.e.*, whether the product is circumventing the order and rightly should

be covered by that order). *Id.; see also* 19 U.S.C. § 1677j. Before determining whether a

product is circumventing an order, Commerce first determines whether it is already covered by the scope of the order and, if it is, "it is unnecessary to determine whether such merchandise is circumventing the order" because it is already covered by the order. *Id*. at 15 (citing *Deacero S.A. de C.V. v. United States*, 942 F. Supp. 2d 1321, 1461-62 (Ct. Int'l Trade 2013) ("When Commerce initiates a scope inquiry under 19 {C.F.R. §} 351.225(k), it assesses 'whether a particular product is included within the scope of an order.'  When Commerce initiates a circumvention inquiry … it asks whether a product outside an order's literal scope should nonetheless be included within the scope as part of the class or kind of merchandise subject to the antidumping duty order." (internal citations omitted)).

In the *Thailand Circumvention Inquiry*, despite Commerce's inartful description (*i.e.*, rough fittings as "unfinished 'as-formed' pipe fittings" from China), the product at-issue was *not* already covered by the scope of the *Order* and Commerce conducted a circumvention inquiry to determine whether it should be. *Id*. at 16.  In the remand results, Commerce explained that if it had "truly considered the{} rough shapes to be unfinished butt-weld pipe fittings {in the *Thailand Circumvention Inquiry*}, there would have been no need for a circumvention inquiry at all because rough shapes would have already been explicitly covered by the scope of the *Order*."[4]  *Id*. at 16.  The product at-issue in the *Thailand Circumvention Inquiry* only became subject to the *Order* as a result of Commerce's circumvention determination. *Id*. at 21-22.

TFA now argues that Commerce fails to satisfy the Court's directive to provide sufficient reasons for treating similar situations differently.  Pl. Comments at 3-4.  But once again, the record belies TFA's contention.  As detailed above, Commerce explained its misstep in

---

[4] In such cases, Commerce would typically conduct a substantial transformation analysis to determine whether the processing occurring in the third country was significant enough to shift the country of origin to the third country or whether it remained subject to the order. *Id*.

describing the product at-issue in the *Thailand Circumvention Inquiry*.  Upon this clarification, Commerce continued to find that the *Thailand Circumvention Inquiry* supports the agency's determination that rough shapes produced from only the first stage of the production process are not subject to the scope of the *Order* covering finished or unfinished carbon steel butt-weld pipe fittings from China.  Remand Results at 16-17; *see also Order*, 57 Fed. Reg. at 29,702.  Although Commerce agreed that the merchandise in the *Thailand Circumvention Inquiry* and the covered merchandise inquiry in this case are similar in that both have only undergone the first stage of production, Commerce disagreed that its treatment is inconsistent because the question asked of Commerce in the two inquiries differed.  Remand Results at 18.

TFA claims that Commerce's remand results are "fatally undermine{d}" by the fact that the products at-issue in the *Thailand Circumvention Inquiry* and the covered merchandise inquiry are "physically indistinguishable."  Pl. Comments at 5-7.  TFA further asserts that the "only difference" between these "physically indistinguishable" products is Commerce's determinations that they were subject to the *Order* in the *Thailand Circumvention Inquiry* and not subject to the *Order* in the covered merchandise inquiry.  *Id*. at 6-7.  TFA is incorrect.  As stated above, Commerce acknowledged the similarity of the products:  both underwent the first stage of production in China and the second and third stages of production in a third country.  Remand Results at 18.  However, Commerce's determinations regarding whether the products were within the scope of the *Order* are not different.  *Id*. at 16 (stating that Commerce did *not* find that the products were within the scope of the *Order*).  Rather, Commerce's determinations in these two cases were subject to two different inquiries, analyses, and determinations.  The product at-issue in the *Thailand Circumvention Inquiry* was only included in the scope of the *Order* as a result of the agency's circumvention determination.  *Id*.

