Slip Op. 25-156

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**TUBE FORGINGS OF AMERICA, INC. AND MILLS IRON WORKS, INC.,**

    **Consolidated Plaintiffs,**

**v.**

**UNITED STATES,**

    **Defendant,**

**and**

**NORCA INDUSTRIAL COMPANY, LLC AND INTERNATIONAL PIPING & PROCUREMENT GROUP, LP,**

    **Consolidated Defendant-Intervenors.**

</td><td>

**Before: Jennifer Choe-Groves, Judge**

**Consol. Court No. 23-00231**

</td></tr>
</table>

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final results of redetermination pursuant to the first remand order in the final scope ruling in a covered merchandise referral regarding certain carbon steel butt-weld pipe fittings.]

Dated: December 16, 2025

Lawrence J. Bogard and John B. Totaro, Jr., Neville Peterson, LLP, of Washington, D.C., for Consolidated Plaintiffs Tube Forgings of America, Inc. and Mills Iron Works, Inc.

Anne M. Delmare, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was Leslie M. Lewis, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. Also of counsel was Jack Dunkelman, Attorney, and Ruslan N. Klafehn, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jeremy W. Dutra, Squire Patton Boggs (U.S.) LLP, of Washington, D.C., for Defendant-Intervenors Norca Industrial Company, LLC and International Piping & Procurement Group, LP.

Choe-Groves, Judge: This case concerns the final covered merchandise referral determination published by the U.S. Department of Commerce ("Commerce") regarding carbon steel butt-weld pipe fittings. See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Final Determination"), 88 Fed. Reg. 69,909 (Dep't of Commerce Oct. 10, 2023) (final determination of covered merchandise inquiry) and accompanying Decision Memorandum for the Final Results of Covered Merchandise Inquiry ("Final IDM"), PR 83[1]; see also Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Order"), 57 Fed. Reg. 29,702 (Dep't of Commerce July 6, 1992). Commerce determined that certain carbon steel

---

[1] Citations to the administrative record reflect the public record ("PR"), ECF Nos. 36, 63.

butt-weld pipe fittings with "rough fittings" produced in the People's Republic of China ("China") that underwent the second and third stages of production in the Socialist Republic of Vietnam ("Vietnam") were not subject to the scope of the antidumping order on butt-weld pipe fittings from China.  See Final Determination 88 Fed. Reg. at 69,909.  Before the Court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 56-1.

Consolidated Plaintiffs Tube Forgings of America, Inc. ("Tube Forgings of America") and Mills Iron Works, Inc. ("Mills Iron Works") (collectively, "Plaintiffs," "Petitioners," or "Tube Forgings") filed their comments in opposition. Mem. Consol. Pls.' Opp'n Redetermination Remand ("Consol. Pls.' Cmts."), ECF No. 58.  Consolidated Defendant-Intervenors Norca Industrial Company, LLC ("Norca") and International Piping & Procurement Group, LP ("IPPG") (collectively, "Defendant-Intervenors") filed their comments in support.  Def.-Intervs.' Cmts. Supp. Remand Results ("Def.-Intervs.' Cmts."), ECF No. 62. Defendant United States ("Defendant" or "the Government") filed its response to Consolidated Plaintiffs' comments.  Def.'s Resp. Consol. Pls.' Cmts. Remand Redetermination ("Def.'s Resp."), ECF No. 64.

For the following reasons, the Court remands the Remand Redetermination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case.  See Tube Forgings of Am., Inc. v. United States ("Tube Forgings I"), 49 CIT __, 750 F. Supp. 3d 1364 (2025).

U.S. Customs and Border Protection ("Customs") submitted a covered merchandise referral to Commerce on September 6, 2022, requesting a determination whether merchandise described in the referral was within the scope of the Order.  See Customs' Covered Merchandise Referral Request for Merchandise Under EAPA Consolidated Case Number 7335 (Remand Number 7717), Imported by Norca Industrial Company, LLC and International Piping & Procurement Group, LP: Antidumping Duty Order on Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Covered Merchandise Referral Request") (Sept. 6, 2022), PR 7.  In the Covered Merchandise Referral Request, Customs stated that the record showed contradicting information provided by Norca and BW Fittings, and described the production of Norca's and IPPG's carbon steel butt-weld pipe fittings as involving three stages of production:

1. Converting seamless pipe into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process;

2. Reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to; and

    3. Undergoing finishing processes such as shot blasting or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting.

Covered Merchandise Referral Request at 3–4.