And again, circumvention inquiries center on whether the product at-issue, which does *not* fall within the scope of the order, *should* be covered by the order (*i.e.*, whether the product is circumventing the order and should be covered by that order). *See* 19 U.S.C. § 1677j. A covered merchandise inquiry centers on whether the product at-issue falls within the scope of an order. 19 C.F.R. § 351.225(k) *et seq*. As noted by the Court, circumvention inquiries are governed by a specific statutory scheme. Remand Order, 750 F. Supp. 3d at 1380 n.8. The anticircumvention statutory provision provides that Commerce may include merchandise within the scope of an existing order if: (1) the merchandise imported into the United States is of the same class or kind as merchandise produced in a foreign country that is subject of an order; (2) before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise imported from another country which is subject to the order, and (3) the difference between the value of the completed merchandise exported to the United States and the value of the merchandise imported to the third country prior to completion or assembly for export to the United States is small. 19 U.S.C. § 1677j.

In the remand results, Commerce analyzes and explains how the different outcomes in these two cases resulted from the two different inquiry types. In the *Thailand Circumvention Inquiry*, Commerce was asked whether Chinese-origin butt-weld pipe fittings which are completed in Thailand are circumventing the *Order* such that the product *should* be included in the scope of the *Order*; whereas, in the covered merchandise inquiry, the agency was asked whether Chinese-origin rough fittings which underwent the second and third stages of production in Vietnam *are* within the *Order*'s scope. Remand Results at 18-19. Having conducted analysis and made affirmative circumvention findings on the statutory elements, listed above, in the *Thailand Circumvention Inquiry*, Commerce determined that butt-weld pipe fittings completed in

Thailand, should be covered by the *Order*. *Id*. at 16, 19; 19 U.S.C. § 1677j. Commerce

emphasized, however, that "an affirmative circumvention finding was necessary for that

conclusion." Remand Results at 19. For the covered merchandise inquiry, there was no request

for a circumvention inquiry, and Commerce did not conduct a circumvention analysis.

Accordingly, because Commerce did not conduct a circumvention inquiry nor made any findings

of circumvention which would have brought the products, however similar to those in the

*Thailand Circumvention Inquiry*, into the *Order*, the conclusions in the two cases reasonably

differed as a result of the different legal frameworks, analyses, and determinations. *Id*. Contrary

to TFA's argument that the agency treated the two products arbitrarily and inconsistently, the

record supports Commerce's treatment as reasonable and in accordance with law.

TFA also claims that Commerce's use of the term "unfinished fitting" in the *Thailand*

*Circumvention Inquiry* was not a mistake and that the agency avoided any reference to the actual

language of that decision in the remand results. Pl. Comments at 7-8. In the remand results,

however, Commerce acknowledged that it made a mistake of wording in the *Thailand*

*Circumvention Inquiry* and explained that the origin of the mistake came from the petitioner's

circumvention allegation. Remand Results at 21-22; *see also id*. at 15-17. Specifically, in the

*Thailand Circumvention Inquiry*, the petitioners alleged that producers of butt-weld pipe fittings

from China were circumventing the antidumping duty order on butt-weld pipe fittings by

exporting "unfinished {butt-weld pipe fittings} to Awaji Sangyo Co. (Thailand)." *Id*. at 21.

According to Commerce, "{i}n the same way that the underlying covered merchandise inquiry

language relied on the terminology transmitted in the original referral by CBP (*i.e.*, 'rough

fittings'), Commerce too relied on the terminology that set the proceeding into motion (*i.e.*,

'unfinished fittings')." *Id*. Commerce further explained that regardless of the terms of reference

applied to these products, the description of the production processes carried out in each stage has been consistent throughout the life of the *Order*. *Id*. An affirmative circumvention determination *was* necessary to bring the product at-issue in the *Thailand Circumvention Inquiry* into the *Order* regardless of the language used.