    Norca claimed that its merchandise exported by BW Fittings into the United States underwent at least the second and third stages of production in Vietnam, and that the rough fittings imported by BW Fittings from China were not "unfinished" carbon steel butt-weld pipe fittings covered by the Order. Id. at 4. BW Fittings reported that it phased in its production capabilities for carbon steel butt-weld pipe fittings. Id. BW Fittings' production records showed that in some cases it performed only the third stage of production, while in other cases it performed both the second and third stages of production. Id. Customs requested that Commerce determine whether Norca's and IPPG's "Chinese-origin rough fittings" purchased from BW Fittings were covered by the Order in two scenarios: (1) Chinese-origin rough fittings that only underwent the third stage of production (i.e., finishing processes) in Vietnam and (2) Chinese-origin rough fittings that underwent both the second and third stages of production in Vietnam. Id.

    Commerce defined the subject merchandise at issue as "rough and unfinished fittings originating in China and processed into butt-weld pipe fittings through two production scenarios in Vietnam," with the first production scenario involving "Chinese-origin unfinished butt-weld pipe fittings [that] undergo the

final stage (*i.e.*, finishing processes) of three production stages in Vietnam" and the

second production scenario involving "Chinese-origin rough butt-weld pipe fittings

[that] undergo the second and third stages of production in Vietnam."  Final IDM

at 3.

  Commerce issued a preliminary covered merchandise determination on June

23, 2023, in which it determined that "rough butt-weld pipe fittings from China

that are processed in Vietnam into finished butt-weld pipe fittings in the final two

stages of production are not subject to the scope of the Order" and "that unfinished

butt-weld pipe fittings from China that are processed in Vietnam into finished butt-

weld pipe fittings are subject to the scope of the Order."  Certain Carbon Steel

Butt-Weld Pipe Fittings from the People's Republic of China ("Preliminary

Determination"), 88 Fed. Reg. 41,075 (Dep't of Commerce June 23, 2023)

(preliminary results of covered merchandise inquiry) and accompanying Decision

Memorandum for the Preliminary Results ("PDM"), PR 63, 66; Tube Forgings I,

49 CIT at __, 750 F. Supp. 3d at 1371.

  On October 10, 2023, Commerce issued its final covered merchandise

determination and continued to determine that "rough fittings originating from

China that undergo the second and third stages of production in Vietnam are not

subject to the scope of the Order."  Final Determination, 88 Fed. Reg. 69,909.

Additionally, Commerce determined that "unfinished fittings from China that

undergo the third stage of production in Vietnam are subject to the scope of the Order." Id.

On January 2, 2025, this Court remanded the Final Determination, holding that Commerce's determination that "rough fittings" that undergo the second and third stages of production in Vietnam are not subject to the scope of the Order was not supported by substantial evidence. See Tube Forgings I, 49 CIT at __, 750 F. Supp. 3d at 1383. The Court stated that at the heart of this case was the distinction between "rough," "unfinished," and "finished" fittings. Id. at __, 750 F. Supp. 3d at 1373. The Court concluded that Commerce arbitrarily deviated from its long-standing practice of considering products in the "rough shape of an elbow, tee, or reducer, which were not heated or formed," to be butt-weld pipe fittings that fall in scope of the Order. Id. at __, 750 F. Supp. 3d at 1383.

On May 2, 2025, Commerce issued its Remand Redetermination and continued to determine that "merchandise that has undergone the first stage of production in China and then undergoes the second and third stages of production in Vietnam is not subject to the scope of the Order." Remand Redetermination at 39.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade ("CIT") has jurisdiction pursuant to Section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(vi), and 28 U.S.C. § 1581(c).  The Court will hold unlawful any

determination unsupported by substantial evidence on the record or otherwise not

in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B)(i).  The Court also

reviews determinations made on remand for compliance with the Court's remand

order.  Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730,

992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Legal Framework for Scope Determination

The descriptions of merchandise covered by the scope of an antidumping or

countervailing duty order must be written in general terms, and questions may arise

as to whether a particular product is included within the scope of an order.  See 19

C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it

to issue scope rulings that clarify whether the product is included within the scope.

Id.  Although there are no specific statutory provisions that govern Commerce's

interpretation of the scope of an order, Commerce is guided by case law and

agency regulations.  See Meridian Prods., LLC v. United States ("Meridian

Products"), 851 F.3d 1375, 1381 (Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  See, e.g.,

OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  Id.  If the

language is ambiguous, however, Commerce interprets the scope with the aid of

the sources set forth in 19 C.F.R. § 351.225(k)(1).  <u>Meridian Prods.</u>, 851 F.3d at

1382.  If the (k)(1) sources do not dispositively answer the question, Commerce

may consider the (k)(2) factors under 19 C.F.R. § 351.225(k)(2).  <u>Id.</u>

Commerce may consider the following interpretive sources under 19 C.F.R.

§ 351.225(k)(1) to determine whether merchandise is covered by the scope of an

order:

(A)  The descriptions of the merchandise contained in the petition pertaining to the order at issue;

(B)  The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

(C)  Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

(D)  Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1)(i).