According to TFA, the conclusion that Chinese-origin as-formed-pipe fittings were unfinished fittings subject to the order "was a foundational element" of Commerce's determination in the *Thailand Circumvention Inquiry*, rather than a result of that inquiry. Pl. Comments at 9, 8-11. TFA recites the statutory requirements of the circumvention provision at 19 U.S.C. § 1677j(b)(1)(B)(i), requiring that merchandise completed or assembled in a third country must be completed or assembled *from merchandise which is subject to the antidumping duty order*. *Id*. at 10-11. However, in the remand results, Commerce explained that it conducted the *Thailand Circumvention Inquiry* under 19 U.S.C. § 1677j(b), which is the circumvention statutory provision for imports completed or assembled in a third country from merchandise which is *either* subject to the order *or* is produced in the country to which the order applies. Remand Results at 19-20; *see also* 19 U.S.C. § 1677j(b). The purpose of the circumvention statute is to include within the scope of an order merchandise which is completed or assembled in a third country other than the country named in the antidumping order (*i.e.*, by completing or assembling the product in a third country, the product is not subject to the order because it is not from the subject country via circumvention of the order.) Accordingly, TFA is mistaken in its claims that Chinese-origin as-formed fittings were already subject to the order and not dependent on the outcome of the *Thailand Circumvention Inquiry*. As explained in the redetermination decision, because section 1677j(b) "contemplates further processing in a third country, where additional processing has the potential to substantially transform the merchandise such that the

country of origin could shift from the order country to the third country, section {1677j(b)} permits Commerce to bring the merchandise back under the order despite additional processing." Remand Results at 20.

TFA next asserts that Commerce attributes unwarranted significance to the *China Plywood Circumvention* determination, arguing that it does not support the redetermination. Pl. Comments at 12-14 (citing *Certain Hardwood Plywood Products from the People's Republic of China,* 87 Fed. Reg. 45753 (July 29, 2022) and accompanying Preliminary Decision Memorandum *and Certain Hardwood Plywood Products From the People's Republic of China,* 88 Fed. Reg. 46740 (July 20, 2023) and accompanying Issues and Decision Memorandum (collectively, *China Plywood Circumvention*)). In the remand results, Commerce cited to the *China Plywood Circumvention* to support its long-standing circumvention practice that the agency first determines whether the merchandise is already covered by the scope of the order, and if it is, then it is unnecessary to determine whether such merchandise is circumventing it (as it is already covered by the order). Remand Results at 15 n.48, n.49. Commerce emphasized that in circumvention inquiries, the inquiry merchandise is the finished merchandise exported from the third country that is allegedly circumventing the order. For example, in the *China Plywood Circumvention*, the inquiry merchandise was plywood exported from Vietnam that was assembled using certain inputs from China and, in the *Thailand Circumvention Inquiry*, the inquiry merchandise was finished butt-weld pipe fittings exported from Thailand which were further processed from the as-formed Chinese fittings. *Id.* at 22. Commerce explained that in the remand redetermination it was attempting to draw attention to the inaccurate description of inputs to the inquiry merchandise as opposed to stating that the rough shapes from China were the primary merchandise. *Id*.

28

TFA's arguments regarding the *China Plywood Circumvention* do not detract from Commerce's determination.  In the remand results, Commerce explained that it conducted the *Thailand Circumvention Inquiry* under 19 U.S.C. § 1677j(b), which is the circumvention statutory provision for imports completed or assembled in a third country from merchandise which is *either* subject to the order *or* is produced in the country to which the order applies.  Remand Results at 19-20; *see also Thailand Circumvention Final*, 59 Fed. Reg. at 15,155; 19 U.S.C. § 1677j(b).  That Commerce made a finding in the *China Plywood Circumvention* pursuant to subsection (ii) of 19 U.S.C. § 1677j(b)(1)(B) is irrelevant.  Commerce conducted both inquiries pursuant to 19 U.S.C. § 1677j(b), which allows Commerce to include merchandise in the scope of an existing antidumping duty order provided certain statutory requirements are met.  As Commerce explained, it is not the agency's normal practice to conduct a circumvention inquiry on merchandise already subject to an antidumping duty order; instead, Commerce's analysis of merchandise explicitly covered by an order would be covered by a scope ruling; in cases where the scope ruling involves a product further processed outside of the order country, Commerce typically analyzes whether the merchandise was substantially transformed in the third country, such that the country of origin of the product would shift to the third country, thus removing it from the order.  Remand Results at 15-16, 19.  Again, the difference between the outcomes in the *Thailand Circumvention Inquiry* and the covered merchandise inquiry, here, resulted from the different underlying allegations, analyses, and determinations.[5]  Still, for the