Secondary interpretive sources include any other determinations of the

Secretary or the Commission not identified above, rulings or determinations by

Customs, industry usage, dictionaries, and any other relevant record evidence.  <u>Id.</u>

§ 351.255(k)(1)(ii).  If there is a conflict between these secondary interpretive

sources and the primary interpretive sources of this section, the primary

interpretive sources will normally govern in determining whether a product is

covered by the scope of the order at issue.  Id.

It is well-established that "Commerce cannot 'interpret' an antidumping

order so as to change the scope of th[e] order, nor can Commerce 'interpret' an

order in a manner contrary to its terms."  Eckstrom Indus., Inc. v. United States,

254 F.3d 1068, 1072 (Fed. Cir. 2001).  When a party challenges a scope

determination, the Court must determine whether the scope of the order "contain[s]

language that specifically includes the subject merchandise or may be reasonably

interpreted to include it."  Duferco Steel, Inc. v. United States, 296 F.3d 1087,

1089 (Fed. Cir. 2002).

## II.    Plain Language of the Scope Order

The scope language of the Order in this case states in relevant part:

> The products covered by this order are carbon steel butt-weld pipe
> fittings, having an inside diameter of less than 14 inches, imported in
> either finished or unfinished form.  These formed or forged pipe fittings
> are used to join sections in piping systems where conditions require
> permanent, welded connections, as distinguished from fittings based on
> other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).
> Carbon steel butt-weld pipe fittings are currently classified under
> subheading 7307.93.30 of the Harmonized Tariff Schedule (HTS).
> Although the HTS subheading is provided for convenience and customs
> purposes, our written description of the scope of this proceeding is
> dispositive.

Order, 57 Fed. Reg. at 29,702.

This Court concluded in Tube Forgings I that the scope language is ambiguous with respect to whether "unfinished" fittings include further processed "rough" fittings because "the plain scope language does not mention the subject merchandise that were the focus of the covered merchandise scope referral," and is also ambiguous as to what the definition of "unfinished" fittings means. 49 CIT at __, 750 F. Supp. 3d at 1373. The Court held that because the scope language is ambiguous as to the definition of an "unfinished butt-weld pipe fitting," Commerce's examination of the (k)(1) sources was in accordance with law. Id. at __, 750 F. Supp. 3d at 1383. Upon further review of Commerce's Remand Redetermination, the Court now concludes that the (k)(1) sources do not dispositively support Commerce's determination with substantial evidence, the (k)(1) review is not in accordance with law, and as explained below, a second remand is necessary for Commerce to consider the (k)(2) criteria set forth in 19 C.F.R. § 351.225(k)(2).

## III.    Terminology Used By Commerce

The scope language of the Order discusses "carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form." 57 Fed. Reg. at 29,702. Commerce used the term "rough fitting" in its Final IDM, and this Court remanded for Commerce to answer

the question whether a "rough fitting" is identifiable as a "butt-weld pipe fitting."

Tube Forgings I, 49 CIT at __,750 F. Supp. 3d at 1374.

On remand, Commerce explained that:

As a general matter, Commerce acknowledges that our use of the term "rough fitting" to describe the precursor products to both the unfinished and finished butt-weld pipe fittings subject to the Covered Merchandise Inquiry created confusion among the parties and with the Court. We solely adopted this term to refer to the merchandise at issue in a manner which was consistent with the language used in the first production scenario posed by CBP. Thus, we referred to merchandise that had undergone the first production stage as a "rough fitting" and merchandise that had undergone the first two production stages as an "unfinished fitting." However, as noted by the Court, this term is not used in the 1991 Petition. To cure this confusion, and for purposes of this remand, Commerce instead identifies products by stage of production as follows: (1) "rough shapes" for pipe which has undergone only conversion into a rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process; and (2) "unfinished fittings" for rough shapes which have been reformed or sized to match the pipe as it is destined to be welded to, but which have not been finished.

Remand Redetermination at 6 (internal citations omitted).

Customs discussed the stages of production in the Covered Merchandise

Referral Request, based on Norca's description of its manufacturing processes, as

follows:

Norca states that the first stage of production for [carbon steel butt-weld pipe fittings] involves converting seamless pipe "into the rough shape of an elbow, tee, reducer, etc., through a cold- or hot-forming (or forging) process." Norca further states that the second stage of production involves reforming or sizing the rough fitting so that the fitting will match the pipe it is destined to be welded to, and the third

stage includes finishing processes such as "shot blasting, or other cleaning, machine beveling, boring and tapering, grinding, die stamping, inspection, and painting."

Covered Merchandise Referral Request at 3–4.

The Court reviews Commerce's determination on remand that: "merchandise that has undergone the first stage of production in China and then undergoes the second and third stages of production in Vietnam is not subject to the scope of the Order." Remand Redetermination at 39.