---

[5] TFA's citation to *U.K. Carbon and Graphite Co. v. United States*, 931 F. Supp. 2d 1322, 1334 (Ct. Int'l Trade 2013) also is unavailing.  Pl. Comments at 13 n.11.  In an attempt to distinguish circumvention cases, TFA cites to *U.K. Carbon and Graphite Co.* as "describing Commerce's affirmative findings under both clauses of 19 U.S.C. § 1677j(b)(1)(B) in the underlying {Thailand} circumvention determination."  *Id.*  But *U.K. Carbon and Graphite Co.* concerns the circumvention inquiry under the small diameter graphite electrodes from China

merchandise in the *Thailand Circumvention Inquiry* to be considered merchandise subject to the *Order*, Commerce had to reach an affirmative circumvention determination.  Remand Results at 20.

Commerce explained that the agency conducted the *Thailand Circumvention Inquiry* within the authority described in the Federal Circuit's decision in *Deacero S.A. de C.V. v. United States*, 817 F.3d 1332 (Fed. Cir. 2016).  Remand Results at 24.  In *Deacero*, the Court stated that "{i}n order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope."  *Deacero*, 817 F.3d at 1332.  In the remand results in the present case, Commerce recounted that no circumvention inquiry was conducted nor was there a request for a circumvention inquiry in the covered merchandise inquiry.  Remand Results at 19.  As with the *Thailand Circumvention Inquiry*, here Commerce found that the merchandise at-issue in the covered merchandise inquiry falls outside of the literal scope of the *Order*.  *Id*. at 24.  For merchandise in the *Thailand Circumvention Inquiry* to be considered merchandise subject to the *Order*, Commerce had to reach an affirmative circumvention determination.  *Id*. at 20.

Accordingly, based on the foregoing, the Court should affirm the redetermination decision because Commerce's determination does not conflict with the *Thailand Circumvention Inquiry* Determination.

---

antidumping duty order.  *Id*., 931 F. Supp. 2d at 1296.  Thus, plaintiffs' citation to this case does not appear to have relevance to the issue before the Court here.

**C.     Commerce's Remand Redetermination Complies With The Court's Remand Order To Further Explain Its Treatment Of Industry Declarations**

The Court also directed Commerce to reconsider or provide further explanation for disregarding the evidence of the industry declarations, particularly in light of Commerce's reconsideration on remand whether "rough fittings," or carbon steel pipe in the rough shape of an elbow, tee, or reducer, are butt-weld pipe fittings within the scope of the *Order.* Remand Order, 750 F. Supp. 3d at 1380. TFA incorrectly argues that Commerce's remand results do not comply with the Court's directive. Pl. Comments at 26.

First, TFA's claim that Commerce "neither reconsiders nor provides further explanation for disregarding the industry declarations" misapprehends the redetermination. Pl. Comments at 26. In the remand results, Commerce provided further explanation that it considered the industry declarations within the context of the totality of record evidence and, as lawful under 19 C.F.R. § 351.225(k)(1)(ii), it assigned greater weight to primary interpretive sources than to the sworn declarations of industry usage. Remand Results at 36. Commerce's regulations authorize the agency to consider secondary interpretive sources, including industry usage and "any other relevant record evidence." 19 C.F.R. § 351.225(k)(1)(ii). However, Commerce's regulations also specify that "in the event of a conflict" between secondary interpretive sources and the primary sources, "the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue." 19 C.F.R. § 351.225(k)(1)(ii); *see also* Remand Results at 12. Commerce did not disregard the industry declarations; rather, Commerce considered the industry declarations and further explained in the redetermination that these industry declarations are "less probative" than the primary (k)(1) interpretive sources on the record of this proceeding. *Id*.