## IV.    Use of Interpretative Sources Under 19 C.F.R. § 351.225(k)(1)

In Tube Forgings I, the Court held that Commerce's determination was not supported by substantial evidence and remanded for Commerce to provide further explanation for the following (k)(1) sources: the U.S. International Trade Commission Report ("ITC Report"), the Petition pertaining to the Order, declarations from domestic industry executives, and the Thailand Circumvention Determination. 49 CIT at __, 750 F. Supp. 3d at 1375–76; see generally Petitioners' CMI Questionnaire Resp. at Ex. 7 ("ITC Report"), PR 51; Petitioners' CMI Questionnaire Resp. at Ex. 5 ("Petition"), PR 51; Petitioners' CMI Questionnaire Resp. at Ex. 1 ("Declaration of Patrick R. Benavides"), PR 51; Ex. 2 ("Declaration of Jeffrey Griffith"), PR 51; Ex. 3 ("Declaration of Bruce Rust"), PR 51; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China ("Thailand Circumvention Determination"), 59 Fed. Reg. 15,155 (Dep't of

Commerce Mar. 31, 1994) (affirmative final determination of circumvention of

antidumping duty order); see also Certain Carbon Steel Butt-Weld Pipe Fittings

from the People's Republic of China ("Thailand Preliminary Circumvention

Determination"), 59 Fed. Reg. 62 (Dep't of Commerce Jan. 3, 1994) (affirmative

preliminary determination of circumvention of antidumping duty order).

## V.   Petition

The Court remanded for Commerce to address the Petition's lack of

reference to the term "rough fitting," and analyze whether the Petition answers the

question whether a carbon steel pipe that has been cut to length in the rough shape

of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting. Tube

Forgings I, 49 CIT at __, 750 F. Supp. 3d at 1377.

Commerce acknowledged the confusion that it caused by using the term

"rough fitting," which Commerce admitted does not appear in the Petition.

Remand Redetermination at 6. Commerce acknowledged the Petition's lack of

reference to the term "rough fitting," but stated that the Petition distinguishes

between merchandise that has undergone the first stage of the production process

and merchandise that has undergone the first and second stages of production. Id.

at 7. Commerce noted that the Petition: (1) uses the term "bent pipe," which is a

product of seamless pipe that has undergone the first stage of the production

process; (2) discusses unfinished "tees" and "reducers" as "somewhat different

before the coining operation" as a second stage of production; and (3) refers to the

reforming and coining process as "necessary to ensure that the fitting will match

the pipe to which it is attached." Id. at 7–9.

The Petition confirms that, "[t]he products covered by this Petition are

carbon steel butt-weld fittings having an inside diameter of less than 360

millimeters ([14] inches) classifiable under HTS Subheading 7307.93.30 ('Butt

welding fittings: With an inside diameter of less than 360 mm: Of iron or nonalloy

steel'). Such fittings are imported in either finished or unfinished condition."

Petition at 3–4 (footnotes omitted).

> The Petition discusses "bent pipe" as follows:
>
> The bent pipe drops off the mandrel and is examined for correctness of
> size and shape. Often, the bent pipe must undergo a "reforming" or
> "coining" operation . . . The operation is necessary to ensure that the
> fitting will match the pipe to which it is attached. Fittings that are
> formed at a temperature under 1,200 [degrees Fahrenheit ("F")] or
> above 1,800 [degrees] F must also undergo heat treatment which
> relieves stress build-up within the fitting during the forming process.
> After these processes, the bent pipe is considered to be an unfinished
> "elbow." The production of an unfinished "tee" or an unfinished
> "reducer" is somewhat different before the coining operation.

Petition at 5–6.

The Petition states that after the heat or cold treatment and forming

processes, the bent pipe is considered to be an unfinished elbow. Id. at 6. Based in

part on its review of the Petition, Commerce determined on remand that:

"merchandise that has undergone the first stage of production in China and then undergoes the second and third stages of production in Vietnam is not subject to the scope of the Order." Remand Redetermination at 5, 39.

Although the Petition discusses the three stages of production, the Petition does not state dispositively that carbon steel butt-weld pipe fittings having an inside diameter of less than 360 millimeters that are not heat- or cold-treated and formed are outside the scope of the Order. The Petition supports Commerce's determination in general that a seamless pipe that has been heat- or cold-treated (the first stage of production), and then is formed (the second stage of production) is an unfinished butt-weld pipe fitting that is in scope of the Order. The Petition is silent, however, on whether a product may be in scope before the heat- or cold-treatment and forming processes take place. In other words, the Petition does not dispositively require that a butt-weld pipe fitting must be heat- or cold-treated and formed before it is in scope. Similarly, the plain language of the Order does not require in the scope text that a butt-weld pipe fitting must be heat- or cold-treated and formed before it is in scope.