31

Contrary to TFA's claim that Commerce "merely repeats" its rationale on remand, Commerce provided further explanation consistent with the Court's order and as supported by record evidence. Specifically, acknowledging the Court's concerns that evidence of industry understanding not be "ignored or minimized," Commerce explained that information from the petition and ITC report, primary interpretive sources, contradict the claims made in the industry declarations that the industry has always used the relevant terms, *i.e.*, bent pipe and unfinished fittings, synonymously. Remand Order, 750 F. Supp. 3d at 1380; Remand Results at 12. For example, the petition and the ITC report distinguish between the products produced at each stage of the production process (*i.e.*, bent pipe/forgings after the first stage, unfinished fittings after the second stage, and finished butt-weld pipe fittings after the third stage). Remand Results at 12. Commerce also noted that the claims made in the industry declarations are belied by TFA's own actions because, as far back as 1993, the petitioners alleged that first-stage forgings completed in Thailand were circumventing the *Order*. According to Commerce, had these products already been considered to be in-scope merchandise "such an allegation would have been wholly unnecessary." Remand Results at 12-13.

Second, TFA's disagreement with Commerce that the industry declarations and petition conflict does not render the agency's determination unreasonable or unlawful. Remand Results at 36. TFA's argues that no conflict exists because "the petition says nothing at all." Pl. Comment at 26. The absence of record evidence is not the evidentiary standard. And the absence of terminology in the petition and the ITC report does not support that the terminology of the industry declarations was widely used to refer to the same merchandise. Remand Results at 37. The fact that these terms do not appear in the petition, ITC report, or elsewhere in the 30 year history of the *Order* instead supports a finding that the terms were not interchangeable, as

TFA argues. *Id.* at 37. Moreover, the declarations were produced recently and, therefore, cannot supplant record evidence of the intent of the petition at the time of the investigation. *See Valeo N. Am., Inc. v. United States*, 610 F. Supp. 3d 1322, 1336 (Ct. Int'l Trade 2022) (holding unlawful Commerce's reliance on a declaration prepared by an interested party specifically for the purpose of the scope proceeding).

Next, TFA argues that the various elements of production are irrelevant to scope. Pl. Comments at 27. The production process, however, is vital to understanding the scope of the *Order* with respect to the covered merchandise inquiry. In the petition, the petitioners provided a description of production processes in the "product description." *See* Remand Results at 37. The petition is a primary (k)(1) interpretive source and provides insight at the point when the essential characteristics of products are imparted, and at which point a product becomes subject to the scope. Remand Results at 37-38.

In the remand results, Commerce continues to find that the terms in the primary interpretive sources and in the industry declarations are not understood as interchangeable and, the record contains no evidence supporting interchangeability of the terms in this proceeding until the covered merchandise inquiry. Remand Results at 36-37. Although TFA claims that "Commerce does not provide a scintilla of evidence" as to its finding that these terms are not interchangeable, TFA argues interchangeability based on recent declarations provided for the covered merchandise inquiry, balanced against the petition, the ITC report, and the over thirty-year history of this order, none of which indicate interchangeability of the terms. Pl. Comment at 28; *see also* Remand Results at 37. As Commerce points out, "{t}he absence of a term does little to demonstrate its existence." Remand Results at 37.

In the remand results, Commerce complied with the remand order in analyzing and considering evidence of industry usage, and TFA's claims to the contrary are unavailing.  Pl. Comment at 28 (citing *Vandewater International, Inc., et al. v. United States*, et al., 130 F.4th 981, 992 (Fed. Cir. 2025)).  As the remand results demonstrate, Commerce did not interpret this scope in a vacuum.  *See id.* (citing *Vandewater,* 130 F.4th at 992 (citations omitted)).

## CONCLUSION

For these reasons, this Court should sustain Commerce's remand redetermination and enter final judgment for the United States.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan by Franklin White, Jr.
TARA K. HOGAN
Assistant Director

/s/ Anne M. Delmare
ANNE M. DELMARE
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation
Branch
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 305-0531
Anne.M.Delmare@usdoj.gov

LESLIE M. LEWIS
Senior Attorney
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230-0001

*Attorneys for Defendant*

July 30, 2025

34

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 30th day of July, 2025, a copy of the foregoing "defendant's response to consolidated plaintiff's comments on Commerce's remand redetermination" was filed electronically.

<u>X</u> This filing was served electronically on all parties by operation of the Court's electronic filing system.

<u>/s/ Anne M. Delmare</u>
ANNE M. DELMARE