This Court previously remanded for Commerce to analyze whether the Petition addresses the situation when a carbon steel pipe that has been cut to length in the rough shape of an elbow, tee, or reducer, is identifiable as a butt-weld pipe fitting. Tube Forgings I, 49 CIT at __, 750 F. Supp. 3d at 1377. Commerce did

not address this question satisfactorily on remand (the Petition does not support

Commerce's determination that a product may only be considered to be in scope

after it has been heat- or cold-treated and formed).  Clearly there is a dispute

between the Parties in this case whether a product may be considered to be an in-

scope butt-weld pipe fitting if the carbon steel pipe has been merely cut to length in

the rough shape of an elbow, tee, or reducer, and has not been heat- or cold-treated

and formed.  Commerce must address this question on second remand.

Thus, because the Petition is silent on whether a butt-weld pipe fitting that

has not been heat- or cold-treated and formed is within scope, the Court concludes

that the Petition does not dispositively support Commerce's determination that

"merchandise that has undergone the first stage of production in China and then

undergoes the second and third stages of production in Vietnam is not subject to

the scope of the Order."  Remand Redetermination at 39.

### VI.   ITC Report

The Court concluded in Tube Forgings I that the ITC Report did not support

Commerce's determination that only after the second production stage, or the

sizing and reforming operations, is a carbon steel product identifiable as a butt-

weld pipe fitting that is within the scope of the Order.  49 CIT at __, 750 F. Supp.

3d at 1377.  The Court stated that the term "rough" only appears once in the ITC

Report when referencing "rough-formed unfinished fittings," and identified that

the exact sentence "[t]he combination producers Hackney, Tube Forgings, Tube-Line, and Weldbend purchase and/or import rough-formed unfinished fittings which they bevel, bore, taper, grind, shot blast, die stamp, inspect, and paint" did not support Commerce's determination.  Id.  The Court reasoned that this sentence indicated that rough-formed carbon steel pipes are unfinished fittings that are later processed, and the ITC Report did not confirm Commerce's determination that only after carbon steel pipes are cut, then heat- or cold-treated and formed, are they then considered to be unfinished butt-weld pipe fittings.  Id.

On remand, Commerce noted that its use of the term "rough fittings" was not intended to be synonymous with the term "rough-formed unfinished fittings," because "rough-formed unfinished fittings" are within the scope of the Order after having undergone the first two production stages.  Remand Redetermination at 10.  Commerce also stated that it relied on another sentence in the ITC Report for its determination, rather than on the quotation referenced by the Court:

> [A]n unfinished pipe fitting is a fitting that has been *advanced after forging* but which requires at least one more processing step (*i.e.*, shot blasting, machine beveling, boring and tapering, grinding, die stamping, inspecting or painting) to finish the fitting.

Id. at 10 (citing ITC Report at 4 n.6) (emphasis added).  Commerce reasoned that this quote "clearly shows that a shape that has been forged is not yet an unfinished fitting[,]" but rather the shape must be "'advanced after forging' to attain this

status, and only then may the unfinished fitting be further processed to become the final, finished product[,]" which contributes to Commerce's determination that the second stage of production is necessary for merchandise that has been formed into the shape of a fitting to be considered an unfinished fitting.  Id.

It is unclear, however, what is meant by the phrase "advanced after forging" in footnote 6 of the ITC Report.  Commerce seems to equate "advanced after forging" in the ITC Report with the term "formed" used in the Petition (the second stage of production).  However, the ITC Report does not describe the forging process, and therefore does not dispositively confirm what process applies to a seamless pipe that must be "advanced after forging" in order to be considered an unfinished butt-weld pipe fitting subject to the Order.

The only discussion of forging in the ITC Report appears in the following sentence: "Reducers are hammer-forged to size in the cold-process, followed by heat-treatment to reduce metallurgical stresses, followed by finishing operations that are similar for those reducers produced by the hot-process."  ITC Report at I-7.  This sentence suggests that there is a cold-process/heat-treatment (first stage of production), and then finishing (third stage of production).  There is no discussion in the ITC Report of what is meant by "advanced after forging."  There is not enough information about the production process in the ITC Report to consider this a dispositive (k)(1) source.

Commerce cited to the ITC Report in the Final Results of the Covered Merchandise Inquiry, contending that "the 1992 ITC Report details stages one and two of the production process over six paragraphs covering two pages[.]" Final IDM at 11 (citing PDM at 17 and ITC Report at I-6–I-9). Contrary to Commerce's assertion, the Court observes that a clear description of stage two of the production process is not readily apparent in those six paragraphs. There is a discussion of heat and cold processing, together with sizing (*i.e.*, "[t]he hot elbow is dropped off the mandrel and immediately resized in a die under pressure[,]" ITC Report at I-8), but nowhere in the ITC Report does it state clearly that a product only becomes an unfinished butt-weld pipe fitting after undergoing stages one and two of production. Thus, this record evidence does not support Commerce's determination.

In addition, Commerce discussed footnote 18 of the ITC Report in the context of its substantial transformation analysis pursuant to 19 C.F.R. § 351.225(j). See Final IDM at 7–8; see also PDM at 10 (citing ITC Report at I-8 n.18). Footnote 18 of the ITC Report states that, "[i]rrespective of the process, resizing is necessary to ensure that the butt-weld fitting will match the pipe to which it is to be welded." ITC Report at I-8. The ITC Report does not label this as "stage two" or as a critical step in order for a product to be considered an unfinished butt-weld pipe fitting within the scope of the Order. Commerce cites to

footnote 18 to support its determination that, "[r]ecord evidence suggests that,
although the initial forming process forms the fittings in such a way that is
important for the finished product, resizing and heat treatment are crucial processes
for the integrity of the finished butt-weld pipe fittings; these processes occur in the
second stage of production."  Final IDM at 10 (citing ITC Report at I-8 n.18).  The
Court concludes that the ITC Report does not support Commerce's determination,
because the ITC Report does not state that stage one is heat or cold treatment, does
not state that stage two is resizing or forming, and does not state that only after
undergoing stages one and two does a product become an in-scope butt-weld pipe
fitting.

In fact, the ITC Report provides information about the production process
that is inconsistent with the Petition.  The ITC Report explains that:

> The manufacturing process *may be continuous*: that is, carbon steel pipe
> may be converted into a finished butt-weld fitting *in one continuous
> operation*, rather than the pipe being converted into a semifinished butt-
> weld fitting, inventoried, and subsequently finished in another
> operation.  The Chinese and Thai industries tend to be based on the hot-
> process for making elbows and do not possess the capability for heat-
> treatment or shot blasting.

ITC Report at I-9–I-10 (emphasis added).  This statement from the ITC Report that
there may be "one continuous operation" contradicts Commerce's determination
that there are three distinct stages of production for a product to be transformed
from seamless pipe to an unfinished and then finished butt-weld pipe fitting.

In addition, the ITC Report is silent on whether a butt-weld pipe fitting may only be within the scope of the Order if the product is heat- or cold-treated and formed. The Court concludes that because the ITC Report is unclear on the meaning of the phrase "advanced after forging," discusses one continuous manufacturing process (rather than three distinct stages of production as alleged by Commerce), and does not address whether heat- or cold-treating and forming are required to be in scope, the (k)(1) source of the ITC Report does not provide unequivocal evidentiary support, and does not dispositively support Commerce's determination that "merchandise that has undergone the first stage of production in China and then undergoes the second and third stages of production in Vietnam is not subject to the scope of the Order." Remand Redetermination at 39.

For the reasons discussed above, the Court concludes that Commerce's Remand Redetermination is not supported by substantial evidence based on the (k)(1) sources of the Petition and ITC Report.

### VII.   Prior Thailand Circumvention Determination

The Court remanded for Commerce to address the Thailand Circumvention Determination due to the Court's concerns about contradictory evidence on the record and the failure to provide sufficient reasons for treating similar situations differently. Tube Forgings I, 49 CIT at __, 750 F. Supp. 3d at 1380. Commerce "confusingly stated that a product that Commerce previously called an 'unfinished

butt-weld pipe fitting' in the 1994 Thailand [C]ircumvention [I]nquiry was no longer considered an 'unfinished butt-weld pipe fitting' here, but instead was considered to be a 'rough fitting.'" Id. 49 CIT at __, 750 F. Supp. 3d at 1381. Further, this Court stated that:

> It is contradictory for Commerce to have previously referred to a carbon steel product in the rough shape of an elbow, tee, or reducer, which was not heated or formed, as an "unfinished butt-weld pipe fitting" 30 years ago in 1994 (and apparently for the ensuing 30 years), and then claim that such product is no longer considered an "unfinished butt-weld pipe fitting," but should be considered a "rough fitting" in the 2023 Final IDM . . . [and concluded] that the Thailand Circumvention Determination is a (k)(1) source that detracts from Commerce's determination that carbon steel products in the rough shape of an elbow, tee, or reducer, which were not heated or formed, are "rough fittings" rather than "unfinished butt-weld pipe fittings."

Id. 49 CIT at __, 750 F. Supp. 3d at 1381–82.

On remand, Commerce agreed with the Court that the different terminology used in the Final Determination and the Thailand Circumvention Determination created confusion. Remand Redetermination at 15. Commerce stated that while the terms used were different between the two determinations, the treatment of the products was the same. Id. Commerce explained that it was unnecessary to determine whether the merchandise in the Thailand Circumvention Determination was circumventing the order because such merchandise was already considered to be covered by the scope of the order. See id. (citing Deacero S.A. de C.V. v. United States, 37 CIT 1457, 1461–62, 942 F. Supp. 2d 1321, 1326 (2013) ("When

Commerce initiates a scope inquiry under 19 C.F.R. § 351.225(k) (2012), it

assesses 'whether a particular product is included within the scope of an order.'

When Commerce initiates a circumvention inquiry . . . it asks whether a product

outside an order's literal scope should nonetheless be included within the scope as

part of the class or kind of merchandise subject to the antidumping duty order.").

    The Petitioners' Comments on Covered Merchandise Inquiry described the

merchandise at issue in the <u>Thailand Circumvention Determination</u>, which was

purchased by Awaji Sangyo (Thailand) Co., Ltd. ("AST"):

> During the period of inquiry, AST purchased Chinese 'as-formed'
> fittings from Mitsui Co., Ltd., a Japanese trading company. The 'as-
> formed' fittings were produced by Shenzhen Fitting Manufacturing
> Factory, which is located [in] Shenzhen, China . . . The unfinished tees
> which AST imported from China were in as-formed condition, which
> were not advanced beyond cold-forming (i.e., the bulge process).
> Accordingly, AST had to 'decap' the closed 'head' of the as-formed
> tees and provide heat treatment, as well as run them through all the
> processes downstream of the heat treatment process . . . Neither heat
> treatment, decapping, descaling, end-facing, cleaning, coating nor
> marking had been provided to the as-formed tees prior to the
> importation of the merchandise into Thailand. The unfinished Chinese
> tees which AST converted to finished tees for exportation to the United
> States were as-formed tees not advanced beyond cold-forming.
> Throughout this response, AST referred to these as-formed fittings as
> "unfinished tees."

Petitioners' Comments on Covered Merchandise Inquiry at 8–9, PR 31. The

description of the merchandise in the circumvention inquiry was not "advanced

beyond cold-forming," making them similar products to the "rough fittings" in this proceeding.

> The Government concedes that these products are similar:

> Although Commerce agreed that the merchandise in the Thailand Circumvention Inquiry and the covered merchandise inquiry in this case are similar in that both have only undergone the first stage of production, Commerce disagreed that its treatment is inconsistent because the question asked of Commerce in the two inquiries differed.

Def.'s Resp. at 24 (emphasis omitted).

The Government argues that the conclusions in the two determinations reasonably differed as a result of the different legal frameworks, analyses, and determinations, explaining that because Commerce did not conduct a circumvention inquiry or make any findings of circumvention, the products in the Thailand Circumvention Determination were not within the scope of the Order. Id. at 26. In the Remand Redetermination, Commerce stated that in both the Thailand Circumvention Determination and Final Determination, Commerce did not determine that the products were within the scope of the Order, but rather that the products processed in Thailand were of a similar class or kind of product and were considered within scope as a result of circumvention, and drew a distinction between the result of a circumvention determination and a scope ruling. Remand Redetermination at 16, 18.

Consol. Court No. 23-00231                                                    Page 26

Plaintiffs argue that Commerce determined in the <u>Thailand Circumvention</u> <u>Determination</u> that the butt-weld fittings that had been cut and not advanced beyond cold-forming (which are identical to the products in the instant case), were within the scope of the <u>Order</u>. Consol. Pls.' Cmts. at 5. Specifically, Commerce determined that:

> [W]e have determined that circumvention of the antidumping duty order on pipe fittings from the PRC has occurred within the meaning of section 781(b) of the Tariff Act. We base this determination on the statutory criteria. First, the items completed in Thailand and sold to the United States are of the same class or kind of merchandise as that covered by the order, and are completed from merchandise produced in the PRC and covered by the order. Second, the difference in value between the unfinished pipe fittings sold to Thailand and the value of the finished pipe fittings exported to the United States is small . . . Further, we find that the pattern of trade and level of imports into Thailand indicate a finding of circumvention of the antidumping duty order. Based on the record for this inquiry, we also find that action is appropriate to prevent evasion of the antidumping duty order."

<u>Thailand Circumvention Determination</u>, 59 Fed. Reg. at 15,158.

Commerce determined in the <u>Thailand Circumvention Determination</u> that the products were of the same class or kind of merchandise as that covered by the <u>Order</u>. See <u>id.</u> Consequently, because the products in this case are identical, Plaintiffs argue that the subject merchandise should also be considered as covered by the <u>Order</u>. Consol. Pls.' Cmts. at 5–7.

As Commerce notes in the <u>Remand Redetermination</u>, "[t]here was no request for a circumvention inquiry, and Commerce did not conduct a

circumvention analysis." Remand Redetermination at 19. The Court accepts that

the Thailand Circumvention Determination involves a different analytical

framework, and that a circumvention inquiry is distinct from the scope inquiry at

issue in this case. The Court concludes that the Thailand Circumvention

Determination is not a dispositive k(1) source that supports or detracts from

Commerce's determination.

**VIII.  Use of Interpretative Sources Under 19 C.F.R. § 351.225(k)(2)**

In light of the Court's conclusion that the (k)(1) sources contain conflicting

evidence and are not dispositive, the Court holds that Commerce's scope ruling is

unsupported by substantial evidence. A second remand is necessary for Commerce

to consider the (k)(2) criteria under 19 C.F.R. § 351.225(k)(2). See Vandewater

Int'l Inc. v. United States, 130 F.4th 981, 994 (Fed. Cir. 2025) (affirming CIT's

remand to Commerce for (k)(2) analysis when the (k)(1) sources were equivocal

and non-dispositive).

On second remand when reviewing the (k)(2) criteria, Commerce should

consider the following factors: (1) physical characteristics (including chemical,

dimensional, and technical characteristics) of the product; (2) expectations of the

ultimate users; (3) ultimate use of the product; (4) channels of trade in which the

product is sold; and (5) manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).

Commerce may choose to address the applicable industry standards of the

American Society for Testing and Materials and American National Standards

Institute, which were raised on remand in the discussion about the production

processes of the subject merchandise.  See Remand Redetermination at 28.

Commerce stated that, "[w]hile industry standards can provide important

information regarding the technical specifications for a butt-weld pipe fitting, these

specifications are guidelines for the production and final product.  However, these

specifications do not identify the point in the production process when a fitting

becomes a butt-weld pipe fitting."  Id. at 30.

In addition, Commerce should reconsider the declarations from domestic

industry executives that are on the record.  The Court remanded previously for

Commerce to reconsider or provide further explanation for disregarding the

evidence of the industry declarations, reasoning that "Commerce may not lightly

ignore decades of practice and understanding without providing more explanation

for its determination."  Tube Forgings I, 49 CIT at __,750 F. Supp. 3d at 1380.

On remand, Commerce stated that the primary sources of the Petition and

ITC Report are sufficient to answer the question of whether shapes formed during

the first stage of production are sufficiently processed to be considered unfinished

fittings.  Remand Redetermination at 12.  Commerce explained that:

> [W]e have considered these declarations within the context of the
> totality of the evidence on the record, including the descriptions of the
> production process in the [Petition] and the [ITC Report], the absence
> of these terms in the primary sources described above, and Commerce's
> finding that products that had completed stage one processing were
> circumventing the Order.  Because the recent claims made by industry
> officials in their declarations conflict with information in the primary
> interpretative sources enumerated in 19 C.F.R. § 351.225(k)(1) (all of
> which, unlike the industry declarations were on the administrative
> record long before 2023), we afforded the primary interpretive sources
> more weight than industry declarations, which are secondary
> interpretative sources, consistent with our regulations.

Id. at 13–14.  Because the Court has now held that the (k)(1) sources are equivocal
and non-dispositive, the Court orders Commerce to reconsider the industry
declarations in its (k)(2) analysis on second remand.

## IX.    Country of Origin Under 19 C.F.R. § 351.225(j)

In conjunction with the (k)(2) analysis on second remand, Commerce should
revisit its substantial transformation analysis to determine the country of origin of
the subject merchandise under § 351.225(j).  There is some overlap of criteria
between the § 351.225(k)(2) analysis and the country of origin analysis under
§ 351.225(j) (for example, physical characteristics of the product and intended end-
use/ultimate use of the product).

Plaintiffs allege in their Complaint that Commerce's substantial
transformation analysis is flawed.  Complaint at 4, ECF No. 6.  Plaintiffs argue that
Commerce's determination that sizing is an essential characteristic of the product

is not supported by substantial evidence.  <u>See</u> Consol. Pls.' Mot. J. Agency R. at 32–39, ECF No. 24.

      Commerce noted in its <u>Preliminary Determination</u> that certain information was missing from the record regarding the substantial transformation analysis. PDM at 15–16.  Thus, when Commerce reopens the record on second remand to conduct its (k)(2) analysis, Commerce should consider eliciting additional evidence about substantial transformation that might assist with its country of origin determination.  As discussed above, the Court concludes that the ITC Report excerpts (particularly ITC Report footnote 18 and ITC Report pages I-6–I-9 cited in the Final IDM) are not dispositive on the substantial transformation issue, and therefore Commerce's determination on country of origin is not supported by substantial evidence.

## CONCLUSION

      Because the Court concludes that the (k)(1) sources are non-dispositive and the <u>Remand Redetermination</u> is not supported by substantial evidence, the Court remands the <u>Remand Redetermination</u> for further consideration in accordance with this Opinion.  Accordingly, it is hereby

      **ORDERED** that this case shall proceed according to the following schedule:

        (1)Commerce shall file its second remand redetermination on or before

          March 16, 2026;

(2) Commerce shall file the administrative record on or before March

23, 2026;

(3) Comments in opposition to the second remand redetermination shall

be filed on or before April 13, 2026;

(4) Comments in support of the second remand redetermination shall be

filed on or before May 15, 2026; and

(5) The joint appendix shall be filed on or before May 22, 2026.


                                        /s/ Jennifer Choe-Groves
                                       Jennifer Choe-Groves, Judge

Dated:     December 16, 2025
           New York, New York